79,620-08



# JOANNA STATON
## District Clerk
### BELL COUNTY, TEXAS

**BELL COUNTY JUSTICE COMPLEX**
1201 Huey Road • P. O. Box 909 • Belton, Texas 76513
(254) 933-5197 • Fax (254) 933-5199
Joanna.Staton@co.bell.tx.us • www.bellcountydistrictclerk.org

This document contains some
pages that are of poor quality
at the time of imaging.

August 12, 2015

ABEL ACOSTA
CLERK OF CRIMINAL APPEALS
P.O. BOX 12308
AUSTIN, TX 78711

NO: 57558-D

RECEIVED IN
COURT OF CRIMINAL APPEALS

AUG 1 ? 2015

Abel Acosta, Clerk

EX PARTE

THOMAS RAYMOND CARR

DEAR MR. ACOSTA:

ENCLOSED PLEASE FIND THE <u>ORIGINAL</u> TRANSCRIPT IN THE ABOVE ENTITLED
AND NUMBERED CAUSE.

IF WE CAN BE OF FURTHER ASSISTANCE, LET US KNOW.

SINCERELY,

DEPUTY DISTRICT CLERK

## Postconviction Writ of Habeas Corpus

## Cause No. <u>57558-D</u>

EX PARTE
THOMAS RAYMOND CARR

In the Judicial Courts

VS                              Of

The State of Texas          Bell County, Texas

Delivered to the Court of Criminal Appeals, Austin, Texas on the 12th day of August, 2015.

Joanna Staton
District Clerk
Bell County, Texas

BY: _____
Criminal Deputy Clerk

Filed in the Court of Criminal Appeals, Austin, Texas on the _____ day of _____
2015.

Ex Parte
THOMAS RAYMOND CARR

Application for Writ of Habeas Corpus

**TRIAL COURT WRIT NO. <u>FR 57558-D</u>**

# *CLERKS  SUMMARY SHEET*

APPLICANTS NAME: <u>THOMAS RAYMOND CARR</u>
(As reflected on the Judgment)

OFFENSE: <u>AGGRAVATED SEXUAL ASSAULT</u>
(As reflected on the Judgment)

CAUSE NO: **<u>FR57558</u>**
(As reflected in Judgment)

SENTENCE: <u>THIRTY (30) YEARS TDCJ;ID</u>
(As described on Judgment)

PLEA: ( X ) GUILTY   ( ) NOLO CONTENDERE    ( ) NOT GUILTY

TRIAL DATE: <u>11/21/2006</u>
(Date upon which sentence was imposed)

JUDGE'S NAME: <u>HONORABLE JUDGE MARTHA J TRUDO</u>
(Judge Presiding at Trial)

APPEAL NO: <u>N/A</u> (If Applicable)

CITATION TO OPINION: <u>N/A</u> S.W.2d_____
(If Applicable)

HEARING HELD: _____YES __X____ NO
(Pertaining to the Application for Writ)

FINDINGS & CONCLUSIONS FILED:___X_____ YES _____ NO
(Pertaining to the Application for Writ)

RECOMMENDATION:___ GRANT__DENY____NONE _X__DISMISS
(Trial Court's recommendation regarding the Application)

JUDGE'S NAME: <u>HONORABLE JUDGE  MARTH J TRUDO</u>
(Judge Presiding at Habeas Proceeding)



No. 57558-D

| EX PARTE | X | IN THE 264TH DISTRICT COURT |
| | X | JUDICIAL DISTRICT |
| THOMAS RAYMOND CARR | X | BELL COUNTY, TEXAS |

# INDEX

| VOLUME | PAGE |
| --- | --- |
| Clerk's Report | I |
| Index | II |
| Applicant's Petition | 1 |
| State's Answer | 272 |
| Motion to Enter Proposed Findings of Fact and Conclusions of Law | 274 |
| Findings of Fact and Conclusions of Law of the Court | 276 |
| Clerk's Certificate that Record is True and Correct | 280 |

II

# COURT OF CRIMINAL APPEALS OF TEXAS
## APPLICATION FOR A WRIT OF HABEAS CORPUS
### SEEKING RELIEF FROM FINAL FELONY CONVICTION
### UNDER CODE OF CRIMINAL PROCEDURE, ARTICLE 11.07

## INSTRUCTIONS

1. You must use the complete form, which begins on the following page, to file an application for a writ of habeas corpus seeking relief from a final felony conviction under Article 11.07 of the Code of Criminal Procedure. (This form is not for death-penalty cases, probated sentences which have not been revoked, or misdemeanors.)

2. The district clerk of the county in which you were convicted will make this form available to you, on request, without charge.

3. You must file the entire writ application form, including those sections that do not apply to you. If any pages are missing from the form, or if the questions have been renumbered or omitted, your entire application may be dismissed as non-compliant.

4. You must make a separate application on a separate form for each judgment of conviction you seek relief from. Even if the judgments were entered in the same court on the same day, you must make a separate application for each one.

5. Answer every item that applies to you on the form. Do not attach any additional pages for any item.

6. You must include all grounds for relief on the application form as provided by the instructions under item 17. You must also briefly summarize the facts of your claim on the application form as provided by the instructions under item 17. Each ground shall begin on a new page, and the recitation of the facts supporting the ground shall be no longer than the two pages provided for the claim in the form.

7. Legal citations and arguments may be made in a separate memorandum that complies with Texas Rule of Appellate Procedure 73 and does not exceed 15,000 words if computer-generated or 50 pages if not.

8. You must verify the application by signing either the Oath Before Notary Public or the Inmate's Declaration, which are at the end of this form on pages 11 and 12. You may be prosecuted and convicted for aggravated perjury if you make any false statement of a material fact in this application.

9. When the application is fully completed, mail the original to the district clerk of the county of conviction. Keep a copy of the application for your records.

10. You must notify the district clerk of the county of conviction of any change in address after you have filed your application.

1

Case No. _____

(The Clerk of the convicting court will fill this line in.) 2015 AUG -4 AM 11: 02

## IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## APPLICATION FOR A WRIT OF HABEAS CORPUS
## SEEKING RELIEF FROM FINAL FELONY CONVICTION
## UNDER CODE OF CRIMINAL PROCEDURE, ARTICLE 11.07

NAME: Thomas Raymond Carr

DATE OF BIRTH: 08/14/1967

PLACE OF CONFINEMENT: Texas Department of Criminal Justice, Hughes Unit, Route 2

Box 4400, Gatesville, Texas 76528

TDCJ-CID NUMBER: 01405931              SID NUMBER: 03563080

(1)   This applicant concerns (check all that apply):

    ☑ a conviction     ☐ parole

    ☑ a sentence     ☐ mandatory supervision

    ☐ time credit     ☐ out-of-time appeal or petition for discretionary review

(2)   What district court entered the judgment of the conviction you want relief from?

    (Include the court number and county.)

    264th District Court of Bell County, Texas

(3)   What was the case number in the trial court?

    57, 558

(4)   What was the name of the trial judge?

    The Honorable Martha J. Trudo

1

(5)  Were you represented by counsel? If yes, provide the attorney's name:

Court appointed counsel, John Robert Bingham, Teddy L. Potter, Esq., since retired for

health/disciplinary reason (Ethics Decision Included in prior Application), and Charles

"Monty" Montgomery, Esq.

(6)  What was the date that the judgment was entered?

November 21, 2006

(7)  For what offense were you convicted and what was the sentence?

Aggravated Sexual Assault- First Degree Felony: "Did ...cause a Dildo to ... penetrate the

anus of ... a child less than 17 years of age and ...operated in concert with Tammy Bishop

during the same criminal episode, and ... did ... administer a controlled substance to the

said J███ M█...." Sentence: Thirty (30) years

(8)  If you were sentenced on more than one count of an indictment in the same court at
the same time, what counts were you convicted of and what was the sentence in each
court?

N/A

(9)  What was the plea you entered? (check one)

☐  guilty-open plea          ☑  guilty-plea bargain

☐  not guilty               ☐  *nolo contendere/* no contest

If you entered different pleas count in a multi-count indictment, please explain:

_____

(10)  What kind of trial did you have?

☑  no jury          ☐  jury for guilt and punishment
                   ☐  jury for guilt, judge for punishment

(11)  Did you testify at trial? If yes, at what phase of trial did you testify?

Yes. Applicant's trial counsel called him to the stand to plea and at sentencing.

2

*3*

(12)   Did you appeal from the judgment of conviction?

☐ yes                              ☑ no

If you did appeal, answer the following questions:

(A)  What court of appeals did you appeal to? _____

(B)  What was the case number? _____

(C)_Were you represented by counsel on appeal? If yes, provide the attorney's name:

_____

(D)_What was the decision and the date of the decision? _____

(13)   Did you file a petition for discretionary review in the Court of Criminal Appeals?

☐ yes                              ☑ no

If you did file a petition for discretionary review, answer the following questions:

(A)  What was the cause number? _____

(B)_ What was the decision and the date of the decision? _____

(14)   Have you previously filed an application for a writ of habeas corpus under Article 11.07 of the Texas Code of Criminal Procedures challenging *this conviction?*

☑ yes                              ☐ no

If you answered yes, answer the following questions:

(A) What was the Court of Criminal Appeals' writ number? WR-79,620-02 ,WR-79,620-04,

and WR-79,620-06.

(B) What was the decision and the date of the decision? Dismissed for non – compliance, pro

se not signed, WR- 79,620-02 on 09/11/2013. Denied the relief without written opinion on WR-

79,620-04 on 3/26/2014. Dismissed for non-compliance on WR- 79,620-06 on 7/08/15.

(C) Please identify the reason that the current claims were not presented and could
not have been presented on your previous application.

The medical records received from the TDCJ on June 24, 2014 did not have the Uniform Health

Status Update dated 12/26/06. The decision on WR-79,620-04 was prior to receiving the records.

3

4

Previously. The Bell County, Texas jail indicated that it had no records. The above mentioned status update was not included in any records, previously. Habeas counsel met with Applicant on October 1, 2014. The Texas Uniform Health Status Update form was acquired from the records Department at TDCJ prison system by happenstance. Applicant asked about a document listed as "unavailable to him". A clerk in the prison brought the "filled out" Texas Uniform Health Update dated 12/26/2006 to him. The "WAREHOUSE 337600" box – containing hundreds, if not thousands, of pages of medical records did not contain the update. It was not included in the response to the "Chapter 64" motion, though other medial information was. Competency was discussed in the prior application for writ of habeas corpus, but **did not show the probability that the medication was given ABOVE the prescribed amount and ABOVE the FDA recommended maximum dosage.** The claim based on lack of voluntary and knowingly plea, as it relates to competency at the time of the plea, was not presented earlier, because neither Applicant, nor his attorney, was able to obtain from update form showing the medication dosage for Applicant at or near the time of his plea.

A statement was recently obtained from Robert O. "Buck" Harris, the attorney for Applicant's wife. The statement clearly shows that there was a deal not to prosecute the wife except for one drug charge. Applicant's medication and the prosecutorial misconduct show coercion and a lack of a knowing and voluntary plea.

Applicant's counsel made repeated attempts to contact Applicant's trial counsel since early 2013. Applicant's habeas corpus counsel finally received a three ring binder of what purports to be trial counsel's complete file and notes.

Applicant's counsel was unaware of the victims' medical records containing evidence of the lack of blood tests and of J███ M█'s use of a prescription amphetamine until the response by the State to a Chapter 64 motion. Also, the victims' hospital records were not on the court's docket sheet. Counsel learn that the records had been sealed, recently. The clerk's office indicated that a court order was

4

needed to see the records, but ultimately turned over the records. The above proves the claims for incompetency, lack of a knowing and voluntary plea, coercion, and ineffective assistance of counsel.

(15) Do you currently have any petition or appeal pending in any other state or federal Court?

☐ yes                      ☑ no

If you answered yes, please provide the name of the court and the case number:

_____

(16) If you are presenting a claim for time credit, have you exhausted your administrative remedies by presenting your claim to the time credit resolution system of the Texas Department of Criminal Justice? (This requirement applies to any final felony conviction, including state jail felonies)

☐ yes                      ☑ no

If you answered yes, answer the following questions:

(A) What date did you present the claim? _____

(B) Did you receive a decision and, if yes, what was the date of the decision?

_____

If you answered no, please explain why you have not submitted your claim:

_____

(17) Beginning on page 6, state *concisely* every legal ground for your claim that you are being unlawfully restrained, and then briefly summarize the facts supporting each ground. You must present each ground on the form application and a brief summary of the facts. *If your grounds and brief summary of the facts have not been presented on the form application, the Court will not consider your grounds.* If you have more than four grounds, use pages 14 and 15 of the form, which you may copy as many times as needed to give you a separate page for each ground, with each ground numbered in sequence. The recitation of the facts supporting each ground must be no longer than the two pages provided for the ground in the form.

You may include with the form a memorandum of law if you want to present legal authorities, but the Court will *not* consider grounds for relief set out in a memorandum of law that were not raised on the form. The citations and argument must be in a memorandum that complies with Texas Rule of Appellate Procedure 73 and does not exceed 15,000 words if computer-generated or 50 pages if not. If you are challenging the validity of your conviction, please include a summary of the facts pertaining to your offense and trial in your memorandum

5

**GROUND ONE:**

Applicant's plea was not voluntary and knowing and was coerced under the 6th Amendment because the prosecutor lied about key facts involving circumstances about the plea and issued threats of continued prosecution.

**FACTS SUPPORTING GROUND ONE:**

1. Tammy Bishop, Applicant's wife, actually committed the sexual assault on J███ M█ by shoving a dildo in his anus after the two had a sexual relationship. Applicant had no physical or sexual contact with anyone that claimed to be assaulted, as evident by the statements recently obtained from responses to a chapter 64 motion. See Exhibit 1.

2. Trial counsel, Charles Montgomery, made statements at a hearing to the effect that Tammy Bishop was let totally off the hook, was in prison on a light sentence, and was not being prosecuted at all for rape of juveniles. **The prosecutor, Mark Kimball, as an officer of the court, stated at that hearing, "That is a lie." He then stated "It's a lie before the court."** See. Exhibit 2.

3. The prosecutor, Mark Kimball, again, as an officer of the court, stated at Tammy Bishop's plea hearing on November 30, 2005, **"I will let the court know that there are further charges that will be filed against Ms. Bishop. She is well aware of it."** He further says **"This, by no means, is the end of cases against Ms. Bishop, and she is well aware of it."**
To this day, she has been convicted of only of one delivery of a controlled substance to minor charge. See Exhibit 3.

4. At Applicant's bond hearing, Mr. Kimball stated "And every time he [Applicant] gets closed to getting out of jail, "I'm going to file case after case after case. I have seventeen different cases." See Exhibit 4.

6

5. Mr. Kimball asked the following question at Applicant's plea hearing on November 21, 2006, "One thing you mentioned yesterday… what's going to happen to my wife and you understand what happens to your wife is up to the State of Texas and the courts and I absolutely refuse to answer that question" See Exhibit 5.

6. Applicant's counsel has now learned that Mr. Kimball and the wife's attorney, Robert O. "Buck" Harris, had an agreement to pursue only one delivery of a controlled substance to a minor charge. Attached is a statement from Buck Harris saying "As part of the plea, the prosecutor agreed to **NOT PROCEED** to indict Ms. Bishop on any sexual assault charge or any other drug charge." He also says "The prosecutor never made any demand to plead guilty to any sexual assault charge." See Exhibit 6. This evidence is completely at odds with prosecutor Kimball's dire and false statements on the hearing records. Based on Applicant's clear concerns about his rapist wife's deal and his medication over dosage, as shown below, his plea was not knowing and voluntary and was coerced.

7. Based on Kimball's statements. Applicant believed that his wife, Tammy Bishop, was being prosecuted for aggravated sexual assault just like he was. In reality, Tammy Bishop was "off the hook" for anything other than on drug conviction. Mr. Kimball sees how important the wife's plea is to Applicant yet still misleads Applicant at Applicant's plea hearing by not disclosing the agreement.

## GROUND TWO:

The prosecutor lied about having "blood tests" showing that the alleged victims had taken methamphetamines. The testing showed that, possibly only amphetamines, not methamphetamines, were present.

**FACTS SUPPORTING GROUND TWO:**

1. The affidavit for Arrest and Complaint signed by Detective Mike Simmons was filed on July 15, 2004 to arrest Applicant on the delivery of the controlled substance methamphetamine. Detective Simmons states "I have been further informed by the parents of all three juveniles that the children tested positive for methamphetamine." The Bell County prosecutor, Mark Kimball, stated that "blood tests are in evidence," under the falsehood that the tests showed methamphetamines. See Exhibit 7 and 8

2. In facts, no blood tests were performed. The alleged victims were tested only once at Metroplex Hospital late in the evening on June 21, 2004 or possibly June 22, 2004. Only standard urinalysis drug screen test were done, not blood tests as stated by Mark Kimball. The tests were positive for amphetamines and THC. No tests indicated methamphetamines. This is true, even though the victims were tested two days after the incident date. The literature indicates that methamphetamines could show up in the urine within that time period, if proper testing procedures were done. See Exhibit 9 and Exhibit 10. Additionally, the Metroplex hospital records show that Je███ M███ was taking a prescription drug, Concerta, an amphetamine. See Exhibit 9. This supported the Applicant's allegations that the victims were crushing up pills and using them. Trial counsel, Montgomery, should have reviewed the hospital records. The records would have been available to him. He never discussed this with Applicant. This shows ineffective assistance of counsel, lack of a knowing and voluntary plea, and coercion.

8

**GROUND THREE:**

Applicant's trial counsel, Charles Montgomery, lied about researching the law and explaining the law to Applicant. Trial counsel's representation of Applicant over the entire representation shows ineffective assistance of counsel. Applicant now has trial counsel's notes after repeated requests.

**FACTS SUPPORTING GROUND THREE:**

1. The indictments and the amended indictment are so confusing that you cannot understand them. Mr. Montgomery never explained the indictments or the aggravated sexual assault allegations to Applicant. See Exhibit 11.

2. Mr. Montgomery was ordered by the trial court to file a court-ordered affidavit. Montgomery was to explain his research of the applicable law. He failed to answer any important questions for the court. He goes into a rant about everything except the law of aggravated sexual assault and of delivery of a controlled substance. If he could not even explain the law to the trial court, then he certainly did not have the ability to explain it to Applicant. See Exhibit 12.

3. Mr. Montgomery did not know the law. Mr. Montgomery eventually sent Applicant's habeas corpus counsel his entire file in a three ring binder. The binder only had two-pages of documents on the law. It consisted of portions of the U.S. and Texas Constitution and of the severance of trial provisions of the Texas Code of Criminal Procedure. See Exhibit 13 and Exhibit 14.

4. Mr. Montgomery's file shows that he recommended filing an "interlocutory" appeal. He based this appeal recommendation on supposedly errors at the pre trial motion stage. Mr. Montgomery stated in the court ordered affidavit that he was never going to file an appeal; however, Mr. Montgomery's own notes contradict this position. See Exhibit 15.

9

## GROUND FOUR:

Applicant could not enter a voluntary and knowing plea due to his incompetence at the time of his plea hearing. Applicant was being treated with 1200 mg of Seroquel at the time.

## FACTS SUPPORTING GROUND FOUR:

1. At the time of Applicant's plea, an unnamed medical provider was dosing Applicant with 1200 mg daily of an antipsychotic drug, Seroquel. The Texas Uniform Health Status Update shows that Applicant was prescribed 200 mg T q. am., which means one 200 mg does before noon, and 200mg TTTTT q.h.s, which means five 200 mg doses at bedtime. See Exhibit 16 and the list of medical abbreviations in Exhibit 17.

   The prescribed amount far exceeds the 800 mg daily recommended maximum dosage in the literature. The literature indicates that side effects of the drug could include dizziness, drowsiness, altered mental status, confusion, and other potential complications. These severe side effects are for the recommended dosage at a maximum of 800 mg daily. Applicant was receiving 1200 mg daily. See Exhibit 16 and 17.

2. Frank Pugliese, Ph.D, a forensic psychologist, appointed by the trial court apparently on Montgomery's request, determined Applicant incompetent. Dr. Pugliese found that Applicant was delusional and hallucinating to the point that it resulted in impaired judgment and ineffective communication with Montgomery. According to Pugliese, competency restoration included adjusting his medication needs. The adjustment would be appropriately addressed in a psychiatric facility. See Exhibit 18.

3. The trial court ordered Applicant to be committed to North Texas State Hospital. The order included assessing whether he could be restored to competency and if he had a mental illness. Joseph Black M.D. at the facility eventually sent a report indicating that Applicant's competency was restored. Joseph Black M.D. See Exhibit 19.

10

Dr. Black's report does not indicate that he ever interviewed Applicant after the initial admission. Instead, B. Thomas Gray, Ph.D., a psychologist, did the entire evaluation. He found Applicant to be malingering. **At the same time, he says that it is "quite important" for Applicant to take his psychoactive medication.** He also states that it is unclear whether Applicant needs the medication to maintain trial competency. It was at this facility that Dr. Black switched Applicant from a previous antipsychotic medication to 800 mg daily of Seroquel. See Exhibit 19.

## GROUND FIVE:

Applicant could not have been found guilty under the aggravated sexual assault statute because no "date rape" drug was administered.

## FACTS SUPPORTING GROUND FIVE:

1. Applicant was indicated for aggravated sexual assault with one of the aggravating factors being the administration of a "date rape" drug to the alleged victim. See Exhibit 11

2. The legislative history of the statute makes it clear that Methamphetamines are not included as an aggravating factor and are not defined as "date rape" drug. *See* Memorandum of Law.

3. The Metroplex Hospital Records of the victims show that NO "date rape" drug was found in their systems. Additionally, the statements of the victims and of Tammy Bishop show that no one was administered a "date rape" drug. See Exhibit 1 and Exhibit 9.

13

**GROUND SIX:**

Applicant could not have been found guilty under the aggravated sexual assault statute because he did not "act in concert" with Tammy Bishop.

**FACTS SUPPORTING GROUND SIX:**

1. Applicant was indicted for aggravated sexual assault with one of the aggravating factors being that he acted in concert with Tammy Bishop. The statute provides that Applicant must 1) cause the penetration of the anus of the victim and 2) act in concert with another assailant who causes the penetration of the anus of the same victim. See Exhibit 11.

2. The legislative history of the statute indicates that this aggravating factor was added for "gang rape" situations. The history shows that the intent was to stop multiple rapists situations. *See* Memorandum of Law.

3. After obtaining the statements of the alleged victims and of Tammy Bishop, it is clear that there were not multiple rapists, here. The only rapist was Tammy Bishop. She was the only person to have sex with any of the victims. She was the only person to have actual physical contact with the victims by dildoing them in their anuses. See Exhibit 1.

13

**GROUND SEVEN:**

Applicant was threatened with repeated prosecutions because he exercised a legal right.

**FACTS SUPPORTING GROUND SEVEN:**

1. Applicant was almost certainly loaded up with 1200mg of an extremely strong medication.

2. The Prosecutor had an "under-the-table" deal with Tammy Bishop, the wife, to which he would never admit, even to the point of lying to the trial court.

3. Applicant's attorney heavily pressed Applicant to plead guilty to the bizarrely written indictment based on the threats of successive prosecutions against Applicant and, falsely as it turned out, Applicant's wife. The successive prosecutions were never going to take place.

4. The Prosecutor admitted Applicant was concerned about his wife during the proceedings, but intentionally left the question about what would happen to Applicant's wife unanswered. Mr. Kimball knew that would happen to the wife, Tammy Bishop, but did not tell Applicant that she was not going to be prosecuted for any sexual assault crimes.

14

## WHEREFORE, APPLICANT PRAYS THAT THE COURT GRANT APPLICANT

## RELIEF TO WHICH HE MAY BE ENTITLED IN THIS PROCEDDING.

## VERIFICATION

This application must be verified or it will be dismissed for non-compliance. For verification purposes, an applicant is a person filing the application on his or her own behalf. A petitioner is a person filing the application on behalf of an applicant, for example, an applicant's attorney. An inmate is a person who is in custody.

The inmate applicant must sign either the "Oath Before Notary Public" before a notary public or the "inmate Declaration" without a notary public. If the inmate is represented by a licensed attorney, the attorney may sign the "oath Before a Notary Public" as petitioner and then complete "Petitioner's Information. A non-inmate applicant must sign the "Oath Before a Notary Public" before a notary public unless he is represented by a licensed attorney, in which case the attorney may sign the verification as petitioner.

A non-inmate non-attorney must sign the "Oath Before a Notary Public" before a notary public and must also complete "Petitioner's Information. An inmate petitioner must sign either the "Oath Before a Notary Public" before a notary public or the "Inmate's Declaration" without a notary public and must also complete the appropriate "Petitioner's Information.

**OATH BEFORE A NOTARY PUBLIC**

STATE OF TEXAS

COUNTY OF CORYELL

_Timothy Tesch_____, being duly sworn, under oath says "I am the applicant / petitioner (circle one) in this action and know the contents of the above application for a writ of habeas corpus and, according to my belief, the facts stated in the application are true.

_____
Signature of Applicant / Petitioner (circle one)

SUBSCRIBED AND SWORN TO BEFORE ME THIS _3ʳᵈ_ DAY OF August 2015.

SHAINA R. MEDFORD
Notary Public, State of Texas
My Commission Expires
February 20, 2019

_____
Signature of Notary Public

15

16

**PETITIONER'S INFORMATION**

Petitioner's printed name: Timothy Tesch

State Bar Number, if applicable: 19008200

Address: P.O. Box 255

Gatesville, TX 76528

_____

Telephone: 254-865-0313

Fax: 1-254-731-2584

## INMATE'S DECLARATION

I, _____, am the applicant / petitioner (circle one) and

Being presently incarcerated in _____, declare under penalty of

Perjury that, according to my belief, the facts stated in the above application are true and correct.

Signed on _____, 20___.

_____
Signature of Applicant / Petitioner (circle one)

16

17

## PETITIONER'S INFORMATION

Petitioner's printed name:_____

Address: _____

_____

_____

Telephone:_____

Fax:_____

Signed on _____, 20____.

_____
Signature of Petitioner

17



CAUSE NUMBERS 57,558-A and 57,557-A

EX PARTE § IN THE 264TH
§
§ DISTRICT COURT OF
§
THOMAS RAYMOND § BELL COUNTY,
CARR § TEXAS

## MEMORANDUM OF LAW CONCERNING COMPETENCY, INEFFECTIVE ASSISTANCE OF COUNSEL, KNOWING AND VOLUNTARY PLEA, CONSTITUTIONALITY OF STATUTE, AND OF ACTUAL INNOCENCE

Applicant presents this memorandum of law. He states that all facts alleged in this document and **all legal authority cited are fully incorporated into the Application for Writ of Habeas Corpus.** The Exhibits List, containing three pages and indicating twenty-five exhibits, is **fully incorporated into this memorandum of law and into the Application for Writ of Habeas Corpus.** Pursuant to T.R.A.P. 73 the word count for this Memorandum of Law is 3,561 and for the Exhibits List is 738 words. The total word count is 4,299 words.

## I. APPLICANT NEVER HAD A PROPER COMPETENCY HEARING BASED ON TEXAS LAW

**ISSUE PRESENTED:** If a defendant was heavily over-medicated, had been previously declared incompetent to stand trial, and was found competent solely on a hospital doctor's report – after said doctor never interviewed the defendant – in declaring defendant competent to stand trial, may defendant plead guilty to a crime?

1. Applicant can seek relief through habeas corpus if the court does not hold a proper competency hearing. *Ex parte McKenzie*, 582 S.W.2d 153, 154 (Tex. Crim. App. 1979). The appropriate remedy is a remand for a retrospective hearing if possible. *Ex parte Ridley*, 658 S.W.2d 177, 178 (Tex. Crim. App. 1983). **Applicant is entitled to relief where he was (1) denied effective**

19

**assistance of counsel at a competency hearing, (2) the competency hearing was improper for some reason, or (3) the trial court erroneously failed to hold a competency hearing. Ex Parte Garrett, No. WR-75,447-01, 2011 WL 2382572 (Tex. Crim. App. June 8, 2011) cited because it lists cases holding that the proper relief is a retrospective competency hearing, if possible.** *Huff v. State,* 807 S.W.2d 325 (Tex.Crim.App.1991); *Hawkins v. State,* 660 S.W.2d 65 (Tex.Crim.App.1983)(vacated on other grounds, 494 U.S. 1013; 110 S.Ct. 1313; 108 L.Ed.2d 489; 1990)); *Brandon v. State,* 599 S.W.2d 567 (Tex.Crim.App.1980)(vacated on other grounds, 453 U.S. 902, 101 S.Ct. 3134, 69 L.Ed.2d 988 (1981)); *Garcia v. State,* 595 S.W.2d 538 (Tex.Crim.App.1980); *Callaway v. State,* 594 S.W.2d 440 (Tex.Crim.App.1980); *Caballero v. State,* 587 S.W.2d 741 (Tex.Crim.App.1979); *Ex Parte Winfrey,* 581 S.W.2d 698 (Tex.Crim.App.1979).

    a. Applicant's trial counsel, Montgomery, objected to a restoration to competency at what was entitled "Motion on Competency". It was heard on March 24, 2006. He objected to the North Texas State Hospital Report. See Exhibit 2. Transcript V1 P 95 through 99. However, Applicant's trial counsel failed to request a separate hearing, which could be in front of a Jury, if requested.

    b. The Honorable Martha Trudo found Applicant competent based solely on the report from Dr. Black. See Exhibit 2. Transcript V1-97. Lines 7 through 11.

    c. If a defendant objects to the finding of competency that is based solely on the report, then the issue **shall** be set for a hearing before

the court, except if requested, it shall be before a jury. T.C.C.P. 46B.084.

d. Applicant would then have the opportunity to question the North Texas State Hospital doctors, Dr. Black and the psychologist, Dr. Gray, who authored most of the report. See Exhibit 19. Applicant could then present evidence of 1) the medication being prescribed and its effects on him, and 2) incompetence.

e. Despite Applicant taking large doses of medication and his prior incompetence, the trial court at the plea hearing simply asked applicant "Do you believe you are mentally competent to proceed to court today." See Exhibit 5. Plea and Sentencing Hearing Transcript V1-8, Line 10.

f. It is baffling that trial counsel had strongly objected to Dr. Black's report and the circumstances around it, and then states that Applicant was somehow competent at the plea hearing. In the court-ordered affidavit, Montgomery responded to Applicant's concern for psychiatric medication affecting his plea by "trashing" Applicant. Exhibit 12, page 6.

g. Here, despite Applicant taking large dosages of medication and Applicant being found competent based solely on the report from Dr. Black, the trial court simply asked applicant "Do you believe you are mentally competent to proceed to court today." See Exhibit 5. Plea and Sentencing Hearing Transcript V1-8, Line 10.

h. The trial court was required to hold a trial on the issue of return to competency because 1) the trial court based its competency ruling

21

solely on the final report of Dr. Black , 2) trial counsel, Charles Montgomery, objected to the report, and 3) Montgomery failed to request a hearing.

2. In order to convict a defendant of a crime he must be competent to stand trial. A defendant cannot make a knowing and voluntary plea if he is on too much medication at his plea hearing. A defendant must be able to understand the indictments and the statutes related to the crimes for which he is charged. The standard for determining whether a defendant is incompetent to stand trial, states:

   (a) A person is incompetent to stand trial if he does not have:

   (1) sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding; or

   (2) a rational as well as factual understanding of the proceedings against him.

   (b) A defendant is presumed competent to stand trial and shall be found competent to stand trial unless proved incompetent by a preponderance of the evidence. TCCP sec. 46B.003.

3. In sum, based on the statutes and rules a defendant must be competent at the time of his plea to be sentenced. *Casey v. State*, 924 S.W.2d 946; 949 (Tex. Crim. App. -- 1996).

4. Applicant's trial counsel did not inform Applicant of the charges and proceedings against him because: a) the indictments do not make any sense, when compared to the aggravated sexual assault statute, b) Montgomery did not research the applicable law or inform Applicant of the law, c) Montgomery does not even outline the law as requested by the court and as

requested in a June 14, 2014 letter from habeas counsel. Instead, he rants about everything under the sun, except the applicable law, in the court ordered affidavit. In response to the June 14, 2014 letter, he provided a two-page document that contained only the double jeopardy provisions of the U.S. Constitution and Texas Constitution and the statute dealing with joinder of certain offenses. T.C.C.P. Art.21.24. Montgomery says that he kept no other research, and says he incorporated his research into his pretrial motions. However, no research on law was cited in the pretrial motions.

II.    DEFENDANT WAS PROSECUTED UNDER A STATUTE THAT WAS CREATED FOR GANG-RAPE SITUATIONS INVOLVING SPECIFIC "DATE RAPE" DRUGS

ISSUE PRESENTED: If a defendant pleads guilty to conduct that was not meant to be covered by the criminal statute, is the defendant entitled to relief in post-conviction?

5. The following is a **summary of the case law on aggravated sexual assault involving** "acting in concert" in gang rape situations. (The legislative history is explained *infra*.)

   a. In Miranda v. State, 391 S.W. 2d 302 (Tex. App.-Austin 2012, writ refused), Miranda actually sexual assaulted the victim as a principal actor. Other assailants sexually assaulted the victim, too. While the case goes into an explanation of "the law of the parties" and "acting in concert", the defendant could have been convicted without the use of the "law of the parties."

23

b. In <u>Moreno v. State</u>, 04-12-04456-CR (Tex. App.-San Antonio, August 21, 2013), the defendant could have been convicted on multiple theories without using the "law of parties."

c. In <u>Arredondo v. State</u>, 270 S.W. 2d 676 (Tex. App.- Eastland 2008, writ ref'd), Arredondo pled guilty to sexual assault, but not guilty to aggravated sexual assault. The jury found him guilty of aggravated sexual assault, because another assailant testified as to pleading guilty himself to aggravated sexual assault. The court said that was proof of "acting in concert," because no objection was made by Arrendondo's trial counsel to the use of the other assailant's guilty plea to prove "acting in concert."

d. The court in <u>Arredondo v. State</u>, 270 S.W. 2d at 679 attempts to define "acting in concert" through the use of legal dictionary definitions. However, the definition of "law of the parties under " Texas Penal Code Sec. 7.02 is essentially the same conduct required for "acting in concert." This is double jeopardy.

e. If a double jeopardy claim is apparent on the face of the record, the court can review a double jeopardy claim in a habeas corpus proceeding. <u>Ex Parte Denton,</u> 399 S.W. 2d 540 (Tex. Crim. App. 2013).

6. The Texas Aggravated Sexual Assault Statute, Tex. Penal Code Sec. 22.021 (1999) was intended to apply to "date rape" drugs only. Please see the drugs

24

defined in the statute. Also, **the legislative history indicates that it applies to date rape drugs only.** TXB.An., S.B. 1100, 5/13/99.


III. APPLICANT COULD NOT HAVE BEEN FOUND GUILTY OF DELIVERY OF A CONTROLLED SUBSTANCE WITHOUT THE COOERCED PLEA

ISSUE PRESENTED: Can a defendant plead guilty to a crime, while over-medicated, if the state could not have convicted the defendant in a criminal trial?

7. Based on the statements of the alleged victims and Tammy Bishop and on the Metroplex hospital records, the State could not convict Applicant on the delivery of a controlled substance charge. The State had no physical evidence taken from the scene of the crime. The state simple had uncorroborated statements of accomplices.


8. Absent any corroborative evidence, possible statements from witnesses will not prove a drug is Methamphetamine. *Steele v. State*, 681 S.W.2d 129 (Tex.App.- Houston [14th District ] 1984, pet. ref'd). *Bright v.State*, 556 S.W.2d 317 (Tex.Cr.App.1977). In *Steele*, the defendant admitted that the substance he sold to a police officer was cocaine. The chemist did not testify that the substance was cocaine. The court held that without other evidence corroborating the police officer's testimony, such as a lab report, the State failed to prove a material element of the offense. *Steele v. State*, 681 S.W.2d at 131.


9. Here, Applicant was arrested at his home on July 9, 2004, twenty days after the alleged incident based upon a search warrant. At the time of arrest,

25

Applicant denied "providing drugs to the boys" and "denied injecting any of them with Methamphetamine." At the same time, the police seized the items in Exhibit 8. See Exhibit 21. The Bell County District Attorney's office never provided Applicant's trial counsel or habeas corpus counsel with Applicant's denial statements. The information was provided as a response to a T.C.C.P.chapter 64 motion.

10. According to the Bell County District Attorney's office, offense reports show that potential illegal drugs were seized on July 20, 2004. See Exhibit 25. The offense reports have never been provided.

11. The affidavit for arrest for the delivery charge states that the incident occurred on June19, 2004. It states that statements were taken, a videotape was reviewed, and the juveniles' parents say their children tested positive for Methamphetamines. See Exhibit 7.

12. The affidavit for arrest on the aggravated sexual assault charge was filed over six months after the alleged incident and sworn to by Detective Mike Simmons. See Exhibit 21. He swears under oath to Judge Martha Trudo the following "I have reviewed the medical records of all three boys, which showed positive results for Methamphetamine." The accompanying sworn complaint was signed by Detective Simmons and by Bell County Assistant District Attorney, Mark Kimball. See Exhibit 21. They knew the Methamphetamine information was false based upon the Metroplex Hospital records. See Exhibit 9.

13. Per *Steele v. State*, if you take away the statements of the accomplices, here, who were not even police officers as in *Steele v. State*, you have no corroborative evidence to prove delivery of a controlled substance. No drugs were recovered at the scene of the alleged crime. Only urine tests were done on the juveniles several days after June 19, 2004 at Metroplex Hospital. The tests were potentially positive for Amphetamines, not Methamphetamines. J██ M█, to whom the Methamphetamine was allegedly delivered, was taking an Amphetamine, Concerta, at the time of the urine test. While it would not be corroborative evidence of delivery of Methamphetamine, the State did not even have lab tests done on the items seized at Applicant's home.

## IV. TEXAS' AGGRAVATED SEXUAL ASSAULT STATUTE IS UNCONSTITIONAL AS APPLIED DUE TO IT BEING SUBSTANTIALLY OVERBROAD

**ISSUE PRESENTED:** Can a defendant on huge amounts of Seroquel plead guilty to conduct that was not intended to be covered by the aggravated sexual statute by the Texas legislature?

14. The Texas Penal Code has a confusing and tortured aggravated sexual assault statute. Tex. Penal Code Ann., sec. 22.021 (West 2003).

   a. In this case, the facts center on the two aggravation provisions alleged by the Bell County, Texas District Attorney in the amended indictment as they relate to the statute.

   b. First the State has to prove " [a] person intentionally or knowingly causes the penetration of the anus or sexual organ of a child by any means." Tex. Penal Code Ann., sec. 22.021(a)(1)(B)(i) (West 2003). After

27

proving these facts, the State has to prove the aggravating subsection of the statute.

c. The first applicable aggravating subsection involves " administer[s] or provide[s] ...rohypnol, gamma hydroxybutyrate, or ketamine to the victim of the offense with the intent of facilitating the commission of the offense." Tex. Penal Code Ann., sec. 22.021(a)(1)(B)(i) and 2(A)(vi) (West 2003). Applicant found no case law on the provision. The legislative history of the subsection clearly indicates that the provision only involves administering "date rape" drugs to the victim with the intent of "facilitating" the commission of the offense. Crim. Justice, Bill Analysis, Tex. S.B. 1100, 76th Leg., R.S. (1999).

   1. First, a defendant has to "rape" the child. Next, the defendant has to provide a "date rape" drug or a "mickey-if you will" to the child with the intent of making it easier to rape the child. The "mickey" has to be one of the defined drugs.

   2. Based on the newly discovered statements of Tammy Bishop and the alleged victims, no "date rape" drug was involved in this case. This aggravating subsection does not fit.

   3. Clearly, in a "date rape" drug scenario a defendant could be a party to the offense, under the law of the parties, and fit within the statute. He could have provided a "date rape" drug or a "mickey-if you will", to the victim. In this scenario, he could commit aggravated sexual assault.

   4. Charles Montgomery somehow had Applicant plead to this aggravating factor, when no "date rape drug" was administered.



d. The second applicable subsection involves 1) "act in concert" with another rapist who causes the penetration of the anus of a child "directed toward the same victim." Tex. Penal Code Ann., sec. 22.021(a)(1)(B)(i) and 2(A)(v) (West 2003). The Texas Penal Code does not define act or acting in concert. The scant case law found attempts to use legal dictionaries to define act in concert. None of the dictionaries defined it. The cases turned to "concerted action" to interpret the "term of art". Black's Law Dictionary, P.262 (5th ed. 1979); Black's Law Dictionary, concerted action (18c) (10th ed. 2014).

1. Since the Texas Penal Code does not define "act[s] in concert", the courts try to give the words their ordinary meaning. Since the definition is not apparent after trying to give the words their ordinary meaning, courts turn to the legislative history behind the statute to determine legislative intent.

2. The "act in concert" provision was enacted in 1993 as part of a fairly extensive change in the Texas Penal Code. Tex. S.B. 1067, 73rd Leg., R.S. (1993). Tex.HB 77 had a Bill Analysis provision giving a background of the bill that was incorporated into the final bill, Tex. S.B.1067. Comm. on Crim. Justice, Bill Analysis, Tex. HB 77, 73rd Leg., R.S.(1993). The legislative purpose of the bill was to "clarify sexual assault as aggravated sexual assault if more than one individual engages in conduct directed toward the same victim at the same time". Several high-profile cases of "gang rape" were part of the reason for the bill. For example, prior to the bill becoming law, a gang of men could each rape the same women. Each man could only be charged with sexual assault, unless she

was threatened with serious bodily injury or some other factor, such as use of a weapon.

3. This interpretation is further bolstered by the statute using the words or terms "acts in concert with another [who engages in the rape of the child] directed toward same victim"... Tex. Penal Code Ann., sec. 22.021(a)(1)(B)(i) and 2(A)(v) (West 2003). The legislature chose to use the words "same victim" in the statute. The legislature inserted the words "same victim" in the statute.

15. Concerted action means "[a]n action ... agreed on by parties acting together ..., so that all involved are liable for the actions of one another." *Black's Law Dictionary* 18c (10th ed. 2014); Concerted action (or plan). "Action that has been ... agreed on and settled between parties acting together pursuant to some design or scheme". *See* Accomplice. *Black's Law Dictionary* 289 (6th ed. 1990)Why ? If one leaves out the word same in "same victim", then the change would affect the meaning intended. That meaning is gang rape.

V.    A DEFENDANT MUST MAKE A KNOWING AND VOLUNTARY WAIVER OF HIS POST CONVICTION REMEDIES AND GROSS INEFFECTIVE ASSISTANCE OF COUNSEL PREVENTS IT

**ISSUE PRESENTED:** Can a defendant on huge amounts of Seroquel waive his right to post-conviction remedies even if his counsel was grossly ineffective, especially in not obtaining discovery or putting minimal or no effort into a case with raised competency issues?

16. The Court of Criminal Appeals, in a waiver of post-conviction habeas corpus case, outlines knowing and intelligent waivers of post-conviction remedies. *Ex Parte Reedy*, 282 S.W.3d 492 (Tex. Crim. App. 2009). The

30

court found that the ineffective assistance of counsel claim under the Sixth Amendment was of such a magnitude as to render the guilty plea involuntary. *Ex Parte Reedy*, 282 S.W.3d at 499. The trial counsel was alleged to have been unprepared to present any viable defense for the applicant. *Ex Parte Reedy*, 282 S.W.3d at 500. The court also discussed other claims that could affect a knowing and intelligent waiver of post-conviction rights such as actual innocence based on new evidence, the suppression of material, exculpatory evidence by the State, and ineffective assistance of counsel. These claims may be based upon facts not within the applicant's knowledge or comprehension despite due diligence and the assistance of counsel at the time of the plea and waiver. *Ex Parte Reedy*, 282 S.W.3d at 498.

17. The Facts mentioned above and in the Application show no rational juror could have found Applicant guilty beyond a reasonable doubt or "actual innocence". Also, the facts indicate despite due diligence, Applicant can show relief based on suppression of evidence by the State and ineffective assistance of counsel.

18. The following facts indicate suppression of material, exculpatory evidence by the State that by its very nature could not have been discovered by Applicant.

    a. The Bell County District Attorney's office failed to provide witness statements, or at least information from the statements that it had:

        1. No "date rape" drugs anywhere in the case;

        2. No blood tests, or any test showing a positive result for Methamphetamine, and in fact lied about it;

31

3. No drug evidence recovered from the scene;

4. No evidence to corroborate the statements of accomplices that Methamphetamines were delivered to J██ M██ and

b. The Bell County District Attorney's office provided false information or flat out lied about:

1. Prosecuting Tammy Bishop for aggravated sexual assault, when Mark Kimball, the Bell County Assistant District Attorney, had an under the table deal to not prosecutor her;

2. Pursuing Tammy Bishop on numerous charges, when Mark Kimball had no intention of doing so;

3. Having blood tests to confirm Methamphetamines in J██ M██ and the other juveniles systems;

c. The Bell County District Attorney fail to provide trial counsel with a copy of a statement/information about Applicant denying delivering drugs to the alleged victims at the time of his arrest.

d. Evidence discovered from trial counsel, Charles Montgomery, shows that he had viable defenses, but failed to either follow up or understand them. The following information has been discovered that he:

1. Did not show facts or law to counter the State's burden of proof/evidentiary requirements for delivery of a controlled substance and for aggravated sexual assault. The facts and law were there;

2. Failed to follow up on the absolute right to a competency hearing;

Applicant submits this memorandum of law to the court for review. Applicant prays for any relief to which he is entitled. Applicant requests a hearing, and an

33

explanation if possible as to why his claims should not be reviewed, especially in light of the newly obtained evidence.

Respectfully submitted,

Timothy Tesch
SBN:19808200
Tesch Law Firm
P.O. Box 255
Gatesville, Texas 76528
254-865-0313 (ph)
254-731-2584(fax)
teschlaw@gmail.com

## Certificate of Compliance

I, Timothy Tesch, certify that this Memorandum of Law contains 3,561 words and the Exhibit List contains 738 words. The total word count is 4,299 words.

Timothy Tesch, Petitioner

33

## Information and Facts Including 1) Trial Counsel's Notes and Documents Provided to Applicant, 2) Bell County, Texas D.A. Documents That Show Incorrect Sworn Affidavits and Exculpatory Evidence, and 3) Evidence of Mental Incompetency

1. Statement of Tammy Bishop dated July 9, 2004. Statement of J███ M██ dated July 1, 2004 with November 4, 2005 crossed out and with initials R.S. Statement of S████ G███ dated July 8, 2004. Statement of C████ V██ dated July 8, 2004. Note the statements of G███ and V██ say James M. Simmons notarizes them, but the numbers on pages do not match the notary information.

2. Part of Thomas Raymond Carr Motions (sic) on Competency heard on March 24, 2006.

3. Part of Tammy Michelle Bishop Plea of Guilty hearing heard on November 30, 2005.

4. Part of Thomas Raymond Carr Motion to Reduce Bonds hearing heard on January 3, 2005.

5. Part of Thomas Raymond Carr Plea and Sentencing hearing heard on November 21, 2006.

6. Statement of Robert O. "Buck" Harris, Tammy Bishop's attorney.

7. Affidavit for Arrest and Complaint filed July 15, 2004 by Detective Mike Simmons to arrest Thomas Raymond Carr for the June 19, 2004 delivery of Methamphetamines to a minor, J███ M██.

8. Notarized Affidavit of Daniel C. De Leon as custodian of the evidence section for the Harker Heights Police Department dated July 17, 2014. An evidence log is attached to the affidavit. The section labeled "Lab Analysis Needed" is blank. This indicates no items were drug tested.

9. Business Records Affidavits from Metroplex Hospital dated November 1, 2006 for J██ M█, S████ G███, and C██████ V██ Some, but not

all, of the records are attached. The urine drug screen tests indicate positive findings for amphetamines and THC.

10. 16 pages of drug testing information for Methamphetamines and amphetamines.

11. The indictment for aggravated sexual assault dated March 23, 2005. The amended indictment for aggravated sexual assault that was amended on March 24, 2006 by the trial court. Neither indictment tracks the statutory language of the aggravated sexual assault statute.

12. Court Ordered Affidavit filed by Charles Montgomery, trial counsel, in Cause Numbers 57,557-A and 57,558-A on April 10, 2013.

13. Acknowledgment of Receipt of Thomas Carr's File from Attorney Charles Montgomery received by Tesch Law Firm on June 26, 2014. The receipt is six pages. The documents sent by Charles Montgomery are attached in other exhibits.

14. Two page Document from Charles Montgomery, trial counsel, showing only research in his file. It consists of U.S. Constitution, Amendment V, Texas Constitution Art.1.10, and Texas Code of Criminal Procedure 21.13.

15. Handwritten note from Charles Montgomery recommending the filing of an interlocutory appeal.

16. Texas Uniform Health Status Update (with handwritten number of #1403931). This document shows the current prescriptions being administered to Applicant. Note the dosage of Seroquel (one tablet (200 mg) before noon and five tablets (200 mg) before bedtime.

17. Rxlist, Medicinenet, and other literature. The medication that Thomas Carr was taking rendered him incompetent to make a plea. The class of drug, dosage, and side effects for Seroquel include an atypical antipsychotic and the Max. dosage per day at 800 mg. Common side effects – drowsiness and dizziness. Other side effect – altered mental state.

18. Report from court ordered examination with Dr. Frank A. Pugliese that was filed with the trial court on October 7, 2005.



19. One page report from Joseph L. Black M.D. and five page report of B. Thomas Gray, Ph.D. Both reports were filed with the trial court on March 6, 2006.

20. Affidavit for Arrest and Complaint filed July 15, 2004 by Detective Mike Simmons to arrest Tammy Bishop for the June 19, 2004 delivery of Methamphetamines to a minor, J█████ M███

21. Affidavit for Arrest and Compliant filed January 3, 2005 by Detective Mike Simmons to arrest Thomas Carr for aggravated sexual assault.

22. Complete docket information sheet for State of Texas v. Thomas Raymond Carr, Cause No. 57, 557, delivery of Methamphetamines to a minor, J████ M██.

23. Complete docket information sheet for State of Texas v. Thomas Raymond Carr, Cause No. 57, 558, aggravated sexual assault.

24. Copy of June 6, 2014 letter to Charles Montgomery and of release of file to Charles Montgomery. The released asked for specific information. Montgomery has the original signed documents. The copies are not signed.

25. Part of response by the Bell County District Attorney to Applicant's Chapter 64 motion.

# Exhibit 1

OCL-01847

THE STATE OF TEXAS

COUNTY OF Bell

COPY

Before me, the undersigned authority in and for the said county and State, on this the 9th day of July A.D. 2004 personally appeared, Tommy Bishop, Address 114 W. Mark H.H. TX Age 29 Date of Birth 7-15-74 Phone Number 254-699-0780

who, after being by me duly sworn, deposes and says: About a week or so before Father's Day 2004 I met Jerrid May for the first time. He came over to the house after a phone call to my partner, Thomas Carr. Jerrid helped set up a pool in the backyard later in the afternoon. Jerrid left sometime between 3-5pm. I think it was Friday, June 18, 2004, Tom told me that we were going over to Jerrid's house. I think it was late evening when we got there. Jerrid had a couple of his friends over. We drank several drinks together. We started playing around, sat on the

S

**State's Exhibit No. 6, page 1 of 4**

38

trapauline. I think it was Tom's intention for Jerrid to have sex with me. Tom has been wanting me to do something with another man for quite some time. Jerrid and I went to the back porch area. I sat on Jerrids lap and he kind of was kissing on me. One of Jerrid's friends stood in front of me and touching on me On my legs + in between my legs. When we first got there, all three (Jerrid + friends) did a line of meth. I think the one that was rubbing on me was Chris. We went up to Jerrid's room. There was a dildo there, and I don't know the first boy's name but I used the dildo on him anally. Jerrid + Chris left the room

I have read this statement consisting of __2__ page(s), each of which bears my signature and I swear and affirm that everything contained herein is true and correct to the best of my knowledge. My name is Tammy Bishop I am 29 years old, have completed 12 years of formal education and I do read and write the English language This statement was completed at (location) HHPD at (time) 2:05pm on (date) 7-9-04

signature _____

Sworn to and subscribed before me at (location) HHPD
at (time) 2:05pm on (date) 7-9-04

signature of Notary          typed name of Notary James M. Simmons  Peace Officer
Notary Public in and for the State of Texas. My commission expires on _____

HHPD FORM # A-16

4

**State's Exhibit No. 6, page 2 of 4**

39

04-01847

THE STATE OF TEXAS

COUNTY OF Bell

COPY

3

Before me, the undersigned authority in and for the said county and State, on this the 9th day of July A.D. 2004 personally appeared, Tammy Bishop, Address 114 W. Mark, HH TX

Age 29 Date of Birth 7-15-74 Phone Number 254-699-0720

who, after being by me duly sworn, deposes and says:

While that happened Jerrid and Chris came back and I used the dildo on them anally. After that, I laid on the bed and they kissed on me. Tom was there and he video taped that. Jerrid performed oral sex on me. I was enjoying that, even though I was against this happening in the first place. I think that is why Tom got mad and the whole thing kind of stopped. Between going upstairs and being on the back porch, Jerrid, the two boys and I used shot up. Each of them went into the bathroom with Tom and I assume they shot up I felt sick for a few days after this. There might have been

3

40

something wrong with the dog? Tom got mad because I didn't pay any attention to him when he wanted to get involved. I was playing him. We left Jerrid's and went to our house. Tom and I argued outside of the camper about me ~~kissing~~ [TB] ~~one of the boys~~ [TB] ignoring him. Before that, Jerrid and I got up on the top bunk in the camper and he performed oral sex on me. After the incident outside, I think Tom took the boys home.

Jerrid told me ~~truth~~ [TB] that he was 18.

X _[signature]_

I have read this statement consisting of __2__ page(s), each of which bears my signature and I swear and affirm that everything contained herein is true and correct to the best of my knowledge. My name is _Tammy Bishop_ I am _24_ years old, have completed / _2_ years of formal education and I do read and write the English language. This statement was completed at (location) _HHPD_ at (time) _2:05pm_pn (date) _7-9-04_

signature _[signature]_

Sworn to and subscribed before me at (location) _HHPD_ at (time) _2:05pm_ on (date) _7-9-04_

_[signature]_
signature of Notary

_James M. Simmons_
typed name of Notary

Notary Public in and for the State of Texas. My commission expires on ___ _Peace Officer_

HHPD FORM I A-18

COPY

04-01847

# DEPARTMENT OF PUBLIC SAFETY
## STATE OF TEXAS

### VOLUNTARY STATEMENT-(not under arrest)

THE STATE OF TEXAS
COUNTY OF NUECES

Before me, the undersigned authority in and for said County and State, on this the day of ~~November 11th~~ 2005, personally appeared Jerrid May who, after being duly sworn, deposes and says:

July 1st 2004

-RS.

I Jerrid May am giving this statement to Sergeant Saenz and Sergeant Rohrman on my own free will. While I was in a drug chat room in either May or June I met a person named "Tom". We talked about smoking marijuana online, and also "Tom" spoke of another drug that I can't remember. After about a thirty minute online chat (Yahoo), I asked "Tom" if we could meet sometime, and "Tom" gave me his phone number (254-458-9651) I think. I called "Tom" the next day and we set up a meeting at Harker Heights Park. We met at the park at about 8:00 am. We spoke for a while and "Tom" invited me back to the house. While we spoke "Tom" told me that he had been arrested for marijuana two years ago. We went to Tom's house and I met his family. Tom's wife's name was Tammy, she was thin with blonde hair and blue eyes. I also met their daughter named Alexis. We went to Wal Mart and bought a swimming pool. We hung out in the family room talking for and watching TV until four in the afternoon. In the morning time Tom asked me if I wanted to do drugs and I told him yes. Tom then showed me some "ice" and asked me if I wanted to try some. I told Tom that I did not want to try "ice", but that I would smoke weed if I he had some. I went home at four in the afternoon.

About a week later I went back to Tom's house at about 9:00 pm. It rained really bad and we smoked some marijuana that I had brought over. We smoked the marijuana in Tom's room while Tammy slept in the family room. Tom also shot up some methamphetamine. I saw several needles lying around the room. Tom told me that Tom cooks the methamphetamine himself, he also offered to give me a job selling the methamphetamine for Tom. I ended up staying the night at Tom's house on this night. I slept in the family room. When we woke up we set up the new swimming pool that Tom had bought. I then went home.

The next time I saw Tom was Friday the 18th of June. My parents were out of town. I went over to Stephen's house and hung out with them for a little while. Me, my friend Chris and Stephen went to my house to hang out. They wanted to get high so I called Tom for some drugs. Tom came over with some ice in a little baggie. He charged me $25, but I only gave him $12. Me and my friends then snorted the ice using our noses. The ice was in rock form, and we didn't know how to use the ice so we just crushed it. Tom called me back on our house phone (254-690-4302) and told us that he had some marijuana. Tom said that he could be over in about 20 minutes. It was about 10 pm. Tom and Tammy showed up with the weed and more crystal methamphetamine. We snorted this ice and it was pretty strong.

On Saturday the 19th, Tom showed up to the house at about 4:00 pm. Tom had needles and some more ice. My friends were still staying with me. Tom went into the bathroom and put the ice in a spoon and added water. He then heated it up with

42

COPY

A lighter. Tom then put the liquid into a needle and then gave me the needle. I did not know that Tom wanted me to shoot up. Tom put the needle into my veins and showed me how to shoot up. I told Chris to shoot up because it felt good. Chris also shot up with the methamphetamine. Tom then shot Stephen up with the methamphetamine. I gave Tom the rest of the $25 for the drugs. While Tom was at my house, Tom sat at my family's computer desk for a little while. Later that night my dad called. Tom, Tammy, Chris and Stephen all went to Tom's house because I thought that my dad might send someone to check up on me. Tom came and picked me up later in the night and I stayed the night with Tom. We slept in the trailer outside. We all stayed in the trailer (Myself, Tom, Tammy, Chris and Stephen).

On Sunday morning I woke up about 5 am, and everyone was smoking weed. Tammy and I started talking and we ended up having oral sex. I performed oral sex on Tammy while Tom was watching. Chris and Tom were arguing over something Chris said about Tammy. Tom punched Chris twice in the face and left some marks. Tom started acting crazy and acting like he was going to hurt us. After a while Tom calmed down and drove us home. That was the last time that I saw Tom. Tom threatened Chris and Stephen and they are extremely scared of Tom. They both would probably talk with law enforcement and not tell Tom. I was the only one who had contact with Tom.

_Jeremiah May_

Witness _Ronal S_ #9163

_____ #9161

Subscribed and sworn to before me, the undersigned authority, on this the ____ day of ____ , 1998.

_____
Notary Public in and for Nueces County, Texas

43

04-01847

THE STATE OF TEXAS

COUNTY OF __Bell__

COPY

Before me, the undersigned authority in and for the said county and State, on this the __8th__ day of __July__ A.D __2004__ personally appeared, __Stephen Garcia__, Address __4910 Greenlee, Killeen__ Age __14__ Date of Birth __2-21-1990__ Phone Number __254-534-7675__

who, after being by me duly sworn, deposes and says: On Friday, June 19, 2004 I went over to Jerrid May's house in Harker Heights. My friend Chris Valez was with me. This was in the afternoon. Jerrid called his friend Tom to bring some drugs. Tom brought some pills and we went upstairs. We crushed the pills and sniffed them. The pills were white. Tom also brought some red pills but we didn't do them. On ~~Saturday~~ later Friday evening Tom brought some hydro marijuana and a gas mask. On Saturday evening Tom brought some needles and some crystal meth. Tom's wife came over also. Jerrid was the first to use the meth. Chris was second. I was last. Tom put the needle in my arm.

he pulled the needle back and I saw red in the needle. After I got the shot, I got where I couldn't breath very well. Jerrid helped me into a cold shower. In all, I think I did three shots of meth. We stayed up all night on Saturday. On Saturday after we did the meth, we went to Tom's house and smoked weed. I didn't see anyone have sex but Tom told us that if we wanted to we had to do the meth. Sometime while we were at Jerrid's, Jerrid and Chris fingered Tom's wife. I think Tom video taped that.

Det. Simmons wrote this statement for me as I told him.  X Stephen Garcia

I have read this statement consisting of __1__ page(s), each of which bears my signature and I swear and affirm that everything contained herein is true and correct to the best of my knowledge. My name is Stephen Garcia I am 14 years old, have completed 6 years of formal education and I do read and write the English language. This statement was completed at (location) 1910 Greenlee, Harker Heights, TX at (time) 10:55am on (date) 12-8-04

signature Stephen Garcia

Sworn to and subscribed before me at (location) 1910 Greenlee, Harker Heights, TX at (time) 10:55am on (date) 12-08-04

Signature of Notary

ary Public in and for the State of Texas. My commission expires on _____

James M. Simmons
typed name of Notary

11HPO FORM 1 A-18

State's Exhibit No. 2, page 2 of 2

45

THE STATE OF TEXAS

COUNTY OF _Bell_

Before me, the undersigned authority in and for the said county and State, on this the 8

A.D. 2004 personally appeared, ████████████████████████

Age 14 Date of Birth 9-21-89

_____Phone Number ████████████

who, after being by me duly sworn, deposes and says: On Friday, June 18, 2004, ██████ and I went to ███████s house in Harker Heights. ██ made a phone call to a person that he said was his uncle. That guys name is Tom. Jerrid later told me that he was not his uncle. Tom ~~left~~ brought some meth with him and we snorted it. Tom left for about 30 minute and came back with Tammy and some weed. Tom and Tammy went upstair. Stephen went up while Jerrid and I smoked a cigarette. Tammy called Jerrid into the downstairs bathroom. Jerrid came back and told me to go shoot up. I first told him that I didn't want to but I eventally did. When I got into the bathroom, I saw some needles and a bag of meth. Tom put the meth in a spoon, melted it with a lighter.

Tom shot the ~~~~ in my ~~left arm~~ right arm. I was afraid to do it myself. I went to the couch + talked to Jerrid. I went to tell Stephen to shoot up to. ███████ went into the bathroom and apparently shot up. Everybody went outside and he showed me the mask. The mask was in a black bag. ██████, me and Stephen smoke marijuana out of the mask. We went back inside and we talked for a little while. ██████ was really messed, he was running in walls and stuff. I think Tom video taped some of this because he had a video camera set up on a tripod. It was early morning when Tom and Tammy said they had to leave. Me, Stephen + Jerrid took showers. Jerrid drove us to our houses

I have read this statement consisting of __3__ page(s), each of which bears my signature and I swear and affirm that everything contained herein is true and correct to the best of my knowledge. My name is Christopher Velez I am 14 years old, have completed 7 years of formal education and I do read and write the English language. This statement was completed at (location) HHPD at (time) 7:30pm on (date) 7-8-04

signature Chris Velez

Sworn to and subscribed before me at (location) HHPD at (time) 7:3pm on (date) 7-8-04

signature of Notary                          typed name of Notary James M. Simmins
Notary Public in and for the State of Texas  My commission expires on _____ Police Officer

HHPD FORM # A-18

State's Exhibit No. 3, page 2 of 5

04-01847

THE STATE OF TEXAS

COUNTY OF Bell

COPY

Before me, the undersigned authority in and for the said county and State, on this the 8 day of ____

A D 2004 personally appeared, ██████████████████████████████████

Age 14 Date of Birth ████████ Phone Number 670-6588

who, after being by me duly sworn, deposes and says:

So we could change clothes. We went back to Jerrid's. We were up in his room watching a movie when ███y called and said that they were coming back. When they got there we shot up again and smoke more pot. We messed around for a while. After dav█ ████ father called and ███ thought he heard a doorbell ring. Me, Tammy, ████ ── █ █nt out a side door to hide in case there was somebody there ███ stayed at his house and the rest of us went to ███. We stayed in a storage room in the backyard. We waited there and Tammy called every once in a while to see if it was safe to go back. Finally he

8

48

# Exhibit 2

49

REPORTER'S RECORD

VOLUME 1 OF 2

TRIAL COURT CAUSE NO. 57,557 and 57,558

| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| VS. | ) | OF BELL COUNTY, TEXAS |
| THOMAS RAYMOND CARR | ) | 264TH JUDICIAL DISTRICT |

MOTIONS ON COMPETENCY

On the 24th day of March, 2006, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Martha J. Trudo, Judge presiding, held in Belton, Bell County, Texas:

Proceedings reported by Computerized Machine Shorthand Method.

Elizabeth A. Young, CSR, RPR

50

MR. MONTGOMERY: That's my whole point, Your Honor.

THE COURT: Okay. Mr. Montgomery, stop. I'm finding him competent based on what I've received. Any objections you have we'll deal with it later. That's what I'm now finding him competent to proceed.

MR. MONTGOMERY: All right, Your Honor. At the conclusion of this hearing I'd like to make a bill of exception.

THE COURT: All right. Now we're going to proceed with the motion to quash the subpoena. All right. State.

MR. ODOM: Your Honor, for the Court's information, yesterday I accepted service for Mr. Garza's subpoena in this case. After meeting with Mr. Montgomery, I was advised that he had intended to call Mr. Garza concerning office policy about the back of the indictment in this case, that is, that the -- not the charging portion of the indictment but the back of it contains the words "of a child" after aggravated assault. Mr. Montgomery has complained about that, about including that.

I will state to the Court right now we agreed to redact those words even though it's not part of the indictment itself from the back of that

apprising the jury of the whole aggravated conduct on the part of the defendant. The jury is going to hear it all, Judge. So if the jury is going to hear it all and sentence him for all of it, I want them bound by that verdict.

Your Honor should know perhaps it will make a lot of this go a lot easier, if we address the ugly fact that the heart of this crime is that his wife dildoed three juveniles over the age of 14. He had no hand in it except he filmed it. Now true, they can hold him responsible under the law of parties for what she did.

They cannot as my motion to quash points out without being in violation both of the Texas constitution, the United States constitution, double jeopardy clauses. They cannot then use the same facts which constitute him acting together with her under the law of parties to come along and say, oh, by the way, that's also acting in concert and under the statute it elevates the second degree offense to first degree.

They had a good first degree case against Tammy. She was the one who did the dildoing. And since he was filming it they could have argued that Tammy was prosecutable under for a first degree offense.

And they could have prosecuted Tammy for

Elizabeth A. Young, CSR, RPR

a second degree offense of sexual assault. But no. What have they done? They have let Tammy totally off the hook. She doesn't get prosecuted at all for the sexual assault for the rape of these juveniles. She's in prison on a light sentence and they promised her quick release which is another matter I'll get to.

MR. KIMBALL: Your Honor, I'm going to object. That is a lie.

MR. MONTGOMERY: She is.

MR. KIMBALL: It's a lie before the Court.

THE COURT: All right. Wait. One at a time. I want to first deal with this consolidation and joinder and as I look at 302 why should not I order since it is apparently and I think that I heard a bond or didn't -- I believe I heard something on this a long time ago. It seems that that --

MR. MONTGOMERY: There was a high bond.

THE COURT: I think I heard something on this a long time ago.

MR. MONTGOMERY: Yes, you did. Your Honor saw the tape.

THE COURT: And so why should I not join these for saving the Court's time and --

MR. KIMBALL: Because the defendant does

Elizabeth A. Young, CSR, RPR

that and then a summary and recommendations. That's what I am referring to and that's what I have reviewed.

MR. MONTGOMERY: Exactly, Your Honor, and -- and on the next to last page there or second from last page, you have him saying that the defendant seems to enjoy trivia game and shows knowledge in many subjects. Okay?

And in another part of his report he said that the defendant was observed making organized request of his family on the phone. Mommy, don't send me cookies. Is that an organized request? Telling his mother that he can't have cookies at the hospital? Or that they can't send him razor blades. Is that an organized report? This report is full of bull.

This doctor got tired of Tom's staying longer than the other patients stayed and wrote a report that is full of bull. And we need the report that should have been written by the attending psychiatrist who interviewed this defendant certainly before you can eradicate and wipe off the chalk board the report by the Ph.D. here in Bell County who had interviewed the defendant and had found him incompetent.

THE COURT: This is an updated diagnosis per Joseph Black, M.D. attending psychiatrist and that's the report.

# Exhibit 3

REPORTER'S RECORD
VOLUME 1 OF 1
TRIAL NO. 58,703

THE STATE OF TEXAS ) IN THE DISTRICT COURT
)
VS. ) OF BELL COUNTY, TEXAS
)
TAMMY MICHELLE BISHOP ) 27TH JUDICIAL DISTRICT

*PLEA OF GUILTY*

On the 30TH DAY of NOVEMBER, 2005, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Joe Carroll, Judge presiding, held in Belton, Bell County, Texas:

Proceedings reported by Computerized Machine Shorthand Method.

**ORIGINAL**

*GAYLA R. MAY, CSR, RPR*
*27TH JUDICIAL DISTRICT COURT*
*OFFICIAL REPORTER*
*P. O BOX 747*
*BELTON, TEXAS 76513*
*(254) 933-5270*
*FAX (254) 933-5977*

GAYLA R. MAY, CSR, RPR

\* \* \* **A P P E A R A N C E S** \* \* \*


FOR THE STATE:

DISTRICT ATTORNEY'S OFFICE
BY: Mr. Mark Kimball
Assistant District Attorney
SBOT No. 11418030
P. O. Box 540
Belton, TX 76513
(254) 933-5215


FOR THE DEFENDANT:

LAW OFFICE OF R. O. HARRIS
BY:  Mr. R. O. (Buck) Harris
SBOT No. 09098800
P. O. Box 169
Killeen, TX 76540
(254) 690-4800

the charges against you, Ms. Bishop.

MR. KIMBALL: Your Honor, the State offers the defendant's confession for all purposes.

MR. HARRIS: No objection to State's 1 as tendered.

THE COURT: State's Exhibit No. 1 is admitted against you, Ms. Bishop.

(State's Exhibit No. 1 admitted.)

Based on that I will state that the evidence is sufficient to find you "guilty." I will withhold a finding and ask: Is there any further evidence from the State or Defense on punishment issues?

MR. KIMBALL: Your Honor, I don't think we need a PSI in light of the plea agreement. I would let the Court know that there are further charges that will be filed against Ms. Bishop. She is well aware of it. She is the major witness against the co-defendant in this case, or a major witness against the co-defendant in this case. There will be several trials in which she will have to appear probably on first-degree felony offenses involving sexual abuse of a child.

And the main reason we are doing this, Judge, she has been in jail a long time, but it is just not safe to put her on the streets. The State has reason to believe her life is in danger if she hits the streets or that she might go back

58

using methamphetamine. We certainly don't want that. This, by no means, is the end of cases against Ms. Bishop, and she is well aware of that.

THE COURT: Anything from the Defense?

MR. HARRIS: Your Honor, Defense would concur with Mr. Kimball's resuscitation.

Ms. Bishop, you agree to waive a presentence investigation report at this time. Is that correct?

THE DEFENDANT: Yes, sir.

MR. HARRIS: Thank you.

Your Honor, I would further advise the Court that Ms. Bishop's sister-in-law and parents are present in the courtroom, and they have been made a part of the loop, and they have been made aware of the events we have testified to.

THE COURT: All right. That is obviously the father back there.

MR. HARRIS: Yes, sir, it is.

THE COURT: Okay. All right, Ms. Bishop. I will find you "guilty," assess your punishment at eight years' confinement in the Texas Department of Criminal Justice, Institutional Division. I will give you credit for all the days you have served in the county jail and sentence you to the eight-year term.

Do you understand what's happened to you now?

THE DEFENDANT: (Indicating)

# Exhibit 4

REPORTER'S RECORD

CAUSE NOS. 01,847B AND 53,430

STATE OF TEXAS

VS.

THOMAS RAYMOND CARR

X   IN THE DISTRICT COURT

X

X   OF BELL COUNTY, TEXAS

X

X   264TH JUDICIAL DISTRICT

* * * * * * * * *

HEARING

MOTION TO REDUCE BONDS

* * * * * * * * *

On the 3rd day of January, 2005, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Martha Jane Trudo, Judge presiding, held in Belton, Bell County, Texas.

Proceedings reported by BETSY MOCK CLIFTON by machine shorthand and computer-aided transcription.

BETSY MOCK CLIFTON

CERTIFIED SHORTHAND REPORTER

P. O. Box 365

BELTON, TEXAS 76513

(254) 933-5790

ORIGINAL

APPEARANCES:

MARK KIMBALL

ASSISTANT DISTRICT ATTORNEY
BELL COUNTY, TEXAS


FOR THE STATE


MR. TED POTTER

ATTORNEY AT LAW
BELTON, TEXAS

FOR THE DEFENDANT

State rests.

THE COURT: All right.

Mr. Potter, any other evidence?

MR. POTTER: Your Honor, the only other evidence we would have simply that he has no assets. His truck was sold. He has no assets at all. He has to depend on his father who's the only one to help him with any situation. He has no -- nothing to convert to cash for bail bond.

I have nothing further.

THE COURT: Mr. Kimball?

MR. KIMBALL: Well, number one, the motion to reduce bail in the deferred adjudication case, since that's entirely up to the Court -- and was filed this morning -- it was entirely up to the Court what bail you set in that case. And I think a hundred thousand is too low. I think it should be about two million now. By law you have to reduce the bail in the new case. But you can put as many restrictions on there as you want to.

I need to inform the Court that sitting on my desk, which will be filed afternoon, is another complaint. This time of aggravated sexual assault of a child because, under the law, when two

people are involved in sexual assault of a child, that's a first degree felony. And I'm going to be bringing that up to the Court and asking the Court to set two million dollar bail in that case.

And every time he gets close to getting out of jail, I'm going to file case after case after case after case. I have 17 different cases. Like I said, delivery of methamphetamine to all three of these kids, aggravated sexual assault, indecency with child, sexual performance by a child. And every -- every time, Judge -- and that was my low count.

I have seen this tape, unfortunately, twice before today. And I couldn't look at a lot of it. And I think you know why.

The bail is too low in his probation case. And I ask you to set the tightest restrictions possible. He doesn't need to be within three hundred foot of any child ever.

And obviously, you know, his wife, who's the actress in this Cecil B. DeMille production has a vested interest in seeing him not go down. She has a vested interest.

I submit to the Court, if you let him out on bail, at any time, we'll never see him again. And it's real easy to sit there and say, well

you are to have no contact and not use those types of devices to contact people.

Of course, you are to have no contact with these young people shown in the video and those that are alleged to have been given illegal drugs by you.

You will know -- and your lawyer knows who those people are and the names of those people and who's in these videos.

And, if you are to get out and get back with your wife and live together, then these rules apply the same. That you do not have any contact with these people whatsoever whether directly or indirectly or to their families or by mail or any way. I don't want you to get in touch with these people --

THE DEFENDANT: I understand.

THE COURT: -- whatsoever.

Now, is she on bond?

MR. KIMBALL: No, Your Honor. She's in jail. She's represented by Mr. Harris. He's not seeking a bond reduction at this time because I have promised 17 indictments for her as well should she seek a bond reduction.

THE COURT: Okay. Now, like I

# Exhibit 5



REPORTER'S RECORD

VOLUME 1 OF 1

TRIAL COURT CAUSE NO. 57,558

| | |
|---|---|
| THE STATE OF TEXAS | ) IN THE DISTRICT COURT |
| VS. | ) OF BELL COUNTY, TEXAS |
| THOMAS RAYMOND CARR | ) 264TH JUDICIAL DISTRICT |

PLEA AND SENTENCING HEARING

On the 21st day of November, 2006, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Martha J. Trudo, Judge presiding, held in Belton, Bell County, Texas:

Proceedings reported by Computerized Machine Shorthand Method.

FILED 2013 JAN 29 AM 9:20

Elizabeth A. Young, CSR, RPR

A P P E A R A N C E S

DISTRICT ATTORNEY'S OFFICE

MR. MARK KIMBALL
SBOT NO. 11418030
1201 Huey Road
P O Box 540
Belton, Texas  76513
Tel 254 933-5125
Attorney for the State

MR. CHARLES "MONTY" MONTGOMERY

SBOT No. 14288000
4400 Seven Coves Rd
Temple, Texas  76502-6551
Tel 254 986-2531
Cell 254 541-4164
Attorney for the Defendant

A    Yes, sir.

Q    And so I informed you, did I not, that you either take this or we just go to trial December 4 and you just get what you get?

A    Yes, sir.

Q    I also told you that this case would not -- I would not give you 30 years if the families of the three boys involved did not give their assent to that 30 years, correct?

A    Yes, sir.

Q    Well, you've got some thanking to do for some people, right?

A    Yes, sir.

Q    Not keeping you locked up for the rest of your life. You understand the addendum that I prepared for your plea bargain that the judge mentioned specifically prohibits you from filing any type of writ of habeas corpus or any time seeking any kind of judicial review for either of these convictions. Period.

A    Yes, sir.

Q    You're stuck.

A    Yeah.

Q    Nothing you can do. You go down and serve your time. When you're done, you're done.

A    Yes, sir.

Q    If you seek judicial review, if you file writ of habeas corpus, if you try to file out of time appeal or anything like that, you understand that your confessions that you've signed and sworn to will be admissible in any subsequent proceedings?

A    Right.

Q    All bets are off and I'm going to file as many cases as I can and come at you with full force. You understand that?

A    Yes, sir.

Q    You had a little stint in Vernon's, correct, when we had an order restoring your insanity back in August or restoring your competency back in August, correct?

A    Yes, sir.

Q    And you told the judge you felt you were mentally competent. You understood everything that has happened here today, the charges against you and your options and everything like that?

A    Yes.

Q    In fact, Mr. Montgomery didn't bring it up but he has spent, many, many, many hours with you on this case, has he not?

A    Yeah.

Q   And he's also I'm sure told you of the many, many, many hours that he has spent getting discovery from me as well as talking with witnesses and so forth?

A   Yes.

Q   One thing you mentioned yesterday when in our discussions was what's going to happen to my wife and you understand what happens to your wife is up to the State of Texas and the courts and I absolutely refuse to answer that question.

A   Yes, sir.

Q   All right.

MR. KIMBALL:  Pass the witness.

MR. MONTGOMERY:  Well, I have a couple of other questions, Your Honor, real quickly.

REDIRECT EXAMINATION

BY MR. MONTGOMERY:

Q   Yesterday I told you I was given by the prosecutor the State's witness list and notice of other crimes, extraneous offenses, et cetera, that might be offered in evidence in its case in chief, plus the medical records that we had requested and I won't name those in court, you know what they were.

You understood that the State has done everything that was necessary under the voluminous pretrial requests that we had in this case and that

# Exhibit 6

# TESCH LAW FIRM

PH. 1.254.865.0313 | FX. 1.254.731.2584
WWW.TESCHELDERLAW.COM | TESCHLAW@GMAIL.COM
P.O. Box 255 | Gatesville, TX 76528

MAY 20, 2015

Sent via: email

Comish Law Firm
404 North Main Street
Belton, Texas 76513

ATTN: Robert O. "Buck" Harris

RE:   Statement Tammy Bishop v. State of Texas; Cause No. 58703

Dear Mr. Harris:

As mentioned in our phone conversation, I am handling a habeas corpus matter for Thomas R. Carr. You indicated that you would sign a statement regarding the handling of Tammy Bishop's case.

Enclosed please find my proposed statement based on our conversation. Please review it. If there are any changes, please note them on the statement and email it back. I will make them and resend the statement. If there are not any changes, please fax or email the signed statement to me. Please mail me the original. Thank you.

Sincerely,

Timothy Tesch

73

# Statement of Robert O. "Buck" Harris

My name is Robert O. "Buck" Harris. I am a licensed attorney in the State of Texas. I practice criminal law in Bell County, Texas.

Tammy Bishop was a client of mine in 2004 and 2005. The State through Bell County investigated allegations that she delivered a controlled substance to three minor males and that she sexually assaulted them. The incident allegedly occurred on or about June 18, 2004. She was never indicted.

I was aware of and reviewed a copy of a videotape purporting to show Ms. Bishop sexually assaulting three minor males. None were less than 14 years old. The videotape showed a woman, allegedly Tammy Bishop, having sex with the minors. It also showed a women using a dildo on the anuses of the three minors. I took the position with the prosecutor that I would try any case involving sexual assault if Ms. Bishop was indicted. The circumstances surrounding the three minor males having sex and having a dildo used on them anally would be extremely embarrassing at a jury trial. Eventually, the prosecutor chose to work out an agreement to have Ms. Bishop plead guilty to one drug charge rather than proceed to indictments on any other allegations.

I remember Thomas Carr, the common law husband of Tammy Bishop, being represented by Ted Potter and Charles "Monty" Montgomery. I did not discuss anything related to Ms. Bishop's or Mr. Carr's criminal case with Mr. Carr's attorneys.

Bell County did not indict my client. The prosecutor agreed to have Ms. Bishop plead guilty by information to one count of delivery of a controlled substance, methamphetamine, to Jerrid May, a child less than 17 years of age. In Cause No. 58703 she pled guilty on November 30, 2005 and was sentenced to eight (8) years in prison. The prosecutor never made any demand to plead guilty to any sexual assault charge.

As part of the plea, the prosecutor agreed not to proceed to indict Ms. Bishop on any sexual assault charge or any other drug charge. The understanding was that Ms. Bishop would complete her sentence and not get into any other trouble. If she complied, then Bell County would not pursue any further charges. While the agreement was not in writing, I would not have recommended that Ms. Bishop do the plea without an understanding with Bell County not to pursue further charges.

Robert O. "Buck" Harris

# Exhibit 7

RACE ___ SEX ___ D/O/B ___

D A ___ 04-922    CHARGE: DELIVERY OF A CONTROLLED SUBSTANCE TO MINOR

DATE FILED: 07-13-04    FILING AGENCY: HHPD    CAUSE NO: ___

PLAINANT/VICTIM: STATE OF TEXAS    OFFENSE NO: 04-01847

CO-DEFENDANT(S): TAMMY BISHOP    DATE OF OFFENSE: 06-19-04

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS:

BEFORE ME, the undersigned authority, on this the __13TH__ day of __JULY__, A.D., 20__04__,
personally appeared __MIKE SIMMONS__ who,

after being by me duly sworn, on oath deposes and says: That I have good reason to believe that heretofore, to wit: on or about the __19TH__ day of __JUNE__, A.D., 20__04__, and before the making and filing of this

Complaint, in the County of Bell, the State of Texas
**THOMAS RAYMOND CARR**    *01847B*

did then and there knowingly deliver a controlled substance to wit: Methamphetamine, to J███ ██, a child less than 18 years of age

against the peace and dignity of the State.

Complainant

SWORN TO AND SUBSCRIBED before me on the date first stated above

Assistant District Attorney
27th Judicial District
Bell County, Texas

AFFIDAVIT FOR ARREST

STATE OF TEXAS }
COUNTY OF BELL }

COMES NOW THE UNDERSIGNED AFFIANT, A PEACE OFFICER UNDER THE LAWS OF THE STATE OF TEXAS, AFTER HAVING BEEN DULY SWORN ON OATH, WHO DEPOSES AND SAYS THAT I HAVE GOOD REASON TO BELIEVE AND DO BELIEVE THAT **THOMAS RAYMOND CARR** HAS COMMITTED THE OFFENSE OF **DELIVERY OF A CONTROLLED SUBSTANCE TO A MINOR** AS CHARGED IN THE COMPLAINT TO WHICH THIS AFFIDAVIT IS ATTACHED AND THAT MY BELIEF IN THE FOREGOING IS BASED ON THE FOLLOWING INFORMATION.

I AM A CERTIFIED POLICE OFFICER UNDER THE LAWS OF THE STATE OF TEXAS CURRENTLY EMPLOYED BY THE HARKER HEIGHTS POLICE DEPARTMENT AS A DETECTIVE. PURSUANT TO MY DUTIES AS A DETECTIVE, I HAVE BEEN ASSIGNED THE INVESTIGATION OF A REPORT OF DELIVERY OF A CONTROLLED SUBSTANCE TO A MINOR IN WHICH THE SUSPECT'S NAME IS THOMAS RAYMOND CARR.

I HAVE READ THE STATEMENT OF J███ M██, WHO IS 16 YEARS OLD. HE REPORTS THAT THE SUSPECTS, THOMAS CARR AND TAMMY BISHOP, CAME OVER TO HIS HOME IN HARKER HEIGHTS, BELL COUNTY, TEXAS ON JUNE 19, 2004, WITH MARIHUANA AND METHAMPHETAMINE. JERRID AND HIS TWO 14 YEAR OLD FRIENDS WERE GIVEN METHAMPHETAMINE, BY INJECTION, BY THOMAS CARR. I HAVE SPOKEN TO TAMMY BISHOP, WHO GAVE A VOLUNTARY STATEMENT IN WHICH SHE ADMITS TO INGESTING METHAMPHETAMINE WITH THE THREE JUVENILES, WHICH SHE AND CARR BROUGHT TO THE RESIDENCE. I HAVE ALSO REVIEWED A VIDEOTAPE IN WHICH THE THREE JUVENILES, CARR AND BISHOP ALL REFER TO DRUG USE, AND IT IS APPARENT, BASED ON MY TRAINING AND EXPERIENCE AS A POLICE OFFICER, THAT ALL THREE JUVENILES ARE INTOXICATED. I HAVE BEEN MADE AWARE THROUGH MY INVESTIGATION THAT ONE OF THE 14 YEAR OLDS HAD A BAD REACTION TO THE DRUGS AND WAS TREATED AT A LOCAL HOSPITAL. I HAVE BEEN FURTHER INFORMED BY THE PARENTS OF ALL THREE JUVENILES THAT THE CHILDREN TESTED POSITIVE FOR METHAMPHETAMINE.

WHEREFORE, PREMISES CONSIDERED, YOUR AFFIANT REQUESTS THAT A WARRANT OF ARREST ISSUE FOR **THOMAS RAYMOND CARR** FOR THE FELONY OFFENSE OF **DELIVERY OF A CONTROLLED SUBSTANCE TO A MINOR.**

_____
Affiant

Sworn to and subscribed before me by the above named Affiant, a credible person, this the 13th day of July 2004.

_____
JUSTICE OF THE PEACE
PRECINCT NO. _____
BELL COUNTY, TEXAS

2004 JUL 15 AM 8: 17

78

# Exhibit 8

No. <u>57,558</u>

| | | |
|---|---|---|
| IN RE | § | IN THE 264TH JUDICIAL |
| | § | DISTRICT COURT OF |
| THOMAS RAYMOND CARR | § | BELL COUNTY, TEXAS |

# Affidavit

Before me, the undersigned authority, personally appeared **Daniel C. De Leon**, who, after by me being duly sworn, deposed as follows:

"My name is Daniel C. De Leon. I am over the age of 21 years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated.

"I am currently employed as a detective with the Harker Heights Police Department ('HHPD') in Harker Heights, Texas, and serve as the custodian of the evidence section. At the request of the Bell County District Attorney's Office, I have searched our records in an effort to locate any evidence in our possession on 2004 HHPD Case Number 04-01847. The date of offense in this case was June 18, 2004, the suspect was Thomas Raymond Carr (DOB: 8-14-67), and the victims were: J███ M█, S███ G██, and C████████ r V██, who, at that time, were all juveniles residing in Harker Heights/Killeen area. I have attached the two page Evidence Submission Report ('Report') to this affidavit as Exhibit "A," and it is included by reference for all purposes. The Report lists items that were seized and placed into evidence by the HHPD officers who investigated the case. Basically the list is composed of a computer and its peripherals, a camera, papers, and items containing suspected illegal drugs or illegal drug residue. Items 3, 11, and 14, which are various video recordings, are no longer in our custody because they were returned to the defendant's mother, at his request. In addition, not listed are three Metroplex Hospital reports containing the blood test results of the three victims, which we do have in our custody. We have no other items of evidence in this case, and do not now have, nor have we ever had, any biological evidence, or items thought to contain such, in our possession relating to this case.

**"Further affiant saith not."**

Daniel C. De Leon, Affiant

SWORN TO AND SUBSCRIBED before me on this the ____ / 7 ____ day of July, 2014.



MELISSA M. JOUETT
Notary Public
STATE OF TEXAS
My Comm. Exp. 02/02/2015

Seal

NOTARY PUBLIC IN AND FOR
THE STATE OF TEXAS

State's Exhibit No. 7, page 1 of 1

80

CASE NUMBER: 04-01847     DATE: 7/9/04     PAGE 1 of 1      CONTROL NUMBER: _____

OFFENSE: Delivery of Controlled Substance / Sexual Assault     LOCATION: _____

COMPLAINANT: _____ ADDRESS: _____ **COPY**    PHONE: _____

ASSOCIATED BUSINESS: _____    PHONE: _____

## PERSONS INFORMATION

| | NAME | ADDRESS | RACE/SEX/DOB | SSN# | CHARGE FILED |
|---|---|---|---|---|---|
| 1 | Orr, Thomas | 114 W Mark | w/m/8-14-1967 | | |
| 2 | Bishop, Tammy | 114 W Mark | W/F/7-15-1974 | | |
| 3 | | | | | |
| 4 | | | | | |

## PROPERTY SUBMITTED

| ITEM# | QTY | CODE | DESCRIPTION | LAB ANALYSIS NEEDED |
|---|---|---|---|---|
| 1 | 1 | E | Systemax Computer SN 105056368 | |
| 2 | 1 | E | Computer monitor (MAG) SN EGVI 39319966U | |
| 3 | 55 | E | Video Tapes | |
| 4 | 1 | E | Logitech Keyboard SN MET 22817471 | |
| 5 | 2 | E | wireless mouse & receiver | |
| 6 | 1 | E | Logitech Quik cam | |
| 7 | 1 | E | Digital Audio Player w/ flash memory card | |
| 8 | 2 | E | Plastic envelopes w/ white powder residue | |
| 9 | 2 | E | 2 Plastic containers of marijuana | |
| 10 | 1 | E | Plastic bag unidentified pills | |

CODES.   E=evidence    F=found property    N=narcotics

SUBMITTED BY: _____ DATE: _____ TIME: _____ RECEIVED BY: _____ DATE: _____ TIME: _____

# Exhibit-A, page 1 of 2

81

| ITEM# | QTY | CODE | DESCRIPTION | LAB ANALYSIS NEEDED |
|-------|-----|------|-------------|---------------------|
| 11 | 32 | E | 8mm Tapes in Plastic bag | |
| 12 | | E | MISC. PAPERS | |
| 13 | 1 | E | Blk. mask with hose / Pipe Attachment | |
| 14 | 40 | E | DVD TAPES / DISC'S | |
| 15 | 1 | E | Sony Handycam SN 1018061 model # DCR-TRV510 | |
| 16 | 1 | E | Box Marlboro cigarettes w/ 1 "Joint" | |

## CUSTODY AND DISPOSITION RECORD

| FROM | RECEIVED BY | DATE | TIME | REMARKS |
|------|-------------|------|------|---------|
| | | / / | | |
| | | / / | | |
| | | / / | | |
| | | / / | | |
| | | / / | | |
| | | / / | | |

REMARKS:

DISPOSITION.

HMPD #A 22 (03/96)

Exhibit-A, page 2 of 2

82

# Exhibit 9

83

# AFFIDAVIT

Before me, the undersigned authority, personally appeared _____

_Melba Leanne Starkovich_ _____ who being by me duly sworn
(FULL NAME)

deposed as follows:

My name is _Melba Leanne Starkovich_ _____. I am of sound mind,

capable of making this affidavit, and personally acquainted with the facts herein

stated:

I am the custodian of the records of _Metroplex Hospital_

_2201 S. Clear Creek Rd Killeen, TX 76549_

(NAME OF FACILITY AND ADDRESS)

Attached here are _306_ pages of records from the medical records of _____

██████████ █████████ , hospital stay period:

(NAME OF PATIENT)

_11-19-04 Emergency Room + 6-21-04 to 6-26-04_

(ADMISSION AND DISCHARGE DATE)

These said pages of records are kept by said Hospital in the regular course of
business, and it was the regular course of business of said Hospital for an
employee or representative of said Hospital, with knowledge of the act, event,
condition, opinion, or diagnosis, recorded to make the record or to transmit
information thereof to be included in such record; and the record was made at or
near the time or reasonable soon thereafter. The record attached hereto are the
original of exact duplicates of the original.

_Melba Leanne Starkovich_
(SIGNATURE)

SWORN TO AND SUBSCRIBED before me on this _1_ day of _November_ 2006, 199__.

_Lisa Lucas_
Notary Public in and for the STATE OF TEXAS

_Lisa Lucas_
(Printed Name)

SEAL

My Commission Expires: _9-16-2007_


LISA LUCAS
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
SEPTEMBER 16, 2007

84

COPY

# THE STATE OF TEXAS
### *** SUBPOENA - Duces Tecum ***
### Cause No. 57558



57558

2 9 4 22 P
6-21-04 P
11-19-04 P

To The Sheriff, Constable, or any Peace Officer of BELL County, said State, Greeting:

You are hereby commanded to summon:

**CUSTODIAN OF RECORDS**
**METROPLEX HEALTH SYSTEM**

Or Serve At:
RETURN TO DA'S OFFICE FOR SERVICE

to be and appear * * * * * **I N S T A N T E R** * * * * before the Honorable 264 *District Court* of Bell County, Texas, to be held at the Courthouse of said *County*, in *Belton*, Texas, then and there to testify as witness in behalf of the **STATE OF TEXAS** in a criminal action pending in said Court, entitled and numbered on the Criminal Docket of said Court, THE STATE OF TEXAS vs. THOMAS RAYMOND CARR, No. 57558, and therein remain from day to day, and from term to term, until discharged by due course of law.

Returnable INSTANTER.

HEREIN FAIL NOT, and make due return hereof, showing how you have executed the same. Witness my official signature, at Belton, Texas, this 30th day of October, A.D. 2006.

Shelia F. Norman, Clerk,
264 District Court, Bell County

By:_____ Deputy.

Please contact the District Attorney's Office prior to appearance to avoid
an unnecessary trip to court. 939-3521 or 1-800-460-2355, ext. 5215

NOTE "It is an offense for a person to intentionally influence or coerce a witness to testify falsely or to elude legal process. It is also a felony offense to harm or threaten to harm a witness or prospective witness in retaliation for or on account of the service of the person as a witness or to prevent or delay the person's service as a witness to a crime."

NOTICIA "Es delito intimar u obligar a un testigo a declarar con falsedad o a evadir el proceso judicial. Tambien es delito penal herir o amenazar con herir a un testigo, o a un testigo prospectivo, en represalia o a consecuencia de haber declarado en juicio o con el alan de impedir o demorar su comparecencia como testigo de un delito."

** DUCES TECUM TO BRING OR PRODUCE ANY & ALL MEDICAL RECORDS, INCLUDING ANY & ALL PSYCHIATRIC RECORDS, OF JERID MAY DOB:05/13/1988, CONCERNING EXAMINATION & TREATMENT OF JERID MAY FROM JUNE 19,2004, THROUGH PRESENT DATE ***

### Officer's Return

Came to hand the 30 day of October A.D. 20 06, at /00 o'clock P M, and executed by delivering a copy of this SUBPOENA to Floyd Pearson in person at Metroplex Hospital on the 30 day of Oct, 2006, at 145 o'clock __M.

Not executed as to the witness _____ for the following reasons:

_____

I actually and necessarily traveled _____ miles in the service of this Subpoena

_____ Sheriff/Constable/Peace
Officer/Private Process
BELL _____ County, Texas.

FEES --Summoning Witnesses - $_____
Mileage ----------- _____
Total ------------- $_____   By:_____ Deputy

©1996-2002 T-System, Inc. Circle or check affirmatives, backslash (\) negatives.

# METROPLEX HEALTH SYSTEM
## EMERGENCY PHYSICIAN RECORD
### Psych Disorder, Suicide Attempt, Overdose (5)

CCC294227     1049706

KAY, JERRID S
DOB 5/13/88     C16/M
    11/19/04

DATE 19 Nov TIME 15²⁵ ROOM: 2   EMS Arrival

HISTORIAN: _patient _spouse _paramedics _mother

_HX / _EXAM LIMITED BY: _____

V/S B/P 121/74 P 111 R 20 T 97³ SaO₂

## HPI  chief complaint(s): Reg drug screen

Suicidal Thoughts  Depression
Agitated  Hallucinating

Onset: _____

Worsened since: _____

**severity:**
mild  moderate  severe

Suicide Attempt
Self-Injury
Intentional Drug Overdose
Accidental Drug Ingestion

When? _____

**context:**
_situational problems
    related to  spouse / parent / son / daughter / significant other
      work / lost job / school / legal problems

**current/associated complaints:**
_depressed / angry / frustrated / agitated / hostile / paranoid

_confused / hallucinating

_suicidal thoughts / specific plan / gesture or attempt

_ingestion (see list below)
    suicide attempt  wanted to "escape"  accidental  will not answer

_incised / abraded wrist ( R / L )

### LIST OF SUBSTANCES INGESTED (if applicable)

| name | | strength | # taken | when taken |
|------|------|----------|---------|------------|
| acetaminophen | Y / N | | | |
| aspirin | Y / N | | | |
| ethanol | Y / N | | | |
| | | | | |
| | | | | |
| | | | | |

## "RESCUE FACTOR" (if suicide attempt):
How did Ingestion/other acts come to attention?
_____

Arrived by: _private car  _ambulance (who called?)
    _police     patient  spouse

_Recently seen/treated by doctor _____

## ROS
**PULMONARY & CVS**
_cough
_trouble breathing
_chest pain

**NEURO & EYES**
_headache
_visual disturbance

**GI - GU**
_abdominal pain
_nausea
_vomiting
_diarrhea
_problems urinating

**SKIN & LYMPH & MS**
_skin rash / swelling
_joint pain

☐ all systems neg. except as marked

## PAST HISTORY  / negative
_prior suicide attempt

_psychiatric problems
    depression  bipolar disorder
    schizophrenia  other

_other problems

_cardiac disease
_hypertension
_NIDDM / IDDM
_lung disease
+HIV / AIDS

**Surgeries:**
_tonsillectomy _____ _appendectomy
_cholecystectomy _____ _hysterectomy

**Medications** _none _see nurses note
Adderall

**Allergies** _ NKDA
_see nurses note

## SOCIAL HX  _smoker _____ _drugs
_recent alcohol use / binge drinking / alcoholism

marital status  _single  _married  _children

## FAMILY HX  _mental illness

86

☑ Nursing Assessment Reviewed   ☑ BP, HR, RR, Temp reviewed

## PHYSICAL EXAM
### GENERAL APPEARANCE
/ alert
/ no acute distress

_anxious / lethargic / obtunded_____
_mild / moderate / severe_____
_uncooperative for exam_____

### ENT
/ nml ENT inspection
/ pharynx nml
_if obtunded:_
/ nml gag reflex

_abnormal TM ( R / L )_____
_dry mucosa_____

_gag reflexed diminished / absent_____

### EYES
/ pupils equal, round
& reactive to light
/ EOM's intact

_nystagmus_____
_disconjugate gaze_____
_mydriasis / meiosis / anisocoria_____
R Pupil_____ mm   L Pupil_____ mm

### NEURO / PSYCH
_mental status_
/ mood/affect nml

_slow / no response to commands_____
withdraws to pain   no response to pain
_depressed affect_____
_tearful / hostile / non-communicative_____
_suicidal ideation_____

For suicide attempts:   On direct query, patient ADMITS / DENIES
continued consideration of suicide as an option.
if denies why?_____

orientation
/ normal x3

_uncooperative / cannot determine_____
_disoriented_____
to: day-of-week   day-of-month
month   year   place   person

cranial nerves
sensory, motor
/ CN's intact as tested
/ nml motor response
/ nml sensory response
/ nml reflexes
/ nml gait

_facial droop / CN abnormality_____
_motor/sensory deficit_____

_abnormal gait_____

### NECK / BACK
/ normal inspection
/ neck supple

_cerv. lymphadenopathy ( R / L )*_____
_thyromegaly / meningismus_____

### RESPIRATORY
/ no resp. distress
/ breath sounds nml

_wheezing_____
_rales / rhonchi_____

### CVS
/ regular rate, rhythm
/ heart sounds normal

_irregularly irregular rhythm_____
_extrasystoles ( occasional / frequent )
_tachycardia / bradycardia_____
_JVD_____
_guarding_____
_hepatomegaly / splenomegaly_____

### GI (ABDOMEN)
/ non-tender
/ nml bowel sounds*
/ no organomegaly

### SKIN
/ color nml, no rash
/ warm, dry

_cyanosis / diaphoresis / pallor_____
_skin rash_____

### EXTREMITIES
/ normal ROM*
/ no signs of injury
/ no pedal edema

_laceration_____
_pedal edema_____

PROCEDURES:   ☐ Restraints
☐ Intubated __by ED physician   nasal /oral   #____ ET tube
____breath sounds equal   __ tube position confirmed w CXR
☐ Gastric Lavage   __pill fragments recovered
☐ Charcoal ____gm given   Sorbital _____oz given

_Underline indicates organ system_
_* equivalent or minimum required for organ system exam_

Overdose -52

## LABS, XRAYS, and PROGRESS
EKG MONITOR STRIP   __NSR   Rate____
EKG __NML   ☐Interp. by me   ☐Reviewed by me   Rate____
__NSR   __nml intervals   __nml axis   __nml QRS   __nml ST/T

not / changed from:_____
CXR   ☐Interp. by me   ☐Reviewed by me   ☐Disc'sd w/radiologist
__nml/NAD   __no infiltrates   __nml heart size   __nml mediastinum

not / changed from:_____

| CBC | Chemistries | ABG's | Toxicology |
|---|---|---|---|
| normal except | normal except | time: | normal except |
| WBC____ | Na____ | | acetamin.____ |
| Hgb____ | K____ | pH.____ | aspirin-____ |
| Hct____ | Cl____ | pCO2____ | ETOH-____ |
| Platelets____ | CO2____ | pO2____ | |
| segs____ | Gluc____ | | Triage™ urine |
| bands____ | BUN____ | _RA | drug screen- |
| lymphs____ | Creat____ | _O2 ____ L | |
| Pulse Ox   ____% on RA /___L / ___% | | | interp ____ |

Time_____   __unchanged   __improved   __re-examined_____

ORDERS: _____
_____
_____

INTERVIEW WITH OTHER RESPONSIBLE ADULT:
Name:_____   Relationship:_____
Considers ongoing suicide risk:   high   low   uncertain
Capable / comfortable with observing patient at home?   Yes   No   N/A

MEDICAL CLEARANCE FOR PSYCHIATRIC REFERRAL (if needed)
Back-slash to indicate that diagnosis is unlikely based on H&P and, when needed, lab testing
•Toxic (PCP, Amphetamines, Hallucinogens, Acetaminophen, ASA, ETOH, Other)
•Infectious   (Meningitis, Encephalitis, Sepsis)
•Metabolic   (Thyroid, Hypoglycemia, Drug Withdrawal, Hypoxemia, Electrolytes)
•CNS Vascular and Other   (CVA, TIA, Seizure, Trauma)
•Other Unstable Comorbidities   ☐cleared medically for psych referral

Discussed with Dr._____
will see patient in:   office / ED / hospital
_Counseled patient / family regarding:
lab results   diagnosis   need for follow-up
_Rx given   _Admit orders written

CRIT CARE- 30-74 min
75-104 min _____ min
_Prior records ordered /
reviewed
_Additional history from
family   caretaker   paramedics

## CLINICAL IMPRESSION:
Ethanol Intoxication   Psychosis   Schizophrenia- acute exac
Depression   Drug Overdose( Intentional/ accidental)
major   manic   Suicide Attempt/ Ideation

DISPOSITION-   ☐home   ☑admitted   ☐transfer
Time
CONDITION-   ☐ unchanged   ☑ improved   ☐ stable

RESIDENT / PA / NP SIGNATURE

ATTENDING NOTE:
_Resident / PA / NP's history reviewed, patient interviewed and examined
Briefly, pertinent HPI is:_____
My personal exam of patient reveals:_____
Assessment and plan reviewed with resident / midlevel. Lab and ancillary
studies show:_____
I confirm the diagnosis of:_____
_Care plan reviewed. Patient will need._____
Please see resident / midlevel note for details

ATTENDING PHYSICIAN SIGNATURE

☐ Template Complete

11/19/2004
15 25

Metroplex Hospital
2201 S Clear Creek Road
Killeen, TX 76549

AUTO RESULT REPORT
PAGE 1

NAME ████████
H# · 000294227          LOC· ER      ROOM:          AGE: 16Y      SEX: M
HOSP.  ID: MET
ACCT. 1049766           DR:  CASHON, MEDFORD III,CODE: 01187

F25892     COLL: 11/19/2004 14:00 REC: 11/19/2004 15:14 PHYS: CASHON, MEDFORD III

Drug Screen, Urine
   Amphetamines,Urine        * Positive        [NEG]
   Barbituates,Urine           Negative        [NEG]
   Benzodiazapine,Urine        Negative        [NEG]
   Cocaine,Urine               Negative        [NEG]
   Opiates,Urine               Negative        [NEG]
   Phencyclidine,Urine         Negative        [NEG]
   THC,Urine                   Negative        [NEG]



# METROPLEX HEALTH SYSTEM

## DISCHARGE INSTRUCTIONS

These will help you care for yourself after your visit to the Emergency Room. *Please do not throw them away until you are better.* If you have any questions about these instructions or your care, please call the Emergency Room at (254) 519-8103 or (512) 556-3682 Ext. 275.

### ☐ CUTS & SCRAPES
- Keep wound clean & dry for next 24 hours. Leave bandage on for 1 day unless told differently
- On the second day, use mild soap & water or hydrogen peroxide with equal parts water to keep wound clean. Clean whenever dirty and let dry. You should do this even when you have stitches or staples
- The cleaner your stitches, the easier it will be to take them out
- RETURN to be re-checked if you have more pain, swelling, redness, streaking, or pus.
- Your stitches or staples should be taken out in _____ days

### ☐ SPRAINS & STRAINS
- Use pillows to keep injured part above level of heart
- Use an ice pack for first 48 hours. This will help reduce pain
- If an ace wrap was applied, it needs to be taken off and put back on every 8 hours until swelling and pain is gone
- Loosen the ace if you have any numbness or tingling and put back on more loosely

### SPLINTS & CASTS
- Use pillows to keep injured part above level of heart
- Use an ice pack for 24 hours.
- Let splint/cast to air dry for 48-72 hours
- Do not stand or walk on splint/cast.
- Do not rest cast on hard or sharp objects for first 48 hours
- Return to the Emergency Room if
  a) Fingers or toes are numb, tingly, or difficult to move
  b) Fingers or toes are blue or pale
  c) Cast gets very tight
  d) Severe, steady, or greater pain

### ☐ FLUID INTAKE
- Drink 5-12 full glasses of water a day
- Clear liquids for 12-24 hours
- Start taking small amounts of liquids every 10-15 minutes to keep from getting sick to your stomach. Do this for 1-2 hours. If you feel better, then you may drink fluids when needed to keep from getting dehydrated

### ➡ Your Prescription:

Neg drug screen

Your medicines may cause you to feel sleepy. DO NOT drive or use any machines while taking this medicine.

☐ It is not safe to drink any alcohol while taking this medicine.

☐ You have been given antibiotics. You need to take them as directed until they are all gone in order to get well

☐ If you are given a penicillin based antibiotic and are using birth control pills, you must use another form of birth control (condoms, foam) while taking the medicine in order to prevent pregnancy. You should not drink beer while taking penicillin.

☐ A tetanus shot may cause redness, swelling, sore arm, or low fever. You may take Tylenol to make you feel better. This immunization will protect you for up to 5 years.

☐ Always ask your pharmacist to go over your medicines with you when you get them filled

☐ Never take any one else's medicine or give your child another child's medicine even if they are from the same family

### ACTIVITY
☐ No restrictions
☐ Up to bathroom only
☐ Bed rest for _____ days
☐ No lifting over _____ pounds
☐ Do not drive any type of vehicle for _____ days

### INSTRUCTION SHEETS
☐ Abdominal pain
☐ Anxiety, panic attacks, hyperventilation
☐ Back and neck pain
☐ Bladder infection, kidney stones
☐ Burns
☐ Chest pain, costochondritis
☐ Conjunctivitis, corneal abrasion
☐ Fever (tylenol/motrin dosing)
☐ Fracture _____
☐ Headaches
☐ Head injuries
☐ Impetigo, diaper rash
☐ Nose bleeds, sinus infection
☐ Otitis media/externa (ear infections)
☐ Pelvic pain and infection
☐ Poison ivy, contact dermatitis, hives
☐ Scabies, crabs, pin worms, lice
☐ STD
☐ Threatened miscarriage
☐ URI, sore throat, colds
☐ Vomiting & diarrhea in adults
☐ Vomiting & diarrhea in children
☐ Other _____

### FOLLOW UP CARE
☐ Make appointment with doctor if not improved in _____ days
☐ You will be called if your cultures or x-rays are not normal AND you need more treatment or medicine
☐ Return to the Emergency room in _____ days for recheck
☐ Return to the Emergency Room if you have more pain, high fever, trouble breathing, feel faint, coughing up blood, are unable to stop vomiting and can't take fluids or medicine, or if you feel much worse in any way

### ACKNOWLEDGEMENT OF INSTRUCTIONS
The staff has gone over my instructions with me and I have been given a copy of my instructions. I understand that I have been given emergency treatment only. I am responsible for my own follow-up care and treatment as listed on my instructions.

Pt _____

Nurse _____

Time 1600     Date 11-19-04

#900382

89

|---|---|---|---|---|---|
| Application of Ace Wrap, Sling & C-Collar, taping and post-op shoe (Do not use when reducing, splinting or dressing) | 3 | Personal Hygiene/Bathroom Assist | 2 | ER Level 1 Triage only | 330-5315 |
| Cardiac Monitoring (Order Required) | 4 | Postmortem Care | 8 | ER Level 1 Follow-up | 330-5316 |
| Decontamination - Simple | 5 | Restraint Management/Combative Patient | 5 | ER Level 1 Basic (No points or procedures) | 330-5226 |
| Decontamination - Complex | 6 | Ring Cutter | 2 | ER Level 2 (No points with procedure) Procedure only | 330-5309 |
| DOA | 5 | Seizure Observation/Care | 4 | ER Level 2 (1-2 points) | 330-5309 |
| Drug Screen/Chain of Custody | 2 | Sexual Assault/Rape Kit | 5 | ER Level 3 (3-6 points) | 330-5261 |
| Eye Exam /Tray set up | 2 | Specimen Collection - Urine, Stool, Sputum, Etc (Not including blood drawing.) | 2 | ER Level 4 (7-10 points) | 330-5262 |
| Emotional Care | 4 | Suctioning | 2 | ER Level 5 (11+ points) | 330-5283 |
| Enema Administration/Rectal Disimpaction | 3 | Surgery Consult | 3 | ER Level 6 (Critical Care) | 330-5264 |
| Fetal Heart Tones | 2 | Tracheal Care | 2 | | |
| Icepack | 1 | Transfer to another Acute, Rehab, Behavioral Hospital | 5 | Total Points : 4 | |
| Isolation Care/Precautions | 4 | Transfer/Return to Nursing Home or Other | 3 | | |
| IV – Preexisting | 2 | Transport to Floor by ER with Monitor | 5 | | |
| IV Insertion - Uncomplicated | 3 | Transport to Floor by ER without Monitor | 3 | | |
| IV insertion - Complicated | 4 | US/CT/X-ray with Nurse Accompaniment | 4 | | |
| Neuro Checks (3 or more) | 3 | Visual Acuity Testing | 2 | | |
| Newborn Care (cord care, warmer, etc.) | 8 | Vital Signs - Frequent (3 or more excluding Orthostatic signs) | 2 | | |
| Order Entry (1) including Med orders | 2 | Vital Signs - Orthostatic | 1 | | |
| Order Entry (2) including Med orders | 2 | Wound Dressing, Cleaning, & Irrigation – Simple (Not Repaired) | 2 | | |
| Order Entry (3) including Med orders | 3 | Wound Dressing, Cleaning, & Irrigation- Complex (Not Repaired) | 3 | | |
| Order Entry (4 +) including Med orders | 4 | | | | |
| Oxygen by Cannula or Mask | 1 | | | | |

This form is to be used to determine the "ED Service Level" of care provided to the patient.

In addition to the ER Service Level Visit charge, all procedures performed on/for the patient should be charged

Only one ER Service Level is to be charged for each episode of care

Level 1 Patients are those that have no points and no procedure charges.

Level 2 patients are those that either have no points but have a procedure billed on the ED charge sheet or that are assigned 1 - 2 points with or without a procedure

Level 6 (Critical Care) patients are assigned using the definitions contained in the charge capture guidelines of this document. Points are not assigned to these patients

## METROPLEX HEALTH SYSTEM

ER LEVEL POINT SHEET MH

Stock # 900560

MH 560 Rev 02/04, 09/04

EDLVCGHS

90

# METROPLEX HOSPITAL/ROLLINS BROOK COMMUNITY HOSPITAL/METROPLEX PAVILION

CONSENT IS GIVEN TO METROPLEX HOSPITAL RBCH METROPLEX PAVILION ITS CONTRACTORS, AND ITS EMPLOYEES TO PROVIDE SERVICE AND ADMINISTER PHYSICIAN ORDERS. CERTAIN PROCEDURES REQUIRE A SEPARATE CONSENT. THE PHYSICIAN IS RESPONSIBLE FOR EXPLAINING THE PROCEDURE.

I IRREVOCABLY AUTHORIZE THAT MY INSURANCE BENEFITS BE PAYABLE DIRECTLY TO THE HOSPITAL PHYSICIAN CONSULTANT ON MY BEHALF. I UNDERSTAND THAT I AM RESPONSIBLE FOR MY DEDUCTIBLES AND CO-PAYS AND NON-COVERED CHARGES. I UNDERSTAND IT IS MY RESPONSIBILITY TO SATISFY CONTRACT REQUIREMENTS CONCERNING PRE-CERTIFICATION AND SECOND OPINION. I UNDERSTAND THAT PAYMENT IN FULL IS DUE AT TIME OR SERVICE.

I CONSENT TO THE RELEASE OF INFORMATION FROM MY MEDICAL RECORD AS NECESSARY FOR THE COLLECTION OF THIS HOSPITAL ACCOUNT. I ALSO UNDERSTAND THAT I AM RESPONSIBLE FOR THE PAYMENT FOR REASONABLE ATTORNEY FEES AND COLLECTION EXPENSES IF REQUIRED FOR THE COLLECTION OF THIS ACCOUNT.

I CERTIFY THAT THE INFORMATION GIVEN TO ME IN APPLYING FOR PAYMENT UNDER TITLE XVIII AND/OR TITLE XIX OF THE SOCIAL SECURITY ACT IS CORRECT. I AUTHORIZE THE HOLDER OF MEDICAL AND OTHER INFORMATION ABOUT ME TO RELEASE TO THE SOCIAL SECURITY ADMINISTRATION OR ITS INTERMEDIARIES ANY INFORMATION NEEDED FOR THIS OR RELATED MEDICARE AND/OR MEDICAID CLAIM. I REQUEST PAYMENT OF AUTHORIZED BENEFITS BE MADE ON MY BEHALF. I ASSIGN THE BENEFITS PAYABLE TO THE BILLING ENTITY AND AUTHORIZE SUBMISSION OF A CLAIM ON MY BEHALF TO MEDICARE MEDICAID.

WHEN YOU USE THE SERVICES OF METROPLEX HOSPITAL RBCH METROPLEX PAVILION YOU WILL RECEIVE AT LEAST TWO BILLS FOR EACH SERVICE.

TECHNICAL SERVICE
METROPLEX HOSPITAL PROVIDES THE NURSES TECHNICIANS, EQUIPMENT AND SUPPLIES FOR YOUR SERVICE

PROFESSIONAL SERVICE
YOUR PHYSICIAN WILL BILL FOR HIS SERVICE. THE EMERGENCY ROOM PHYSICIAN SUPERVISES YOUR VISIT BY DETERMINING THE COURSE OF TREATMENT ORDERING TESTS AND PROVIDING INSTRUCTIONS FOR RELEASE OR ADMITS TO THE HOSPITAL. THE PATHOLOGIST SUPERVISES INTERPS YOUR LABORATORY TESTS AND IS AVAILABLE FOR CONSULTATION WITH YOUR PHYSICIAN. THE RADIOLOGIST SUPERVISES INTERPS YOUR X-RAY AND IS AVAILABLE FOR CONSULTATION WITH YOUR PHYSICIAN. IF YOU HAVE SURGERY THE ANESTHESIOLOGIST SUPERVISES AND REGULATES THAT PORTION OF YOUR CARE. NEITHER THE EMERGENCY ROOM PHYSICIAN PATHOLOGIST RADIOLOGIST NOR ANESTHESIOLOGIST NOR YOUR PRIVATE PHYSICIAN ARE EMPLOYEES OF THE HOSPITAL AND WILL BILL SEPARATELY FOR THEIR PROFESSIONAL SERVICE.

## WRITTEN ACKNOWLEDGEMENT OF RECEIPT OF METROPLEX HEALTH SYSTEMS NOTICE OF PATIENT PRIVACY PRACTICES

By signing this written acknowledgement of receipt of Metroplex Health Systems (MHS) Notice of Patient Privacy Practices (NPPP) ("Acknowledgement") I hereby expressly acknowledge my receipt of MHS NPPP.

Acknowledgement NOT obtained because:____ Patient or legal representative declined ____ Other (describe)_____

Data required by the Privacy Act of 1974. Legal authority for the personal information including the Social Security Number required on this Form is 44 USC 3101 41 CFR et seq. and 10 USC 1079 and 1086. The principal purpose of this information is to evaluate eligibility for civilian health benefits authorized by 10 USC Chapter 55 and to issue payment upon the establishment of eligibility and determination that the medical care verification with the appropriate Uniformed Service. The Office of the Civilian health and Medical Program of the Uniformed Services and CHAMPUS (Tricare) contractors use the information to control and process medical claims for payment for control and approval of medical treatment and interface with providers of medical care to control and accomplish reviews of utilization for review to Peer Review Committees or similar professional review organizations to control and review providers medical care, for control to third party contracts without the consent of the individual to whom the information pert. in situations where the party to be connected has or is expected to have information necessary to establish the validity of evidence or to verify the accuracy of the information presented by the individual concerning eligibility for benefits under CHAMPUS CHAMPVA TRICARE the amount of benefit payments and review of suspected abuse or fraud, or any concern for the programs integrity. For the issuance of deductible certificates. To respond to inquiries from Congressional offices made at the request of the individual covered by the system. For referral to the Secy. of the Dept. of Health Education and Welfare and/or the Administrator of the Veteran's Administration consistent with their statutory administrative responsibilities under CHAMPUS CHAMPVA TRICARE, for referral to the Department of Justice and/or foreign law enforcement agencies for investigation and possible criminal prosecution and for the referral to the Department of Justice for representation of the Secy. of Defense in civil actions. The information must be provided if the patient/beneficiary sponsor desires to have a portion of the charges paid by the government. Failure to provide information will result in denial of or delay in payment of the claim.

Code of Laws 18 USC 287 and 1001 provide for knowingly submitting or making any false, fictitious or fraudulent statement or claim in any manner within the jurisdiction of any department or agency of the United States. Examples of fraud include situations in which ineligible persons knowingly use an authorized identification card or in filing of a CHAMPUS CHAMPVA TRICARE claim or where a beneficiary/patient sponsor fails to disclose other medical benefits or health insurance coverage.

* * * * * * * * * * * * * * * * * * * * * * * * *

COMPLETE THIS SECTION FOR INPATIENT AND OBSERVATION PATIENTS.
RESPONSIBILITY FOR VALUABLES. It is understood and agreed that the hospital maintains a safe for safekeeping of money valuables and further than the hospital shall not be liable for the loss damage of such money valuables unless deposited with the hospital for safekeeping.

PATIENT RIGHTS. I have received information regarding Right and Responsibilities of Patients and the Patient Self-Determination Act
ADVANCE DIRECTIVE. I do ___ do not have a current Living Will ___ I do ___ do not have a current Durable Power of Attorney for Healthcare ___ I have ___ have not ___ will provide(d) a signed copy to Metroplex Hospital RBCH Metroplex Pavilion ___ I was provided information on Advance Directives
AN IMPORTANT MESSAGE FROM MEDICARE TRICARE. ACKNOWLEDGEMENT OF RECEIPT

A PHOTOSTATIC COPY OF THIS AUTHORIZATION SHALL BE CONSIDERED AS EFFECTIVE AND VALID AS THE ORIGINAL.
The undersigned certifies that he/she has read and understands the foregoing and is the patient or duly authorized to acknowledge the above and accept its terms

X _____  MOM  CLEO  11-19-04
Patient or authorized agent          Relationship    Witness    Date

ACCOUNT # _____  1049766

057    1049766

H57PBCOAM2

### PSYCHIATRIC DISCHARGE SUMMARY

**IDENTIFYING INFORMATION:**
J████ is a 16-year-old white male admitted with a history of shooting himself in the veins with crystal amphetamines at a friend's home and having breathing problems. The friend brought him to the emergency room. Refer to the psychiatric evaluation for details.

**LABORATORY FINDINGS:**
CBC with differential revealed low hematocrit at 41.7%, (42 to 52), MCH at 29.9 pg (30 to 34), segs at 38.1%, elevated eosinophils at 9.2%, and basophiles at 1.7%. Comprehensive metabolic panel revealed slightly low total proteins at 6.1 gm/dl (6.4 to 8.2) and elevated SGOT at 38 units/lt (15 to 37). Urine drug screen was positive for amphetamines and THC. Urinalysis within normal limits. RPR nonreactive. Thyroid panel within normal limits.

**HOSPITAL COURSE:**
Concerta was discontinued and no medications were given during his stay here. He said his parents told him that if he does not change he may end up in jail or be dead and had encouraged him not to use drugs but he ignored them. We reiterated the same issues and gave his packets of drug education as assignments. He had no remorse for his behaviors and no motivation to changes. He was euthymic with a blunted affect. He denied suicidal or homicidal ideation. We reviewed the after-care plans. His parents wanted him to be assessed at Shoreline for possible drug rehab admission there. He denied depressive feelings, moods swings, auditory or visual hallucinations or paranoid delusions and was discharged to his parents to be taken to Taft, Texas where he will be assessed by Shoreline Facility for admission to the drug rehab program.

**DISCHARGE DIAGNOSIS:**
AXIS I:
1. Stimulant induced psychosis.
2. Stimulant abuse.
3. Cannabis abuse.
4. Attention deficit hyperactivity disorder, combined type by history.
5. Oppositional defiant disorder.
6. Anxiety disorder not otherwise specified.
AXIS II:
None.
AXIS III:
None.

| | |
|---|---|
| Admit: 06/21/2004 | Patient Name: ████, J████ S |
| Disch: 06/26/2004 | MR#: 294227    Acct#: 1008423 |
| Sex: M  Age: 16Y | Dictating: Vijayababu Jampala, MD |
| Room:  Pt Type: P | Attending: JAMPALA, VIJAYABABU, MD |

ORIGINAL

Page 1 of 2

AXIS IV:
Severe - problems with primary support system, peer relationship problems, school problems and legal problems.
AXIS V:
GAF 50.

RECOMMENDATIONS:
1. He is on no medications.
2. He is being discharged to the parents with recommendations to be assessed by the Texas Commission on Alcohol and Drug Abuse in Killeen, Texas for follow-up rehab programs. The parent were also given the name and the number for the Shoreline Drug Rehabilitation Program in Taft, Texas where the parents plan to take the patient for assessment for the inpatient drug rehabilitation program.

Vijayababu Jampala, MD

VJ/uw
D: 07/26/2004
T: 07/27/2004 11:26:58 E.T.
E: 07/27/2004 11:26:58 E.T./uw
Job #: 163760   Doc #: 2327224
CC:
C.T. = Central Time / E.T. = Eastern Time

| | | | |
|---|---|---|---|
| Admit: 06/21/2004 | Patient Name: ███, J████ S | | |
| Disch: 06/26/2004 | MR#: 294227 | Acct#: 1008423 | |
| Sex: M  Age: 16Y | Dictating: Vijayababu Jampala, MD | | |
| Room:  Pt Type: P | Attending: JAMPALA, VIJAYABABU, MD | | |

ORIGINAL

Page 2 of 2

**PSYCHIATRIC DISCHARGE SUMMARY**



METROPLEX
HEALTH SYSTEM
*Pavilion*

Nursing Admission Summary

1008423   M   W V 000294227
█, █████ S
JAMPALA, VIJAYABABU, MD
900B    6/21/04     016Y I
5/13/88
ADDRESSOGRAPH

## MEDICAL ISSUES SUMMARY

## INTERVIEW SUMMARY

*[handwritten text, largely illegible]* ... male admitted to acute care service of Dr. Jampala ... diagnosis R/O Epilepsy, ODD, polysubstance abuse. Pt is cooperative and accompanied by parents, states "I'm here because of drugs." Parents confirm they were concerned ... has come home four out of five ... and pt hallucinating ... telling mom there were dead mice all over the house which were in reality dust balls, that pt later admitted to using crystal meth ... and that the pt ... had an adverse reaction ... pt refused evening meal. Parents report pt has ... history of drug use ... previous charges of "minor under the influence" and had been required to do community service as well as take classes on drug use. Pt is reported to be "intelligent" with history of skipping school, passing tests but making no effort on homework. Placed on Q15 min checks for safety.

Completed by *[signature]*          Date/Time 6/21/04 1720

# METROPLEX PAVILION MENTAL HEALTH
## NURSING ASSESSMENT

Patient Name ████ ████ D████
    Last            First      Middle          Date of Birth: 5/13/88

Age 16 yrs    Sex: (M) F    Race: C    Marital Status (S) M D W (circle one)

Type of Admission: X Voluntary    _____ Involuntary

Pending Legal Charges. (No) Yes _____

Date of Admission: 6/21/04    Time: 1615    a.m (p.m.)

Accompanied by: Juanita + Kevin May    Relationship to Patient: mom + dad

Mode of transportation: family car

(Ambulatory)/Non-Ambulatory: _____

Reason for Admission (precipitating event): *Continued problems i drugs + poor choices. Over weekend had accepted meth + marijuana. "Got high i his friends when parents out of town." "4th a 5th drug incident" "are least 5 months not keep family rules + his friends was like they are cut." "One of his friends overdosed" while pt i friend. His friends i his friend revealed he was gasping pain + forced put him in hot shower to warm him up + fun — took to nurse treatment + cola + watched him throughout night. Next day mom could tell he was under influence of drugs + talk i about love more all over [illegible]*

| Current Medications (include OTC) | Dosage | Route | Times | Classification |
|---|---|---|---|---|
| Concerta | 10 mg | po | 8 am | Stimulant |
| pt states did not take over weekend | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Disposition of Meds    Sent Home with Family _____    Allergies (Meds) amoxicillin
    Sent to Pharmacy _____
    None    X

Label

1008423    M    W V 000294227
M██, J████    S
JAMPALA, VIJAYABABU, MD
900B    6/21/04    016Y I
    5/13/88

95

MP 374 rev 1/03

# REVIEW OF SYSTEMS

**VISION:**
___X_ Glasses  _____ Contacts  _____ Cataracts  _____ Glaucoma  _____ Diplopia
_____ Pupils  _____ Blurring  _____ Eye Surgery (When) _____
_____ WNL  Comments _____

**SPEECH:**
_____ Speech Impairment  _____ Slurring  _____ Difficulty Expressing  _____ Language Barrier
_____ Pressured
__X__ WNL  Comments _____

**HEARING:**
_____ Pain  _____ Limited  _____ Right  _____ Left  _____ Tinnitus  _____ Discharge
_____ Hearing Aid  _____ Ear Infections  _____ Tubes
__X__ WNL  Comments _____

**RESPIRATORY:**
_____ Pain  _____ Dyspnea  _____ Cough  _____ Sputum/Color  _____ Sinusitis
_____ Epistaxis  _____ Apnea  _____ Frequent Colds  _____ Shortness of Breath
_____ Smoking Type _____ Amount _____
_____ Asthma  _____ Breath Sounds (Describe) _____
__X__ WNL  Comments _had a flare up past, flare up around colds_

**CARDIAC AND CIRCULATORY:**
_____ Chest Pain  _____ Hypertension  _____ Hypotension  _____ Congenital Heart Disease
_____ Pacemaker (Date) _____ Heart Disease
_____ Surgeries (Date & What) _____
_____ Heart Attack (Date) _____ Numbness (Location) _____
_____ Edema (Location & Measure) _____
__X__ WNL  Comments _____

**GASTRO-INTESTINAL:**
_____ Nausea  _____ Vomiting  _____ Bowel Sounds  Last BM _____
_____ Laxative Usage  _____ Constipation  _____ Diarrhea  _____ ABD (Soft / Hard / Distended)
_____ Gerd  _____ Hemorrhoids  _____ Eating Disorders
__X__ WNL  Comments _____

**URINARY:**
_____ Incontinence  _____ Stress Incontinence  _____ Burning  _____ Color  _____ Odor
_____ Frequency  _____ Nocturia  _____ Hematuria  _____ Flank Pain  _____ History UTI's
__X__ WNL  Comments _____

**NEUROLOGICAL:**
_no_ Seizures  _____ Paralysis  _____ Paresthesia  _____ Weakness  _____ Sensory Limitations
_no_ Loss of Consciousness (Explain) _____
_____ Headaches  _____ Tremors  _____ Stroke  _____ Surgery  _yes_ Head Injury
_____ Dizziness  _____ Neurological Testing YES / NO When/Where? / _____
_____ WNL  Comments _fell off swing @ day care about a year_
_and had to have stitches_

**PAIN:**
Primary Site _____  How Long? _____
Relieved by OTC/Prescribed Meds. _____
What/How Often Taken? _____
Pain Scale  LOW  1  2  3  4  5  6  7  8  9  10  EXTREME
Comments _____

**FUNCTIONAL SCREEN:**
_____ Limited ROM/ADL's  Explain _____
_____ Contractures (Location) _____ Redness/Swelling
_____ Bone/Joint Problems _____ Falls/Or History _____ Prosthesis _steady_ Gait
_____ Assistive Device Type _____
_____ Newly Identified CVA or Head Trauma  _____ New Weakness or Paralysis
__X__ WNL  Comments _____
If any of the above is present, request rehab screen

1008422  V 00029422
VIJAYABABU, MD
900B  6/21/04  016Y  I
5/13/88

96

MR 314 rev. 1/03

**REPRODUCTIVE FEMALE:** _____ Onset of Menstruation _____ Problems
_____ LMP _____ Discharge/Infection
_____ Last Mammogram _____ _____ Regular Self Breast Exam _____ _____ Hysterectomy
_____ Birth Control (Type) _____ Last Pap Smear (date) _____
_____ Pregnancies (dates) _____ Menopause
Sexual Preference _____ Male / Female _____ Sexually Active Yes / No _____ History of STD's Yes / No
Comments _____

**REPRODUCTIVE MALE:** _____ Discharge _____ Lesions _____ Infection _____ Birth Control
Sexual Preference Male (Female) _____ Sexually Active Yes / No _____ History of STD's Yes / No
Comments _____

**NUTRITIONAL:** Adult/Adolescent Screening
_____ Unintentional weight loss ≥ 5% of usual body weight within the last month
_____ Admission Diagnosis including Anorexia, Bulimia, Malabsorption, Malnutrition (circle)
Child Screening
_____ Unintentional weight loss ≥ 5% of usual body weight within the last month
_____ <10% percentile weight for height
Upon admission, if patient meets one or more of the above high-risk categories, request nutritional referral
_____ Food Allergies (List) _____
_____ Nutritional Referral Yes / No
_____ WNL Comments _____

**SKIN:** _____ Color _____ Rash _____ Cysts _____ Inflammation _____ Needle Marks _____ Diaphoresis
_____ Lesions _____ Psoriasis _____ Eczema _____ Scabies _____ Lice _____ Ring Worm
_____ Diaphoretic _____ Turgor: Good / Fair / Poor _____ Dry _____ Warm _____ Cool _____ Cold
✗ WNL Comments _____

**SLEEP:** _____ DGA _____ MNA _____ EMA _____ Insomnia _____ Hypersomnia _____ Nightmares _____ Naps
Number of Hours of Sleep/Night _____ Sleep Aids (Name) _____
Recent Changes _____ _____ No Problems
Comments poor sleep "would rather stay up all night & sleep all day" has gone as long as 72 hrs Ē sleep

**HOSPITALIZATION AND SURGERIES:** _____ Hospitalizations/Surgeries (dates & reason): _____
_____ Psychiatric Hospitalization If yes, did you require restraint/seclusion? Explain _____
Adult Would you like family notified about restraint/seclusion? Yes / No

**SUBSTANCE ABUSE:** _____ Alcohol _____ Prescription Meds _____ LSD _____ Marijuana _____ Methadone
_____ Cocaine _____ Heroine _____ PCP _____ Stimulants _____ Inhalants
_____ Tobacco _____ Caffeine _____ Other (What?) ecstacy, crystal meth
Explain how long usage and how much 1st incident Jan 2003, was caught @
off school grounds Ē marijuana + charged Ē being under the
influence
Date of Last Use 6/9/05
History of Withdrawal (Yes)/ No Describe hallucinations
Family History of Drug Use (Who, What?) 2 aunts

**ABUSE/NEGLECT HISTORY:** _____ History of Sexual Abuse
_____ History of Physical Abuse
_____ History of Neglect
Describe _____

Label

# MENTAL STATUS EXAM

**PERSONAL APPEARANCE:** __X__ Appropriate _____ Well Groomed _____ Unkempt _____ Older / Younger (that stated age)
Comments _____

**MOOD:** _____ Dysphoria _____ Euphoria _____ Labile __X__ Anxious _____ Irritable _____ Calm
_____ Paranoid _____ Appropriate
_____ Anger (How do you handle anger. Explain) _____
Comments _____

**PSYCHOMOTOR BEHAVIOR:** __X__ Coordinated _____ Hyperactive _____ Erect Posture _____ Agitated _____ Uncoordinated
_____ Slumped _____ Grimaces/Tics
Comments _____

**AFFECT:** _____ Constricted __X__ Flat _____ Tearful _____ Sad _____ Angry _____ Appropriate
Comments _____

**THOUGHT PROCESS:** __✓__ Orientation _____ Time _____ Place _____ Person _____ Logical _____ Illogical
_____ Circumstantial _____ Tangential _____ Loose Associations _____ Flight of Ideas
_____ Delusional _____ Ideas of Reference _____ Paranoid Ideation _____ Preoccupied
_____ Difficulty Concentrating _____ Confused _____ Grandiose _____ Appropriate
Comments _____

**HALLUCINATIONS:** _____ Visual _____ Tactile _____ Auditory _____ Olfactory _____ Command
_____ Gustatory _____ None
Comments _hallucinating from drugs two._

**HOMICIDAL/ SUICIDAL HISTORY:**

1. Past history of suicide/homicidal attempt (by plan) _NW_
2. Date of attempt _NA_ __X__ Yes __X__ No  Who? _____
3. History of suicide in nuclear and/or extended family __X__ Yes __X__ No  If yes, where? _____
4. Self-inflicted burns / wounds present _____ Yes __X__ No
5. History of frequent accidents
   Comment _____
6. History of self-mutilation _____ Yes __X__ No
7. History of restraint usage YES / (NO) Explain: _____

PRESENT SUICIDAL POTENTIAL (Explain any checked items)
_____ No evidence of suicide/homicidal thought or history
_____ Rumination
_____ Current express intent
_NO_ Other violence (i.e., cruelty to animals, fire-setting, etc )
Comments _____

**MEMORY:** _____ Poor Short Term _____ Poor Long Term __X__ Intact

Label

1008423   M   W  V  000294227
M___, _____
JAMPALA, VIJAYABABU, MD.
900B     6/21/04     016Y   I
5/13/88



# PSYCHOSOCIAL DATA

**OCCUPATIONAL STATUS:**
_____ Disabled _____ Menial _____ Physical
_____ Full Time / Part Time Employment (Where?) _____
_____ Unemployed __X__ Student
Are living arrangements satisfactory?    Yes / No
Religious Preference / Needs _____
Comments _____

**PRENATAL AND CHILDHOOD DEVELOPMENT:**
_____ Birth Trauma _____ Complications During Pregnancy
Developmental Delay: _____ Motor _____ Speech _____ Other
Learning Disability _____
Immunization Status _up to date_ , _diagnosed ADHD_
Childhood Illness _____
__X__ WNL    Comments _____

**EDUCATIONAL NEEDS:**
Primary Language _English_                    _____ Limited Education Background
_____ Reading or Writing Problems _____ Speech / Language Barrier
_____ Motivated Learner _____ Special Education
_____ WNL    Comments _regular classes, likes to skip, gets good grades in tests but doesn't turn in homework, no class participation_

**RECENT LOSSES:**
_____ Health _____ Job _____ Divorce _____ Death of Loved One
_____ Disruption in Lifestyle    Other: _Aunt was in Kuwait + parents 2003, came_
Comments _back Feb 2004, was there due to drug problems_

**HOBBIES & LEISURE ACTIVITIES:**
_drawing_
_car enthusiast_

**PATIENT'S IDENTIFIED STRENGTHS:**
_intelligent_
_artistic_

**PATIENT'S GOALS OF TREATMENT:**
_make better decisions, be responsible_
_no more drugs that are illegal_

**DISCHARGE SUMMARY PLAN:**
DISCHARGE TO WHOM: SELF / PARENT / GUARDIAN / SIGNIFICANT OTHER
_home i parents_
_are open to drug rehab or drug treatment_

Source of Information _Juanita & Kevin May_    Relationship to Patient _mom + dad_

Upon assessment, if the patient requires a referral, notify the appropriate department:

| DEPARTMENT | TIME NOTIFIED | STAFF SIGNATURE |
|---|---|---|
| Nutrition Therapy | | N/A |
| Physical Therapy | | |
| Occupational Therapy | | |
| Speech Therapy | | |

_signature_ , RN    6/21/04
RN Signature                     Date

Label

137d/rev 1/03

# Metroplex Pavilion Integrated Progress Notes

1008423   M   W  V  000294227

JAMPALA, VIJAYABABU, MD
900B    6/21/04    016Y   I
                   5/13/88

**DATE/TIME OF ENTRY - DOCUMENT EACH SHIFT TO INCLUDE**
  All signs/symptoms, interventions, evaluation

| DATE | TIME | SRVC | PROGRESS NOTES |
|------|------|------|----------------|
| 6/8/04 | 5:31 | 7a/RN | Met with (Mo) and adoptive (Fa) per RN. This is (Pt's) 4th drug experiment Bio Fa had psy hospitalization when reason Bio (Fa) mood swings and had delusions — "told lies that actually believed." M 66F sexual. Contains Mo's sister child — schizophrenia. Mo Biol ... Note that (Pt) periodically has times when up all night up to 72 hours at a time. Also note that when pt 2y to 5.6y. at times stayed in home of man who later convicted of child molestation of mans own son and another male child. (Pt) has made no outcry of sex abuse. ... Information given to parents regarding effects of drugs dealer TOM (No last name) who lives on Rock Street in Parker Heights down street from Police station with Blue and white suburban and a Camper in the Drive way — Phone # 755-4691 ... |
| 6/8/04 | 5:47 | 9a/RN | (Pt) minimal input in group when asked question about drugs (Pt's) response "What you asking me for?" Reminded (Pt) responded "Don't care." (Pt) said he told next time caught using drugs will go to jail. (Pt) said he didn't care what people think. (Pt) ... ... — little input |

Ordering Physician: JAMPALA, VIJAYABABU, MD

Patient: M█████████

Physicians:

JAMPALA, VIJAYABABU, MD

Admit Date: 06/21/2004   Discharge Date: 06/26/2004

Location: 9A        Room: 9A0904-A
Case #: 1008423
Med Rec#: 000294227

**************************************** Hematology ****************************************

| TEST UNITS LO-HI | WBC x10'3/uL 4.0-12.0 | RBC x10'6/uL 4.7-6.1 | HGB g/dL 14.0-18.0 | HCT % 42.0-52.0 | MCV fL 80-94 | MCH pg 30-34 | MCHC g/dL 32-36 | MPV fL |
|---|---|---|---|---|---|---|---|---|
| 06/22/04 0515 | 8.0 | 4.83 | 14.4 | 41.7L | 86.3 | 29.9L | 34.6 | 9.4 |

============================================ Hematology ============================================

| TEST UNITS LO-HI | RDW % 11.5-13.5 | PLT x10'3/uL 140-450 | DTYPE | SEGS % 40-75 | LYMPHS % 15-50 | MONOS % 1-12 | EOS % 0-5 | BASOS % 0-1.5 |
|---|---|---|---|---|---|---|---|---|
| 06/22/04 0515 | 13.0 | 173 | AUTO DIFF | 38.1L | 44.9 | 6.1 | 9.2H | 1.7H |

**************************************** Chemistry ****************************************

| TEST ●TS █1 | Free t4 Index ug/dL |
|---|---|
| 06/22/04 0515 | 3 10 |

**************************************** Chemistry ****************************************

| TEST UNITS LO-HI | Sodium mEq/L 135-146 | Potassium mEq/L 3.5-5.3 | Chloride mEq/L 98-108 | CO2 mEq/L 21-32 | Glucose mg/dL 70-110 | BUN mg/dL 7.0-22.0 | Creat mg/dL 0.6-1.2 | Calcium mg/dL 8.5-10.1 |
|---|---|---|---|---|---|---|---|---|
| 06/22/04 0515 | 141 | 3.8 | 104 | 29 | 78 | 14 | 1.1 | 9.0 |

============================================ Chemistry ============================================

| TEST UNITS LO-HI | Bilirubin mg/dL 0 0-1.0 | Total Protein g/dL 6 4-8.2 | Albumin g/dL 3.4-5.0 | Alk Phos U/L 50-136 | SGOT (AST) U/L 15-37 | SGPT (ALT) IU/L 30-65 | T-3 Uptake % 25.0-41.0 | T4 ug/dL 4 5-12.1 |
|---|---|---|---|---|---|---|---|---|
| 06/22/04 0515 | 0.7 | 6.1L | 3.7 | 74 | 38H | 52 | 35.2 | 8.7 |

9A/ 9A0904-A

Ordering Physician: JAMPALA, VIJAYABABU, MD

Patient:     █ J█████ S                          Location: 9A        Room: 9A0904-A
Physicians:                                       Case #: 1008423
    JAMPALA, VIJAYABABU, MD                       Med Rec#: 000294227
Admit Date: 06/21/2004   Discharge Date: 06/26/2004

===================================== Chemistry =====================================

| TEST.        | TSH   |
|--------------|-------|
| UNITS        | uIU/L |
| LO-HI:       |       |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

06/22/04
    0515     0.78


************************** Drug Screen **************************

06/21/04
    1450   Drug Screen, Urine
           Amphetamines, Urine      * Positive     [NEG]
           Barbituates, Urine         Negative     [NEG]
           Benzodiazapine, Urine      Negative     [NEG]
           Cocaine, Urine             Negative     [NEG]
           Opiates, Urine             Negative     [NEG]
           Phencyclidine, Urine       Negative     [NEG]
           THC, Urine               * Positive     [NEG]


************************** Immunology **************************

| DATE<br>TIME: | 06/22/04<br>0515 | NORMALS | UNITS |
|------|------|------|------|
| RPR  | NON REACTIVE | NR | |


************************** Urinalysis **************************

| DATE<br>TIME | 06/22/04<br>0600 | NORMALS | UNITS |
|------|------|------|------|
| Color | Yellow | | |
| Clarity | Clear | | |
| pH | 5.5 | 5.0-9.0 | |
| Specific Gravity | >= 1.030 | 1.001-1 035 | |
| Glucose | Negative | NEG | mg/dL |
| Bilirubin | Negative | NEG | mg/dL |
| Ketones | Negative | NEG | mg/dL |
| Blood | Negative | NEG | /uL |
| Protein | Negative | NEG | mg/dL |
| Urobilinogen | 0.2 | 0.2-1.0 | mg/dL |

9A/ 9A0904-A

102

# AFFIDAVIT

Before me, the undersigned authority, personally appeared _____

_Melba Leanne Starkovich_ _____ who being by me duly sworn
                    (FULL NAME)

deposed as follows:

My name is _Melba Leanne Starkovich_ . I am of sound mind,

capable of making this affidavit, and personally acquainted with the facts herein

stated:

I am the custodian of the records of _Metroplex Hospital_

_2201 S. Clear Creek Rd Killeen TX 76549_
                    (NAME OF FACILITY AND ADDRESS)

Attached here are _124_ pages of records from the medical records of _____

██ █ █ █ █ █ █ ██ █ █ ██ █  ██ ██ ███
█ ██ █ █ █  ██ █ █ ██ -04
                    (ADMISSION AND DISCHARGE DATE)

These said pages of records are kept by said Hospital in the regular course of
business, and it was the regular course of business of said Hospital for an
employee or representative of said Hospital, with knowledge of the act, event,
condition, opinion, or diagnosis, recorded to make the record or to transmit
information thereof to be included in such record; and the record was made at or
near the time or reasonable soon thereafter. The record attached hereto are the
original of exact duplicates of the original.

_Melba Leanne Starkovich_
                    (SIGNATURE)

SWORN TO AND SUBSCRIBED before me on this _1_ day of _November_, ~~199~~ 2006.

_Lisa Lucas_
Notary Public in and for the STATE OF TEXAS

_Lisa Lucas_
                    (Printed Name)

My Commission Expires: _9-16-2007_

LISA LUCAS
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES
SEPTEMBER 16 2007

SEAL

LISA LUCAS
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES
SEPTEMBER 16

103

# THE STATE OF TEXAS

COPY

*** SUBPOENA - Duces Tecum ***

Cause No. 57558



To The Sheriff, Constable, or any Peace Officer of BELL County, said State, Greeting:

You are hereby commanded to summon:

CUSTODIAN OF RECORDS
METROPLEX HEALTH SYSTEM

Or Serve At:
RETURN TO DA'S OFFICE FOR SERVICE

to be and appear * * * * * INSTANTER * * * * * before the Honorable 264 District Court of Bell County, Texas, to be held at the Courthouse of said County, in Belton, Texas, then and there to testify as witness in behalf of the STATE OF TEXAS in a criminal action pending in said Court, entitled and numbered on the Criminal Docket of said Court, THE STATE OF TEXAS vs. THOMAS RAYMOND CARR, No. 57558, and therein remain from day to day, and from term to term, until discharged by due course of law.

Returnable INSTANTER.

HEREIN FAIL NOT, and make due return hereof, showing how you have executed the same. Witness my official signature, at Belton, Texas, this 30th day of October, A.D. 2006.

Shelia F. Norman, Clerk,
264 District Court, Bell County

By: _____ Deputy

Please contact the District Attorney's Office prior to appearance to avoid
an unnecessary trip to court. 939-3521 or 1-800-460-2355, ext. 5215.

NOTE "It is an offense for a person to intentionally influence or coerce a witness to testify falsely or to elude legal process. It is also a felony offense to harm or threaten to harm a witness or prospective witness in retaliation for or on account of the service of the person as a witness or to prevent or delay the person's service as a witness to a crime."

NOTICIA "Es delito intimar u obligar a un testigo a declarar con falsedad o a evadir el proceso judicial. Tambien es delito penal herir o amenazar con herir a un testigo, o a un testigo prospectivo, en represalia o a consecuencia de haber declarado en juicio o con el afan de impedir o demorar su comparecencia como testigo de un delito."

" DUCES TECUM TO BRING OR PRODUCE ANY & ALL MEDICAL RECORDS,INCLUDING ANY & ALL PSYCHIATRIC RECORDS,OF STEVEN GARCIA DOB.02/21/1990,CONCERNI NG EXAMINATION & TREATMENT OF STEVEN GARCIA FROM JUNE 19,2004 THROUGH PRESENT DATE "

Officer's Return

Came to hand the _10_ day of _October_ A.D. 2006, at _100_ o'clock _P_M, and executed by deliverying a copy of this SUBPOENA to _Roqde Frazier_ in person at _Monoplex Hospital_, on the _10_ day of _October_ 2006, at _245_ o'clock _P_M

Not executed as to the witness _____ for the following reasons

I actually and necessarily traveled _____ miles in the service of this Subpoena.

_____ Sheriff/Constable/Peace
Officer/Private Process

_Bell_ _____ County, Texas

FEES --Summoning Witnesses - $ _____
   Mileage ---------- _____
   Total ------------ $ _____

By: _____

104

## PSYCHIATRIC DISCHARGE SUMMARY

**IDENTIFYING INFORMATION:**
S████ is a 14-year-old Hispanic male who was admitted with a history of using drugs including methamphetamine, resulting in auditory and visual hallucinations and paranoid delusions on the night of admission. Refer to the psychiatric evaluation for details.

**LABORATORY FINDINGS:**
Psychological testing on 6-25-04 by Eugene Waters, Ph.D., revealed a psychotic disorder not otherwise specified and borderline personality traits. Refer to his report for further details.

CBC with differential revealed increased monocytes. Comprehensive metabolic panel revealed elevated alkaline phosphatase and bilirubin at 1.3 mg/dl (0 to 1). TSH within normal limits. Urine drug screen positive for THC and amphetamines. RPR nonreactive. Urinalysis revealed a small amount of bilirubin, trace ketones and protein with 2-5 red blood cells. EEG revealed normal sinus rhythm.

**HOSPITAL COURSE:**
He was maintained on no medications during his short stay here, as it was felt that his psychosis was the result of the drug abuse. He was alert, awake and more appropriate as the treatment progressed. Family therapy went well. He admitted to low esteem and depressive feelings. The guy who gave him drugs had reportedly threatened to kill him if he told anyone about who gave him the drugs. No cravings for drugs were seen. His lip abrasion was treated with peroxide. He needed nutrition supplements. He denies suicidal or homicidal thoughts, urges or plans or florid psychotic symptoms. He admitted that using drugs is wrong and that he would not repeat such a mistake again. We processed how drugs can be detrimental to his health and how they can cause mental status changes. At birth he had anoxia secondary to aspirations. He said he felt supported. He denied suicidal or homicidal thoughts, urges or plans and was discharged in stable condition to his mother. We gave him a drug package which he worked on in his therapy sessions.

**DISCHARGE DIAGNOSIS:**
AXIS I:
1. Psychotic disorder not otherwise specified.
2. Dysthymic disorder.
3. Stimulant abuse, episodic.
AXIS II:
Borderline personality traits.
AXIS III:
None.

| | |
|---|---|
| Admit: 06/22/2004 | Patient Name: G████, S████ |
| Disch: 06/28/2004 | MR#: 294254    Acct#: 1008534 |
| Sex: M  Age: 14Y | Dictating: Vijayababu Jampala, MD |
| Room.  Pt Type: P | Attending: JAMPALA, VIJAYABABU, MD |

ORIGINAL

105

CONFIDENTIAL

AXIS IV:
Severe - problems with primary support system, peer relationship problems.
AXIS V:
GAF 50.

RECOMMENDATIONS:
1. Consider antipsychotic medication in the future if he regresses to any psychosis, but at this point he does not need any medications.
2. He will be seeing Dr. Daheim on 7-6-04 for follow-up individual and family therapy.

Vijayababu Jampala, MD

VJ/uw
D   07/26/2004
T.  07/27/2004 10:18:34 E.T.
E.  07/27/2004 10:18:34 E.T./uw
Job #:  163748  Doc #:  2326622
CC:
C.T. = Central Time / E.T. = Eastern Time

Admit   06/22/2004   Patient Name: ███████ ███████
Disch   06/28/2004   MR#: 294254           Acct#: 1008534
Sex: M  Age: 14Y     Dictating: Vijayababu Jampala, MD
Room    Pt Type: P   Attending: JAMPALA, VIJAYABABU, MD

ORIGINAL                          Page 2 of 2

PSYCHIATRIC DISCHARGE SUMMARY

1010

## PSYCHIATRIC EVALUATION

### IDENTIFYING INFORMATION:

S████ is a 14-year-old Hispanic male in 8th grade at Liberty Hill Middle School. He lives with his mom, stepdad and 2 sisters 17 and 5. There is another 2 ½ old girl in the home.

### HISTORY OF PRESENT ILLNESS;

The patient reportedly used drugs on the night of admission including methamphetamine, resulting in auditory and visual hallucinations and paranoid delusions. He has been biting his lip and has an abrasion on his lower lip. He has had behavioral changes in the last 2 weeks and the parent blame a couple of friends. He has also been having strange body movements, talking to himself with animation and has been telling recent happening about his lifestyle in bits and pieces. He has also been making comments like, "Take my life, drowsy, hypocrite," etc., which has been getting worse. The mom is being reminded of the biological dad when she looks at him.

This admission was necessitated as the patient injected methamphetamine over the weekend and became psychotic with paranoid delusions, auditory and visual hallucinations, biting his lip and saying that he was in a fight. He was hallucinating and talking to the walls and boxes. No previous behavioral problems are reported. He claims he is seeing someone who has a mask and he cannot see her face.

### PAST PSYCHIATRIC HISTORY:
None.

### FAMILY PSYCHIATRIC HISTORY:
The mom is 7 months pregnant and feels that she cannot handle him and is scared for the safety of herself and the unborn infant. The stepfather of 10 years works at McLane. The biological father has been in prison for murder in California. The biological dad reportedly committed the crime while he was under the influence of drugs. The patient's last saw his biological father at age 5.

### DEVELOPMENT HISTORY:
He is the product of a normal pregnancy and had meconium with labor 45 minute long. He weight 10 pounds 8 ounces. He was slow in talking in sentences and walking and toilet training.

### MEDICAL HISTORY:
He is allergic to cats. He has never been hospitalized. He has seasonal asthma. No staring spells, no epilepsy, no headaches.

### MENTAL STATUS EXAMINATION:
He is casually dressed, appearing his stated age. He is sleeping and is

| | | |
|---|---|---|
| Admit: 06/22/2004 | Patient Name: G████, S████ | |
| Disch: | MR#: 294254 | Acct#: 1008534 |
| Sex: M Age: 14Y | Dictating: Vijayababu Jampala, MD | |
| Room: 0902 Pt Type: P | Attending: JAMPALA, VIJAYABABU, MD | |

ORIGINAL

Page 1 of 2

PSYCHIATRIC EVALUATION

difficult to awaken. He answered monosyllabically, nodding or answering in 1 word (he reportedly had Geodon and Ativan shots last night). His 3 wishes are to be rich, to have a good life and for his family to have a good life. He denies current suicidal or homicidal ideation. His career plan is to be an artist. He is sad, blunted in affect, unarousable. He is oriented to place only with poor judgement operationally, no insight and no remorse for his drug abuse.

**DIAGNOSES:**
AXIS I:
1. Stimulant induced psychosis.
2. Rule out major depression.
3. Dysthymia.
4. Oppositional defiant disorder.
AXIS II:
None.
AXIS III:
None.
AXIS IV:
Severe - problems with primary support system, peer relationship problems.
AXIS V:
GAF 30.

Severity - severe.      Prognosis guarded.

**RECOMMENDATIONS:**
1. Admit to acute inpatient treatment with close observations, structured milieu behavioral management, individual, family, group and activity therapy and specialized educational services.
2. Will not start any medications at this point. Although Geodon was ordered, will discontinued at this point to watch his baseline behaviors and need for antipsychotic medication. I believe this is a stimulant use psychosis if there is no previous history of psychosis.
3. Drug education, and referral to outpatient rehab services will be made.

Vijayababu Jampala, MD

VJ/uw
D: 06/22/2004
T: 06/22/2004 15:04:13 E.T.
E: 06/22/2004 15:04:13 E.T./ uw
Job #: 152028   Doc #: 2165402
CC:
C.T. = Central Time / E.T. = Eastern Time

Admit: 06/22/2004      Patient Name:  GA▐▐▐▐▐
Disch:                                         1008534
Sex: M  Age: 14Y      Dictating: Vijayababu Jampala, MD
Room: 0902  Pt Type: P  Attending:  JAMPALA, VIJAYABABU, MD

ORIGINAL                              Page 2 of 2

PSYCHIATRIC EVALUATION

108

METROPLEX HOSPITAL
2201 S. Clear Creek Road
Killeen, TX 76549
(254) 526-7523

## PSYCHOLOGICAL EVALUATION

DOB:  2-21-90 age 14     DATE OF EVALUATION:  6-25-04

**REASON FOR REFERRAL:**
Stephen is referred for psychological evaluation by Dr. Jampala, as part of
his admission to Metroplex Pavilion.  The request is for assistance with
differential diagnosis, personality dynamics, and treatment planning.

**ASSESSMENT TECHNIQUES:**
Diagnostic Interview
Review of Hospital Records
Test of Non-Verbal Intelligence (TONI 2)
Wide Range Achievement Test (WRAT-3)
House-Tree-Person (Projective Drawings)
Bender Gestalt Projective Drawings
Rorschach Inkblot Test

**BACKGROUND INFORMATION:**
S███████ says he was admitted to the hospital because "I did drugs and I was
hallucinating," adding that he did "the shot kind" of drug, unable to recall
the name, and that his only prior drug use was "the pipe kind."  For a
detailed history, the reader is referred to the psychiatric evaluation done by
Dr. Jampala, as well as the psychosocial evaluation.

**ASSESSMENT RESULTS:**
█████████ presents as passive, cooperative, somewhat lethargic and slow.
Efforts at drawing are detailed and careful, and her participates without
incident.  He scores at third grade level in both Reading and Spelling, and at
fourth grade level in Math, with probable significant deficits in all three
areas that would require remedial intervention.  Standard scores are 71, 76,
and 75, respectively.

His Bender suggests conflict and tension in his relationships with both
parents and in his role in his interpersonal world, where he appears to feel
isolated, and there also appear to be ego-integrity problems in his
relationship with his mother.  Overall inner tension is suggested by the
pressure exerted in his drawings.  His very artistic drawings suggest and
active (out of control?) fantasy life, a possible traumatic event early in his
childhood, and a sense of alienation within the family constellation, with
unresolved oral dependency needs.

His Rorschach indicates that S████n readily distorts reality, with no
apparent concern for the incongruous nature of some of her percepts and fluid
boundaries, making it difficult for him to interpret events accurately.  Self-
concept is distorted, as is his view of others, and his passive behavioral
style makes him vulnerable to being used or manipulated by others.  He has

| | | |
|---|---|---|
| Admit: 06/22/2004 | Patient Name:  G████, S████ | |
| Disch· 06/28/2004 | MR#: 294254          Acct#: 1008534 | |
| Sex· M  Age: 14Y | Dictating: EUGENE C. WATERS,  Ph.D. | |
| Room:   Pt Type: P | Attending:  JAMPALA, VIJAYABABU, MD | |

ORIGINAL                                                    Page 1 of 2

withdrawn from age-appropriate competitiveness, with lowered aspirational level, probably due to his lowered self-esteem, and lack of self-confidence, and he keeps others at a safe and superficial distance in order to avoid compromise, not expecting to have positive interactions. Oral dependency needs are unresolved, and he easily feels challenged, due to his fragile sense of integrity. One metamorphosis response suggests that personality is organized at a borderline level, and he appears to be extremely ambivalent, unable to clear define his boundaries.

DIAGNOSTIC IMPRESSION:

AXIS I:
Psychotic disorder, not otherwise specified.
AXIS II:
Borderline personality traits.
AXIS III:
Deferred to physician.

RECOMMENDATIONS:
An antipsychotic medication appears appropriate, and psychotherapy may have to explore family dynamics as part of intervention as well as self-esteem and self-concepts issues.

EUGENE C. WATERS, Ph.D.
Clinical Psychology

EW/uw
D: 07/26/2004
T: 07/26/2004 15:24:49 E.T.
E: 07/26/2004 15:24:49 E.T./uw
Job #. 163734  Doc #: 2323163
CC:
C.T = Central Time / E.T. = Eastern Time

Admit: 06/22/2004
Disch: 06/28/2004
Sex: M  Age: 14Y
Room:  Pt Type: P

Patient Name: G██████, S██████
MR#: 294254          Acct#: 1008534
Dictating: EUGENE C. WATERS, Ph.D.
Attending: JAMPALA, VIJAYABABU, MD

ORIGINAL

Page 2 of 2

PSYCHOLOGICAL EVALUATION

Metroplex Pavilion Integrated Progress Notes

1008534    M   H   D   000294254
G██████    S██████
JAMPALA,  VIJAYABABU,  MD
902A      6/22/04      014Y   P
2/21/90

DATE/TIME OF ENTRY - DOCUMENT EACH SHIFT TO INCLUDE
All signs/symptoms, interventions, evaluation

| DATE | TIME | SRVC | PROGRESS NOTES |
|------|------|------|----------------|
| 6-25-04 | 1300 | PhD | Psychological evaluation ē Stephen _____ who was admitted because "I did drugs" & I was hallucinating", adding that he did "the shot kind" of drug, unable to recall the name, + that his only prior drug use was "the pipe kind". He presents as passive, cooperative, somewhat lethargic & slow. Efforts at drawing are detailed & careful as he participates s̄ incident. He scores at 3rd grade level in both Reading & Spelling, & at 4th grade level in Math c̄ probable significant deficits in all three areas that would require remedial intervention. Standard scores are 71, 76, & 75 respectively. His Bender suggests conflict & tension in his relationships c̄ both parents and in his role in his interpersonal world where he appears to feel isolated. There also appear to be ego-integrity problems in his relationship c̄ his mother. Overall inner tension is suggested by the pressure exerted in his drawings. His very artistic drawings suggest an active (out of control?) fantasy life, a possible traumatic event early in his childhood and a sense of alienation with the parental constellation, ē un- resolved oral dependency needs. His Rorschach indicates that Stephen readily distorts reality, ē no apparent concern for the incongruous nature of some of his percepts and fluid boundaries, making it diffic- ult for him to interpret events accurately. Self- concept is distorted, as is his view of others, and his passive behavioral style makes him vulnerable to being used or manipulated by others. He has withdrawn from age-appropriate competitiveness, ē lowered aspiration level, probably due to his lowered self-esteem and |

PROGRESS RECORD MH 5/93
302065

DATE/TIME OF ENTRY - DOCUMENT EACH SHIFT TO INCLUDE
All signs/symptoms, interventions, evaluation

| DATE | TIME | SRVC | PROGRESS NOTES |
|------|------|------|----------------|
| 6-25-04 | *Am* | *(MD)* | lack of self-confidence, id he keeps others at a safe id superficial distance in order to avoid compromise, not expecting to have positive inter-actions. Oral dependency needs are unresolved id he easily feels challenged due to his fragile sense of unicity. One metamorphosis response sug-gests that personality is organized at a borderline level. He appears to be excessively ambivalent, unable to clearly define his boundaries. DX Imp: Psychotic D/O, NOS; Borderline personality traits, antipsychotic medication appear appropriate, & psychotherapy may have to explore family dynamics as part of intervention as well as self-esteem & self-concept issues. ___ (MD) |



## PSYCHOSOCIAL ASSESSMENT

I. **IDENTIFYING INFORMATION**

NAME.                                    DOB and AGE:

DATE OF ASSESSMENT:                      ETHNIC:
    6/24/04
(Jessica)  INFORMANTS:                   ADDRESS: 4910 Green Oak Dr
    Mo - Jessie Mendez 37.                        Killeen 76542

II. **SPECIFIC REASONS FOR ADMISSION** (Include referral source)

What precipitated the admission to the Pavilion? *Drugs — wch*
*Chris - (3rd child invalid - lies doing street. Pro cigar*
*     ail some pleury his nad fully work s on*
*     form of span.*

Who brought the pt in?  Voluntary or Involuntary?

A/V Hallucinations?  Content of hallucinations?  Any command AH/ VH?
*Hallucinate, Paranoi —*

SI/HI?  Any plans, intent, past gestures and dates?  Any access to weapons?

What is the pt's mood?  Any Sleep disturbance? *repeatly 7th grade,*
*Depressed ever always had sleepy problem*
*           his trouble going to sleep*
Changes in Appetite?  *OK*

What are the stressors? *Moved ~ 3-04*
*    Mo. Preg -*
(SF) *in home since pt 5 yr.*
Any additional significant events?

History of Present Illness?  When was the onset of symptoms?

Any previous treatment?

113

III.  SOCIAL HISTORY

A.  BIRTH AND CHILDHOOD DEVELOPMENT:

Was pt full term?     Weight?     Vaginal delivery or C-Section?

*10 lb 8 oz*

Was C-Section planned or emergency? — *Rapid delivery —*
*aspiration fluid —*

Any complications during pregnancy, delivery or at birth? *dr hosp 1 wk*
*Talkit may be*
*slow*

Any ETOH or drug use by mom during pregnancy? *heroin*

*Mo Bups*
*(Pt) dkwz —*
*Not understand*
*if talking*
*or heroin*

Developmental milestones WNL? Any developmental delays? In what areas? *Sister naturld*
*Walked at almost 3 yr old —*

Any significant health problems or surgeries or hospitalizations as a child? Age? *18 mo*

*Mo say pt*
*Princes but*
*her portray*
*brain not*
*working*

Any head injuries? LOC? How long? Age?

Where was pt born?  Multiple moves? *— Calif —*
*at almost 3 yr — Mo left Fa  moved*
*back to her ? because of Fa drugs*

B.  EDUCATION:  *10 yr moved to Killeen — with 5 F(*

What grade is pt in?          Name of school?

What type of classes? (i.e. resource, content mastery)  Any other special ed. Services?
*Special Ed — grades  2nd  4 yr — Mo say now know because*
*of drugs*
Any learning disabilities?     Is English the 1st language?
*difficulty focusing*

Was the pt ever retained or advanced a grade?   When? *uses in*
*failed 2nd grade — Failed 7th grade  until this time*
Any behavioral difficulties in class? Detentions? Suspensions? Expulsions? *gone to Dr*
For what reasons?

C.  FAMILY CONSTELLATION AND RELATIONSHIPS (Include discipline):  *37 yr*
*Mother 37 (Jessica)(Jessie)  New 5 Fa  about Mike Lopez (married*
Who lives in the current household? (first and last names, ages, relationship)  *but Mo*
*kept maiden name*

Siblings (half, full or step) *½ Tiffany Collinge — 17 yr ½ ??*
*½ Micaela Lopez 2½ ½ ?? (Mi Kentucky)*
House/apartment/trailer?  *½ — Mo Preg — Due 8-21-04 — that's a girl*
*(just bought)*
Any other siblings living outside the home? (names and ages and where they live?)
*½ sibs from Fa marcelly / ½ Garcia 15 yr — him in Calif  in Foster Care*
Any bio-parent living outside the home?           Where?
*Anthony Garcia — 40 — In Prison for Drugs & Murder Charge —*
Does the pt have any contact with that parent?  How frequently? *Talked about*
*a few letters but  ?? saying he*
*when Fa found out  innocent — mom ??*
*Mo remarried - Fa  upset*
*& Pt great reading*

**114**

Describe pt's relationship with absent parent?

1008534 ▆▆▆ M H D 000294254
JAMPALA, VIJAYABABU, MD
902A    6/22/04    014Y  P
                   2/21/90

Describe pt's relationship with household members?

Who is primary disciplinarian?

What form of discipline is used? *Take play status computer & child extra chore*

Is disciplining effective?


D. MARITAL:  *2nd Mo —     SF 1st marriage*

How many times have parents been married?  Common law or legal?  *Bio Fa + 2nd marr*

Give names of spouses and approximate dates of each marriage/ union?

Any children from these relationships?

Briefly describe each relationship.  Any physical abuse?  *Tiffany Fa abuse no other abuse*

Is (Are) parent(s) currently married, living with or dating anyone?

Length of time?

E  WORK/FINANCIAL (Include military history):

Where are parents working? (Include bio and step parents)  How long?

Describe job.  *Mo — work at Caldwell Banker United*
*SFa — Melanie — in temple*

Any past work or military history?  Length of time?

Any other source of income?  (SSI/SSD, child support, housing, food stamps, TANF, etc )  How much?

Does anyone else contribute to the household?

What type of insurance does pt have?

Any financial stressors?  *ok*

Does family have access to transportation?

115

F. SPIRITUAL/RELIGION:

Does pt or family have any religious affiliation?   Current belief system?
What church do they attend?

*Christian House of Prayer.*
Is pt involved in any church activities?
*also St Paul Catholic*

Does pt enjoy attending church?  *yes*

Was pt baptized?  Does pt or family consider spiritual beliefs a large part of their life?
*no -*

G. PHYSICAL/SEXUAL ABUSE:

Is there any hx of physical or sexual abuse with pt or family member?
When, Where, What, Who, and by whom?

Age of abuse?   Age of perpetrator, if known?   *none*

Was a report made?  To Whom?

Is CPS currently involved with family?   CPS worker's name and #?
*no*
Age pt achieved menarche?    Any difficulties?

Is pt currently sexually active or has hx of being sexually active?
*none*

Sexual orientation?

Sexual preference?  *- has girlfriend*

Any hx of STD?

Any pregnancies?

Does pt use birth control?    Type?

H. SOCIAL RELATIONSHIPS:
*only best*
*Chris & Bob*
Does pt have any friends?    Any best friends?   *Jerrid not when used drug*

Is pt able to make friends and maintain long term relationships?

Does pt socialize more with males or females?

Is pt able to share?

Who does pt consider a support system?

What does pt do for fun? *Loves to Draw*
*Play Station Computer*

Any involvement in extracurricular activities or other leisure activities? *Tried base & foot ball but didn't work out self esteem low*

## I ALCOHOL/DRUG HISTORY:

*Feb 22·04 started using Drug*

Does pt drink or use drugs?        What kind?         Frequency?
How much?                          *Meth Pot Speed?*

When did pt start using? *2-22-04*

Does pt feel he/she has a problem with drugs/ETOH? *no*

How much does pt spend on drugs or ETOH? *~*

Has pt ever been to rehab?    Where?   When?   How long?
Was it successful? *no*

Does pt attend any support groups?

Any legal problems due to drugs/alcohol?

Any family hx of abuse? (Give details) *Bro Drug- Meth, Speed,*

## J. LEGAL:

*None*
Has pt ever been arrested? Why, When, Where, How long, What reason?

Is pt currently on probation or parole? Why?

Any charges or warrants filed against them? Why?

Any other legal issues? (custody, divorce, restraining orders, DWI'S, etc.)

Any family history of legal involvement? Who, Why, When...?

117

## IV. PERTINENT MEDICAL/PSYCHIATRIC HISTORY

Has the pt ever been hospitalized before for any psychiatric problems?
Where? When? Why? (Include diagnoses and meds, if known)

Any past suicide attempts or gestures? (Include dates and nature of attempt)

Has the pt had any outpatient counseling?
With Whom?        When?        Where?
*Dr, Peurse at Scott & White?*
*No counselor — Durham here*

Any current outpatient therapy for counseling or med management?
With whom and where?

*Bad Reaction to Ritalin*
*Silent / drowsy*

Any family history of psychiatric problems or psychiatric hospitalizations?
Who, when, where, why and diagnoses, if known? — *Bio Fa wanted to put in / used Drugs — in prison / for access to Murder*
*— PGM - Depression / very over weight*

Any significant medical problems with pt or any family members? 
*Mat Uncle - (Mo's Bro) / BiPolar — anger prob, / would get so / angry would black / out*

Is pt on any meds for a medical condition?

## V. INTERVIEW OBSERVATIONS (Include family expectations/participation)

Appearance:     *✓ Neat Clean*

Eye Contact:     *good*

Mood            *Cheerful*

Affect:          *appropriate*

Thought Process:   *Clear*

Speech:          *Clear — — approp into Mo.*

What is pt's/family's expectation from treatment?

# VI. DIAGNOSTIC SOCIAL ASSESSMENT SUMMARY

A STRENGTHS: *Caring for other willing to help*

B WEAKNESSES: — *Low self esteem problem*

C GOALS:


# VII. DIAGNOSTIC SUMMARY

Summary of why patient is admitted.   Diagnoses.

What are the patient's current needs?

Assessment of the case.

Goals of treatment.


# VIII. SOCIAL DISCHARGE PLAN

Where will pt be discharged to?

Aftercare arrangements?

Any identified services needed?

## HISTORY AND PHYSICAL

**CHIEF COMPLAINT:**
Admission to Metroplex Pavilion

**HISTORY OF PRESENT ILLNESS:**
The patient's mother has been reporting changes in his behavior for about 2 weeks now. He got in with a group of kids that were doing drugs. The mother did not know that he had been smoking marijuana for probably over 2 years. His father is in prison for murder in California. The patient was 5 years old the last time he saw his father. He has been talking to himself and having hallucinations according to the mother. Over the weekend, he was apparently with some friends and they did marijuana and crystal meth. He chewed on his lower lip during this time under the influence.

**PAST MEDICAL HISTORY:**
He was delivered normally after a normal pregnancy. Birth weight was 10 ½ pounds. There is no history of birth injuries or breathing difficulties. He had no problems while in the Nursery or for the first month of life. There is no history of him being hospitalized previously, and there have been no chronic illnesses, except for seasonal allergies.

**ALLERGIES:**
No known medical allergies according to the chart. He is allergic to cats.

**IMMUNIZATIONS:**
Stated to be up to date.

**FAMILY HISTORY:**
There is a family history of asthma and school dysfunction.

**REVIEW OF SYSTEMS:**
Negative.

### PHYSICAL

**GENERAL:** He is a tall, thin boy. He climbed on the table and immediately laid down. He could not open his eyes well for the exam. His eyes were pinpoint when I finally could look at them. He was very wobbly in his gait. He apparently got some Ativan and Vistaril last night because of the reaction to the crystal meth injection and he is still under the influence of that at this time.
**VITAL SIGNS:** Noted and are within normal limits.
**HEENT:** Nose, mouth, pharynx, eyes, and ears are normal. His lower lip on the right side has been chewed considerably inside and out. It does not look infected. It is swollen, and there are abrasions.
**NECK:** Supple and normal.
**CHEST:** Normal.

| | | |
|---|---|---|
| Admit: 06/22/2004 | Patient Name: ▮▮▮ S▮▮▮ | |
| Disch: | MR#: 294254 | Acct#: 1008534 |
| Sex: M Age: 14Y | Dictating: Pamela Hornbeck, APNP | |
| Room: 0902 Pt Type: P | Attending: JAMPALA, VIJAYABABU, MD | |

ORIGINAL

**HEART:** S1 and S2 are normal. Regular rate and rhythm. No murmur.
**LUNGS:** Clear to auscultation.
**ABDOMEN:** Soft. No hepatosplenomegaly. Nontender. No masses.
**EXTREMITIES:** Within normal limits.
**BACK:** Within normal limits.
**SKIN:** Within normal limits.
**NEUROLOGICAL:** At this time, he is under the influence of Ativan and Vistaril from what the nurse told me. His examination was within normal limits, except for the fact that he kept falling asleep and could not stand up straight, just from the drug effect.

ADMITTING DIAGNOSIS:
1. DYSTHMIA, OPPOSITIONAL DEFIANT DISORDER, RULE OUT MAJOR DEPRESSION.
2. NORMAL NEUROLOGICAL EXAM.
3. NORMAL PHYSICAL EXAM.

PLAN:
1. Psychiatric evaluation and treatment as per the Psychiatric Team at Metroplex Pavilion.
2. Cleared medically for admission to the Pavilion.
3. Normal neurological exam, with the exception mentions. No further neurological consultation is warranted unless indicated by further course and/or information.

Pamela Hornbeck, APNP
For Omar Homsi, M.D.

PH/sb
D: 06/22/2004
T: 06/22/2004 16:06:30 *E.T.*
E: 06/22/2004 16:06:30 *E.T.*/sb
Job #: 152051  Doc #: 2165836
CC:
*C.T. = Central Time / E.T. = Eastern Time*

Admit: 06/22/2004     Patient Name: G███ S████
Disch:                MR#: 294254          Acct#: 1008534
Sex: M  Age: 14Y      Dictating: Pamela Hornbeck, APNP
Room: 0902  Pt Type: P  Attending: JAMPALA, VIJAYABABU, MD

ORIGINAL                             Page 2 of 2

HISTORY AND PHYSICAL

000294254                1008534

014/M
6/21/04

| Sign Triage Part 1 | _L. Elledge RN_ | TRIAGE LEVEL |
|---|---|---|
| Triage Part 2 | | 1  2  ③  4 |

**TRIAGE Part 1**                                      PRIMARY PHYSICIAN: Cole @ S+W

| DATE | TRIAGE SIGNED IN | TRIAGE TIME | DOB | AGE | SEX | GIVEN NAME | Phone # |
|---|---|---|---|---|---|---|---|
| 6-21-04 | 1908 | 1910 | 2-21-90 | 14 | M | Stephen GARCIA | 554-7675 |

Mode of Arrival: ☒ Private car  ☐ Ambulance        Method: ☐ Alone  ☒ Brought in by _Mom_
☐ Helicopter  ☐ Others                                      Mode of Transport: ☒ Ambulation  ☐ Wheelchair  ☐ Carried  ☐ Stretcher  ☐ Other

Chief Complaint/Time started: Psych eval. Hallucinations, Paranoid, talking to voices, Biting lower lip

**TRIAGE Part 2** Nursing Assessment – Review of Systems (Circle/Check all that apply)

VS: BP 130/82    Pulse 110    RR 20    O2 Sat 98    Accucheck _____    Weight  actual/stated/guard ___ kg 150 lbs
Temp 100    (Oral/Rectal/Tympanic)             Pediatric Head Circumference _____ cm

LOC  Alert  Alert  Oriented  Anxious           Breathing Effort  Unlabored  Labored  Airway:  Clear  Part obstruction  Obstruction
     Confused  Combative  Unresponsive          Breath sounds:  Clear  Abnormal

Circulation: Color  Pink  Mottled  Pale  Blue     Pulses:  Present  Decreased  Absent     Skin:  Warm  Cold  Hot
Cap Refill: <2 Sec  >2sec                                                                          Wet  Dry

Pain  Y/N     Pain Scale: 0 1 2 3 4 5 6 7 8 9 10 or Mild Moderate Severe     Pediatric Pain Scale     ☺ 0  ☺ 2  ☺ 4  ☹ 6  ☹ 8  ☹ 10
              If yes: Location _____

PMH  None  DM  HTN  CVA  TIA  Pacemaker  PVD  Pulmonary  SZ          HX of Smoking:  Non Smoker  Smoker
     ESRD  Transplant  CA  Cardiac Surgery  Learning disability     Pediatrics:  Lives with non smoker at home  Lives with smoker at home
     OTHERS:

LMP _____   Tetanus:  UTD  NA  UNK  NUTD        Immunizations:  UTD  NA  UNK  NUTD

ALLERGIES  NKDA  Latex Allergy  Others (List) _____

Triage RX  None  Ice  Elevate  DRSG  BB  C-Collar  Keep NPO  ↑ PO Fluids  Splint      Notified:  Police  Animal Control  Others
          Medication/s

Triage Reassessment
Vital Signs   Time____ BP____ Pulse____ RR____ Temp____      Time____ BP____ Pulse____ RR____ Temp____
                                                              Time____ BP____ Pulse____ RR____ Temp____

Nursing Notes (Include time, notes, initial/signature)   Used Meth - yesterday

---

### NOTICE TO ALL PATIENTS OR PATIENT REPRESENTATIVE

A physician is on duty in this Emergency Room. That physician is not an employee or agent of Metroplex Hospital. You may request to be seen by your family physician or you may choose to be seen by the physician on duty in the Emergency Room.

### AVISO A NUESTROS PACIENTES

Hay un medico de turno aqui en esta sala de emergencia. Ese medico no es empleado ni agente del Metroplex Hospital. Usted puede pedir que su medico personal tu atienda a usted aqui o usted puede ver al medico de turno.

### AUTHORIZATION FOR MEDICAL AND/OR SURGICAL PROCEDUERS AND TREATMENT

I hereby authorize the attending physician and whomever he may designate as his assistant to administer such medications and treatment as is necessary, and such operations or procedures as are considered therapeutically necessary on the basis of findings in my case. I also consent to the administration of such anesthetics as are necessary.

Signature of Patient _____
Signature of Person Authorized to Consent for Patient _____     Signature of Nurse  _L. Elledge RN_   Relationship to Patient _mom_

Time 2010    **EMERGENCY ROOM** Nursing Assessment (Circle/check all that apply)

Current Medications:  None  ☐ See attached list

OTC/Herbal/Vitamins

General appearance:  good / poor     Hygiene:  good / poor     Dentition:  good  poor

HEENT:  No abnormalities noted     Exudate Present     Bleeding     Visual acuity w/o corrective lens:  R ___/___  L ___/___
        Fontanel:  Bulging  Sunken                              Visual acuity w/ corrective lens:  R ___/___  L ___/___

MHS Form 380 10/02 Rev 2/03 #900380

122

000294254          1008534

G████ ████████

████ █/21/90          014/M

6/1/04

| DATE | TIME | ORDERS | | Ordered By/ MD Signature | Nurse Signature |
|------|------|--------|---|---------------------------|-----------------|
| | | **LABS/TEST:** | | | |
| | | ☐ ABG   ☐ Accucheck   ☐ Amylase | | | |
| | | ☐ BS   ☐ Blood Alcohol Level   ☐ B - Met   ☐ C - Met | | | |
| | | ☐ CBC   ☐ CPK   ☐ CKMB   ☐ Troponin   ☐ Carboxy Hgb | | | |
| | | ☐ Cultures/Sensitivity: ☐ Blood X ___   ☐ Urine ☐ Throat ☐ Wound | | | |
| | | ☐ Drug Level: ☐ ASA   ☐ Acetaminophen ☐ Digoxin   ☐ Dilantin | | | |
| | | ☐ Phenobarb ☐ Valproic Acid/ Depakote   ☐ Others ___ | | | |
| | | ☐ ECG | | | |
| | | ☐ LFT | | | |
| | | ☐ PT / PTT | | | |
| | | ☐ SHCG: ☐ Quant (M)   ☐ Quali   ☐ Sed Rate | | | |
| | | ☐ STD Work-up: ☐ GC   ☐ Wet Prep   ☐ Chlamydia   ☐ Cervical C/S | | | |
| | | ☐ T3 T4   ☐ TSH | | | |
| | | ☐ Type & Crossmatch X ___ units   ☐ Type and Screen | | | |
| | | ☐ UA   ☐ Urine Drug Screen | | | |
| | | **RADIOLOGY/IMAGING:** | | | |
| | | ☐ CXR Port 2V   ☐ AAS   ☐ C Spine: XTL / LTD   ☐ KUB | | | |
| | | ☐ X Ray (State): ___ | | | |
| | | ☐ Skull LTD | | | |
| | | ☐ CT - Head  w/ contrast / w/o contrast   ☐ ABD | | | |
| | | ☐ Others: ___ | | | |
| | | ☐ U/S : ___ | | | |
| | | ☐ cardiac monitor   ☐ Pulse Oximetry   ☐ Bair hugger | | | |
| | | ATIVAN ~ 3 至 IM | | 2152 BP | |

| Medications /IV Orders/Additional Orders | Ordered By/ MD Signature | Time Given | Given By |
|------------------------------------------|--------------------------|------------|----------|
| | | | |
| | Joseph N. Picer DO FACEP | | |

**Discharge Orders**

Patient Disposition: Discharge   Admit   Transfer
To: Home  OR  ICU  L&D  SDS   Inpt. Unit: Rm # ___
Receiving Facility: ___
Nursing Home: ___
Other: ___

MHS Form  559  10/02  Rev 2/03

123

C.   M.   ng Information.

D.   Key Interpretations.

Reportedly used drugs on the Night of Admission
including Methamphetamine, Nothing in A/V Hallucinations
& Paranoid delusions. Has Been Biting his lip & has
a lesion on his lower lip. Strange Body Movements, talks
to himself & Antmechm & telling Bits & Pieces of Lifestyle
Makes comments like, "Take my life, drowsy, hypo anxic," etc
Getting Worse. Claims he sees Someone who to a Mask
and he can't see the face.

E.   Treatment Planning Recommendations.

DX, Hx Meds, Med mgmt, ED, ON/diversibity, ET1/61/61

ET1/61/61 - ① coping Skills ② problem solving ③ Family
& peer Relationships ④ Drug Rehabs

A1 - ① evidence ② Social ③ Recreational ④ Other Aypartner Welfare

F.   Anticipated Problems (optional).

Completed By: _____   Date: 6/24/07

124



1008534 M H D 000294254
G███, S███
JAMPALA, VIJAYABABU, MD
902A 6/22/04 014Y P
2/21/90
ADDRESSOGRAPH

**MEDICAL ISSUES SUMMARY**

Seen @ pt age 11 or 12 by Dr Pierce c auditory hallucinations & SI in 3rd grade was put on Ritalin but (M) reported it made at frame the mouth + she took him off of it

Is in 8th grade SpEd @ Liberty Hill
Is slow learner — is in summer school

**INTERVIEW SUMMARY**

(M) reports changes in behavior for ± 2wks. Previous had been somebody, a loner + was intended to stay @ home + watch TV. On Sun 6/20/04 pt came home was biting up + having strange body movements. Had been malignant + was paranoid that the people or person he had a fight with was coming to get him. Was talking to himself out loud. Only told (M) bits + pieces of story. Pt was drowsy then hyperactive c bizarre body movements, talking out loud. "Take my life. leave my Mom + Sister alone." (M) reported pt's behavior reminded her of pt's bio (F) behavior when he was on drugs. (M) unaware that pt smoking MJ x 2 yrs. Marines 7mo PG.

Bio (F) in/out of jail since pt 2yrs old — last saw pt when he was 5 yr old. Currently in prison in Calif — for murder, while under influence of drugs.

Pt has seasonal allergy. ⊕ THC + amph. UDS
Pt's friend admitted previously here — (M) reports friend is the leader of the drug use + pt a "follower".
(M) reports pt under peer pressure for not "being cool"

Completed by _____ mccenter _____ Date/Time _____ 6/22/04 05 **125**

# METROPLEX PAVILION MENTAL HEALTH
# NURSING ASSESSMENT

Patient Name ███████████████████ ▓▓▓ 2-21-90

Last       First       Middle

Age __14__    Sex: (M) F    Race: __H__    Marital Status: S M D W (circle one)

Type of Admission: __✓__ Voluntary     ____ Involuntary

Pending Legal Charges: (No) / Yes _____

Date of Admission: __6/22/04__     Time: __0045__ a.m. p.m.

Accompanied by: __bio Mom__     Relationship to Patient: _____

Mode of transportation: __POV__

(Ambulatory)/Non-Ambulatory: _____    behavior Δ' bec friend found [illeg]
   last 2 wks.   before long [somebody]

Reason for Admission (precipitating event): Sun 3rd P - Had been acting up +
got into fight - strange body movements, talking to self outloud -
told (M) bits + pieces    Paranoid

"Take My Life..." drowsy + then hyperactive. Got ↑ worse. /
   reminded (M) of bio (F).

| Current Medications (include OTC) | Dosage | Route | Times | Classification |
|---|---|---|---|---|
| | | | | |
| | | | | |
| Ritalin - reaction - mom took off in 2nd grade | | | | |
| | | | | |
| | | | | |

Disposition of Meds:    Sent Home with Family ____
    Sent to Pharmacy ____
    None __✓__

Allergies (Meds): __Ø__

(M) 7mo Pg → Coldwell Banter in Killeen
(SF) if 10yrs - McClane

1008534   M   H D   000294254
G▓▓▓▓ ▓▓▓▓▓
JAMPALA, VIJAYABABU, MD
902A   6/22/04   014Y   P
        2/21/90

m TXX 4 yrs

Stephen
Tiffany - 1/2S
Micaele - 2's

Anthony Garia
bio F - prom - murder - him + 2 acquaintances
under influence of drugs - [illeg]

126

MP 374/rev 1/03

## REVIEW OF SYSTEMS

*Doesn't Here* ✓

**VISION:** ✓ _____ Glasses _____ Contacts _____ Cataracts _____ Glaucoma _____ Diplopia
_____ Pupils _____ Blurring _____ Eye Surgery (When) _____
_____ WNL   Comments _____

**SPEECH:** _____ Speech Impairment _____ Slurring _____ Difficulty Expressing _____ Language Barrier
_____ Pressured
✓ WNL   Comments _____

**HEARING:** _____ Pain _____ Limited _____ Right _____ Left _____ Tinnitus _____ Discharge
✓ Hearing Aid _____ Ear Infections _____ Tubes
✓ WNL   Comments _____

**RESPIRATORY:** _____ Pain _____ Dyspnea _____ Cough _____ Sputum/Color _____ Sinusitis
_____ Epistaxis _____ Apnea _____ Frequent Colds _____ Shortness of Breath
✓ Smoking Type _____ Amount _____
✓ Asthma _____ Breath Sounds (Describe) _____
✓ WNL   Comments _____ Seasonal usually summer/winter

**CARDIAC AND CIRCULATORY:** _____ Chest Pain _____ Hypertension _____ Hypotension _____ Congenital Heart Disease
_____ Pacemaker (Date) _____ _____ Heart Disease
_____ Surgeries (Date & What) _____
_____ Heart Attack (Date) _____ _____ Numbness (Location) _____
_____ Edema (Location & Measure) _____
✓ WNL   Comments _____

**GASTRO-INTESTINAL:** _____ Nausea _____ Vomiting _____ Bowel Sounds   Last BM _____
_____ Laxative Usage _____ Constipation _____ Diarrhea _____ ABD (Soft / Hard / Distended)
_____ Gerd _____ Hemorrhoids _____ Eating Disorders
✓ WNL   Comments _____

**URINARY:** _____ Incontinence _____ Stress Incontinence _____ Burning _____ Color _____ Odor
_____ Frequency _____ Nocturia _____ Hematuria _____ Flank Pain _____ History UTI's
✓ WNL   Comments _____

**NEUROLOGICAL:** _____ Seizures _____ Paralysis _____ Paresthesia _____ Weakness _____ Sensory Limitations
_____ Loss of Consciousness (Explain) _____
_____ Headaches _____ Tremors _____ Stroke _____ Surgery _____ Head Injury
_____ Dizziness _____ Neurological Testing YES / NO When/Where? _____
✓ WNL   Comments _____

**PAIN:** Primary Site _____ How Long? _____
Relieved by OTC/Prescribed Meds _____
What/How Often Taken? _____

Pain Scale ⊘ LOW   1   2   3   4   5   6   7   8   9   10   EXTREME
Comments _____

**FUNCTIONAL SCREEN:** _____ Limited ROM/ADL's   Explain _____
_____ Contractures (Location) _____ _____ Redness/Swelling
_____ Bone/Joint Problems _____ Falls/Or History _____ Prosthesis _____ Gait
_____ Assistive Device Type _____
_____ Newly Identified CVA or Head Trauma _____ New Weakness or Paralysis
✓ WNL   Comments _____
's present, request rehab screen

1008534   M   H D   000294254
JAMPALA, VIJAYABABU, MD
MF3   902A   6/22/04   014Y   P

127

## REPRODUCTIVE FEMALE:
_____ Onset of Menstruation _____ Problems _____
_____ LMP _____ Discharge/Infection _____ Regular Self Breast Exam _____ Hysterectomy
Last Mammogram _____ Last Pap Smear (date) _____
_____ Birth Control (Type) _____ Menopause _____
_____ Pregnancies (dates) _____
Sexual Preference _____ Male / Female _____ Sexually Active Yes / No _____ History of STD's Yes / No
Comments _____

## REPRODUCTIVE MALE:
_____ Discharge _____ Lesions _____ Infection _____ Birth Control
Sexual Preference _____ Male / Female _____ Sexually Active Yes (No) _____ History of STD's Yes / No
Comments _____
(M) denies any Hx of sexual abuse

## NUTRITIONAL:
Adult/Adolescent Screening
_____ Unintentional weight loss ≥ 5% of usual body weight within the last month
_____ Admission Diagnosis including Anorexia, Bulimia, Malabsorption, Malnutrition (circle)
Child Screening
_____ Unintentional weight loss ≥ 5% of usual body weight within the last month
_____ <10% percentile weight for height
Upon admission, if patient meets one or more of the above high-risk categories, request nutritional referral
_____ Food Allergies (List) _____
_____ Nutritional Referral Yes / No
_____ WNL Comments _____

## SKIN:
_____ Color _____ Rash _____ Cysts _____ Inflammation _____ Needle Marks _____ Diaphoresis
_____ Lesions _____ Psoriasis _____ Eczema _____ Scabies _____ Lice _____ Ring Worm
✓ Diaphoretic _____ Turgor: Good / Fair / Poor ✓ Dry _____ Warm _____ Cool _____ Cold
✓ WNL Comments _____

## SLEEP:
✓ DGA _____ MNA _____ EMA _____ Insomnia _____ Hypersomnia _____ Nightmares _____ Naps
Number of Hours of Sleep/Night _____ Sleep Aids (Name) _____
Recent Changes _____ No Problems
Comments _____

## HOSPITALIZATION AND SURGERIES:
⊘ Hospitalizations/Surgeries (dates & reason): _____
⊘ Psychiatric Hospitalization If yes, did you require restraint/seclusion? Explain: _____
Adult Would you like family notified about restraint/seclusion? Yes / No _____ since 6th grade

## SUBSTANCE ABUSE:
_____ Alcohol _____ Prescription Meds _____ LSD ✓ Marijuana _____ Methadone
_____ Cocaine _____ Heroine _____ PCP ✓ Stimulants _____ Inhalants
_____ Tobacco _____ Caffeine _____ Other (What?) _____
Explain how long usage and how much _____
Date of Last Use _____
History of Withdrawal Yes / No Describe: _____
Family History of Drug Use (Who, What?) _____ Bio F, MV — murdered @ bar

## ABUSE/NEGLECT HISTORY:
_____ History of Sexual Abuse
_____ History of Physical Abuse
_____ History of Neglect
Describe: _____

008534 M H D 000294254
A, S VIJAY, MD
JAMPALA, VIJAY 014Y P
902A 6/22/04 2/21/90

128

# MENTAL STATUS EXAM

**PERSONAL APPEARANCE:** _____ Appropriate _____ Well Groomed _✓_ Unkempt _____ Older / Younger (that stated age)

Comments _____

**MOOD:** _____ Dysphoria _____ Euphoria _____ Labile _✓_ Anxious _____ Irritable _____ Calm
_____ Paranoid _____ Appropriate
_____ Anger (How do you handle anger. Explain) _____
Comments _____

**PSYCHOMOTOR BEHAVIOR:** _____ Coordinated _____ Hyperactive _____ Erect Posture _✓_ Agitated _____ Uncoordinated
_____ Slumped _____ Grimaces/Tics
Comments _____

**AFFECT:** _____ Constricted _✓_ Flat _____ Tearful _____ Sad _____ Angry _____ Appropriate
Comments _____

**THOUGHT PROCESS:** _____ Orientation _____ Time _____ Place _____ Person _____ Logical _____ Illogical
_____ Circumstantial _____ Tangential _____ Loose Associations _____ Flight of Ideas
_____ Delusional _____ Ideas of Reference _____ Paranoid Ideation _____ Preoccupied
_____ Difficulty Concentrating _____ Confused _____ Grandiose _____ Appropriate
Comments _____

**HALLUCINATIONS:** _____ Visual _____ Tactile _✓_ Auditory _____ Olfactory _____ Command
_____ Gustatory _____ None
Comments ____ ⊕ UDS ____

**HOMICIDAL/SUICIDAL HISTORY:**
1. Past history of suicide/homicidal attempt (by plan) ____ age 11 or 12 ____
2. Date of attempt _____
3. History of suicide in nuclear and/or extended family _____ Yes _✓_ No  Who? _____
4. Self-inflicted burns / wounds present _____ Yes _✓_ No  If yes, where? _____
5. History of frequent accidents _____ Yes _✓_ No
   Comment _____
6. History of self-mutilation _____ Yes _✓_ No
7. History of restraint usage YES / NO Explain: _____

PRESENT SUICIDAL POTENTIAL (Explain any checked items)
_____ No evidence of suicide/homicidal thought or history
_____ Rumination
_____ Current express intent
_____ Other violence (i.e., cruelty to animals, fire-setting, etc.)
Comments _____

_talking to devil telling him to kill himself age 11. Dr Pierce_

**MEMORY:** _____ Poor Short Term _____ Poor Long Term _____ Intact

1008534   M   H  D  000294254
██████, ██████
JAMPALA, VIJAYABABU, MD
902A     6/22/04     014Y   P
             2/21/90

129

MP 374 rev 1/03

# PSYCHOSOCIAL DATA

**OCCUPATIONAL STATUS:**
_____ Disabled _____ Mental _____ Physical  *8th grade*  *Spec Ed*
_____ Full Time / Part Time Employment (Where?) _____  *Jennigen School*  *Slow*
_____ Unemployed _____ Student  *Liberty Hill*  *(Learner*
Are living arrangements satisfactory?  Yes / No
Religious Preference / Needs  *Christian*
Comments _____

**PRENATAL AND CHILDHOOD DEVELOPMENT:**
_____ Birth Trauma _____ Complications During Pregnancy
Developmental Delay _____ Motor _____ Speech _____ Other _____
Learning Disability _____
Immunization Status _____  *swallowed meconium*
Childhood Illness _____
✓ WNL    Comments _____

**EDUCATIONAL NEEDS:**
Primary Language  *ENG*  _____ Limited Education Background
_____ Reading or Writing Problems _____ Speech / Language Barrier
_____ Motivated Learner _____ Special Education
✓ WNL    Comments _____

**RECENT LOSSES:**
_____ Health _____ Job _____ Divorce _____ Death of Loved One  *peer pressure*
_____ Disruption in Lifestyle    Other: _____  *'cause not cool'*
Comments _____  *PG.*

**HOBBIES & LEISURE ACTIVITIES:**  *draw*  *Art*

**PATIENT'S IDENTIFIED STRENGTHS:**  *per (M) sweet kid*  *concerned for others ...*

**PATIENT'S GOALS OF TREATMENT:**  *lazy NFD.*

**DISCHARGE SUMMARY PLAN:**
DISCHARGE TO WHOM: SELF / PARENT / GUARDIAN / SIGNIFICANT OTHER
*Home*

Source of Information  *br (M)*    Relationship to Patient _____

Upon assessment, if the patient requires a referral, notify the appropriate department:

| DEPARTMENT | TIME NOTIFIED | STAFF SIGNATURE |
|---|---|---|
| Nutrition Therapy | | |
| Physical Therapy | | |
| Occupational Therapy | | |
| Speech Therapy | | |

RN Signature _____    Date _____

1008534   M   H D 000294254
JAMPALA,  VIJAYABABU,  MD
902A    6/22/04    014Y  P

MP 374/rev 1/03

**130**

Ordering Physician: JAMPALA, VIJAYABABU, MD

Patient: ███ ███
Physicians:
    JAMPALA, VIJAYABABU, MD
Admit Date: 06/22/2004

Location: 9A    Room: 9A0901-A
Case #: 1008534
Med Rec#: 000294254

**************************** Hematology ****************************

| TEST: | WBC | RBC | HGB | HCT | MCV | MCH | MCHC | MPV |
|---|---|---|---|---|---|---|---|---|
| UNITS: | x10'3/uL | x10'6/uL | g/dL | % | fL | pg | g/dL | fL |
| LO-HI: | 4.0-12.0 | 4.7-6.1 | 14.0-18.0 | 42.0-52.0 | 80-94 | 30-34 | 32-36 | |
| 06/22/04 | | | | | | | | |
| 0530 | 8.2 | 5.17 | 14.9 | 43.6 | 84.2 | 28.7L | 34.1 | 8.2 |

==================== Hematology ====================

| TEST: | RDW | PLT | DTYPE | SEGS | LYMPHS | MONOS | EOS | BASOS |
|---|---|---|---|---|---|---|---|---|
| UNITS: | % | x10'3/uL | | % | % | % | % | % |
| LO-HI: | 11.5-13.5 | 140-450 | | 40-75 | 15-50 | 1-12 | 0-5 | 0-1.5 |
| 06/22/04 | | | | | | | | |
| 0530 | 12.0 | 229 | AUTO DIFF | 46.9 | 35.9 | 12.3H | 3.9 | 1.0 |

**************************** Chemistry ****************************

| TEST: | Free t4 Index |
|---|---|
| UNITS: | ug/dL |
| HI: | |
| 06/22/04 | |
| 0530 | 3.80 |

**************************** Chemistry ****************************

| TEST: | Sodium | Potassium | Chloride | CO2 | Glucose | BUN | Creat | Calcium |
|---|---|---|---|---|---|---|---|---|
| UNITS: | mEq/L | mEq/L | mEq/L | mEq/L | mg/dL | mg/dL | mg/dL | mg/dL |
| LO-HI: | 135-146 | 3.5-5.3 | 98-108 | 21-32 | 70-110 | 7.0-22.0 | 0.6-1.2 | 8.5-10.1 |
| 06/22/04 | | | | | | | | |
| 0530 | 140 | 4.1 | 104 | 25 | 69L | 21 | 0.9 | 9.0 |

==================== Chemistry ====================

| TEST: | Bilirubin | Total Protein | Albumin | Alk Phos | SGOT (AST) | SGPT (ALT) | T-3 Uptake | T4 |
|---|---|---|---|---|---|---|---|---|
| UNITS: | mg/dL | g/dL | g/dL | U/L | U/L | IU/L | % | ug/dL |
| LO-HI: | 0.0-1.0 | 6.4-8.2 | 3.4-5.0 | 50-136 | 15-37 | 30-65 | 25.0-41.0 | 4.5-12.1 |
| 06/22/04 | | | | | | | | |
| 0530 | 1.3H | 6.6 | 4.1 | 261H | 35 | 31 | 37.5 | 10.0 |

9A/-9A0901-A

GARCIA, STEPHEN
DOB:02/21/1990 AGE:14Y   SEX:M
Printed 06/25/2004  07:15  CHART COPY CUMULATIVE SUM

CONTINUED  Page 1



Ordering Physician: JAMPALA, VIJAYABABU, MD

Patient: **GARCIA,STEPHEN**          Location: 9A        Room: 9A0901-A
Physicians:                          Case #: 1008534
    JAMPALA, VIJAYABABU, MD          Med Rec#: 000294254
Admit Date: 06/22/2004

================================= Chemistry =================================

TEST:       TSH
UNITS·      uIU/L
LO-HI:,

---------------------------------------------------------------------------
06/22/04
    0530    2.54


*************************** Drug Screen ***************************

06/21/04
    2010  Drug Screen, Urine
          Amphetamines,Urine      * **Positive**      [NEG]
          Barbituates,Urine         Negative          [NEG]
          Benzodiazapine,Urine      Negative          [NEG]
          Cocaine,Urine             Negative          [NEG]
          Opiates,Urine             Negative          [NEG]
          Phencyclidine,Urine       Negative          [NEG]
          THC,Urine               * **Positive**      [NEG]


*************************** Immunology ***************************

DATE:                  06/22/04
TIME·                    0530                  NORMALS    UNITS
---------------------------------------------------------------------------
PPD            NON REACTIVE                      NR


*************************** Urinalysis ***************************

DATE·                  06/21/04
TIME·                    2010                   NORMALS    UNITS
---------------------------------------------------------------------------
Color             Yellow
Clarity           Clear
pH                5.5                        5.0-9.0
Specific Gravity  >= 1.030                   1.001-1.035
Glucose           Negative                     NEG       mg/dL
Bilirubin         **Small** *                  NEG       mg/dL
Ketones           **Trace** *                  NEG       mg/dl.
Blood             Negative                     NEG       /uL
Protein           **Trace** *                  NEG       mg/dL
Urobilinogen      0.2                        0.2-1.0     mg/dL


**GARCIA,STEPHEN**                    9A/ 9A0901-A
DOB:02/21/1990 AGE:14Y  SEX:M
Printed 06/25/2004  07:15  CHART COPY CUMULATIVE SUM         CONTINUED  Page 2



Ordering Physician: JAMPALA, VIJAYABABU, MD

Patient: **GARCIA, STEPHEN**　　　　　　　　　Location: 9A　　　　Room: 9A0901-A
Physicians:　　　　　　　　　　　　　　　　　　Case #: 1008534
　　　JAMPALA, VIJAYABABU, MD　　　　　　　Med Rec#: 000294254
Admit Date: 06/22/2004

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* Urinalysis \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| DATE: | 06/21/04 | | |
|-------|----------|---------|-------|
| TIME: | 2010 | NORMALS | UNITS |
| Nitrite | Negative | NEG | |
| Leukocyte esterase | Negative | NEG | /uL |
| WBC | 0-2 | 0-2 | /hpf |
| RBC | 2-5 | 0-2 | /hpf |
| Bacteria | Few | | |
| Epithelial | Few | | |
| Mucus | Many | | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* CANCELLED TESTS \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

06/22/04　　0213　　　CANCELLED: Urinalysis,auto,w Micr
　　　　　　　　　　　REASON:　　Lab Cancelled.
　　　　　　　　　　　　　　　　SEE ACC M9204 DONE IN ER

9A/ 9A0901-A

**GARCIA, STEPHEN**
DOB:02/21/1990 AGE:14Y　　SEX:M
Printed 06/25/2004　07:15　CHART COPY CUMULATIVE SUM　　　　END OF REPORT　Page:13

133

# AFFIDAVIT



Before me, the undersigned authority, personally appeared _____

_____Melba Leanne Starkovich_____ who being by me duly sworn
(FULL NAME)

deposed as follows:

My name is _Melba Leanne Starkovich_. I am of sound mind,
capable of making this affidavit, and personally acquainted with the facts herein
stated:

I am the custodian of the records of _Metroplex Hospital_
_2201 S. Clear Creek Rd Killeen TX 76549_
(NAME OF FACILITY AND ADDRESS)

Attached here are _33_ pages of records from the medical records of _____
_Christopher Lee Velez_, hospital stay period:
(NAME OF PATIENT)

_3-11-05 Emergency Room ? 6-21-04 Emergency Room_
(ADMISSION AND DISCHARGE DATE)

These said pages of records are kept by said Hospital in the regular course of
business, and it was the regular course of business of said Hospital for an
employee or representative of said Hospital, with knowledge of the act, event,
condition, opinion, or diagnosis, recorded to make the record or to transmit
information thereof to be included in such record; and the record was made at or
near the time or reasonable soon thereafter. The record attached hereto are the
original of exact duplicates of the original.

_____Melba Leanne Starkovich_____
(SIGNATURE)

SWORN TO AND SUBSCRIBED before me on this _1_ day of _November_, ~~199~~ 2006.

_____Lisa Lucas_____
Notary Public in and for the STATE OF TEXAS

_____Lisa Lucas_____
(Printed Name)

SEAL

My Commission Expires: _9-16-07_

LISA LUCAS
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
SEPTEMBER 16, 2007

134

**COPY**

# THE STATE OF TEXAS
*** SUBPOENA - Duces Tecum ***
Cause No. 57558



To The Sheriff, Constable, or any Peace Officer of BELL County, said State, Greeting:

You are hereby commanded to summon:

CUSTODIAN OF RECORDS
METROPLEX HEALTH SYSTEM COPY    Or Serve At:
RETURN TO DA'S OFFICE FOR SERVICE

I 0008 6
3-11-05 ER
6-21-04 ER

to be and appear * * * * * **I N S T A N T E R** * * * * before the Honorable 264 District Court of Bell County, Texas, to be held at the Courthouse of said County, in Belton, Texas, then and there to testify as witness in behalf of the STATE OF TEXAS in a criminal action pending in said Court, entitled and numbered on the Criminal Docket of said Court, THE STATE OF TEXAS vs. THOMAS RAYMOND CARR, No. 57558, and therein remain from day to day, and from term to term, until discharged by due course of law.

Returnable INSTANTER.

HEREIN FAIL NOT, and make due return hereof, showing how you have executed the same. Witness my official signature, at Belton, Texas, this 30th day of October, A.D. 2006.

Shelia F. Norman, Clerk,
264 District Court, Bell County

By:_____ Deputy

Please contact the District Attorney's Office prior to appearance to avoid
an unnecessary trip to court. 939-3521 or 1-800-460-2355, ext. 5215.

NOTE "It is an offense for a person to intentionally influence or coerce a witness to testify falsely or to elude legal process. It is also a felony offense to harm or threaten to harm a witness or prospective witness in retaliation for or on account of the service of the person as a witness or to prevent or delay the person's service as a witness to a crime."

NOTICIA "Es delito intimar u obligar a un testigo a declarar con falsedad o a evadir el proceso judicial. Tambien es delito penal herir o amenazar con herir a un testigo, o a un testigo prospectivo, en represalia o a consecuencia de haber declarado en juicio o con el afan de impedir o demorar su comparecencia como testigo de un delito."

" DUCES TECUM.TO BRING OR PRODUCE ANY & ALL MEDICAL RECORDS,INCLUDING ANY & ALL PSYCHIATRIC RECORDS OF ██████ LEE ████████ V████ FROM JUNE 19,2004 THROUGH PRESENT DATE. "

Officer's Return

Came to hand the _24_ day of _October_ A.D. 20_06_, at _100_ o'clock _P_M, and executed by delivering a copy of this SUBPOENA to _Rogelo Franich_ in person at _Metroplex Hospital_, on the _30_ day of _October_ 20_06_, at _245_ o'clock _P_M.

Not executed as to the witness _____ for the following reasons:

_____

I actually and necessarily traveled _____ miles in the service of this Subpoena.

_Billy Conway_
Sheriff/Constable/Peace
Officer/Private Process
_Bell_ County, Texas

FEES --Summoning Witnesses - $_____
     Mileage ---------- _____
     Total ------------ $_____

By:_____ De**136**

CHIEF COMPLAINT / ONSET: _Injected methamphetamine Friday & Saturday. States 1st time_

_Feels "tired & jittery" now_

_Came here Sunday, talking to self, hallucinating._

_Sunday - auditory hallucinations and responding verbally to them. Same paranoia Sunday_

_He is scared, remorseful_

_In no acute physical distress_

_Counseled on drug use, sequelae, responsible behavior._

_Poor sleep & appetite r/t methamphetamine use_

MENTAL STATUS:

ORIENTED: _x4_

HALLUCINATIONS: _none now_

SPEECH: _WNL_

APPEARANCE: _NL_

AFFECT: _depressed_

MOOD: _calm_

THOUGHT CONTENT/PERCEPTION: _logical_

APPROPRIATE CONCENTRATION _✓_    EASILY DISTRACTED _____    POOR JUDGMENT _✓_

REVIEW OF SYMPTOM: MAJOR DEPRESSION (MUST MEET DSM IV DIAGNOSTIC CRITERIA)

- POOR APPETITE; SIGNIFICANT WEIGHT LOSS
- INSOMNIA OR HYPERSOMNIA
- PSYCHOMOTOR AGITATION OR RETARDATION
- LOSS OF ENERGY OR FATIGUE
- FEELING OF WORTHLESSNESS, SELF-REPROACH OR EXCESSIVE OR INAPPROPRIATE GUILT
- RECURRENT THOUGHTS OF DEATH, SUICIDAL IDEATION, WISHES TO BE DEAD OR SUICIDE ATTEMPT
- COMPLAINTS OR EVIDENCE OF DIMINISHED ABILITY TO THINK, CONCENTRATE (SUCH AS SLOWER THINKING INDECISIVENESS NOT ASSOCIATED WITH MARKED LOOSENING OF ASSOCIATIONS) OR INCOHERENCE.

136

A. ASSESSMENT OF LETHALITY FOR DANGER TO SELF OR OTHERS:

IDEAS: _____ *Denies* _____

THREATS: _____

GESTURES: _____

PLANS: _____

ATTEMPTS: _____

ASSESSMENT OF THREAT TO SELF AND/OR OTHERS: ____ NONE ____ MILD ____ MOD ____ SEVERE

DISPOSITION:

_____ PSYCHIATRIST NOTIFIED UPON COMPLETION OF PRE-EVALUATION
        DR. _____ TIME NOTIFIED _____ TIME RESPONDED _____
✓ DISCHARGED BY ER PHYSICIAN TO *home = M* WHEN MEDICALLY STABLE
✓ REFERRED FOR OUTPT. FOLLOW-UP WITH: *TECADO, Santa Fe*
_____ INSURANCE VERIFIED
_____ ADMIT TO METROPLEX HOSPITAL
_____ HOLD FOR 23 HOURS OBSERVATION TO METROPLEX PAVILION
_____ ADMIT TO METROPLEX PAVILION INPT. UNIT*
_____ PATIENTS' BILL OF RIGHTS EXPLAINED/SIGNATURE OBTAINED
_____ CONSENT FOR TREATMENT FORM SIGNED
_____ DIRECTOR, MENTAL HEALTH SERVICES NOTIFIED OF ADMISSION REQUEST
_____ ADVANCE/MENTAL HEALTH DIRECTIVE FORM SIGNED

ATTENDING ER PHYSICIAN: *V. Mork*

ADMITTING PHYSICIAN: _____

PHYSICIAN'S ADMITTING DIAGNOSIS: _____

_____  6-22-04
SIGNATURE                                DATE

• NOTE: THE FOLLOWING ITEMS SHOULD ACCOMPANY PATIENTS BEING ADMITTED: (1) EMERGENCY MENTAL HEALTH EVALUATION, (2) EMERGENCY ROOM EVALUATION/FACE SHEET, (3) BLUE CARD AND (4) SIGNED PATIENTS' BILL OF RIGHTS COVER SHEET.

137

**Metroplex Hospital**

2201 SOUTH CLEAR CREEK RD.
PHONE (254) 526-752█
EXT 8103 EMERGENCY █
KILLEEN, TEXAS ███
DEA. ████

For _____████████████_____

Address _____

Age _____ Weight _____ Date _____

℞ A GENERICALLY EQUIVALENT DRUG PRODUCT MAY BE DISPENSED UNLESS THE PRACTITIONER HANDWRITES THE WORDS 'BRAND NECESSARY' OR 'BRAND MEDICALLY NECESSARY' ON THE FACE OF THE PRESCRIPTION.

Vicodin (5(500))
T ƨ ꝓ H, p q4H p~ pain
Dispense # 20 (Twenty)

_____ RO _____ M.D.
_____ Signature

Physician DEA No. _____

Refill _____ Times

Do not Refill _____

— Pharmacy Use Only —

138

METROPLEX HEALTH SYSTEM
EMERGENCY DEPARTMENT
PHYSICIAN ORDERS

000100086        1008838

████████████                    L E E

ALLERGIES:

| DATE | TIME | ORDERS | DOB    9/21/89 | 014/M |
|------|------|--------|----------------|-------|
|      |      | | Ordered By/ MD Signature | Nurse Signature |

LABS/TEST:
- ☐ ABG    ☐ Accucheck    ☐ Amylase
- ☐ BS      ☐ Blood Alcohol Level    ☐ B - Met    ☐ C - Met
- ☐ CBC    ☐ CPK    ☐ CKMB    ☐ Troponin    ☐ Carboxy Hgb
- ☐ Cultures/Sensitivity: ☐ Blood X _____    ☐ Urine ☐ Throat ☐ Wound
- ☐ Drug Level: ☐ ASA    ☐ Acetaminophen    ☐ Digoxin    ☐ Dilantin
         ☐ Phenobarb ☐ Valproic Acid/ Depakote    ☐ Others _____
- ☐ ECG
- ☐ LFT
- ☐ PT / PTT
- ☐ SHCG: ☐ Quant (M)    ☐ Quali    ☐ Sed Rate
- ☐ STD Work-up: ☐ GC    ☐ Wet Prep    ☐ Chlamydia    ☐ Cervical C/S
- ☐ T3 T4    ☐ TSH
- ☐ Type & Crossmatch X _____ units    ☐ Type and Screen
- ☐ UA    ☐ Urine Drug Screen

RADIOLOGY/IMAGING:
- ☐ CXR Port 2V    ☐ AAS    ☐ C Spine: XTL / LTD    ☐ KUB
- ☐ X Ray (State): _____
- ☐ Skull LTD
- ☐ CT - Head  w/ contrast / w/o contrast    ☐ ABD
        ☐ Others: _____
- ☐ U/S : _____

☐ cardiac monitor    ☐ Pulse Oximetry    ☐ Bair hugger

PAUIXIV

| Medications /IV Orders/Additional Orders | Ordered By/ MD Signature | Time Given | Given By |
|------------------------------------------|--------------------------|------------|----------|
|  |  |  |  |

Discharge Orders

Patient Disposition: Discharge    Admit    Transfer
To: Home  OR   ICU   L&D   SDS    Inpt. Unit: Rm # _____
Receiving Facility: _____
Nursing Home: _____
Other: _____

Joseph N Pigal DO FACEP
Metroplex Hospital
___ S Clear Creek
Killeen, TX 76542

MHS Form  559  10/02 Rev 2/03

139

METROPLEX HEALTH SYSTEM
EMERGENCY DEPARTMENT
PHYSICIAN ORDERS

Addressograph

DOB 9/21/89                    014 / M

ALLERGIES:

| DATE | TIME | ORDERS | Ordered By/ MD Signature | Nurse Signature |
|------|------|--------|--------------------------|-----------------|
|      |      | **LABS/TEST:** <br> ☐ ABG  ☐ Accucheck  ☐ Amylase <br> ☐ BS   ☐ Blood Alcohol Level  ☐ B - Met  ☐ C - Met <br> ☐ CBC  ☐ CPK  ☐ CKMB  ☐ Troponin  ☐ Carboxy Hgb <br> ☐ Cultures/Sensitivity: ☐ Blood X ____  ☐ Urine ☐ Throat ☐ Wound <br> ☐ Drug Level: ☐ ASA  ☐ Acetaminophen  ☐ Digoxin  ☐ Dilantin <br> ☐ Phenobarb ☐ Valproic Acid/ Depakote  ☐ Others _____ <br> ☐ ECG <br> ☐ LFT <br> ☐ PT / PTT <br> ☐ SHCG: ☐ Quant (M)  ☐ Quali  ☐ Sed Rate <br> ☐ STD Work-up: ☐ GC  ☐ Wet Prep  ☐ Chlamydia  ☐ Cervical C/S <br> ☐ T3  T4  ☐ TSH <br> ☐ Type & Crossmatch X ____ units   ☐ Type and Screen <br> ☐ UA   ☐ Urine Drug Screen <br> **RADIOLOGY/IMAGING:** <br> ☐ CXR Port 2V   ☐ AAS   ☐ C Spine: XTL / LTD   ☐ KUB <br> ☐ X Ray (State): _____ <br> ☐ Skull LTD <br> ☐ CT - Head  w/ contrast / w/o contrast  ☐ ABD <br> ☐ Others: _____ <br> ☐ U/S : _____ |  |  |
|      |      | ☐ cardiac monitor   ☐ Pulse Oximetry   ☐ Bair hugger |  |  |
|      |      | *PA w/ x16r* |  |  |

| Medications /IV Orders/Additional Orders | Ordered By/ MD Signature | Time Given | Given By |
|------------------------------------------|--------------------------|------------|----------|
|  |  |  |  |

Discharge Orders

Patient Disposition: Discharge   Admit   Transfer
To: Home OR  ICU   L&D   SDS   Inpt Unit: Rm # _____
Receiving Facility: _____
Nursing Home: _____
Other: _____

Joseph N Pixel DO FACEP
Metroplex Hospital
2201 S Clear #1001
Killeen, TX 76542

MHS Form 559  10/02 Rev 2/03

140

Metroplex Hospital
2201 S Clear Creek Road
Killeen, TX 76549

NAME: V█████, C████████ █
H# : 000100086          LOC: ER      ROOM:          AGE: 14Y     SEX: M
HOSP. ID: MET
ACCT: 1008538          DR:  PIPER, JOSEPH N., DOCODE: 00301

M9240     COLL: 06/21/2004 20:30 REC: 06/21/2004 20:36 PHYS: PIPER, JOSEPH N., D

Drug Screen, Urine
  Amphetamines, Urine      * Positive       (NEG)
  Barbituates, Urine         Negative       (NEG)
  Benzodiazapine, Urine      Negative       (NEG)
  Cocaine, Urine             Negative       (NEG)
  Opiates, Urine             Negative       (NEG)
  Phencyclidine, Urine       Negative       (NEG)
  THC, Urine               * Positive       (NEG)

141

06/21/2004
20:58
Metroplex Hospital
2201 S Clear Creek Road
Killeen, TX 76549
AUTO RESULT REPORT
PAGE 1

NAME: V█████ C█████████ █
H# : 000100086 ████ : ER     ROOM:          AGE: 14Y    SEX: M
HOSP. ID: MET
ACCT: 1008538        DR:  PIPER, JOSEPH N., DOCODE: 00301

M9240      COLL: 06/21/2004 20:30 REC: 06/21/2004 20:36 PHYS: PIPER, JOSEPH N., D

Urinalysis,auto,w Micr
| Test | Result | Reference | Units |
|---|---|---|---|
| Color | Yellow | | |
| Clarity | Clear | | |
| pH | 5.5 | [5.0-9.0] | |
| Specific Gravity | >= 1.030 | (1.001-1.035) | |
| Glucose | Negative | [NEG] | mg/dL |
| Bilirubin | * Small | [NEG] | mg/dL |
| Ketones | Negative | [NEG] | mg/dL |
| Blood | Negative | [NEG] | /uL |
| Protein | * 30 | [NEG] | mg/dL |
| Urobilinogen | 1.0 | [0.2-1.0] | mg/dL |
| Nitrites | Negative | [NEG] | |
| Leukocyte esterase | Negative | [NEG] | /uL |
| WBC, Urine | 2-5 | [0-2] | /hpf |
| RBC, Urine | 10-15 | [0-2] | /hpf |
| Bacteria | Few | | |
| Epithelial | Few | | |
| Crystals | Moderate | | |
|  | Amorph Urate | | |
| Mucus | Many | | |

142

METROPLEX/ROLLINS BROOK COMMUNITY HOSPITAL
EMERGENCY MENTAL HEALTH EVALUATION

B-3

DATE/TIME: 6-22-04  915   EVALUATOR: Bo Devine R.N.

POTENTIAL PATIENT NAME:

ADDRESS: 320                                    M / F

CITY/STATE:

SSN:                                    TELEPHONE:

RESOURCES/INSURANCE: MD   TELEPHONE:

MILITARY SERVICE:        YEARS SERVICED:        DISCHARGE:
VA ELIGIBLE:
(When over 3 years in service with an honorable discharge; or over 180 days in service with a medical discharge, the patient is VA eligible and should be transferred to VA Hospital if he/she meets inpatient criteria.)

LEGAL GUARDIAN/SPOUSE:                    TELEPHONE:

LMP: Ø   UDS: THC   ALLERGIES: NKDA

CURRENT LAB RESULTS: PKG & NL ; UA ↑ sm. bili, protein >30

MEDICAL HISTORY: unremarkable

PAST PSYCHIATRIC HISTORY: None

FAMILIAL PSYCHIATRIC HISTORY: Ø

PAST SEXUAL/PHYSICAL ABUSE: Ø

ALCOHOL/SUBSTANCE ABUSE: M.J. since January
Meth and WF

MEDICATIONS: Ø

SUPPORT SYSTEMS: Alvarado adequate

PRIMARY PHYSICIAN: Alvarado

REFERRED BY: E.B.   BROUGHT IN BY: P.O.V.

THERAPIST/PSYCHIATRIST: Ø

143

# Exhibit 10



National Institute
on Drug Abuse

# DrugFacts

www.drugabuse.gov

# Stimulant ADHD Medications: Methylphenidate and Amphetamines

Stimulant medications including amphetamines (e.g., Adderall) and methylphenidate (e.g., Ritalin and Concerta) are often prescribed to treat children, adolescents, or adults diagnosed with attention-deficit hyperactivity disorder (ADHD).

People with ADHD persistently have more difficulty paying attention or are more hyperactive or impulsive than other people the same age. This pattern of behavior usually becomes evident when a child is in preschool or the first grades of elementary school; the average age of onset of ADHD symptoms is 7 years. Many people's ADHD symptoms improve during adolescence or as they grow older, but the disorder can persist into adulthood.

ADHD diagnoses are increasing. According to the U.S. Centers for Disease Control and Prevention, as of 2011, 11 percent of people ages 4–17 have been diagnosed with ADHD.

## How Are Prescription Stimulants Used?

Prescription stimulants have a calming and "focusing" effect on individuals with ADHD. They are prescribed to patients for daily use, and come in the form of tablets or capsules of varying dosages. Treatment of ADHD with stimulants, often in conjunction with psychotherapy, helps to improve ADHD symptoms along with the patient's self-esteem, thinking ability, and social and family interactions.

Prescription stimulants are sometimes abused however—that is, taken in higher quantities or in a different manner than prescribed, or taken by those without a prescription. Because they suppress appetite, increase wakefulness, and increase focus and attention, they are frequently abused for purposes of weight loss or performance enhancement (e.g., to help study or boost grades in school; see box).

145

Because they may produce euphoria, these drugs are also frequently abused for recreational purposes (i.e., to get high). Euphoria from stimulants is generally produced when pills are crushed and then snorted or mixed with water and injected.

## Do Prescription Stimulants Make You Smarter?

A growing number of teenagers and young adults are abusing prescription stimulants to boost their study performance in an effort to improve their grades in school, and there is a widespread belief that these drugs can improve a person's ability to learn ("cognitive enhancement").

Prescription stimulants do promote wakefulness, but studies have found that they do not enhance learning or thinking ability when taken by people who do not actually have ADHD. Also, research has shown that students who abuse prescription stimulants actually have lower GPAs in high school and college than those who don't.

## How Do Prescription Stimulants Affect the Brain?

All stimulants work by increasing dopamine levels in the brain—dopamine is a neurotransmitter associated with pleasure, movement, and attention. The therapeutic effect of stimulants is achieved by slow and steady increases of dopamine, which are similar to the way dopamine is naturally produced in the brain. The doses prescribed by physicians start low and increase gradually until a therapeutic effect is reached.

When taken in doses and via routes other than those prescribed, prescription stimulants can increase brain dopamine in a rapid and highly amplified manner (similar to other drugs of abuse such as methamphetamine), thereby disrupting normal communication between brain cells and producing euphoria and, as a result, increasing the risk of addiction.

## What Are the Other Health Effects of Prescription Stimulants?

Stimulants can increase blood pressure, heart rate, and body temperature and decrease sleep and appetite. When they are abused, they can lead to malnutrition and its consequences. Repeated abuse of stimulants can lead to feelings of hostility and paranoia. At high doses, they can lead to serious cardiovascular complications, including stroke.

Addiction to stimulants is also a very real consideration for anyone taking them without medical supervision. Addiction most likely occurs because stimulants, when taken in doses and routes other than those prescribed by a doctor, can induce a rapid rise in dopamine in the brain. Furthermore, if stimulants are abused chronically, withdrawal symptoms—including fatigue, depression, and disturbed sleep patterns—can result when a person stops taking them. Additional complications from abusing stimulants can arise when pills are crushed and injected: Insoluble fillers in the tablets can block small blood vessels.

## Do Prescription Stimulants Affect a Patient's Risk of Substance Abuse?

Concerns have been raised that stimulants prescribed to treat a child's or adolescent's ADHD could affect an individual's vulnerability to developing later drug problems—either by increasing the risk or by providing a degree of protection. The studies conducted so far have found no differences in later substance use for children with ADHD who received treatment and those that did not. This suggests treatment with ADHD medication appears not to affect (either negatively or positively) an individual's risk for developing a substance use disorder.

## Learn More

For more information on prescription stimulants, visit
www.drugabuse.gov/publications/
research-reports/prescription-
drugs/director.

147



**(http://www.dependency.net)**

READY TO BECOME INDEPENDENT AGAIN? CALL TOLL FREE 24/7

1-888-290-6365 (TEL:+18882906365)

# Ritalin Dependence –Signs of Ritalin Use Vs. Abuse, Tolerance

Ritalin is the trade name for methylphenidate, a stimulant that is most commonly used to treat attention-deficit hyperactivity disorder (ADHD) in children and adults and chronic sleep disorder. It is listed as a controlled substance in the United States and is comparable to the drug **amphetamine**

**IN THIS ARTICLE**          **PRINT VERSION**

**Is Ritalin Addictive?**

**Understanding Ritalin Dependency and Tolerance**

**Effects/Side Effects**

**Withdrawal and Detoxification**

**Treatment for Ritalin Addiction**

**(http://www.dependency.net/learn/amphetamine/).** Abuse of Ritalin produces effects similar to cocaine.

When used exactly as prescribed, Ritalin is considered safe, which is why it is so frequently prescribed for children. Although Ritalin increases the levels of dopamine in the brain, like other stimulants, the controlled dosage prevents the chemical changes from inducing the euphoric effects of illegal stimulants. Abuse by Ritalin users with a legal **prescription (http://www.dependency.net/learn /prescription-drugs/)** is not common; however, abuse by people who obtain the drug illegally for its ability to mimic the effects of cocaine at high doses is very common. The most common abusers of Ritalin are teenagers and young adults who use the drug for its euphoric effects, to stay

Act Now Get Help Today ▢

*Don't worry, we hate spam*

I'm seeking treatment for..

Your name

Your email

Your Phone Number

**Submit Form**

**Or Call Toll Free**

**1-888-290-6365 (tel:+18882906365)**

**To Speak With a Treatment Advisor**

Popular Treatment Centers

148

awake, and to increase concentration. Other abuses of the drug include taking it to lose weight or enhance performance.

## Is Ritalin Addictive?

Studies indicate that Ritalin is not addictive when taken orally and used exactly as prescribed; however, it is addictive when abused. How addictive is Ritalin? It is highly addictive when misused and can result in **severe psychological dependence (http://www.dependency.net/learn/drug-and-alcohol-tolerance-vs-dependence/)**. Basically, Ritalin abusers seek to turn the drug into a substitute for cocaine and experience the same addictive dangers.

In addition to taking Ritalin in excessive dosages, Ritalin abusers often crush the pills and snort the powder or mix the powder with water and inject it. This type of abuse produces results that are almost exactly the same as cocaine use. Abusers who use Ritalin to stay awake typically take the drug orally, while abusers who are interested in getting "high" snort or inject it.

## Understanding Ritalin Dependency and Tolerance



A person who abuses Ritalin can develop a psychological dependence on the drug. Likewise, the person can develop a physical tolerance to the drug that requires an increased dosage to attain the same results. Ritalin dependence can lead to drug cravings and panic attacks if the drug is not available. These panic attacks can cause psychotic episodes and heart problems.

It is important to distinguish between abusers who are



Choices From The Nation's

**TOP REHAB CENTER**

**GET HELP ▸**   (A)Rehabs

**Click here (/treatment-center/)** to contact a treatment center advisor, or review a facility below.



## Axis Residential Center

Indian Wells CA 92210

**Axis Residential Treatment Center is a full-service, private and safe treatment facility with professional, caring staff providing 24 hours a day, 7 days a week support.**

Browse Articles

## Prescription Drugs

Adderall



misusing Ritalin for performance purposes, which may cause them to stray into dependency and **addiction (http://www.dependency.net/learn/drug-addiction/),** and those who are specifically seeking a cocaine-like high. Some hardcore abusers engage in "binge-crash" behavior, where continual use over the course of days without sleep results in a lapse into a coma-like state of heavy sleeping. If this sounds very much like cocaine abuse, it is because the tolerance and dependency dangers are almost identical.



Featured from The Nation's Best Rehabs

**PROMISES** TREATMENT CENTERS
Luxury and Executive Programs Detox, Dual-Diagnosis and more
Call 1-800-768-1799 Today
Or    Get Facility Details

**axis** RESIDENTIAL TREATMENT
Effective, Affordable Luxury Insurance, Financing Available
Call 1-800-798-7926 Today
Or    Get Facility Details

**Rehabs...**
**His House** Residential Treatment
Excellent Value, Insurance Accepted
Call 1-800-934-3143 Today
Or    Get Facility Details

# Effects/Side Effects

## Withdrawal and Detoxification

People who abuse Ritalin can overdose on the drug. It is important to be able to recognize the symptoms of an overdose in friends and loved ones so you can arrange immediate treatment. A Ritalin overdose can cause psychosis, agitation, lethargy, and seizures. If you suspect an overdose, contact a poison control center. A Ritalin overdose has the potential to cause an onset of sudden death, especially in people with underlying heart conditions, so immediate medical attention is advisable.

Withdrawal from Ritalin can result in a change in the person's behavior that may be difficult for you to handle alone. Ritalin withdrawal **symptoms are psychological (http://www.dependency.net/learn/drug-addiction/),** and suddenly stopping the drug can cause psychotic behavior, aggression, panic, extreme fatigue and depression, and even suicidal tendencies.

(http://www.dependency.net/learn/adderall/)
Alprazolam (http://www.dependency.net/learn/alprazolam/)
Ambien (http://www.dependency.net/learn/ambien/)
Amphetamine (http://www.dependency.net/learn/amphetamine/)
Antidepressant (http://www.dependency.net/learn/antidepressant/)
Antipsychotic (http://www.dependency.net/learn/antipsychotic/)
Ativan (http://www.dependency.net/learn/ativan/)
Barbiturate (http://www.dependency.net/learn/barbiturate/)
Benzodiazepine (http://www.dependency.net/learn/benzodiazepine/)
Clonazepam (http://www.dependency.net/learn/clonazepam/)
Codeine (http://www.dependency.net/learn/codeine/)
Darvocet (http://www.dependency.net/learn/darvocet/)
Demerol (http://www.dependency.net/learn/demerol/)
Dexedrine (http://www.dependency.net

150

## Short-Term Effects of Ritalin

Ritalin abuse produces a stimulant-like effect. The Ritalin high induces euphoria, wakefulness, and increased focus and awareness. The intensity of the high depends on the delivery method. Taking the drug orally produces little euphoric effect, unless it is taken in larges dosages. Snorting or injecting the drug greatly heightens the experience. The side effects of abusing Ritalin can include an increase in blood pressure, heart rate, and body temperature. Ritalin can also cause nervousness, dizziness, vomiting, stomach pain, diarrhea, shortness of breath, chest pain, hallucinations, itching, rashes, fainting, and seizures. Coming down from Ritalin can induce withdrawal symptoms, especially if the person is psychologically dependent. These symptoms can include panic, depression, mood changes, and psychotic episodes.

## Long-Term Effects of Ritalin

Long-term Ritalin use may cause heart disease or stroke. Ritalin can block small blood vessels over time in abusers who inject the drug. Ongoing intravenous use can also expose the abuser to various blood-borne viruses, such as hepatitis B and C.

# Treatment for Ritalin Addiction

Ritalin abuse treatment can be complicated by the severe psychological dependency that abusers experience, which can cause them to exhibit psychotic behavior **when taken off (http://www.drugs.com/sfx/ritalin-side-effects.html)** the drug. This behavior can manifest in life-threatening ways that may be too complex for an untrained individual to handle alone. People who are **interested in l nding (http://pubs.niaaa.nih.gov/publications/arh22-1 /44-46.pdf)** inpatient or outpatient services should consider

/learn/dexedrine/)
Diazepam (http://www.dependency.net /learn/diazepam/)
Dilaudid (http://www.dependency.net /learn/dilaudid/)
Fentanyl (http://www.dependency.net /learn/fentanyl/)
Fioricet (http://www.dependency.net /learn/l oricet/)
Hydrocodone (http://www.dependency.net /learn/hydrocodone/)
Klonopin (http://www.dependency.net /learn/klonopin/)
Lorazepam (http://www.dependency.net /learn/lorazepam/)
Lorcet (http://www.dependency.net /learn/lorcet/)
Lortab (http://www.dependency.net /learn/lortab/)
Methadone (http://www.dependency.net /learn/methadone/)
Methamphetamine (http://www.dependency.net /learn /methamphetamine/)
Morphine (http://www.dependency.net /learn/morphine/)
Narcotic (http://www.dependency.net

151

calling **1-888-290-6365 (tel:+18882906365)** or filling out a quick contact form so they can find the support they need.



Luxury and Executive Programs Detox, Dual-Diagnosis and more

**Call 1-800-768-1799 Today**

Or    Get Facility Details



Effective, Affordable Luxury Insurance, Financing Available

**Call 1-800-798-7926 Today**

Or    Get Facility Details



Excellent Value, Clean and Comfort, Insurance Accepted

**Call 1-800-934-9249 Today**

Or    Get Facility Details

## Related articles

**Darvocet Dependence: Signs of Darvocet Use Vs. Abuse, Tolerance** (http://www.dependency.net/learn/darvocet/)

**Dexedrine Dependence: Signs of Dexedrine Use Vs. Abuse, Tolerance** (http://www.dependency.net/learn/dexedrine/)



Norco (http://www.dependency.net/learn/norco/)

Rehabs (http://www.dependency.net/opiate/)

(http://www.dependency.net/learn/opioid/)

Oxycodone (http://www.dependency.net/learn/oxycodone/)

OxyContin (http://www.dependency.net/learn/oxycontin/)

Percocet (http://www.dependency.net/learn/percocet/)

Ritalin

Roxicodone (http://www.dependency.net/learn/roxicodone/)

Sedative (http://www.dependency.net/learn/sedative/)

Soma (http://www.dependency.net/learn/soma/)

Tramadol (http://www.dependency.net/learn/tramadol/)

Tranquilizer (http://www.dependency.net/learn/tranquilizer/)

Valium (http://www.dependency.net/learn/valium/)

Vicodin

**152**

(http://www.dependency.net
/learn/vicodin/)
Vicoprofen
(http://www.dependency.net
/learn/vicoprofen/)
Xanax
(http://www.dependency.net
/learn/xanax/)

## Article categories

Drug Addiction

Prescription Drugs
(http://www.dependency.net
/learn/prescription-
drugs/)
Drug & Alcohol
Tolerance vs.
Dependence
(http://www.dependency.net
/learn/drug-
and-alcohol-tolerance-
vs-dependence/)
cocaine
(http://www.dependency.net
/learn/cocaine/)
Crack Cocaine
(http://www.dependency.net
/learn/crack-cocaine/)
Crystal Meth
(http://www.dependency.net
/learn/crystal-meth/)
ecstasy
(http://www.dependency.net
/learn/ecstasy/)
heroin
(http://www.dependency.net
/learn/heroin/)
ketamine
(http://www.dependency.net

(http://www.dependency.net
/learn/vicodin/)
Vicoprofen
(http://www.dependency.net
/learn/vicoprofen/)
Xanax
(http://www.dependency.net
/learn/xanax/)

## Article categories

Drug Addiction

Prescription Drugs
(http://www.dependency.net
/learn/prescription-
drugs/)
Drug & Alcohol
Tolerance vs.
Dependence
(http://www.dependency.net
/learn/drug-
and-alcohol-tolerance-
vs-dependence/)
cocaine
(http://www.dependency.net
/learn/cocaine/)
Crack Cocaine
(http://www.dependency.net
/learn/crack-cocaine/)
Crystal Meth
(http://www.dependency.net
/learn/crystal-meth/)
ecstasy
(http://www.dependency.net
/learn/ecstasy/)
heroin
(http://www.dependency.net
/learn/heroin/)
ketamine
(http://www.dependency.net

/learn/ketamine/)
LSD
(http://www.dependency.net
/learn/lsd/)
marijuana
(http://www.dependency.net
/learn/marijuana/)

CALL US TOLL FREE

1-888-290-6365

(TEL:+18882906365)

OR USE OUR

☐ Live chat

☐ Contact form

Quick Jump To Page

© 2015 Dependency.net | All Rights Reserved

Terms of Service | Privacy Policy (/tos-pp/)

155



PRACTICAL PAIN MANAGEMENT

≡

Q

Subscribe to PPM and get a FREE Practice Listing.

FOLLOW US f 🐦 g+

RENEW OR SUBSCRIBE TO PPM

Subscription is FREE for qualified healthcare professionals in the US.

RENEW | SUBSCRIBE

🄳 Download

✉ Email

🖨 Print

🐦 Tweet

ↄ Subscribe or renew to PPM

## Methamphetamine Urine Toxicology: An In-depth Review

By Michael DeGeorge, Jr., PharmD (/author/11339/degeorge-jr) and John Weber (/author/11340/weber)

g+1  4    -    Like { 12 }

When a patient's urine drug screen tests positive for methamphetamine by mass spectrometry, the result has serious implications for the patient and the provider. Determining the source of the methamphetamine is an important next step and is not always as straightforward as it appears.

### Background

Methamphetamine increases synaptic dopamine, primarily by stimulating presynaptic release rather than by blocking reuptake. Small doses have central stimulant effects without significant peripheral actions. Methamphetamine produces subjective effects that are similar to those of cocaine, and it is for this reason that it is often a medication of abuse.[1] In 2011, 133,000 persons aged 12 years or older abused methamphetamine for the first time and the overall number of past-month methamphetamine abusers was 439,000.[2] Methamphetamine abuse carries significant morbidity. According to the Drug Abuse Warning Network, 6.6% of emergency department visits involving illicit drugs in 2009 were due to methamphetamine.[3]

In the United States, methamphetamine is a schedule II drug and is approved for treating both attention deficit hyperactivity disorder and obesity under the brand name Desoxyn. In addition, benzphetamine (Didrex) is a schedule III medication approved for treatment of obesity. Didrex is metabolized to methamphetamine. Besides prescription sources, methamphetamine (ie, "crystal meth") can also be produced in small, clandestine laboratories using ephedrine or pseudoephedrine as a key ingredient. This has prompted restrictions on the distribution of these over-the-counter (OTC) medications.

### Toxicology

Methamphetamine has 2 isomers, d-methamphetamine and l-methamphetamine. Prescription methamphetamine (Desoxyn)[4] is composed entirely of the d isomer. D-methamphetamine increases alertness, concentration, energy, and in high doses, can induce euphoria, enhance self-esteem, and increase libido.[1] These traits make d-methamphetamine very attractive to a potential abuser.

156

On the other hand, l-methamphetamine affects the sympathetic nervous system but has little activity in the central nervous system, so it is not thought to possess an addiction potential anywhere near that of the d-methamphetamine isomer. Among its few physiological effects is vasoconstriction, which makes it useful for nasal decongestion.[1]

(http://www.practicalpainmanagement.com/sites/default/files
/imagecache/lightbox-large/images/2012/11/29/1109_0.png)

The challenge for the laboratory is to differentiate between the d and the l isomer forms of methamphetamine. The clinician needs this critical information because without the d:l-isomer ratio, the clinician is unable to narrow down the potential sources of the methamphetamine. A positive methamphetamine test could be caused by use of an OTC product, a prescription drug, or illicit use (Table 1).[5-8] The laboratory may run up to 3 distinct tests to produce a complete amphetamine profile. The first test is an immunoassay (IA) screening test for the amphetamine class of medications, which includes both amphetamines and methamphetamines. If the screening test is positive (a reaction greater than the cutoff), then a mass spectrometry (MS) confirmation test is performed to determine which specific compounds, amphetamine and/or methamphetamine, are present. Once methamphetamine is confirmed positive by MS, a third test may be performed to ascertain the ratio between the 2 isomers of methamphetamine. The d,l-isomer test also is performed by MS. Understanding each of the 3 testing steps is essential to clinical decision making related to patient care.

As noted, the first test is the IA screening test. This step is nonspecific in that the reaction can be caused not only by amphetamines but also by other compounds with a similar molecular structure, phentermine being a classic example. If the IA test is negative, no further testing is required and the amphetamines are considered negative. If the IA test is positive, the sample is analyzed by MS to determine whether it was an amphetamine that caused the reaction.

The MS confirmation test can come back with 4 possible results: 1) no amphetamines detected; 2) amphetamine only detected; 3) methamphetamine only detected; and 4) both amphetamine and methamphetamine detected (Figure 1). If no amphetamines are detected, then the amphetamine result is negative and no further testing is needed. If only amphetamine is detected, once again no further testing is needed. A finding of amphetamine-only positive by MS can be caused by prescription drugs (Adderall and various amphetamine salts) or as a result of methamphetamine metabolism, where the methamphetamine (whatever the source) has been converted to amphetamine. When methamphetamine is detected or both amphetamine and methamphetamine are detected, then the lab can run a d,l-isomer test to try and narrow the source of the positive methamphetamine finding (Figure 1).

157



(http://www.practicalpainmanagement.com/sites/default/files
/imagecache/lightbox-large/images/2012/11/29/6755019_l_opt.jpeg)

The third and final test is the methamphetamine d,l-isomer test by MS (Figure 2). Based on a 1991 Department of Health and Human Services Technical Advisory, a d-methamphetamine level that is >20% of the total is considered indicative of a source other than an OTC product or a metabolite of selegiline.9 These sources could include a prescription medication or illegally manufactured methamphetamine. If the patient does not have a prescription for a drug that would result in >20% d-methamphetamine, illicit use of a diverted prescription product or street methamphetamine should be considered as a source.

A recent study by Esposito et al published in the Journal of Analytical Toxicology showed that d-methamphetamine percentages often were a few percentage points above or below the expected value based on the standard solutions they were testing.9 This was due to impurities in some of the derivatizing agents used. When interpreting test results, a clinician should consider that the result might never be 100% d or l isomer due to these impurities. Esposito concluded that the >20% d-methamphetamine guideline is still relevant and appropriate based on their findings.9

## Summary

Illicit methamphetamine availability and use poses a serious health risk in the United States today. If abuse is suspected, urine drug tests are available to help clinicians detect its presence and intervene in order to optimize patient outcomes. There are a few distinct sources of methamphetamine. Using current methodology for urine toxicology testing will allow clinicians to narrow down the possible source of a positive result and assist them in managing their patients accordingly.

View Sources (/treatments/pharmacological/non-opioids/methamphetamine-urine-toxicology-depth-review#fieldset)

First published on: November 1, 2012

## Related Articles

Ziconotide for Chronic Severe Pain (/treatments/pharmacological/non-opioids/ziconotide-chronic-severe-pain)

Why Some Patients Require High Dose Opioid Therapy (/treatments/pharmacological/opioids/why-some-patients-require-high-dose-opioid-therapy)

Urine Drug Testing as an Evaluation of Risk (/treatments/pharmacological/opioids/urine-drug-testing-evaluation-risk)

Doctors May Now Electronically Prescribe Schedule II Drugs (/treatments/pharmacological/doctors-may-now-electronically-prescribe-schedule-ii-drugs)

FDA's Proposed Risk Evaluation and Mitigation Strategy (REMS) for Opioids (/treatments/pharmacological/opioids/fda-proposed-risk-evaluation-mitigation-strategy-rems-opioids)

Making Practical Sense of Cytochrome P450 (/treatments/pharmacological/opioids/making-practical-sense-cytochrome-p450)

Vertical Health Websites



⊕ SHOW MAIN MENU



⊙ SHOW SUB MENU

Types of Pain

Acute Pain

Post-surgical Pain

Sports and Overuse Injury

Trauma

Cancer PainHeadache

Cluster Headache

Migraine

Post-trauma Headache

Tension Headache

Neuropathic Pain

Carpal Tunnel Syndrome

CRPS/RSD/Causalgia

Diabetic Neuropathy

Multiple Sclerosis

Phantom Limb Syndrome

Postherpetic Neuralgia

Trigeminal Neuralgia

Oral and Maxillofacial Pain

TMJ

Tooth Pain

Rheumatologic and Myofascial Pain

Fibromyalgia

Inflammatory Arthritis

Lupus and Other Autoimmune Disorders

Lyme and Other Infectious Diseases

Osteoarthritis

Plantar Fasciitis

Spine Pain

Discogenic Pain

Facet Syndrome

Myofascial Back Pain

Radiculopathy

Trauma

Other Types of Pain

Abdominal and Pelvis Pain

Brain Injury

General Musculoskeletal Pain

Pain Co-morbidities

Pain Treatments

Complementary Treatments

Acupuncture

Biobehavioral

Homeopathy

Lasers

Magnets

Prolotherapy

Interventional Pain Management

Ablations

Injections

Pumps

Stimulators

Manipulation and Massage

Massage

Osteopathic

Pharmacological

Non-opioids/OTC

Opioids

Psychological

Biofeedback

Cognitive-behavioral Therapy

Rehabilitation

Exercise

Physical Therapy

Resources

Clinical Practice GuidelinesDiagnostic TestsEthics and LegalClinical ResourcesHospice/Palliative CareNews and ResearchPractice Management

PCP Updates

Literature Review

Past Issues

FOR PATIENTS

**Pain Treatments**

Bracing/Splinting/Prosthesis

Complementary Treatments

Hormone Therapy

Interventional Pain Management

Manipulation and Massage

Nutraceutical

Pharmacological

Non-opioids/OTC

Opioids

Psychological

Rehabilitation

# Will I Pass A Methamphetamine Drug Test

88 Replies   Updated Wed, Apr 29 '15, 5 31 AM

Home › Drugs: M › Methamphetamine › Discussions

### *Conversation Starter*

**Angela** Says:
Sun, Aug 21 '11, 3 39 PM

For the last two weeks ive been smoking meth, nomore then two grams throughout that time. Havent touched it since yesterday aug, 20th. I have to see my probation officer on sept, 2nd and will be getting drugged tested. Here's another thing. Im prescribed **Adderall** 20mg and never had a problem passing test, now that I have been using **methamphetamine** this month, will it trigger me to have a positive drug test even if the meth is already out of my system? Whats the longest time meth has stayed in someones system? What can I do in 13 days?? Please help!

### Showing Replies 1 - 20 of 88

**Verwon** Says:
Thu, Aug 25 '11, 11 15 AM

Though it can vary from person to person, depending on their own individualizing factors, **Methamphetamine** is generally detectable for approximately 5 days, after use in a standard urine test

However, as to the longest time it's been detected, the answer is a lifetime. There is no explanation for it, but traces tend to linger in some people, even with just one use.

As to the **Adderall**, the **Amphetamine** salts in it can cause a false positive for Methamphetamine.

http://www.medschat.com/wiki/Adderall/

http://www.medschat.com/wiki/Methamphetamine/

Are there any other questions or comments?

**Frank Linn** Says
Thu, Aug 25 '11, 1 22 PM

Meth will not show up on the piss test after 13 days.
they will see the meds that you have a script for, as long as you have proof you're in the clear.
Allthough, if anybody does a hair test on you you'd be toast...unless you shave your head.

**Angela** Says:
Fri, Aug 26 '11, 6 10 PM



# Exhibit 11

102

# IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

THE GRAND JURY, for the County of Bell, State of Texas, duly selected, empaneled, sworn, charged, and organized as such at the January Term, A.D. 2005 of the 27th Judicial District Court for said County, upon their oaths present in and to said court at said term that

THOMAS RAYMOND CARR    57558

hereinafter styled Defendant, on or about the 18th day of June A.D. 2004, and before the presentment of this Indictment, in the County and State aforesaid,

did then and there cause an object, to wit: a "dildo" to contact and penetrate the anus of J████ N████, a child less than 17 years of age and not the spouse of the said Thomas Raymond Carr, and the said Thomas Raymond Carr operated in concert with Tammy Bishop during the same criminal episode, and the defendant did provide to and administer a controlled substance to the said J███ d M██ with the intent of administering said offense

against the peace and dignity of the State.

_____
District Attorney 27th Judicial District of Texas

_____
Foreman of the Grand Jury

FILED
2005 MAR 23 AM 11: 33
SHEILA NORMAN
DISTRICT COURT
BELL COUNTY, TX

163

# THE STATE OF TEXAS
# COUNTY OF BELL

I, _____

of the _____ District Court of Bell County, Texas, do hereby certify that the within and foregoing is a true and correct copy of the original Bill of Indictment, filed in said Court on the _____ day of _____ A.D., 20_____, in cause No. _____, styled The State of Texas vs. _____

Given under my hand and the seal of said Court, at office in _____ this _____ day of _____ A.D., 20_____

_____ Clerk

By _____ Deputy

NAMES OF WITNESSES:

NO. 57538

THE STATE OF TEXAS
VS.
RAYMOND CARR

INDICTMENT

OFFENSE

AGGRAVATED ASSAULT OF A CHILD

_____, District Attorney

_____ Foreman of Grand Jury

_____ day of _____ 20___

_____ District Clerk

_____ Deputy

164

# IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

THE GRAND JURY, for the County of Bell, State of Texas, duly selected, empaneled, sworn, charged, and organized as such at the January Term, A.D. 2005 of the 27th Judicial District Court for said County, upon their oaths present in and to said court at said term that

<u>**THOMAS RAYMOND CARR**</u>   *57558*

hereinafter styled Defendant, on or about the 18th day of June A.D. 2004, and before the presentment of this Indictment, in the County and State aforesaid,

did then and there cause an object, to wit: a "dildo" to contact and penetrate the anus of Jerrid May, a child less than 17 years of age and not the spouse of the said Thomas Raymond Carr, and the said Thomas Raymond Carr operated in concert with Tammy Bishop during the same criminal episode, and the defendant did provide to and administer a controlled substance to the said Jerrid May with the intent ~~of administering~~ said offense

*to facilitate commission of*
∧ *-mpt 3/24/06*

against the peace and dignity of the State.

_____
Foreman of the Grand Jury


District Attorney 27th Judicial District of Texas

105

SCAN

# THE STATE OF TEXAS
## COUNTY OF BELL

I, _____

of the _____ District Court of Bell County, Texas, do hereby certify that the within and foregoing is a true and correct copy of the original Bill of Indictment, filed in said Court on the _____ day of _____ A.D., 20_____, in cause No. _____, styled The State of Texas, vs _____

Given under my hand and the seal of said Court, at office in _____ this _____ day of _____ A.D., 20____

_____ Clerk

By _____ Deputy

---

NAMES OF WITNESSES

No. _57558_

THE STATE OF TEXAS

VS.

THOMAS RAYMOND CARR

# INDICTMENT

## OFFENSE

AGGRAVATED SEXUAL ASSAULT OF A CHILD

Henry Garza, District Attorney

Foreman of Grand Jury

A TRUE BILL

Filed _____ day of _____, 20____

District Clerk

By_____ Deputy

Amount of Bail, $ _____

# Exhibit 12

COPY



SHELIA NORMAN
DISTRICT COURT
BELL COUNTY, TX
BY_____DEPUTY

2013 APR 10 PM 2:26

FILED

STATE OF TEXAS §
COUNTY OF BELL §

## COURT-ORDERED AFFIDAVIT
(in Cause Numbers 57,557-A and 57,558-A)

Before me, the undersigned notary, personally appeared this day Affiant, Charles ("Monty") Montgomery Jr., who, after being identified by Driver License and then by me duly sworn, deposed upon his oath and stated as follows:

"I, attorney Charles ('Monty') Montgomery Jr. (State Bar #14288000), give this Affidavit in response to and compliance with the January 23rd, 2013 'Designation of Issues and Order Expanding the Record' in Cause Numbers 57,557-A and 57,558-A of the 27th Judicial District Court of Bell County, Texas; and I have either good reason to believe or personal knowledge of all facts herein set out and swear to the truth of same.

"**As regards the Court's designated factual issue NUMBER 1** (one), as trial counsel, I did investigate the facts of the cases and the law applicable to said facts, and did discuss both, as well as possible defenses, with Applicant, Thomas Raymond Carr. Witness the following 'plea colloquy' / question and answer exchange between myself and Applicant:

~~Tr. Vol 3, beginning at~~ line 16:

Q: ...Now, Tom, have you _any dissatisfaction_ whatsoever with my representation of you?
A: No.

Q: Is there _anything that I have failed to explore_ by way of investigating and preparing _any defensive issues or witnesses_?
A: No.

Q: All right. And it is true, is it not, that I obtained and interviewed and [got] an assessment by Bob [████████] Outten who ... earns his living as a drug and alcohol counselor and was going to give testimony in mitigation of

*Affidavit-Page 1 of 22*



punishment apprising the jury of the role that drugs might have played on your mind and your intent[,] and weighing all of that in the balance, as well as all of the other testimony that we developed, in *interviewing all of the witnesses that you told me about, plus some others that I developed on my own*, you have decided to take the State's plea bargain offer of 30 years rather than risking a trial; is that correct?

A: Yes.

Q: All right. As a matter of fact over the weekend I made contact with and interviewed *the last remaining witness* that you wanted me to talk to and gave you *a report* back on his unwillingness to testify and what that testimony would have been had I compelled it by subpoena, correct?

A: Yes.

Q: All right. And yesterday we met with the two detectives who had worked this case *and we reviewed the original camcorder film from which the State's copy was made and we proceeded to develop any evidence that we thought might serve as a basis for exoneration of guilt, correct?*

A: Yes.

Q: All right. And again weighing that in the balance [,] you decided to take the State's offer rather than go to trial?

A: Yes.

Q: And also yesterday in our meeting with Detectives Jerry Dugger and Mike Simmons, <u>you were provided access to your computer, were you not</u>?

A: Yes.

Q: We were unhappy with the fact that we had been unable to obtain an expert to do a computer analysis for the $500 that the Court had been able to authorize[,] *and Jerry Dugger who is a police officer* and not obligated in any way whatsoever to assist us nevertheless *accessed everything on your computer that you thought would be* to {sic} *of avail in your defense; is that correct?*

A: Yes.

Q: And he promised to develop for you and print up for you and, if necessary, give testimony to all defensive matters that were raised on your computer, correct?

A: Yes.

Q: And he also pointed out some things that did not forebode good, again that they showed sites that [▓▓▓▓▓▓▓▓] you had accessed on your

*Affidavit-Page 2 of 22*

computer. *And he expressed the opinion that* based upon his years of experience in working these types of cases, pornography cases, et cetera, he saw no basis whatsoever *from those computer records that he had found* on your computer on the hard drive in the unallocated space, et cetera, *he saw no evidence whatsoever for any further investigation of any other crimes,* did he not?

A: Yes, sir.

Q: *And he said he would testify to that* and that was one of the detectives who worked this case, correct?

A: Yes, sir.

Q: *Is there any complaint that you've got regarding my failure to do anything in preparation of any possible defense in this case?*

A: No, sir.

~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~

This 'plea colloquy' between myself and Applicant *next* addresses (RR V1-pp16-17) my development of the applicable LAW, regarding which the following explanation should — better than mere quotation of the plea colloquy — illustrate my efforts thereon:

In addition to successfully getting *STRICKEN* from the CAPTION of the Indictment (in Cause No. 57558) *the 'molester'-branding allegation* '[Aggravated Sexual Assault] *Of A Child',* and ALSO forcing AMENDMENT *of that Indictment's allegation of specific intent,* I HAD ADDITIONALLY ATTEMPTED TO QUASH SAID INDICTMENT vis a vis a contention that the law of parties would have to be relied upon to hold Applicant criminally responsible for (his common law wife) *TAMMY BISHOP's* anal dildo-penetration of the (named 16 year old) victim *(and* two 14 year old extraneous victims) — my client's main defensive claim being that *he* did not personally dildo the victims and only *FILMED* it). *THEN* (so my argument ran), this 'Parties-Prosecution' of a *2nd* degree offense would be boot-strapped into a *1st* degree 'Operating-In-Concert' case WITHOUT THE *REQUISITE* factor of any *ADDITIONAL* conduct. I advised my client, Applicant Thomas Carr,

*Affidavit-Page 3 of 22*

that I had done my best to build reversible error into the Record – _in_ the event of a _TRIAL_ followed by an appeal – but that, as Thomas _himself_ kept complaining, TAMMY's _NOT_ HAVING BEEN INDICTED FOR A SEX OFFENSE (or as a co-defendant) would probably _doom_ any appeal or collateral attack _based upon said issue_; AND THAT – as I put on the Record in the plea colloquy (RR-V1, pg 17) – Applicant's judicial confession to the _amended_ indictment, alleging that _HE_ administered the drug to the victim with the intent of _'facilitating commission of the penetration of the anus of [the victim]'_ [FN1] would _DEFEAT_ any appellate contention that there had been reversible error in the trial court's denial of said motion to quash.

> FN1: _Said amendment_, substituting the phrase 'facilitating commission of the penetration of the anus of [the named victim]' for the original allegation 'with the intent of administering said offense', grew out of _another attack by my motion to quash._

There were many other issues, factual and legal, that I dealt with, constantly (when Applicant wasn't either at the Vernon State Hospital on competency commitment or elsewhere, at the San Antonio Dominguez Unit, etc.) over the _23month_ duration of my representing Applicant, a _few_ of which will be touched upon hereinafter. Suffice it to say that, when he was at the Bell County Jail, I was NOT visiting Thomas _for the purpose_ he would have the Court believe (that of getting him to enlist cellmates as my clientele), but, rather, because I was constantly addressing his problems and needs, attending to his medical issues **(infra)** AND to the problems of his parents and children **(infra)** growing out of his and Tammy's incarceration. While this might seem irrelevant to the manner in which I discharged my _criminal-case_ representation responsibilities, the point is that Applicant has fabricated a picture that I 'never counseled' him, 'never did anything to represent' him, and 'just sat there and got [him] to sign a plea, with broken promises [I] would appeal [his] case' _(infra)_.

For example, **Thomas viewed the video TWICE** – not just immediately before signing up for a guilty plea, but, also, months before that; **and on both of those two**

occasions he heard *HIMSELF GIVING DIRECTIONS AND ISSUING THREATS*, as, for example, that if the juveniles resisted the anal penetration that he wanted to film, then they would have to perform Fellatio upon him.

*And as for his complaint that I never showed him Tammy Bishop's alleged written statement, well, NEITHER had Ted Potter* – for thirty years the kingpin of the central Texas criminal defense bar and APPLICANT'S PREVIOUS ATTORNEY (whom I had substituted in for) – *been able to get the State to give it up; it wasn't statutorily discoverable (Tammy NOT being a co-defendant).* I *had*, moreover, gone to the jail to interview her – and she decided not to discuss anything with me *(although my stated agenda was merely discussion of their children's visitation with Applicant's parents / the children's grandparents).*

As for his boast of having gotten 'quite a few people to fire their lawyer and hire [me]', that grew out of his and his cellmates monitoring the block-long walk from my office to the jail; I do not deny benefiting from the earned reputation of a lawyer who *regularly* visits his clients.

As for the State threatening Applicant with '17 [seventeen] indictments' AND my supposedly 'not responding', I had previously told Thomas that by *MY COUNT*, there were indeed FIFTEEN, but not seventeen, possible *total* charges, SOME OF WHICH – if not ALL of which – he should *EXPECT* to receive stacked / consecutive sentences for! IN THE FINAL ANALYSIS, THIS – and *not* the bleak prospects of an appeal, *or* anything else – was why I advised Applicant *to waive trial, waive direct appeal as well as collateral attack, and plead guilty.* I would have loved to have tried that case, as winning it would have been a big feather in my cap; but I owed it to my client to make him see reality – that *we wouldn't win 17 (or even 15) times*; and that any jury who might buy the State's argument that *Tammy's* cooperation as a witness should condone *Thomas* taking all the blame, that would be a jury that WOULD 'MAX' HIM and also recommend consecutive sentencing. AND THAT IS WHY THOMAS ACCEPTED THE STATE'S OFFER. After all, it had taken me 23 months to get it down to thirty years; and it wasn't going to get anything but worse!

*Affidavit-Page 5 of 22*

Finally, as for Applicant's claim of having been on 'psychiatric medication [and] ... scared' and supposedly not allowed to talk to his family before making a decision to accept the offer or reject it, well, simply put, *neither* was the case. *He knew beforehand what the offer was, and that I could not get a better one – and had only gotten THAT offer by meeting with the assembled three juveniles AND their parents,* letting them know that in any trial I would be attempting to litigate the juveniles' previous drugging and boozing – AND ASKING THE JURORS 'Where were the PARENTS?' As for the psychiatric medication, that was the result of Applicant overplaying his hand at Vernon State Hospital, *refusing to participate in interviews by the diagnosing [FN2] doctor* (actually calling him an insulting name which he stupidly joked about in a long distance MONITORED phone call to me), AND being observed demonstrating *hidden* cognitive abilities AND consequently classified as a malingerer who should be returned to Bell County with medications for '*Psychotic Disorder*'. Truth was, Thomas was constantly manipulating, but in complete control; witness the unusual consistency of his very clear, cursive signature on the plea papers.

> FN2: I even tried to *contest* his discharge and return to competency, by arguing that the psychiatric reports had not been *authored* by a doctor who had PERSONALLY *interviewed* this 'Malingering . . . Personality Disorder' patient.

In closing, I must comment further on something only touched upon hereinbefore. Applicant knew that I had great respect for the jury-persuasion skills of lead prosecutor, MARK KIMBALL; but I had *also* informed Applicant that health problems (the back of a Veteran who walks with a cane) were rumored to be bringing about Mark's early retirement. And in that meeting which preceded execution of the plea papers (the description of which meeting is highlighted and set out on pages 2-3 hereinbefore), Mark brought this matter up, then introduced his side-kick, prosecutor MIKE WALDMAN, telling Applicant that the *younger Waldman would be around to carry through on Mark's promise to* return additional indictments and *STACK Thomas*/Applicant if he refused the offer it had taken me *23months* to get. And I told Thomas – out of Kimball and Waldman's presence – that one of Ted Potter's [FN3] last jury-trial clients had paid dearly for the *low*-punishment verdict Ted got a jury to give in the DWI-crash Manslaughter death of a three year old child; true to his 'threat' to return additional indictments and *STACK said Manslaughter defendant if*

*Affidavit-Page 6 of 22*

*he went to trial,* WALDMAN DID INDEED OBTAIN A SECOND INDICTMENT and try *that* case to *another* jury, with the result that the defendant who had only *three* years to do after the *first* trial WOUND UP STACKED, with *twenty-three* years to do after the *second* trial.

FN3: This revelation was significant to Applicant, as well as myself, because said attorney Ted Potter had represented Applicant prior to my being retained.

In short, it was my considered judgment – and advice to Thomas Raymond Carr – that he take the State's offer of a thirty year punishment recommendation, waive appeal and NEVER breach his plea bargain by attempting to get habeas relief.   Apparently (?), my former 'Client & Friend' (as his letters refer to himself) has now forgotten the *TWO* 'DISCLOSURE OF PLEA RECOMMENDATION' provisions  –  WHICH APPLICANT SIGNED *AFTER* I HAD SIGNED THEM *AND* MADE SURE THAT *HE* UNDERSTOOD THEM  –  that if he ever 'attacks the judgment and sentence in *this* case {57,55**8**}' *OR* 'tries, in any way, to collaterally attack the judgment and sentence in *this* cause {57,55**7**}', the State is *no longer bound* by its promise not to file additional charges!

~ ~ ~ | ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~

"As regards the Court's designated factual issue NUMBER 2 (two), to wit, whether I requested and received complete discovery from the State AND shared that information with my client, I must initially note that upon my entry into the case I was met with what my predecessors, Ted Potter and John Bigham, had faced – a *determined* Mark Kimball, who was prepared to return seventeen indictments of Applicant, Thomas Raymond Carr AND GO TO TRIAL if Applicant / then Defendant-Carr would not take a fifty (50) year plea offer.   Kimball initially stonewalled me, then orally assured me that I would get everything I was *entitled to* if I executed a 'Waiver of ... *Formal* Discovery'.   On January 27th, 2005, shortly after my substitution in as counsel of record, I did sign that waiver and do believe that it paid off, in that it got Kimball *talking* to me about the

*Affidavit-Page 7 of 22*

case *AND EVENTUALLY LED TO* a group meeting between myself and the three juvenile victims AND their parents, which meeting (as hereinafter explained) resulted in (RR-VI-19) **parental permission**^being given to Kimball to *COME DOWN* (first from *fifty* years to *thirty-five*, and – after *23 months* of fighting me – from thirty-five to the *thirty* year offer that Applicant decided to take).

*Meanwhile*, however, disagreements between myself and Kimball regarding what I should be considered '*entitled to*' (i.e., differing views regarding what I contended to be Brady-Discovery) caused me, on September 20th, 2005, to file my 'Affidavit Supporting **Application For Deposition Testimony**' and the thereto attached 'Defendant's **Amended Omnibus Pre-Trial Motion**', seeking, inter alia, *joinder* of prosecutions, *quashing* of the indictment, **expert witness funding**, **compelled trial testimony** of the indictment-named victim, **a copy of the video / Defendant's recorded statement**, **notice of extraneous offense evidence**, **a list of the State's case-in-chief witnesses AND of it's expert witnesses**, various other *routine* Discovery requests (criminal histories, etc.), and quite a few requests that were *TAILORED* to discovering evidence corroborating *my client's story that, inter alia, the three juveniles got themselves high on pills they'd been crushing* – which pills supposedly came from the prescription drug stash of the father of the indictment-named victim (contrary to said father's contention, at the above mentioned joint meeting, that none of his pills had been at his house where and when the subject criminal assaults took place); **together with a 'Motion In Limine' AND an 'Application . . . For Deposition Testimony'** *(of / by SAID father).*

*Affidavit-Page 8 of 22*

*AS REGARDS whether I got that 'complete discovery' addressed by the*

*Court's Designated Factual Issue Number Two, I must say in all candor that I told*

*my client / Applicant that I felt the Court had erred in denial of some of my requests*

*BUT that any prejudice thereby occasioned would NOT likely generate a REVERSAL*

*of conviction upon appeal (INFRA, regarding appellate engagement and advice).*

At any rate, I *did* share with Applicant all Discovery obtained;
and the (previously herein described) meeting with Jerry Dugger [FN4] fully explored –
and dashed – all hope that exonerating evidence would be found on the defendant's
computer, so that (by virtue of the described law-enforcement-computer-assistance)
we got *more* discovery than what we were *statutorily* entitled to!

> FN4: Please refer back to pages 2-3 hereof, where the quoted 'plea colloquy'
> between myself and Applicant reflects *his confirmation* of the valuable
> assistance of **Detective Jerry Dugger** in examining Applicant's computer
> in search of exonerating evidence.

~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~

"As regards the Court's designated factual issue NUMBER 3 (three), as trial

counsel, I did consult with Applicant to prepare for trial. As explained on pages 5-7

hereof, Applicant and I basically spent *23 months* constantly rehashing what we could

do *with* the evidence – and what we'd be *stuck* with. Generally, Applicant's proposed

witnesses would **NOT** have done anything *more* than show the juveniles to be typical

teenagers, except that *Tammy's sister, Sonya Bishop – who didn't want to testify – could have*

*corroborated that Tammy said she was going to leave Tom for a RICH eighteen year old who*

*was just back from Kuwait, underscoring the contention that the indictment-named victim*

*LED THOMAS AND TAMMY TO BELIEVE HE AND HIS PALS WERE ADULTS;* this to

*Affidavit-Page 9 of 22*

be coupled with computer evidence that the couple (Thomas and Tammy) had sought out ADULT – rather than juvenile – websites.  *Another* witness that Applicant had me interview was a neighbor that would supposedly testify (1) he'd been told by TAMMY that the (the indictment-named *16-year old*) juvenile said neighbor had seen visiting Tom's house was an **adult** 'rich guy from Kuwait' she was going to leave Tom for;  and **(2) was into drugs**; said witness told me that his testimony would 'Not help' Applicant.

Herewith submitted as **EXHIBIT ONE** is a three-page write-up (one of several Applicant furnished me in our preparations for a jury trial) **of the defense** (in *addition* to the claim that his sole role was the mere *filming* of *Tammy's* actions) **that Thomas wanted to present**, the Court's reading of which will illustrate why I previously herein stressed that drug and alcohol counselor BOB OUTTEN was prepared to give testimony (that I would have *tried* to get in on Guilt-Innocence rather than just on punishment) as to **the effects of drugs** – particularly drugs mixed with alcohol – **on Thomas's mind / intent.**

~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~

"**As regards the Court's designated factual issue NUMBER 4** (four), as trial counsel, I did *NOT* fail to contact any alibi witnesses.   There were NO alibi witnesses, as Applicant himself *appears* momentarily in his own video, wearing a hideous negligee-type 'gown'.   And as Applicant acknowledges in the plea colloquy, I contacted *ALL* of his so-called 'witnesses'; and they generally (supra) would not testify to what Thomas wanted, with another exception, his mother, Gerda, whom I recall *being* able to confirm

*Affidavit-Page 10 of 22*

that – prior to Tom's and Tammy's arrest for the subject offenses – Tammy was sneaking out of the house at night to supposedly rendezvous with the indictment-named juvenile victim. The triviality of this type of 'defense' was in keeping with Applicant's approach to everything: whatever the problem, it was always someone else's fault, as evidenced by **EXHIBIT TWO** (Applicant's five-page 'Overview MTR [Motion To Revoke]' FN5 write-up done to enable my preparation for the then-upcoming hearing on revocation of his felony probation), wherein, on the second page thereof, the second paragraph of said page shows Applicant attributing to his probation officer, Mr. (Joseph) Perez *NOT HAVING AN UNDERSTANDING OF HIS JOB REQUIREMENTS*; just as, two pages later, he talks about the indictment-named victim *BEING A 'PUNK'* – *a punk that 'GOT EXACTLY WHAT HE ASKED FOR'!*

> FN5: The memos Tom generated were *always* *discussed at my next jail visit*, when – he now contends – I was, *assertedly*, NOT counseling him and instead supposedly focusing on which of his cellmates might become my clientele. In point of fact, the complaint raised on the first page of this particular memo (about having been put on '10 years [probation] *immediately*') was resolved with the decision that he should *get started* serving time on *that* case while I continued fighting his new cases, and *thereafter* consider appropriate habeas relief.

~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~

"**As regards the Court's designated factual issue NUMBER 5** (five), as trial counsel, I did timely communicate all plea offers from the State to Applicant. As is recited by two of prosecutor Mark Kimball's letters (**EXHIBITS THREE and FOUR**) to TED POTTER, whom I had replaced, *Kimball offered me, initially, the same fifty (50) years that he'd offered both Potter AND Potter's predecessor, JOHN BIGHAM, telling us all there would be NO FURTHER NEGOTIATION!*
*Affidavit-Page 11 of 22*

Nevertheless, *I* gradually got the offer down to thirty-five years, and finally (after *23 months* fighting for Tom), down to the **thirty** year offer which Tom elected to take *rather* then running the risk that Kimball/Waldman would carry through on their promise of additional indictments / stacked sentences. Each time I had a better offer I immediately went to the jail to report it, but Thomas never understood why HE should get ANY time; it was all the fault of Tammy — *AND OF THE VICTIM* (Exhibit Two, supra, *wherein Thomas says 'The punk got exactly what he asked for').* [FN6]

> FN6: The next sentence, referring to 'his [the pseudonym-named victim's] 35 year old girlfriend in Kuwait', is a reference to the girlfriend about whom Exh.#1 shows Thomas quoting said victim's brags that *she* used to dildo him *because* he liked it; in Thomas's mind, *neither* he *nor* Tammy should be punished for giving said juvenile – and the two younger ones – what the *older* juvenile liked.

~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~

"**As regards the Court's designated factual issue NUMBER 6** (six), as trial counsel, I did agree to prosecute an appeal *IF* Thomas pleaded 'Not Guilty', went to trial AND was convicted. **I made very clear that to get the benefit of a plea-bargained punishment recommendation, his 'Guilty' plea would have to be coupled with a WAIVER of both direct appeal and collateral attack.** I explained what was meant by those terms, and I emphasized that if Thomas *ever* tried to overturn his Guilty plea / conviction, he would then have *released* [RR-VI-17,18] the State from its promise not to return additional indictments; and in that event he would probably face multiple trials and stacked sentences. Finally, I explained to Thomas that, yes, he could plead 'Guilty' *withOUT* benefit of a plea bargained punishment recommendation and STILL APPEAL any of our pre-trial motions that had been *adversely ruled upon,* BUT that there was *little*

*Affidavit-Page 12 of 22*

likelihood that an appellate court would find reversible error, **AND** that *after* such a 'Bench Trial' *on* the sole issue of punishment, the Sentencing-verdict would be difficult to overturn!     *AND WHEN TOM AND I MUTUALLY SIGNED THE PLEA PAPERS, I FASTIDEOUSLY WENT OVER EVERYTHING AGAIN, MAKING SURE THAT APPLICANT, THOMAS RAYMOND CARR UNDERSTOOD – AND TOLD ME THAT HE UNDERSTOOD – EVERYTHING THAT HE WAS SIGNING.*

While my *request* for compensation *additional* to the initial fee *WAS* based on my **continuing** efforts to (1) lower the State's Plea Offer while (2) building whatever defense was available AND (3) attempting to inject reversible error into the case, *it was never stated by me, OR understood by either Thomas or his father Lowry,* that there would be an appeal ***irrespective*** of whether the defendant might plead 'Guilty'!     It was always understood that I was working to generate *the BASIS for an appeal* should one become necessary; and when Thomas WAIVED both direct appeal and collateral attack in order to get the benefit of the thirty-year punishment recommendation, NEITHER he NOR his father Lowry thought that I would be filing any appeal OR refunding any fee, for I'd done everything I had agreed to do! And subsequent to Sentencing, ***NEVER*** did Thomas or Lowry write or call ***inquiring of the status of any appeal.***     Witness EXHIBITs 5 & 5A, wherein Thomas, writing me from the (Abilene) Middleton Unit, speaks of his always-ongoing (infra) medical issues AND being 'ready to move to Gatesville soon' – BUT SAYS *NOTHING* ABOUT EXPECTATION OF APPEAL. See also EXHIBITs 6, 6A, 6B, 7, 7A & 7B, revolving around the singular issue of Lowry's difficulty with having to travel far to see Thomas.     In sum, I did NOT

*Affidavit-Page 13 of 22*

fail to do anything that I had been *paid* to do; and for *comparison* purposes I refer the Court to **EXHIBITS EIGHT AND NINE**, which bespeak the determination of prosecutor Kimball *not* to lower his plea offer (particularly to the point that I alone finally got him to), Kimball's intent to return 17 indictments / seek **stacked** sentences, AND my never-ceasing [FN7] efforts on Thomas's behalf.

FN7: Getting him *15* rather than 20 years in the 2nd degree case facilitated a *possible* parole after serving only *half* of his time on the *30-year* sentence (RR-VI-22).

~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~

"As regards the Court's designated factual issue NUMBER 7 (seven), other facts pertinent to resolution of Applicant's Petition are as follows: I spent *many* hours (confirmed by the plea colloquy between prosecutor *Kimball* & Applicant [RR-VI-18] *et seq.*) tending not only to *Applicant's* personal issues, but also – at Applicant's request – to those of his parents *and* children, issues growing out of Thomas's and Tammy's incarceration (infra). Moreover, Thomas had *constant* medical complaints regarding which he expected me to intercede: one of many such examples is when on March 10[th] of '05, I placed a phone call to said Bell County Jail doctor, SHELLEY HOWEL's *commercial* office (he only visited the *jail* once per week) – a call which he had to later return – regarding Tom's complaints that the doctor was refusing to give him 'Serquill' and had merely increased his former medication (Effexor [FN8]) dosage, and that Tom hadn't had a promised bowel examination (his bowel was bleeding and the pain of his movements hadn't diminished); and I was supposed to pass on to Dr. Howel that Tom was 'uncomfortable – but not excruciatingly so', *AND INQUIRE ABOUT A FOOT*

*Affidavit-Page 14 of 22*

*SOAK!* **The doctor took the complaint professionally** – not at all like Applicant's reported (supra @ Exhibit Five) *Middleton-Unit* doctor's response (which, unfortunately, I highlighted **FN9** in yellow upon my *January of '07* receipt of that letter, not realizing I would one day have to file the letter as an exhibit) **and explained to me his course of 'treatment' for my client; and I thereafter** – after unsuccessful attempts to get Howel to respond to other inquiries – **lodged Thomas's complaints with the Jail Administrator AND Nursing Staff**, **AND** did research on / obtained a federal pamphlet on the liabilities incurred by medical neglect of jail / prison inmates.

FN8: *Cellmate* Nick Hildner's complaint that Tom beat him with a disassembeled piece of shower apparatus was **both *DENIED*** by Tom **and *EXPLAINED*** *vis a vis the remembrance that 'we asked for new psych meds [for Serquill] and instead of change them they increased the dosage [of Effexor]'.* See **EXHIBITS TEN, 10A and 10B** (Tom's LETTER of denial, the ENVELOPE it came in, *AND* his father *LOWRY'S LETTER* cautioning him about getting into more trouble, and advising him to shut his mouth because *Tammy still had 'the letter'* (which *Tom had told me he wrote*, before his incarceration, in a period of *POST-VIDEO* suicidal reflection about what they'd done)!

FN9: It should be mentioned that the reason I highlighted the subject portion of Exhibit Five was that it was a precursor of how hard it was going to be to get Tom a requested assignment to the Gatesville Unit / or any location close to Lowry; *inmates with medical / psychiatric issues do not easily get relocated.*

Moreover (as mentioned previously in connection with my attempt to talk with Tammy), I spent many hours consulting with Thomas's father, **LOWRY**, and mother, **GERDA** (they were separated); and **there were many phone calls in regards not only as to property seized by law enforcement** (upon executing a search of Gerda's & Tom's / Tammy's home) **but also as to both Lowry's and Gerda's desire for visitation with Thomas's and Tammy's children**, Lowry primarily wanting visitation with the then thirteen year old *Michael* and Gerda primarily wanting overnight *and* weekend visitation

*Affidavit-Page 15 of 22*

with then five year old *Alexis* ('from six P.M. Friday to four P.M. Sunday, twice a month) *at* Gerda's residence – which CPS was saying was 'a crime scene' *and* had some wall damage (which Skip was in the act of repairing).     And this role as intermediary between the **CARR** and **BISHOP** families had me also dealing with Potter *as* Lowry's former **custody** attorney (*Lowry wanted me to get a REFUND from Potter, and I did*) and with Potter's then-associate, DAN LIGHT, from whom I obtained such of Potter's *criminal*-case file material as **EXHIBIT ELEVEN** (informing Thomas that it was not a *defense* that he, Thomas, had *wrongly* believed the indictment-named victim to be an ADULT); and Thomas was meanwhile sending me letters, from where he was elsewhere incarcerated, regarding a Bar grievance against Potter (whose written advice to him I'd thought quite *sound*, supra @ Exhibit Eleven).

**EXHIBIT TWELVE** is a 'Message' Memo by my secretary (now deceased) KAY (WHITE) JONES advising me that Lowry / 'Skip' wanted me to call him back regarding an assertedly false claim by Potter that the desired civil-fee refund had *already* been made.     All of these were the sort of *non-criminal* matters I generally refuse to get involved in, but nevertheless was expected to by Thomas and Lowry / Gerda.     And in the *last* phone contact I ever had with Lowry, I remember explaining that Thomas – *in order to get the benefit of the 30 year plea-bargained punishment recommendation* – had *WAIVED* both direct appeal AND subsequent / collateral attack; AND, while Lowry was NOT inquiring about the prospects of an appeal, I nevertheless pointed out to Lowry that under the *circumstances* of the case Thomas would probably be subjecting himself to further prosecution and stacked sentences

183

<u>should he *ever* attempt to overturn his Guilty plea / conviction.</u>

FN10: There was *more* ✻ to this case than just the despicable facts behind the Indictments / the filthy debauchery of the VIDEO and disgusting sight of Tammy wiping off the dildo apparently unbothered by getting the boys' **FECES** on her hands;  more than just the look of *pain* on the face of one of the boys who was threatened with having to perform Fellatio if he didn't submit to being dildoed — — a threat I tried to keep out of evidence by complaining (**EXHIBIT THIRTEEN**) of **NOT** being afforded EITHER a <u>*TRANSCRIPTION*</u> OF or the videoed <u>RECORDING</u> *of Tom's alleged utterance of the threat.*

> ✻: Tom had been told that <u>one of the boys' father was a member of the President's Crawford, Texas security team</u>.   I had *no* confirmation of that; but, still, <u>I closed down my office after it was BURGLARIZED by someone who TOOK NOTHING</u> and merely picked the *hidden* locks – *without damaging them* – of my desk **AND LEFT THE DRAWERS STANDING WIDE OPEN, pulled fully out!**

And when <u>*Lowry*</u> Carr charges that I thereafter was 'no where to be found', he forgets that I *continued* to fight for Tom for <u>*ANOTHER YEAR & FOUR MONTHS,*</u> and finally got Kimball to give me that thirty year offer!    Moreover, Lowry and I had many phone conversations AFTER the closing of my commercial office;  and <u>he knew that I was officing out of my home, *WHERE both HE and GERDA wrote me*</u> *(supra, Exhibits 6, 6A & 6B, 7, 7A & 7B) and see* **EXHIBITS FOURTEEN & 14A,** *containing a newspaper clipping that Gerda wanted me to see.*    And Lowry *should* know that <u>*SUBSEQUENT*</u> to Tom's departure from Bell County,  I accepted a collect phone call from Thomas (in TDCJ) inquiring NOT ABOUT ANY APPEAL BUT SOLELY WHETHER I COULD GET HIM TRANSFERRED TO A UNIT

*Affidavit-Page 17 of 22*

CLOSER TO 'HOME':    I distinctly recall that last phone conversation with Tom, because he told me that 'I can't believe I took thirty years' – but said NOT ONE WORD ABOUT ANY APPEAL; *then* still having a fresh recall of Kimball's Sentencing-admonitions (supra and RR-VI-19 et seq.) about the consequences of "any type of writ ... or ... judicial review", Thomas merely wanted me to try getting him incarcerated close to his father Lowry.    And glances back at Tom's letter from the Middleton Unit (supra, Exhibit Five)  AND Lowry's notes to me (supra, Exhibits Six and Seven) accompanying the letters (supra, Exhibits 6A and 7A) from doctors Braun and Rebecca (attesting to Lowry's health problems with having to travel far), *ALL FAIL TO EVINCE ANY HOPES OF OVERTURNING THE GUILTY PLEAS / CONVICTIONS.*

Examination of my large file has not produced any notes of whom I contacted in regards to Tom's and Lowry's hope that I could accomplish a nearby incarceration;  and I loathe the thought that perhaps the time-demands of my practice kept me from adequately following up on their request;  nevertheless, the point is that from the correspondence I received, *NONE of the Carr's (neither Tom nor Lowry nor Gerda) ever expressed any desire for or expectation of an APPEAL.*

Finally, I would reiterate that I was also required to handle for Tom both a misdemeanor and the hereinbefore briefly mentioned felony probation revocation in Cause #54340 (wherein he had been placed on probation for an April 25th, 2002 Possession of Marijuana Over Four ....);  and pursuant to which,  after it became obvious that I wasn't going to get the new indictments quashed and that he was

*Affidavit-Page 18 of 22*

185

probably going to have to – in lieu of what a *jury* might do – take at least *some* (concurrent) TDCJ time, Thomas entered *selective* pleas of 'True'.

# ADDENDUM in re # 57,557A :

AS REGARDS APPLICANT'S COMPLAINT THAT HE NEVER SAW ANY '*EVIDENCE*' of '*Delivery*' of a controlled substance to a minor, the initial observation must be that, nevertheless, he signed the Judicial Confession thereto and pleaded Guilty AND in the course thereof confirmed (**RR-VI-9 & 10**) to the Court that he had not been coerced in doing so; he thus bears a heavy burden of overcoming the admissions of the plea colloquy AND, further, of explaining away his sworn testimony (supra, page one):

> Q: . .Now, Tom, have you *any dissatisfaction* whatsoever with my representation of you?
> A: **No**.
> Q: Is there *anything that I have failed to explore* by way of investigating and preparing *any defensive issues or witnesses*?
> A: **No**.

Moreover, the advice that I gave Applicant, prior to said Plea, was *sound* advice, to wit, (1) <u>forensics evidence is **NOT** necessary, upon appeal, to support a conviction</u> based upon any Fact Finder's (reasonable) decision regarding whom to believe; **and (2)** <u>my joint meeting with the three **MINORS**</u> (*one* of whom in *particular* was *vulnerable in appearance*) <u>and their parents confirmed that there would indeed be *VICTIM* testimony as to having received Methamphetamine from Applicant</u>, *as was expected by Applicant himself to be* <u>**CORROBORATED by the testimony of TAMMY**</u>; **and (3)** <u>once a jury saw Applicant</u> parading around in his video <u>wearing that hideous 'Teddy Bear negligee' and telling *the juvenile who was protesting* that he could</u> *TAKE IT*

*Affidavit-Page 19 of 22*



(because she /Tammy did it to Applicant all the time) _OR PERFORM FELLATIO upon Applicant_, then he, Applicant, would have lost all credibility; and there was not going to be any jury mercy upon Applicant, for _he would get the MAXIMUM_ second degree felony punishment _of twenty years RATHER THAN THE FIFTEEN YEARS THAT THE STATE WAS AGREEING TO RECOMMEND_ in order to accommodate the possibility of an early Parole on the first degree case (eligibility to be derived from having served half of the thirty years that the State was recommending in said first degree case).

As for the _contended_ lack of (forensic) evidence that Thomas 'did ... knowingly deliver ... Methamphetamine' to the indictment-named (16 year old) victim, **Thomas is hung up on the INCORRECT belief that the State would have had to prove an INJECTION**; and such is not the case, as it would have sufficed for the jury to find from the testimony that _it was HE who supplied to the boys the pills_ that they were (by Tom's own story) 'eating AND crushing up and snorting'.    Whence the Sept. 19th (2006) filing of my 'Motion For Continuance' setting out the following:

1. The State had failed to comply with the Court's pre-trial ruling requiring that Defendant be given a list of case-in-chief witnesses 'no later than fourteen days prior to [our scheduled October] trial' – hampering our ability to timely confer . . . .;
2. The State had concomitantly failed to honor a promise to the Court to provide Defendant – twenty days prior to trial – specified prescription records of the _previously herein mentioned_ father of the indictment-named victim.

Hence, I had again done my best to inject REVERSIBLE ERROR into the Record _in the event that_ we be put to trial without the requested continuance and DISCOVERY;



and this was explained to Applicant before he decided to enter a Guilty plea.

In connection therewith, __it is__, again, __upon the Record__ (RR-VI-21) that *Applicant acknowledged* having been informed by me of *receipt from the prosecutor* (AFTER mine and Applicant's meeting with Detectives Dugger and Simmons, then with prosecutors Kimball and Waldman) of 'the medical records that that we had requested'!

Finally, it is also on the Record (RR-VI-27) that there was *NO* Lab Report; and confirmation as to the 'Methamphetamine' classification of the controlled substance came from 'the victim's blood'. Regarding which I would observe that it is *hardly* ineffective assistance to fail to get discovery of that which never existed. And it was a strategic decision on my part – a decision proven *sound* by obtaining a fifteen year (rather than twenty year) recommendation on the second degree case – NOT to rankle the prosecutor by insistence on seeing the medically documented blood-work.

In closing, I did everything I promised to do – and much more than what the Carr family would have obtained from most attorneys; and it is because of my steadfast efforts on behalf of Applicant, Thomas Raymond Carr that he obtained the prospect of being paroled after ONLY FIFTEEN (rather than twenty) years – a a prospect that I *hope* he has not forfeited by this improvident Writ application."

AFFIANT, Charles ("Monty") Montgomery Jr.
SBOT 14288008       Tel. 254-986-2531
4400 Seven Coves Rd., Temple, TX 76502-6551
*Affidavit-Page 21 of 22*

CERTIFIED COPY
DOCUMENT ATTACHED IS A
TRUE & CORRECT COPY
OF THE ORIGINAL ON FILE

APR 11 2013



SHELIA F. NORMAN
DISTRICT CLERK, BELL CO. TX
BY_____DEPUTY

188

SUBSCRIBED AND SWORN TO, before me, the undersigned Notary, by the above named Affiant (as known to me or identified by Driver License), this the 10th day of April, 2013.

_____
NOTARY PUBLIC

DEBRA KAY STURTEVANT
My Commission Expires
July 25, 2013

## CERTIFICATE OF SERVICE

This is to certify that on this the 10th day of April, 2013, a true and correct copy of the foregoing "Court-Ordered Affidavit (in Cause Numbers 57,557-A and 57,558-A)" was served, by hand delivery, on the Office of the Bell County District Attorney.

_____
CHARLES ("Monty") MONTGOMERY, JR.

*Affidavit-Page 22 of 22*

# Exhibit 13

190

# ACKNOWLEDGMENT OF RECEIPT OF THOMAS CARR's FILE
## FROM ATTORNEY CHARLES MONTGOMERY

The undersigned, **SHAINA MEDFORD** (cell phone # 254-493-2447), on behalf of her employer, Attorney **TIMOTHY TESCH** (office # 254-865-0313), acknowledges her receipt this __26 th__ of June, 2014, of Attorney Charles Montgomery's _original_ file _(i.e., exclusive of post-conviction/collateral relief proceedings)_, subject to inspection by Mr. Tesch, who has agreed to _hereafter_ provide Mr. Montgomery his, Mr.Tesch's, own/personally signed receipt for EACH of the below listed items/documents (tendered in a 3-inch ring-binder notebook and in the following sequence*):

> *: Mr. Tesch will co-sign and date _this_ very same receipt and NOT construct a differently itemized receipt. Should Mr. Tesch contend a herein-listed document to be missing, he shall merely line-through same on this very same receipt. _Meanwhile_, **NO document shall be removed from or rearranged in the tendered notebook**; and should these terms NOT be acceptable, then Mr. Montgomery shall withhold delivery until Mr. Tesch can personally receive / acknowledge receipt of these documents/this file.



1. **Judgment** of Conviction By Court in Cause # 57558 (Aggravated Sexual Assault)
2. **Judgment** of Conviction By Court in Cause # 57557 (Del. C./Substance to a Minor).
3. Seven (7) **"Judges Docket" sheets** (for said 57558 and 57557).
4. The Sixteen (16) page **"Plea Packet"** for _putative_ "co-Defendant" TAMMY MICHELLE BISHOP in Cause # 58,703.
5. Twenty (20) Dist. Ct. Coordinator **"setting notices"**, beginning with a 3-23-0<u>5</u> notice of indictment, scheduled Arraignment and Pre-Trial in Cause 57,55<u>7</u> (only); and ending with the 9-22-06 notice of a 12-4-06 Jury Trial setting, at the bottom of which notice I recorded "Case Closed by Guilty Plea (Tue. 11-21-06) to [Plea Bargained] 30 years before Trudo (Jdg) (with) Kimball as prosecutor [and then also recorded] (after this I put Defendant on the stand for additional <u>oral</u> judicial confession, etc.)" — which notations I've noted here just to help you (Mr. Tesch) understand my shorthand.
6. Thirteen (13) pages of Bell Co. Law Enforcement Center **Medical Request Forms**, inclusive of Defendant's requested "criminal record".
7. Thomas Carr's **PERSONAL WRITINGS** (letters, notes & memorandums / instructions to me, "Monty" Montgomery), interspersed with **NEWSPAPER ARTICLES** (therein referred to by Defendant) **AND THIRD PARTY LETTERS** (to Defendant), all as below itemized:
   (1) A 10-02-0<u>4</u> letter (a copy of which I later obtained from Defendant) headed "Dear Family, (Carr's & Bishop)".
   (2) A 10-25-04 letter-formatted document headed "Dear Lord Jesus"

(3) A 1-4-05 Temple news clipping on "Heights man held on sexual assault of minor", displaying a mug-shot (?) of "Thomas R. Carr" – this article mentioning that "one of the 14-year-olds is *a special-education student*"!

(4) A 1-9-05 (introductory) letter to me, headed "Dear Monty". *no envelope mention*

(5) A 1-15-05 ode-formatted document entitled "I Am Methamphetamine" and labeled on it's left margin "Thomas Carr Bell County Jail #328"

(6) Defendant's one-page "Witnesses" list (as given me, Monty Montgomery) together with two pages of Def's notes regarding said witnesses.

(7) Five pages stapled together, the first two pages headed **"First Meeting"** (with indictment-named victim Jerrid May {referred to as "Gerad"}), the next two pages headed **"Danny Purkey"**, and the last page being a 6-17-06 news clipping regarding "Danny Calvin Purkey" and headed "Man gets probation for drug possession, fleeing police".

(8) A 4-23-06 "In-House Mail" letter from Danny Purkey (cell #202) to Defendant in cell #302. *envelope not ment.*

(9) A 1-28-05 letter headed "Dear Monty", and setting out Tom's defense, to wit: Tammy and he "were not ourselves, we were on Meth. It's a very **controlling drug that makes a person think 'Meth's' way**" – hence our hiring of long-time drug and alcohol counselor Bob Outten to interview Tom and prepare jury testimony on Tom's behalf.

(10) A 3-1-05 "To whom it may concern" letter (withdrawing his "grievance" against attorney "Teddy L. Potter"). *envelope not mentioned*

(11) A 4-3-05 letter headed "Dear 'Monty'". *highlights ? Envelope not*

(12) A 3-24-05 *Killeen* news clipping headlined "Heights man indicted on charges of drugging, raping 16-year-old".

(13) A 3-25-05 *Temple* clipping headlined "Harker Heights man may face life in prison for meth, sexual assault" and picturing Defendant's mug-shot.

(14) A 4-16-05 letter headed "Dear Monty". *envelope ?*

(15) A 4-23-05 letter headed "Dear Monty".

(16) A 5-12-05 letter headed " 'Monty' ". *envelope ?*

(17) A May 28 '05 fax from Ft. Hood number 254-288-2065, labeled "Ask Monty [for] Thomas Carr".

(18) An undated letter addressed " Dear 'Monty' " and signed "Your Client & Friend." *envelope ?*

(19) A December of '05 envelope and Killeen news clipping, headlined "Heights woman given 8 years for giving meth to children", and mailed to me by Gerda Carr (Thomas's mother).

(20) A 4-20-06 (the four looks like a nine) letter / memo addressed "Monty", stapled together with two pages of strategy / instructions for retrieving files from Tom's computer (at that time in the hands of Harker Heights P.D.).

Receipt-Page 2 of 6

192

(21) Four (4) pages stapled together and labeled by Tom at the top thereof, respectively, as "Computer Forensics", "How were we to know", "My [Tom's] closing argument [for his anticipated jury]", and "Gerad's story".

(22) Five pages stapled together, containing undated *further* instructions for me and headed, respectively, "Questions to ask a computer expert", "Back date the computer...", "To copy files we will need..."*, "Things to take pictures of...", and a one page map.

> *: At the bottom of *said* page is <u>my</u> *subsequently* recorded "Post-Plea Memo:
>
> "All of the stuff Tom wanted was accessed by [H.H.P.D. Detective] Jerry Dugger for Defendant at our jail meeting (where we got on Tom's computer and viewed the original cam-corder tape) thru the cam-corder which (with the computer) Dugger & [Detective] Mike Simmons brought to the jail".

(23) An undated (<u>postmarked</u> 8-3-06) and un-addressed letter to me (i.e., without salutation) regarding "Truth and justice..." and swearing to tell the truth.

(24) An undated letter (<u>no</u> envelope) beginning " 'Hay [sic] Tom' " and signed "Joe Starks", and apparently quoting *in red ink* a reader's letter-to-the-editor about Tammy having been given 8 years for Delivery to "boys" while *escaping* indictment ("no charges") for the "sexual molestation".

8. <u>Sixteen*(16) pages stapled together and constituting my / Monty Montgomery's) personal notes / work product</u>, of which, while keeping my originals, I've given you *color* copies so as to enable you to discern red ink from blue or black ink, and thereby better follow my notations.

> *: The sixteen will actually number eighteen, because one page is copied two different ways (i.e., with two extra half-page {top and bottom} copies, ensuring that nothing was lost in the copying process.

9. <u>Seventeen (17) pages</u> (NOT stapled together), <u>containing various letters / other writings</u> by Lowry Thomas Carr (Defendant's father), Duane Miller, Ted L. Potter, R. O. "Bucky" Harris, and a note from my secretary, Kay Jones.

10. <u>Various documents comprising the file history</u> for Cause numbers 57,558 and 57,557, in the following order:

(1) the Complaint for Del. C/Sub. To a Minor

(2) the Complaint for Agg. Sexual Assault

(3) a 1/21/05 printout of Def's criminal history, along with Affidavits For Arrest of both Thomas Carr AND Tammy Bishop on the <u>Delivery charge</u>. (Tammy's 1st "Affidavit" is nothing more than a screwed-up Complaint form; and Tom's contains two Complaints with *no* Affidavit <u>in this particular packet</u>.)

(4) my Motion To Substitute Counsel in Cause # 1847.

(5) " " " " " " " # 1847B

(6) Waiver Of Arraignment in 57,557 and 57,558.

(7) Motion For Continuance in 1847.

(8) " " " in 1847B

(9) Defendant's Election As To Punishment in 57,557 & 57,558.

(10) Complaint & Affidavit For Arrest in 1847 (Aggravated Sexual Assault).

(11) Two-page Waiver Of Right To Formal Discovery And Request For Informal Discovery – which Waiver I later abandoned (with Kimball's agreement).

(12) Indictment in 57558 (with my observations regarding its defects).

(13) " " 57557

(14) my rough-out of a bench warrant (to get Tom back from the San Antonio Dominguez Unit

(15) my type-writer prepared bench warrant (which never was filed).

(16) Kimball's (filed) Bench Warrant.

(17) Photostats of U.S. & Texas' constitutional Double Jeopardy provisions (the only research I kept, as all else would have been incorporated into pretrial motions)

(18) Defendant's [15 page] Omnibus Pre-Trial Motion as filed 8-17-05.

(19) " [18 page] **Amended** Omnibus Pre-Trial Motion as filed 9-20-05, this copy of which contains my Hearing notations.

(20) The **Clerk**'s copy of said motion, with the Court's (Hearing) notations.

(21) The March 6th, 2006 report of the **Vernon Campus** Texas Dept. of State & Health Services Chief Psychiatrist, Dr. Joseph Black, M.D., finding Thomas COMPETENT to stand trial, setting out the medications he was on, diagnosing him as "**Malingering**" and explaining – as verified by Thomas' writings (supra) – that the patient was "feigning . . . mental illness" (see Paragraph 3 on page 4 of the five page report).

(22) the March 8th 2006 Bench Warrant of Thomas back from Vernon.

(23) my "Defendant's Court-Directed Motion For A Setting On A Previously Unheard [actually un-ruled upon] Pre-Trial Motion", as filed 9-19-06.

(24) my application for a **subpoena** of **District Attorney Henry Garza** (along with notation of my agreement to quashing said subpoena in exchange for the State's agreement to deletion of the scarlet words "Of A Child" from the *Caption* of the Indictment), stapled together with the State's Motion To Quash Subpoena.

(25) the bench warrant for Tammy Bishop, issued 9-27-06.

(26) Motion For Continuance in Cause Numbers 57557 & 57558 (complaining of non-compliance by the State with prior court rulings).

(27) a 10-24-05 (belatedly furnished) print-out of Kevin May's cholesterol-prescription (Tom's identification of the pills he said the kids were crushing up and snorting, to wit, "**methylphenidate**" – see above item #7 (21)'s "How were we to know" page – *might* indicate that Mr. Mays had an *ADHD* condition/prescription; but Tom's "AZO 36" observation would have to have been incorrect.)

194

(28) the "Notice Of Intent To Use [hospital blood records*] to prove that the boys had been given Methamphetamine.    *: Those records – filed with the Court Clerk – augment the Affidavit For Arrest ("the children tested positive for meth....").

(29) the State's "Notice Of Other Crimes, Wrongs or Acts".

(30) the State's Witness List (for case-in-chief).

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

(31) a 2-8-05 Transmission Verification Report *reflecting my having sent Bob Outten* (the Beeville, Texas alcohol & drug counselor who I hired to interview Thomas and prepare Bob's jury-defense-testimony, SUPRA) *twenty one (21) pages of factual background on cause #s 57557 & 57558.*

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

(32) a large envelope dated Mar. 14, 2005, repeatedly stamped "Privileged", addressed to Mr. Thomas Carr in cell #304 / changed by Jail personnel to cell 328, and containing a lengthy letter (with exhibits) TO State Bar Senior Investigator J.M.Richards and FROM Ted Potter's grievance attorney, Austin's Jerry Zunker

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

(33) a 3-7-05 **Adjudication of Guilt**; Sentence To State Jail Div., TDCJ in Cause **#53430,** wherein Tom had previously been probated on a 4-25-02 Possession of Marijuana Over Four Ounces and Less Than five Pounds, and now (3-4-05) was pleading True *only to the "tested positive" allegations of a "Second Motion To Adjudicate", with the State abandoning all other allegations* (i.e., those relating to the offenses set out in 57557 & 57558).

(34) the above mentioned (1-31-05) *"Second* Motion To Adjudicate".

(35) Various (together stapled) Cause **#53430** setting notices, respectively dated 1-21-05, 1-27-05, 2-22-05 and 3-1-05 (on which latter notice I recorded that on 3-4-05 Defendant pled True to paragraphs D, E, & F {of said $2^{nd}$ MTA}, *with paragraphs A, B, C & G being abandoned*).

(36) the (8-17-04) *First* Amended Motion To Adjudicate in 53430.

(37) my (1-20-05) Motion To Substitute Counsel in 53430.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

(38) the County Attorney's "Motion To Dismiss" & County Court at Law Judge's 3-16-05 **Order dismissing Cause No. 2C04-05521,** *stapled together with* three (3) preceding Agreed Motion(s) For Continuance.

(39) the County Attorney Office's 1-18-05 two-page DISCOVERY for said 2C04-05521

(40) County Attorney Richard Miller's Cause #2C04-05521 INFORMATION charging Thomas Carr with *Marihuana* Possession Less Than 2 (two) Ounces, *stapled together with* Harker Heights P.D. Detective Jerry Dugger's sworn Complaint and probable cause affidavit AND ten additional pages of supporting Incident / Investigation Report(s), Magistrate's Warning, AND Supplemental Reports(s) – all together establishing that **only marihuana was found** upon execution of the search warrant at Thomas's (Gerda's) residence, and that **there never was any seizure of methamphetamine,** hence *nothing to submit to a lab.*

(41) my 1-18-05 Motion To Substitute Counsel in said Cause 2C04-05521

(42) a 35 page ACLU "Prison & Jail Accountability Project" 2003-2004 Prisoner Resource Guide that Thomas Carr wanted me to consult in regards to taking legal action about his medical complaints.

**ADDENDUM:** The foregoing documents are what *currently* comprises my file on Thomas Raymond Carr and are *additional* to those filed with my April 10th, 2013 "Court-Ordered Affidavit....". For example, I apparently filed therein the original — keeping no copy — of Thomas's 12-31-06 letter (therein denominated "Exhibit Five"); and there may be other such instances.

As for the accuracy of those <u>comments</u> herein whereby I did you the courtesy of alluding to the significance *to me* of any given document herewith provided, it must be borne in mind that the case is nine years old, my memory may be wrong due to the passage of time; and your (Timothy Tesch's) signature hereon will NOT be taken as indicating agreement with my conclusions. You are merely confirming receipt of each of the foregoing documents.

Receipt of the Foregoing is hereby acknowledged by signatures of the undersigned.

EXECUTED June 26th, 2014 by _____

**SHAINA MEDFORD**, as Agent of and subject to inspection by Timothy Tesch

EXECUTED June ___ , 2014 by _____

**ATTORNEY, TIMOTHY TESCH**
(SBOT # 19808200)
Attorney for Thomas Raymond Carr

Receipt-Page 6 of 6

# NOTHING  HERE  FOLLOWS

# Exhibit 14

197

Bill of Rights

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger;

nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb;

nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law;

nor shall private property be taken for public use, without just compensation.



## BILL OF RIGHTS

## - DOUBLE JEOPARDY

No person, for the same offense, shall be twice put in jeopardy of life or liberty, nor shall a person be again put upon trial for the same offense, after a verdict of not guilty in a court of competent jurisdiction.



No person for the same offense shall be twice put in jeopardy of life or liberty; nor shall a person be again put upon trial for the same offense, after a verdict of not guilty in a court of competent jurisdiction

Art. 1.10. [8] [9] Jeopardy

No person for the same offense shall be twice put in jeopardy of life or liberty; nor shall a person be again put upon trial for the same offense, after a verdict of not guilty in a court of competent jurisdiction.

Acts 1965, 59th Leg., vol. 2, p. 317, ch. 722.

Art. 21.13. [407] [463] [451] Act with intent to commit an offense

An indictment for an act done with intent to commit some other offense may charge in general terms the commission of such act with intent to commit such other offense.

Acts 1965, 59th Leg., p. 317, ch. 722, Sec. 1, eff. Jan. 1, 1966



Art. 21.24. [417; 408a] [481] [469] Joinder of certain offenses

... ... ...  offenses may be joined in a single indictment, information, or complaint, with each offense stated in a separate count, if the offenses arise out of the same criminal episode, as defined in Chapter 3 of the Penal Code.

(b) A count may contain as many separate paragraphs charging the same offense as necessary, but no paragraph may charge more than one offense.

(c) A count is sufficient if any one of its paragraphs is sufficient. An indictment, information, or complaint is sufficient if any one of its counts is sufficient.

Acts 1965, 59th Leg., p. 317, ch. 722, Sec. 1, eff. Jan. 1, 1966. Amended by Acts 1973, 63rd Leg., p. 968, ch. 399, Sec. 2(A), eff. Jan. 1, 1974.

# Exhibit 15

200

# BELL COUNTY
## District Court Coordinator



Post Office Box 324
Belton, Texas 76513-0324
(254) 933-5246    Fax: (254) 933-5990
1-800-460-2355 ext. 5246

March 24, 2006

CHARLES MONTY MONTGOMERY
4400 SEVEN COVES ROAD
TEMPLE, TX 76502

Re: 57557 *+ 57558* *(3-24: St announced th "We're going [trying] on [the sex ct]"*
State of Texas Vs. Thomas Raymond Carr

The above case has been scheduled for a Jury Trial on May 1, 2006, at 9:00 a.m. **Docket Call** will be
**April 28, 2006,** at 9:00 a.m.      *↳ This setting was given at Docket Call (PM 3-24)*

*On hearing of PT Mtns later*

You and your client must be present for Docket Call or the bond will be forfeited.      *(even 1:30 PM 3-24-06)*

*the Ct agreed the case would*
*not be set for trial 5-1-06*
*+ would be reset to later date*

Yours Truly,

*Paula King*
Paula King
Court Coordinator

*nifed { by A {*

*Appeal of various*
*PT Mtn rulings*
*(failure to Quash*
*" " Consolidate*
*etc.)*

Notices to:

CHARLES MONTY MONTGOMERY
4400 SEVEN COVES ROAD
TEMPLE, TX 76502

MARK D. KIMBALL
BOX 540
BELTON, TX 76513

*+ then file ... of St's Mtns in Limine*
*said Hrg to be held two weeks before trial*
*per Jdg Trudo*

# Exhibit 16

202

Scanned by ALBERTS, ANDREA L in facility MIDDLETON on 02/02/2007 08:51

Pg 1.of 2

## TEXAS UNIFORM HEALTH STATUS UPDATE  #140393\

I. **NAME:** Carr _____ Thomas _____ R. _____ **DOB:** 08 14 67 **AGE:** 39
   Last        First        MI

   **STATE ID#** _____ **RACE:** white **SEX:** Male X Female ____

   COUNTY/TDCJ# 41790 _____ **WT:** 250 **HT:** 5'7"

II. **CURRENT/CHRONIC HEALTH PROBLEMS**
    A. Health Problems
    ___ 1. None
    ___ 2. Asthma
    ___ 3. Pregnancy
    ___ 4. Dental Priority
    ___ 5. Diabetes
    ___ 6. Drug Abuse
    ___ 7. Alcoholism
    ___ 8. Orthopedic Problems
    ___ 9. Cardiovascular/Heart Trouble
    ___ 10. Suicidal
    ___ 11. Mental Retardation
    X 12. Mental Illness (Specify diagnosis) _____
         Depression
    ___ 13. Recent Surgery
    ___ 14. Seizures
    ___ 15. Dialysis
    X 16. Hypertension
    ___ 17. CARE System  Y/N

    *NOTE: When screening substance abuse facility clients, please contact the TDCJ-ID Health Services Liaison at (936)437-3500 for clients with any chronic disease symptoms deemed unstable.*

    B. Preventive Medicine
    X 1. Tuberculosis Status                    Needs a New TB Test
         Skin Test:   Date Given: 12/15/05  Date Read: 12/16/05  Results ___ 0 ___ mm*
         X-Ray:  Date: __/__/__  Normal ___  Abnormal *  Anti-TB Treatment? No ___ Yes __*
    ___ 2. Hepatitis: A __ B __ C __  Other: _____
    ___ 3. HIV Antibody:  Test Date: __/__/__  Results: Neg ___ Pos ___ CD4: ___ Date __/__/__
    ___ 4. Syphilis: Date: __/__/__  Type: ___  Treatment Completed: ___ Yes ___ No

    *NOTE: If any treatment has been recommended, the X-Ray was abnormal, or skin test indicates infection please attach tuberculosis record.*

    C. Other Health Care Problems: _____

III. **SPECIAL NEEDS (Check all that apply)**
     A. Housing Restrictions
     X 1. None
     ___ 2. Skilled Nursing Facility
     ___ 3. Extended Care Facility
     ___ 4. Psychiatric Inpatient Facility
     ___ 5. Respiratory Isolation
     ___ 6. Other:

     B. Transportation
     X 1. Routine
     ___ 2. Crutches/Cane
     ___ 3. Ambulance
     ___ 4. Wheelchair/Wheelchair Van
     ___ 5. Prosthesis: _____

     C. Pending Specialty Clinic Appointment
        None __X__ Type _____

     D. ALLERGIES _____
     _____
     (NKA) _____

IV. **CURRENT PRESCRIBED MEDICATIONS**      None ____

| Medication | Dosage | Frequency |
|---|---|---|
| Anusol HC 12 Sup. | 1 sup Q6H PRN RCtL | |
| Metamucil 15oz Pwdr | 2 tablespn QID | |
| Lipitor | 20mg Ť QHS | |
| Seroquel | 700mg Ť QAM | |
| Seroquel | 200 mg ŤŤŤŤ Q HS | |
| Dovonex | 120mg 0.0005% CRM KoF | PRN |

**THIS FORM MUST ACCOMPANY ALL OFFENDERS TRANSFERRED TO AND FROM ALL TEXAS CRIMINAL JUSTICE ENTITIES**

COMPLETED BY: C/O Simon Jailer _____ DATE: 12 26 06
                  Signature/Title

PHONE NUMBER: 254-933-5455 FACILITY: Bell County Jail _____

BCJA 97

203

Scanned by ALBERTS, ANDREA L in facility MIDDLETON on 02/02/2007 08.51

Pg 1.f 2

# TEXAS UNIFORM HEALTH STATUS UPDATE #1403931

I. NAME: Carr Thomas R. DOB: 08/14/67 AGE: 39

 Last First MI

STATE ID# _____ RACE: white SEX: Male X Female ___

COUNTY/TDCJ# 41790 WT: 250 HT: 5'7"

II. CURRENT/CHRONIC HEALTH PROBLEMS
A. Health Problems

___ 1. None
___ 2. Asthma
___ 3. Pregnancy
___ 4. Dental Priority
___ 5. Diabetes
___ 6. Drug Abuse
___ 7. Alcoholism
___ 8. Orthopedic Problems
___ 9. Cardiovascular/Heart Trouble
___10. Suicidal
___11. Mental Retardation
X 12. Mental Illness (Specify diagnosis) ___ Depression
___13. Recent Surgery
___14. Seizures
___15. Dialysis
X 16. Hypertension
___17. CARE System  Y/N

*if he just has this*

*NOTE: When screening substance abuse facility clients, please contact the TDCJ-ID Health Services Liaison at (936)437-3589 for clients with any chronic disease symptoms deemed unstable.*

III. SPECIAL NEEDS (Check all that apply)
A. Housing Restrictions

X 1. None
___2. Skilled Nursing Facility
___3. Extended Care Facility
___4. Psychiatric Inpatient Facility
___5. Respiratory Isolation
___6. Other:

B. Transportation

X 1. Routine
___2. Crutches/Cane
___3. Ambulance
___4. Wheelchair/Wheelchair Van
___5. Prosthesis: ___

C. Pending Specialty Clinic Appointment
None X Type ___

D. ALLERGIES _____

NKA

B. Preventive Medicine

Needs a New TB Test

X 1. Tuberculosis Status
Skin Test: Date Given: 12/15/05 Date Read: 12/16/05 Results ___ Ø ___ mm*
X-Ray: Date: _/_/_ Normal ___ Abnormal ___ Anti-TB Treatment? No ___ Yes ___*
___2. Hepatitis: A __ B __ C __ Other: _____
___3. HIV Antibody: Test Date: _/_/_ Results: Neg ___ Pos ___ CD4: ___ Date _/_/_
___4. Syphilis: Date: _/_/_ Type: ___ Treatment Completed: ___ Yes ___ No

*NOTE: If any treatment has been recommended, the X-Ray was abnormal, or skin test indicates infection please attach tuberculosis record.*

C. Other Health Care Problems: _____

IV. CURRENT PRESCRIBED MEDICATIONS    None ___

| Medication | Dosage | Frequency |
|---|---|---|
| Anusol HC 12 Sup. | 1 sup Q6H PRN RC+L | |
| Metamucil 15oz PWDR | 2 tablespn QID | |
| Lipitor | 20mg Ṫ QHS | |
| Seroquel | 700mg Ṫ QAM | |
| Seroquel | 200 mg ṪṪ QHS | |
| Dovonex | 120mg 0.0005% CRM KOP | PRN |

**THIS FORM MUST ACCOMPANY ALL OFFENDERS TRANSFERRED TO AND FROM ALL TEXAS CRIMINAL JUSTICE ENTITIES**

COMPLETED BY: c/o Simon Jailer DATE: 12/26/06

 Signature/Title

PHONE NUMBER: 254-933-5455 FACILITY: Bell County Jail

BCJA 97

204

# Exhibit 17

205

🖶 PRINT THIS TABLE    ⊠ CLOSE

| Indication | Initial Dose and Titration | Recommended Dose | Maximum Dose |
|---|---|---|---|
| Schizophrenia-Adults | Day 1: 25 mg twice daily. Increase in increments of 25 mg-50 mg divided two or three times on Days 2 and 3 to range of 300-400 mg by Day 4. Further adjustments can be made in increments of 25– 50 mg twice a day, in intervals of not less than 2 days. | 150-750 mg/day | 750 mg/day |
| Schizophrenia-Adolescents (13-17 years) | Day 1: 25 mg twice daily. Day 2: Twice daily dosing totaling 100 mg. Day 3: Twice daily dosing totaling 200 mg. Day 4: Twice daily dosing totaling 300 mg. Day 5: Twice daily dosing totaling 400 mg. Further adjustments should be in increments no greater than 100 mg/day within the recommended dose range of 400-800 mg/day. Based on response and tolerability, may be administered three times daily. | 400-800 mg/day | 800 mg/day |
| Schizophrenia-Maintenance | N/A[1] | 400– 800 mg/day | 800 mg/day |
| Bipolar Mania-Adults Monotherapy or as an adjunct to lithium or divalproex | Day 1: Twice daily dosing totaling 100 mg. Day 2: Twice daily dosing totaling 200 mg. Day 3: Twice daily dosing totaling 300 mg. Day 4: Twice daily dosing totaling 400 mg. Further dosage adjustments up to 800 mg/day by Day 6 should be in increments of no greater than 200 mg/day. | 400– 800 mg/day | 800 mg/day |
| Bipolar Mania-Children and Adolescents (10 to 17 years), Monotherapy | Day 1: 25 mg twice daily. Day 2: Twice daily dosing totaling 100 mg. Day 3: Twice daily dosing totaling 200 mg. Day 4: Twice daily dosing totaling 300 mg. | 400-600 mg/day | 600 mg/day |



close window



**RxList**
The Internet Drug Index

- Patient Information

Indications
Dosage
How Supplied

# INDICATIONS

## Schizophrenia

SEROQUEL is indicated for the treatment of schizophrenia. The efficacy of SEROQUEL in schizophrenia was established in three 6-week trials in adults and one 6-week trial in adolescents (13-17 years). The effectiveness of SEROQUEL for the maintenance treatment of schizophrenia has not been systematically evaluated in controlled clinical trials [see Clinical Studies].

## Bipolar Disorder

SEROQUEL is indicated for the acute treatment of manic episodes associated with bipolar I disorder, both as monotherapy and as an adjunct to lithium or divalproex. Efficacy was established in two 12-week monotherapy trials in adults, in one 3-week adjunctive trial in adults, and in one 3-week monotherapy trial in pediatric patients (10-17 years) [see Clinical Studies].

SEROQUEL is indicated as monotherapy for the acute treatment of depressive episodes associated with bipolar disorder. Efficacy was established in two 8-week monotherapy trials in adult patients with bipolar I and bipolar II disorder [see **Clinical Studies**].

SEROQUEL is indicated for the maintenance treatment of bipolar I disorder, as an adjunct to lithium or divalproex. Efficacy was established in two maintenance trials in adults. The effectiveness of SEROQUEL as monotherapy for the maintenance treatment of bipolar disorder has not been systematically evaluated in controlled clinical trials [see **Clinical Studies**].

## Special Considerations in Treating Pediatric Schizophrenia and Bipolar I Disorder

Pediatric schizophrenia and bipolar I disorder are serious mental disorders, however, diagnosis can be challenging. For pediatric schizophrenia, symptom profiles can be variable, and for bipolar I disorder, patients may have variable patterns of periodicity of manic or mixed symptoms. It is recommended that medication therapy for pediatric schizophrenia and bipolar I disorder be initiated only after a thorough diagnostic evaluation has been performed and careful consideration given to the risks associated with medication treatment. Medication treatment for both pediatric schizophrenia and bipolar I disorder is indicated as part of a total treatment program that often includes psychological, educational and social interventions.

# DOSAGE AND ADMINISTRATION

207

## Important Administration Instructions

SEROQUEL can be taken with or without food.

## Recommended Dosing

The recommended initial dose, titration, dose range and maximum SEROQUEL dose for each approved indication is displayed in Table 1. After initial dosing, adjustments can be made upwards or downwards, if necessary, depending upon the clinical response and tolerability of the patient [see Clinical Studies].

### Table 1: Recommended Dosing for SEROQUEL

| Indication | Initial Dose and Titration | Recommended Dose | Maximum Dose |
|---|---|---|---|
| Schizophrenia-Adults | Day 1: 25 mg twice daily. Increase in increments of 25 mg-50 mg divided two or three times on Days 2 and 3 to range of 300-400 mg by Day 4. Further adjustments can be made in increments of 25– 50 mg twice a day, in intervals of not less than 2 days. | 150-750 mg/day | 750 mg/day |
| Schizophrenia-Adolescents (13-17 years) | Day 1: 25 mg twice daily. Day 2: Twice daily dosing totaling 100 mg. Day 3: Twice daily dosing totaling 200 mg. Day 4: Twice daily dosing totaling 300 mg. Day 5: Twice daily dosing totaling 400 mg. Further adjustments should be in increments no greater than 100 mg/day within the recommended dose range of 400-800 mg/day. Based on response and tolerability, may be administered three times daily. | 400-800 mg/day | 800 mg/day |
| Schizophrenia-Maintenance | N/A[1] | 400– 800 mg/day | 800 mg/day |
| Bipolar Mania-Adults Monotherapy or as an adjunct to lithium or divalproex | Day 1: Twice daily dosing totaling 100 mg. Day 2: Twice daily dosing totaling 200 mg. Day 3: Twice daily dosing totaling 300 mg. Day 4: Twice daily dosing totaling 400 mg. Further dosage adjustments up to 800 mg/day by Day 6 should be in increments of no greater than 200 mg/day. | 400– 800 mg/day | 800 mg/day |
| Bipolar Mania-Children and Adolescents (10 to 17 years), Monotherapy | Day 1: 25 mg twice daily. Day 2: Twice daily dosing totaling 100 mg. Day 3: Twice daily dosing totaling 200 mg. Day 4: Twice daily dosing totaling 300 mg. Day 5: Twice daily dosing totaling 400 mg. Further adjustments should be in increments no greater than 100 mg/day within the recommended dose range of 400-600 mg/day. Based on response and tolerability, may be administered three times daily. | 400-600 mg/day | 600 mg/day |
| Bipolar Depression-Adults | Administer once daily at bedtime. Day 1: 50 mg Day 2: 100 mg Day 3: 200 mg Day 4: 300 mg | 300 mg/day | 300 mg/day |



208

| | | | |
|---|---|---|---|
| Bipolar I Disorder Maintenance Therapy-Adults | Administer twice daily totaling 400-800 mg/day as adjunct to lithium or divalproex. Generally, in the maintenance phase, patients continued on the same dose on which they were stabilized. | 400-800 mg/day | 800 mg/day |

1. N/A Not applicable

# Maintenance Treatment for Schizophrenia and Bipolar I Disorder

*Maintenance Treatment* – Patients should be periodically reassessed to determine the need for maintenance treatment and the appropriate dose for such treatment [see **Clinical Studies**].

## Dose Modifications in Elderly Patients

Consideration should be given to a slower rate of dose titration and a lower target dose in the elderly and in patients who are debilitated or who have a predisposition to hypotensive reactions [see **CLINICAL PHARMACOLOGY**]. When indicated, dose escalation should be performed with caution in these patients.

Elderly patients should be started on SEROQUEL 50 mg/day and the dose can be increased in increments of 50 mg/day depending on the clinical response and tolerability of the individual patient.

## Dose Modifications in Hepatically Impaired Patients

Patients with hepatic impairment should be started on 25 mg/day. The dose should be increased daily in increments of 25 mg/day -50 mg/day to an effective dose, depending on the clinical response and tolerability of the patient.

## Dose Modifications when used with CYP3A4 Inhibitors

SEROQUEL dose should be reduced to one sixth of original dose when co-medicated with a potent CYP3A4 inhibitor (e.g., ketoconazole, itraconazole, indinavir, ritonavir, nefazodone, etc.). When the CYP3A4 inhibitor is discontinued, the dose of SEROQUEL should be increased by 6 fold [see **CLINICAL PHARMACOLOGY** and **DRUG INTERACTIONS**].

## Dose Modifications when used with CYP3A4 Inducers

SEROQUEL dose should be increased up to 5 fold of the original dose when used in combination with a chronic treatment (e.g., greater than 7-14 days) of a potent CYP3A4 inducer (e.g., phenytoin, carbamazepine, rifampin, avasimibe, St. John's wort etc.). The dose should be titrated based on the clinical response and tolerability of the individual patient. When the CYP3A4 inducer is discontinued, the dose of SEROQUEL should be reduced to the original level within 7-14 days [see **CLINICAL PHARMACOLOGY** and **DRUG INTERACTIONS**].

## Reinitiation of Treatment in Patients Previously Discontinued

Although there are no data to specifically address re-initiation of treatment, it is recommended that when restarting therapy of patients who have been off SEROQUEL for more than one week, the initial dosing schedule should be followed. When restarting patients who have been off SEROQUEL for less than one week, gradual dose escalation may not be required and the maintenance dose





may be reinitiated.

# Switching from Antipsychotics

There are no systematically collected data to specifically address switching patients with schizophrenia from antipsychotics to SEROQUEL, or concerning concomitant administration with antipsychotics. While immediate discontinuation of the previous antipsychotic treatment may be acceptable for some patients with schizophrenia, more gradual discontinuation may be most appropriate for others. In all cases, the period of overlapping antipsychotic administration should be minimized. When switching patients with schizophrenia from depot antipsychotics, if medically appropriate, initiate SEROQUEL therapy in place of the next scheduled injection. The need for continuing existing EPS medication should be re-evaluated periodically.

# HOW SUPPLIED

## Dosage Forms And Strengths

- 25 mg tablets are peach, round, biconvex, film coated tablets, identified with 'SEROQUEL' and '25' on one side and plain on the other side,
- 50 mg tablets are white, round, biconvex, film coated tablets, identified with 'SEROQUEL' and '50' on one side and plain on the other side
- 100 mg tablets are yellow, round, biconvex film coated tablets, identified with 'SEROQUEL' and '100' on one side and plain on the other side
- 200 mg tablets are white, round, biconvex, film coated tablets, identified with 'SEROQUEL' and '200' on one side and plain on the other side
- 300 mg tablets are white, capsule-shaped, biconvex, film coated tablets, intagliated with 'SEROQUEL' on one side and '300' on the other side
- 400 mg tablets are yellow, capsule-shaped, biconvex, film coated tablets, intagliated with 'SEROQUEL' on one side and '400' on the other side

## Storage And Handling

**25 mg Tablets (NDC 0310-0275)** peach, round, biconvex, film coated tablets, identified with 'SEROQUEL' and '25' on one side and plain on the other side, are supplied in bottles of 100 tablets and hospital unit dose packages of 100 tablets.

**50 mg Tablets (NDC 0310-0278)** white, round, biconvex, film coated tablets, identified with 'SEROQUEL' and '50' on one side and plain on the other side, are supplied in bottles of 100 tablets and hospital unit dose packages of 100 tablets.

**100 mg Tablets (NDC 0310-0271)** yellow, round, biconvex film coated tablets, identified with 'SEROQUEL' and '100' on one side and plain on the other side, are supplied in bottles of 100 tablets, and hospital unit dose packages of 100 tablets.

**200 mg Tablets (NDC 0310-0272)** white, round, biconvex, film coated tablets, identified with 'SEROQUEL' and '200' on one side and plain on the other side, are supplied in bottles of 100 tablets, and hospital unit dose packages of 100 tablets.

**300 mg Tablets (NDC 0310-0274)** white, capsule-shaped, biconvex, film coated tablets, intagliated with 'SEROQUEL' on one side and '300' on the other side, are supplied in bottles of 60 tablets, and hospital unit dose packages of 100 tablets.

**400 mg Tablets (NDC 0310-0279)** yellow, capsule-shaped, biconvex, film coated tablets, intagliated with 'SEROQUEL' on one side and '400' on the other side, are supplied in bottles of 100 tablets, and hospital unit dose packages of 100 tablets.



Store at 25°C (77°F); excursions permitted to 15-30°C (59-86°F) [See **USP**].

Distributed by: AstraZeneca Pharmaceuticals LP Wilmington, DE 19850. Revised: October 2013

*Last reviewed on RxList: 11/8/2013*
This monograph has been modified to include the generic and brand name in many instances.
Indications
Dosage
How Supplied

---

2015 RxList, Inc. All rights reserved.
RxList does not provide medical advice, diagnosis or treatment. See additional information

close window

close window



# MedicineNet.com
We Bring Doctors' Knowledge to You

Source: http://www.medicinenet.com/script/main/art.asp?articlekey=19054

# quetiapine, Seroquel, Seroquel XR

Pharmacy Author:
Omudhome Ogbru, PharmD



## Omudhome Ogbru, PharmD

Dr. Ogbru received his Doctorate in Pharmacy from the University of the Pacific School of Pharmacy in 1995. He completed a Pharmacy Practice Residency at the University of Arizona/University Medical Center in 1996. He was a Professor of Pharmacy Practice and a Regional Clerkship Coordinator for the University of the Pacific School of Pharmacy from 1996-99.

View Full Profile
Medical and Pharmacy Editor:
Jay W. Marks, MD



## Jay W. Marks, MD

Jay W. Marks, MD, is a board-certified internist and gastroenterologist. He graduated from Yale University School of Medicine and trained in internal medicine and gastroenterology at UCLA/Cedars-Sinai Medical Center in Los Angeles.

View Full Profile

## GENERIC NAME: quetiapine

## BRAND NAME: Seroquel, Seroquel XR

DRUG CLASS AND MECHANISM: Quetiapine is an oral atypical antipsychotic drug used for treating schizophrenia and bipolar disorder. Although the mechanism of action of quetiapine is unknown, like other atypical anti-psychotics, it inhibits communication among nerves of the brain. It does this by blocking receptors on the nerves for several neurotransmitters, the chemicals that nerves use to communicate with each other. It is thought that its beneficial effect is due to blocking of the dopamine type 2 (D2) and serotonin type 2 (5-HT2) receptors. The FDA approved quetiapine in September 1997.

PRESCRIBED FOR: Quetiapine is used alone or in combination with other drugs to treat schizophrenia and bipolar disorder. It also is used for treating major depression in combination with antidepressants.

SIDE EFFECTS: The most common side effects for quetiapine are:



- headache,
- agitation,
- dizziness,
- drowsiness,
- weight gain
- and stomach upset.

Other important side effects include a potentially fatal complex referred to as neuroleptic malignant syndrome (NMS), in which patients may have:

- high fevers,
- muscle rigidity,
- altered mental status,
- irregular pulse or blood pressure,
- rapid heart rate,
- excessive sweating, and
- heart arrhythmias.

WARNING: Quetiapine can cause orthostatic hypotension (a drop in blood pressure upon standing that can lead to dizziness or fainting) especially during the first 3-5 day period of treatment, when it is restarted after temporary discontinuation, and after an increase in the dose. The risk of orthostatic hypotension is about 1 in 100 (one of every hundred patients who take quetiapine). Quetiapine frequently causes tiredness (1 in 5 patients), especially during the first 3-5 days of treatment. Because of this tiredness, care should be exercised in any activity requiring mental alertness such as operating a motor vehicle or hazardous machinery. Less common side effects include seizures (1 in 125 patients) and hypothyroidism (1 in 250 patients).

As with other antipsychotics, long-term use of quetiapine may lead to irreversible tardive dyskinesia, a neurologic disease which consists of involuntary movements of the jaw, lips, and tongue.

In animals, quetiapine has been associated with the development of cataracts, and cataracts have been reported in patients using quetiapine for prolonged periods. Although it is not clear if quetiapine was responsible for the cataracts seen in humans, eye examinations by slit-lamp (to identify cataracts before they impair vision) are recommended at the beginning of treatment and every six months during treatment. If cataracts form, treatment should be discontinued. Quetiapine may increase blood concentrations of cholesterol and triglycerides by 11% and 17%, respectively.

There is an increased risk of hyperglycemia (high blood glucose) and diabetes-related events in patients taking atypical antipsychotics, including quetiapine. Patients should be tested during treatment for elevated blood-sugars. Additionally, persons with risk factors for diabetes, including obesity or a family history of diabetes, should have their fasting levels of blood sugar tested before starting treatment and periodically throughout treatment to detect the onset of diabetes. Any patient developing symptoms that suggest diabetes during treatment should be tested for diabetes.

Elderly patients with dementia-related psychosis treated with antipsychotics are at an increased risk of death There is an increased risk of suicidal thinking and behavior in children, adolescents and young adults taking antidepressants for major depression and other psychiatric disorders.

PRESCRIPTION: Yes

GENERIC AVAILABLE: Yes

PREPARATIONS: Tablets: 25, 50, 100, 200, 300 and 400 mg. Tablet (Extended Release): 50, 150, 200, 300 and 400 mg

STORAGE: Tablets should be stored at room temperature, 15 C to 30 C (59 F to 86 F).

DOSING: Immediate release quetiapine usually is taken two or three times daily. Extended release quetiapine is taken once daily. The dose usually is increased slowly over several days or weeks to achieve the desired effect. Quetiapine can be taken with or without food.

The initial dose for bipolar disorder is 50 mg twice daily (100 mg/day) of immediate release quetiapine. The dose can be increased by 100 mg/day to a daily dose of 400 mg/day. Most patients respond to 400-800 mg/day. Doses greater than 800 mg/d have not been studied. The starting dose is 300 mg once daily and the


213

target dose is 400-800 mg once daily when using extended release tablets

The initial dose for schizophrenia is 25 mg twice daily (50 mg/day) of immediate release tablets. The dose can be increased by 25-50 mg two or three times daily. The target dose is 300-400 mg/day in two or three doses. Patients respond to 150-750 mg/day, and doses greater than 800 mg/day have not been evaluated. The starting dose is 300 mg once daily and the target dose is 400-800 mg once daily when using extended release tablets.

The dose range for treating major depression is 150-300 mg/day of extended release tablets. The starting does is 50 mg in the evening for 2 days increasing to 150 mg in the evening.

DRUG INTERACTIONS: Phenytoin (Dilantin) and thioridazine (Mellaril) markedly decrease the amount of quetiapine that is absorbed from the intestine and thereby reduces its effectiveness. Therefore, patients taking phenytoin or thioridazine may require higher doses of quetiapine.

Quetiapine can cause hypotension (low blood pressure) and therefore increase the blood pressure lowering effects of antihypertensive drugs and result in lower blood pressure.

Quetiapine can add to the sedating effects of other drugs that sedate. Such drugs include narcotic pain relievers (for example, oxycodone and acetaminophen [Percocet, Roxicet, Tylox, Endocet]), barbiturates, sedatives such as alprazolam [Xanax] and clonazepam [Klonopin], ethanol, and blood pressure drugs that can cause orthostatic hypotension, such as prazosin (Minipress) and terazosin (Hytrin).

Quetiapine is eliminated from the body by an enzyme in the liver called cytochrome P450 3A. There is a concern that drugs that strongly interfere with the enzyme, for example, ketoconazole (Nizoral), itraconazole (Sporanox), fluconazole (Diflucan), erythromycin, clarithromycin (Biaxin), nefazodone (Serzone), verapamil (Calan, Isoptin, Verelan), diltiazem (Cardizem, Tiazac, Dilacor) may cause elevated and toxic levels of quetiapine.

St. John's Wort, carbamazepine (Tegretol), and rifampin (Rifadin) will decrease the level or effect of quetiapine by increasing the breakdown of quetiapine.

PREGNANCY: There are no adequate studies of quetiapine in pregnant women. Studies in animals are inconsistent. Some studies suggest effects on the fetus and others show no effects. Quetiapine should be used in pregnancy only if the physician feels that it is necessary and that the potential benefits justify the unknown risks

NURSING MOTHERS: Quetiapine is excreted in the milk of animals during lactation. Although it is not known if it is excreted in human milk, it is recommended that women taking quetiapine not breastfeed.

*Medically reviewed by Eni Williams, PharmD*

Reference: FDA Prescribing Information

Report Problems to the Food and Drug Administration

You are encouraged to report negative side effects of prescription drugs to the FDA. Visit the FDA MedWatch website or call 1-800-FDA-1088.

*Medically Reviewed by a Doctor on 12/12/2014*

© 2015 MedicineNet, Inc. All rights reserved.
MedicineNet does not provide medical advice, diagnosis or treatment. See additional information

214

close window

215

close window



**MedicineNet.com**
We Bring Doctors' Knowledge to You

Source: http://www.medicinenet.com/script/main/art.asp?articlekey=19054

# quetiapine, Seroquel, Seroquel XR

Pharmacy Author:
Omudhome Ogbru, PharmD



## Omudhome Ogbru, PharmD

Dr Ogbru received his Doctorate in Pharmacy from the University of the Pacific School of Pharmacy in 1995. He completed a Pharmacy Practice Residency at the University of Arizona/University Medical Center in 1996. He was a Professor of Pharmacy Practice and a Regional Clerkship Coordinator for the University of the Pacific School of Pharmacy from 1996-99.

View Full Profile
Medical and Pharmacy Editor:
Jay W. Marks, MD



## Jay W. Marks, MD

Jay W. Marks, MD, is a board-certified internist and gastroenterologist. He graduated from Yale University School of Medicine and trained in internal medicine and gastroenterology at UCLA/Cedars-Sinai Medical Center in Los Angeles.

View Full Profile

## GENERIC NAME: quetiapine

## BRAND NAME: Seroquel, Seroquel XR

DRUG CLASS AND MECHANISM: Quetiapine is an oral atypical antipsychotic drug used for treating schizophrenia and bipolar disorder. Although the mechanism of action of quetiapine is unknown, like other atypical anti-psychotics, it inhibits communication among nerves of the brain. It does this by blocking receptors on the nerves for several neurotransmitters, the chemicals that nerves use to communicate with each other. It is thought that its beneficial effect is due to blocking of the dopamine type 2 (D2) and serotonin type 2 (5-HT2) receptors. The FDA approved quetiapine in September 1997.

PRESCRIBED FOR: Quetiapine is used alone or in combination with other drugs to treat schizophrenia and bipolar disorder. It also is used for treating major depression in combination with antidepressants.

SIDE EFFECTS: The most common side effects for quetiapine are:



- headache,
- agitation,
- dizziness,
- drowsiness,
- weight gain
- and stomach upset

Other important side effects include a potentially fatal complex referred to as neuroleptic malignant syndrome (NMS), in which patients may have:

- high fevers,
- muscle rigidity,
- altered mental status,
- irregular pulse or blood pressure,
- rapid heart rate,
- excessive sweating, and
- heart arrhythmias.

WARNING: Quetiapine can cause orthostatic hypotension (a drop in blood pressure upon standing that can lead to dizziness or fainting) especially during the first 3-5 day period of treatment, when it is restarted after temporary discontinuation, and after an increase in the dose. The risk of orthostatic hypotension is about 1 in 100 (one of every hundred patients who take quetiapine). Quetiapine frequently causes tiredness (1 in 5 patients), especially during the first 3-5 days of treatment. Because of this tiredness, care should be exercised in any activity requiring mental alertness such as operating a motor vehicle or hazardous machinery. Less common side effects include seizures (1 in 125 patients) and hypothyroidism (1 in 250 patients).

As with other antipsychotics, long-term use of quetiapine may lead to irreversible tardive dyskinesia, a neurologic disease which consists of involuntary movements of the jaw, lips, and tongue.

In animals, quetiapine has been associated with the development of cataracts, and cataracts have been reported in patients using quetiapine for prolonged periods. Although it is not clear if quetiapine was responsible for the cataracts seen in humans, eye examinations by slit-lamp (to identify cataracts before they impair vision) are recommended at the beginning of treatment and every six months during treatment. If cataracts form, treatment should be discontinued. Quetiapine may increase blood concentrations of cholesterol and triglycerides by 11% and 17%, respectively.

There is an increased risk of hyperglycemia (high blood glucose) and diabetes-related events in patients taking atypical antipsychotics, including quetiapine. Patients should be tested during treatment for elevated blood-sugars. Additionally, persons with risk factors for diabetes, including obesity or a family history of diabetes, should have their fasting levels of blood sugar tested before starting treatment and periodically throughout treatment to detect the onset of diabetes. Any patient developing symptoms that suggest diabetes during treatment should be tested for diabetes.

Elderly patients with dementia-related psychosis treated with antipsychotics are at an increased risk of death. There is an increased risk of suicidal thinking and behavior in children, adolescents and young adults taking antidepressants for major depression and other psychiatric disorders.

PRESCRIPTION: Yes

GENERIC AVAILABLE: Yes

PREPARATIONS: Tablets: 25, 50, 100, 200, 300 and 400 mg. Tablet (Extended Release): 50, 150, 200, 300 and 400 mg

STORAGE: Tablets should be stored at room temperature, 15 C to 30 C (59 F to 86 F).

DOSING: Immediate release quetiapine usually is taken two or three times daily. Extended release quetiapine is taken once daily. The dose usually is increased slowly over several days or weeks to achieve the desired effect. Quetiapine can be taken with or without food.

The initial dose for bipolar disorder is 50 mg twice daily (100 mg/day) of immediate release quetiapine. The dose can be increased by 100 mg/day to a daily dose of 400 mg/day. Most patients respond to 400-800 mg/day. Doses greater than 800 mg/d have not been studied. The starting dose is 300 mg once daily and the



target dose is 400-800 mg once daily when using extended release tablets.

The initial dose for **schizophrenia** is 25 mg twice daily (50 mg/day) of immediate release tablets. The dose can be increased by 25-50 mg two or three times daily. The target dose is 300-400 mg/day in two or three doses. Patients respond to 150-750 mg/day, and doses greater than 800 mg/day have not been evaluated. The starting dose is 300 mg once daily and the target dose is 400-800 mg once daily when using extended release tablets

The dose range for treating **major depression** is 150-300 mg/day of extended release tablets. The starting does is 50 mg in the evening for 2 days increasing to 150 mg in the evening.

DRUG INTERACTIONS: Phenytoin (Dilantin) and thioridazine (Mellaril) markedly decrease the amount of quetiapine that is absorbed from the intestine and thereby reduces its effectiveness. Therefore, patients taking phenytoin or thioridazine may require higher doses of quetiapine.

Quetiapine can cause hypotension (low blood pressure) and therefore increase the blood pressure lowering effects of antihypertensive drugs and result in lower blood pressure.

Quetiapine can add to the sedating effects of other drugs that sedate. Such drugs include narcotic pain relievers (for example, oxycodone and acetaminophen [Percocet, Roxicet, Tylox, Endocet]), barbiturates, sedatives such as alprazolam [Xanax] and clonazepam [Klonopin], ethanol, and blood pressure drugs that can cause orthostatic hypotension, such as prazosin (Minipress) and terazosin (Hytrin).

Quetiapine is eliminated from the body by an enzyme in the liver called cytochrome P450 3A. There is a concern that drugs that strongly interfere with the enzyme, for example, ketoconazole (Nizoral), itraconazole (Sporanox), fluconazole (Diflucan), erythromycin, clarithromycin (Biaxin), nefazodone (Serzone), verapamil (Calan, Isoptin, Verelan), diltiazem (Cardizem, Tiazac, Dilacor) may cause elevated and toxic levels of quetiapine.

St. John's Wort, carbamazepine (Tegretol), and rifampin (Rifadin) will decrease the level or effect of quetiapine by increasing the breakdown of quetiapine.

PREGNANCY: There are no adequate studies of quetiapine in pregnant women. Studies in animals are inconsistent. Some studies suggest effects on the fetus and others show no effects. Quetiapine should be used in pregnancy only if the physician feels that it is necessary and that the potential benefits justify the unknown risks.

NURSING MOTHERS: Quetiapine is excreted in the milk of animals during lactation. Although it is not known if it is excreted in human milk, it is recommended that women taking quetiapine not breastfeed.

*Medically reviewed by Eni Williams, PharmD*

Reference: FDA Prescribing Information

Report Problems to the Food and Drug Administration

You are encouraged to report negative side effects of prescription drugs to the FDA. Visit the FDA MedWatch website or call 1-800-FDA-1088.

*Medically Reviewed by a Doctor on 12/12/2014*

© 2015 MedicineNet, Inc. All rights reserved.
MedicineNet does not provide medical advice, diagnosis or treatment. See additional information

218

close window

# List of abbreviations used in medical prescriptions

From Wikipedia, the free encyclopedia

This is a **list of abbreviations used in medical prescriptions and hospital orders** (sometimes referred to as **sig codes**). This list does not include abbreviations for pharmaceuticals or drug name suffixes such as CD, CR, ER, XT (See *Time release technology § List of abbreviations* for those).

Capitalization and the use of periods is a matter of style. In the list, Latin is not capitalized whereas English acronyms are.

Abbreviations which are not recommended by the Joint Commission are marked in red. Those abbreviations which are discouraged by other organizations are marked in orange.

The Joint Commission is an independent, non-profit, non-governmental organization which offers accreditation to hospitals and other health care organizations in the United States. While their recommendations are not binding on U.S. physicians, they are required of organizations who wish accreditation by the Joint Commission.

**Key**

Not recommended for use by other organizations, such as the ISMP (Institute for Safe Medication Practices)[2]



## List of abbreviations used in medical prescriptions[3]

| Abbreviation | Latin | Meaning | Possible confusion |
|---|---|---|---|
| aa | ana | of each | |
| AAA | | apply to affected area | |
| a.c. | ante cibum | before meals | |
| a.d. | auris dextra | right ear | "a" can be mistaken as an "o" which could read "o.d.", meaning right eye |
| ad lib. | ad libitum | use as much as one desires; freely | |
| admov. | admove | apply | |
| agit | agita | stir/shake | |
| alt. h. | alternis horis | every other hour | |
| a.m.m. | ad manu medicae | at doctor's hand | |
| a.m. | ante meridiem | morning, before noon | |
| amp | | ampule | |
| amt | | amount | |
| aq | aqua | water | |
| a.l., a.s. | auris laeva, auris sinistra | left ear | "a" can be mistaken as an "o" which could read "o.s." or "o.l", meaning left eye |
| A.T.C. | | around the clock | |
| a.u. | auris utraque | both ears | "a" can be mistaken as an "o" which could read "o.u.", meaning both eyes |
| BDS/bds | bis die sumendum | twice daily | |
| bis | bis | twice | |
| b.i.d./b.d. | bis in die | twice daily | AMA style avoids use of this abbreviation (spell out "twice a day") |
| B.M. | | bowel movement | |
| BNF | | British National Formulary (http://www.bnf.org/) | |
| bol. | bolus | as a large single dose (usually intravenously) | |

4/29/2015 11:14 PM

221

| | | | |
|---|---|---|---|
| B.S. | | blood sugar | |
| B.S.A | | body surface areas | |
| b.t. | | bedtime | mistaken for "b.i.d", meaning twice daily |
| BUCC | bucca | inside cheek | |
| cap., caps. | capsula | capsule | |
| c̄, c. | cum | with (usually written with a bar on top of the "c") | |
| cib. | cibus | food | |
| cc | cum cibo | with food. (but also cubic centimetre) | mistaken for "U", meaning units; also has an ambiguous meaning; use "mL" or "milliliters" |
| cf | | with food | |
| comp. | | compound | |
| cr., crm | | cream | |
| CST | | Continue same treatment | |
| D or d | | days or doses | ambiguous meaning, write out "days" or "doses" |
| D5W | | dextrose 5% solution (sometimes written as $D_5W$) | |
| D5NS | | dextrose 5% in normal saline (0.9%) | |
| D.A.W. | | dispense as written (i.e., no generic substitution) | |
| dc, D/C, disc | | discontinue or discharge | ambiguous meaning |
| dieb. alt. | diebus alternis | every other day | |
| dil. | | dilute | |
| disp. | | dispersible or dispense | |
| div. | | divide | |
| dL | | deciliter | |
| d.t.d. | dentur tales doses | give of such doses | |
| DTO | | deodorized tincture of opium | can easily be confused with "diluted tincture of opium," which is 1/25th the strength of deodorized tincture of |

f 10

| | | | |
|---|---|---|---|
| | | | opium; deaths have resulted due to massive morphine overdose[4] |
| D.W. | | distilled water | |
| elix. | | elixir | |
| e.m.p. | ex modo prescripto | as directed | |
| emuls. | emulsum | emulsion | |
| et | et | and | |
| eod | | every other day | |
| ex aq | ex aqua | in water | |
| fl., fld. | | fluid | |
| ft. | fiat | make; let it be made | |
| g | | gram | |
| gr | | grain | |
| gtt(s) | gutta(e) | drop(s) | |
| H | | hypodermic | |
| h, hr | hora | hour | |
| h.s. | hora somni | at bedtime | |
| h.s | | hour sleep or half-strength | ambiguous meaning |
| ID | | intradermal | |
| IJ, inj | injectio | injection | mistaken for "IV", meaning intravenously |
| IM | | intramuscular (with respect to injections) | |
| IN | | intranasal | mistaken for "IM", meaning intramuscular, or "IV", meaning intravenously |
| IP | | intraperitoneal | |
| IT | | intrathecal | mistaken for other abbreviations; spell out |
| | | | |
| IV | | intravenous | |
| IVP | | intravenous push | |
| IVPB | | intravenous piggyback | |

4/29/2015 11:14 PM



| Abbr | Latin | Meaning | Notes |
|------|-------|---------|-------|
| kg | | kilogram | |
| L.A.S. | | label as such | |
| LCD | | coal tar solution | |
| lin | linimentum | liniment | |
| liq | liquor | solution | |
| lot. | | lotion | |
| MAE | | Moves All Extremities | |
| mane | mane | in the morning | |
| M. | misce | mix | |
| m, min | minimum | a minimum | |
| mcg | | microgram | Recommended replacement for "μg" which may be confused with "mg" |
| m.d.u. | more dicto utendus | to be used as directed | |
| mEq | | milliequivalent | |
| mg | | milligram | |
| mg/dL | | milligrams per deciliter | |
| ████ | ████ | ████ | |
| mist. | mistura | mix | |
| mitte | mitte | send | |
| mL | | millilitre | |
| ████ | ████ | ████ | |
| nebul | nebula | a spray | |
| N.M.T. | | not more than | |
| noct. | nocte | at night | |
| non rep. | non repetatur | no repeats | |
| NPO | nil per os | nothing by mouth | AMA style avoids use of this abbreviation (spell out "nothing by mouth") |
| NS | | normal saline (0.9%) | |
| 1/2NS | | half normal saline (0.45%) | |



| | | | |
|---|---|---|---|
| N.T.E. | | not to exceed | |
| o_2 | | both eyes, sometimes written as $o_2$ | |
| od | omne in die | every day/once daily (preferred to qd in the UK[5]) | |
| od | oculus dexter | right eye | "o" can be mistaken as an "a" which could read "a.d.", meaning right ear, confusion with omne in die |
| om | omne mane | every morning | |
| on | omne nocte | every night | |
| o.p.d. | | once per day | |
| o.s. | oculus sinister | left eye | "o" can be mistaken as an "a" which could read "a.s.", meaning left ear |
| o.u. | oculus uterque | both eyes | "o" can be mistaken as an "a" which could read "a.u.", meaning both ears |
| oz | | ounce | |
| per | per | by or through | |
| p.c. | post cibum | after meals | |
| pig./pigm. | pigmentum | paint | |
| p.m. | post meridiem | evening or afternoon | |
| p.o. | per os | by mouth or orally | AMA style avoids use of this abbreviation (spell out "orally") |
| p.r. or PR | per rectum | by rectum | |
| PRN, prn | pro re nata | as needed | |
| pulv. | pulvis | powder | |
| PV | per vaginam | via the vagina | |
| q | quaque | every, per | |
| q.a.d. | quaque alternis die | every other day | |
| q.a.m. | quaque die ante meridiem | every day before noon | |
| q.d./q.1.d. | quaque die | every day | mistaken for "QOD" or "qds," spell out "every day" or "daily". AMA style avoids use of this abbreviation (spell out "every day") |



| | | | |
|---|---|---|---|
| q.d.s. | quater die sumendus | four times a day | can be mistaken for "qd" (every day) |
| q.p.m. | quaque die post meridiem | every day after noon or every evening | |
| q.h. | quaque hora | every hour | |
| q.h.s. | quaque hora somni | every night at bedtime | |
| q.1 h, q.1° | quaque 1 hora | every 1 hour; (can replace "1" with other numbers) | |
| q.i.d. | quater in die | four times a day | can be mistaken for "qd" or "qod," write out "4 times a day". AMA style avoids use of this abbreviation (spell out "4 times a day") |
| q4PM | | at 4pm | mistaken to mean every four hours |
| qqh | quater quaque hora | every four hours | |
| q.s. | quantum sufficiat | a sufficient quantity | |
| QWK | | every week | |
| rep., rept. | repetatur | repeats | |
| RL, R/L | | Ringer's lactate | |
| s̄ | sine | without (usually written with a bar on top of the "s") | |
| s.a. | secundum artem | according to the art (accepted practice); use your judgement | |
| SC, subc, subcut, subq, SQ | | subcutaneous | "SC" can be mistaken for "SL," meaning sublingual; "SQ" can be mistaken for "5Q" meaning five every dose |
| s.i.d/SID | semel in die | once a day | used exclusively in veterinary medicine |
| sig | signa | write on label | |



| | | | |
|---|---|---|---|
| SL | | sublingually, under the tongue | |
| S.O.B, SOB | | shortness of breath | |
| sol | solutio | solution | |
| s.o.s., si op. sit | si opus sit | if there is a need | |
| ss | semis | one half or sliding scale | mistaken for "55" or "1/2" |
| SSI, SSRI | | sliding scale insulin or sliding scale regular insulin | mistaken to mean "strong solution of iodine" or "selective serotonin reuptake inhibitor" |
| SNRI (antidepressant) | | Serotonin–norepinephrine reuptake inhibitor | |
| SSRI (antidepressant) | | selective serotonin reuptake inhibitor (a specific class of antidepressant) | |
| stat | statim | immediately | |
| SubQ | | subcutaneously | |
| supp | suppositorium | suppository | |
| susp | | suspension | |
| syr | syrupus | syrup | |
| tab | tabella | tablet | |
| tal., t | talus | such | |
| tbsp | | tablespoon | |
| t.d.s./TDS | ter die sumendum | three times a day | |
| t.i.d. | ter in die | three times a day | AMA style avoids use of this abbreviation (spell out "3 times a day") |
| t.i.w. | | three times a week | mistaken for twice a week |
| top. | | topical | |
| T.P.N. | | total parenteral nutrition | |
| tr, tinc., tinct. | | tincture | |
| troche | trochiscus | lozenge | |
| tsp | | teaspoon | |

| | | |
|---|---|---|
| u.d., ut. dict. | ut dictum | as directed |
| ung. | unguentum | ointment |
| U.S.P. | | United States Pharmacopoeia |
| vag | | vaginally |
| w | | with |
| w/a | | while awake |
| wf | | with food (with meals) |
| w/o, s | | without |
| X | | times |
| Y.O. | | years old |
| µg | microgram | mistaken for "mg", meaning milligram |

**List of symbols used in prescriptions**

| Symbols | Latin | Meaning | Possible confusion |
|---|---|---|---|
| @ | | at | mistaken for "2"; spell out "at" |
| > | | greater than | mistaken for a "7" |
| < | | less than | mistaken for an "L" |
| ℞ | recipe | take, take this, or take thus | |

# Contents

- 1 Numerical Notation
- 2 Currently "Discouraged" Practices
- 3 References
- 4 External links

# Numerical Notation

When expressing a numerical quantity, Roman numerals are commonly used in place of arabic digits so as to avoid confusion. The numbers 1 - 3, (I, II, III) usually written as upper-case Roman numerals, often have the appearance of a capital "T" or a series of capital "T's" with a dot above each "T." They are also sometimes written as lower-case Roman numerals (i, ii, iii).



# Currently "Discouraged" Practices

- Abbreviating names of drugs
- Using apothecary's units
- Using trailing zeros or not using a leading zero

# References

1. "The Official "Do Not Use" List of Abbreviations" (http://www.jointcommission.org/assets /1/18/Do_Not_Use_List.pdf) (PDF). The Joint Commission. Retrieved 23 August 2012.
2. "ISMP's List of Error Prone Abbreviations, Symbols, and Dose Designations" (http://www.ismp.org/tools /errorproneabbreviations.pdf) (PDF). Institute for Safe Medication Practices. Retrieved 11 February 2011.
3. Johnston, Mike (2006). *The pharmacy technician series: Fundamentals of pharmacy practice* (http://www.amazon.com/Fundamentals-Pharmacy-Practice-Technician-Series/dp/013114751X). Pearson Prentice Hall. p. 24. ISBN 9780131147515.
4. "Recurring Confusion Between Opium Tincture and Paregoric" (http://www.pharmacytimes.com/publications /issue/2003/2003-06/2003-06-7241). Pharmacy Times. Retrieved 2015-01-19.
5. BNF (British National Formulary (http://www.bnf.org/)) - published twice yearly by the British Medical Association and Royal Pharmaceutical Society of Great Britain

# External links

- "DAW Codes" (http://web.archive.org/web/20110728070323/http://www.studyrx.org /index.php?option=com_zoo&task=item&item_id=122&Itemid=266). Archived from the original (http://www.studyrx.org/index.php?option=com_zoo&task=item&item_id=122&Itemid=266) on 2011-07-28.

Retrieved from "http://en.wikipedia.org /w/index.php?title=List_of_abbreviations_used_in_medical_prescriptions&oldid=655882514"

Categories: Lists of medical abbreviations

- This page was last modified on 10 April 2015, at 20:41.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.



# Exhibit 18

230

IN ASSOCIATION WITH
EUGENE C. WATERS, PH.D.

(254) 774-8272
FAX: (254) 774-8290

# FRANK A. PUGLIESE, PH.D., P.C.

PSYCHOLOGIST

DIPLOMATE IN FORENSIC PSYCHOLOGY AMERICAN BOARD OF PROFESSIONAL PSYCHOLOGY

19 SOUTH 25TH STREET SUITE 100

TEMPLE, TEXAS 76504

**FILED**

___ a.m. _1:00_ p.m. o'clock

OCT 07 2005

SHELIA NORMAN
District Court, Bell County, Texas
By _____ D o ___

The Honorable Martha J. Trudo
27th Judicial District
Bell County, Texas

September 29, 2005

Cause No. 57558

Judge Trudo:

This report is in compliance with your order for a competence assessment on Thomas Raymond Carr. In completing my evaluation, I conducted a clinical interview of Mr. Carr and administered the Competence to Stand Trial Assessment Instrument to him. I also apprised him of the purpose of my visit with him, the procedures to be utilized during the course of my assessment of him, indicated that a copy of my report would be forwarded to his attorney and to the courts, and discussed the limits of confidentiality. I also received his permission to proceed with the assessment.

MENTAL STATUS AND RELEVANT PAST HISTORY: Mr. Carr is a 38-year-old overweight male of average height who was seen at the Bell County Law Enforcement Center. He responded to most inquiries readily and spoke in a somewhat unclear, tangential manner. That is, he had significant difficulty maintaining a single train of thought and repeatedly complained of being confused by my inquiries. In addition, he reported having auditory hallucinations in which he hears voices and noted he has had ideas of reference in which he believes people are often "laughing at me and talking about me" behind his back. Although he maintained he is currently taking Risperdal prescribed by Dr. Howell, he viewed the medication as being ineffective and in fact "I keep hearing these voices and can't think straight."

Mr Carr related he and his common-law wife, Tammy (30), lived with his mother and his five-year-old daughter, Alexis, and Tammy's eleven-year-old son, Michael, in Harker Heights prior to his arrest and incarceration in June of last year. He said he and Tammy have lived together for approximately twelve years and worked at different jobs for varying periods of time throughout his adult life. He went on to say he remained in the Bell County Law Enforcement Center from June of last year until March of this year when he was transferred to a TDC facility, where he remained until being returned to Bell County on September 12. When I questioned him as to the reason he was sent to a TDC facility from Bell County in March, he repeatedly he insisted he was unaware of what

**231**

prompted the transfer and became increasingly more agitated with me as the session progressed.

Mr. Carr indicated he is an only child who was born in Germany and raised in the Killeen area. He mentioned his father met his mother, a German national, while he was stationed overseas and said he lived in Germany until the early elementary grades when his family moved to the Killeen area. He characterized his childhood as being generally happy and satisfying and did not experience any abuse or neglect. He further noted he attended Killeen area schools throughout his life and made a decision to leave Killeen High School in the tenth grade because of a lack of interest and motivation. He said he was quite oppositional during his childhood and early adolescence and seemed more focused on socializing with peers than in focusing on his schoolwork.

Mr. Carr stated he "piddled around" after leaving high school and met Tammy at a topless bar. He recalled she was a dancer at the time and noted she was his first long-term dating partner. He mentioned they have lived together for the past twelve years and contended they were both equally involved in raising their daughter, Alexis, and Tammy's eleven-year-old son from a previous relationship, Michael. She mentioned both children are currently in the care of extended family members since both he and Tammy were arrested and incarcerated in June of last year.

Mr. Carr stated he has smoked marijuana since adolescence and claimed the substance helped to "calm me down and make the voices go away." He noted he did not consult with any mental health professionals until he and Tammy were visiting her grandmother in Kansas City and he became quite distressed and overwhelmed by the voices he was hearing. He mentioned he went to a free clinic during his brief stay in Kansas City and was prescribed Seroquel, which he continued to take for a few months. He mentioned he was also seen by mental health professionals while he was in the TDC unit earlier this year and was prescribed Stelazine, Nortriptyline, and Cogentin. He felt those medications were instrumental in reducing the frequency and intensity of his "voices" and insisted the Risperdal he is currently taking was ineffective in helping him.

Mr. Carr indicated he has also used methamphetamines on different occasions during the past few years and remembers many occasions when he and Tammy were "up for days at a time." He said his recollection for events was very poor for those time periods and conceded he may have exercised poor judgment during those times.

COMPETENCE ASSESSMENT: Mr. Carr was unclear as to the charges pending against him and verbalized much frustration because "nobody tells me what's going on." He was, nonetheless, quite familiar with court process and procedure, was able to correctly define the roles of different court officers, including defense and prosecuting attorneys and judge, and did not have any difficulty in explaining various legal concepts to me in appropriate fashion.

Mr. Carr went into extensive detail about his communication with two different attorneys, Ted Potter and Monte Montgomery, and insisted he was quite aggravated with



each of them. He noted his most recent communications with Mr. Montgomery have been particularly difficult for him since "he's not doing anything because he's supposed to fix it and get me out of here." He further noted he viewed Mr. Montgomery as "working against me" and felt he was in collusion with the district attorney's office to keep him incarcerated for an extended period of time. He underscored the fact he did not trust Mr. Montgomery, has refused to talk to him on different occasions, and has little confidence in his ability to defend him and present an appropriate defense. Moreover, he asserted he had no additional desire to talk with his attorney because "he's not doing his job and dong what he's supposed to do" and was hopeful of having another attorney appointed for him.

CONCLUSIONS REGARDING COMPETENCE: Mr. Carr is a 38-year-old male who has been in the Bell County Jail for approximately fifteen months awaiting a court hearing for disposition on a charge of aggravated sexual assault. My assessment indicated Mr. Carr does not have sufficient present ability to consult with his attorney with a reasonable degree of rational understanding but does have a rational as well as factual understanding of the proceedings against him. It is my opinion that his tendency to misinterpret and misperceive events occurring around him, coupled with the presence of auditory hallucinations and delusional thinking, impairs his ability to exercise appropriate judgment and communicate effectively with Mr. Montgomery in the preparation of his defense. I do believe, nonetheless, Mr. Carr can be restored to competence within the foreseeable future with specialized help in a psychiatric facility where his medication needs can be appropriately addressed and his behavior can be stabilized.

Respectfully submitted,

Frank A. Pugliese, Ph. D.
Psychologist

FAP/uf

# Exhibit 19

234



### TEXAS DEPARTMENT OF STATE HEALTH SERVICES

EDUARDO J. SANCHEZ, M.D., M.P.H.
COMMISSIONER

NORTH TEXAS STATE HOSPITAL
James E. Smith, LCSW, DCSW
Chief Executive Officer

Vernon Campus
P.O. Box 2231
Vernon, TX 76384
(940) 552-9901

Wichita Falls Campus
P.O. Box 300
Wichita Falls, TX 76307
(940) 692-1220

March 6, 2006

Honorable Judge Joe Carroll
27th District Court
of Bell County
PO Box 747
Belton, Texas 76513-0747

Re:            Thomas Raymond Carr
Case No:       F07308
Cause No:      57,557; 57,558
Admission Date: 12/19/05

Honorable Judge Carroll:

This report is submitted concerning the above named defendant who was admitted to North Texas State Hospital after having been found incompetent to stand trial. This evaluation was for the purpose of determining the defendant's competency to stand trial and not for purposes of mitigating circumstances, guilt, innocence, sanity or future dangerousness.

After a period of observation and treatment, the evaluation has been completed. It is the opinion of the evaluator that the defendant is COMPETENT to stand trial.

Current Medications are as follows.    Seroquel 800mg po q        HS Enalapril 20mg po q AM
Metoprolol 50mg po BID pc           HCTZ 25mg po q AM          ECASA gr V po every other morning

We are now requesting that the sheriff of your county transport the defendant to your court as soon as practical in accordance with Article 46B.079.

We appreciate the opportunity to be of service to your Court and appreciate your prompt consideration and attention to this matter.

Respectfully submitted,
FOR THE SUPERINTENDENT

Joseph L. Black, M.D.
Certified by the American Board of Psychiatry and Neurology, Inc
   in Psychiatry and with Special Qualifications in Forensic Psychiatry
Chief Psychiatrist, Competency Program
North Texas State Hospital-Vernon Campus

Enclosure: Competency Evaluation

cc:    District Attorney
       Defense Attorney
       District Clerk
       Sheriff

Sworn to and subscribed before me
this the 6th day of March, 2006

Jerry N. Witt
Notary Public in and for the
State of Texas
Commission expires 08/08/09





**235**

Referral/Consultation Report

To be completed whenever a standard MHRS form does not provide
adequate space for the required data.

CARR THOMAS RAYMOND                656
BHIS # 217489
08-14-67                                          WM
12-19-05                                          F07808
PROGRAM:     SPRUCE

---

TO: Consultant and/or Service:  Psychological Services

REQUEST:  Reason for Requested Consultation:  Competency Assessment Required by Court

Physician:  Joseph Black, M.D.                    Requested Date: 02-02-06

---

CONSULTANT:  FINDINGS AND RECOMMENDATIONS:

Name: Thomas Raymond Carr                 DOB: 08-14-67                 Race:  White

Sex: Male     DOA: 12-19-05               Hospital #: 7808.            Cause #: 57,557 & 57,558

Committing Court: 27th District Court of Bell County          Report Date:  02-27-06

REASON FOR ADMISSION/ASSESSMENT: Thomas Raymond Carr is a 38 year old White male admitted to the Maximum Security Unit of North Texas State Hospital - Vernon Campus under provisions of Article 46B.073 of the Texas Code of Criminal Procedure. He has felony charges pending after being found Incompetent to Stand Trial.

Attempts were made to interview Mr. Carr on 01-27-06, 02-02-06 and 02-23-06. On each occasion, he refused to participate, insisting he was "not ready," and at one point, "I don't know this man" (referring to the evaluator). It has therefore been necessary to rely almost entirely on information obtained from review of his medical record and relevant preadmission documents, as well as consultation with ward staff and members of his treatment team. To enhance the accuracy of observations, a structured checklist was constructed based on the various symptoms he has reported, and the checklist was completed by unit mental health workers that were able to monitor his behavior more closely. I also observed him during treatment team meetings on the above-listed dates. He was unwilling to attend fully to the full forensic warning when I attempted to deliver that, although he was informed on more than one occasion that our interactions would not be confidential, and that regardless of his level of participation, a report would be prepared that would be sent to the court, to his defense attorney, and to the District Attorney.

RELEVANT BACKGROUND AND HISTORY: The following is a brief synopsis of what is known concerning this man. As noted above, he refused to cooperate with me during attempts to interview him, and the information reported here has been extracted from interviews conducted by others. The interested reader is referred to the full medical record for additional details, if desired.

Mr. Carr is the only child born to an American father and German mother. He spent his early years in Germany, where his father was serving in the US Military, and the family apparently came to the United States after his father retired from the

B. Thomas Gray, Ph.D., ABPP
Signature, Date, and Time

Core Form:  ☐ Yes    ☐ No                    MHRS 3-17



Continuation Form

Dated:    02-27-06

CARR THOMAS RAYMOND                    656
BHIS # 217489
08-14-67                                          WM

12-19-05                                          F07808

PROGRAM:    SPRUCE

To be completed whenever a standard MHRS form does not provide adequate space for the required data.

US Army, while Mr. Carr was in the fourth grade. He has indicated that he is able to speak German quite well, and his English is also fluent. His parents have apparently been married for 30 years, but seem to be currently living apart. Very little is actually known concerning his birth, early development, or family background. He asserted that he was knocked unconscious for brief periods in accidents during his childhood, and that on each occasion, he was hospitalized for approximately one week. There is no independent collateral information to confirm these reports, however. One report suggested that he may have been rather oppositional as a child. It seems that he performed adequately in school, at least until the age of 15, at which time he began using marijuana regularly. He dropped out in the 10th or 11th grade, but later earned his GED. He has held unskilled positions in construction and moving furniture, with his longest period of sustained employment being two years. His first long-term relationship developed into a common-law marriage that has lasted for the past 12 years. At the time of his arrest, he, his wife, their six year old daughter, and his wife's 13 year old son from a prior relationship, were living together with his mother.

As noted above, Mr. Carr began use of marijuana at age 15. It is uncertain when he began drinking alcohol. He informed the treatment team Social Worker that he of late he has been drinking only approximately once per month, but that on those occasions he drinks "a lot," up to 20 beers per sitting. He has been using methamphetamines for at least "the past few years," which by his account has been particularly problematic. During at least one interview he reported having sought treatment at a free clinic in Kansas City several years ago, where he was prescribed an antipsychotic medication (Seroquel). At other times, however, he has stated that his only treatment prior to being incarcerated for the instant offense occurred within the past two years when he was institutionalized, and was prescribed an older antipsychotic (Stellazine) and an antidepressant (Pamelor). There are no records of him having received psychiatric care within the state system.

Issues of competency arose while he was incarcerated for the instant offense, and he was therefore seen for evaluation by Frank A. Pugliese, Ph.D. In a report dated 09-29-05, Dr. Pugliese indicated that Mr. Carr complained of hearing voices, seeing "visions" that he described as shadows, inaccurately attributed personal meaning to unrelated events, and had difficulty maintaining a consistent train of thought. However, Dr. Pugliese went on to note that Mr. Carr was "nonetheless, quite familiar with court process and procedure, was able to correctly define the roles of different court officials, including defense and prosecuting attorneys and judge, and did not have any difficulty in explaining various legal prospects..." However, Dr. Pugliese went on to conclude: "It is my opinion that his tendency to misinterpret and misperceive events occurring around him, coupled with the presence of auditory and delusional thinking, impairs his ability to exercise appropriate judgement and communicate effectively with [his attorney]." He therefore recommended Mr. Carr be considered Incompetent To Stand Trial, the court concurred, and he was transferred to this facility.

COURSE OF HOSPITALIZATION: While incarcerated prior to being transferred here, Mr. Carr had apparently been receiving an antipsychotic medication (Zyprexa), as well as medications to control his hypertension. When he was seen at the time of admission by Joseph Black, M.D., his attending psychiatrist, he complained that the antipsychotic was not effective, but he had previously reported receiving a different medication (Seroquel) that was more effective, and Mr. Carr eventually agreed to switch medications. He has also been enrolled in standard psychosocial educational programming, including a class designed to improve his trial competence. His attendance has been good, although his participation has been hampered somewhat by his repeated insistence that he is unable to remember information pertaining to trial competence. His behavior has otherwise been unremarkable, however, and he was recommended for transfer to the Gateway Program, intended for individuals functioning at a higher and more independent level; he refused this transfer, however, despite the fact that he knew it would involve a loss in his level of privileges.

CURRENT CLINICAL OBSERVATIONS: Thomas Raymond Carr is an obese 38 year old White male of average stature, who appears his stated age. He has been appropriately dressed in casual clothing for those treatment team sessions that

D: 05/BTG    T: 05/tdk/steno    C: 02-26-06
R: 05 @ AM by hand                    Core Form    [ ] Yes    [ ] No
Page 2 of 5

Signature, Date, and Time

B. Thomas Gray, Ph.D., ABPP
Chief Psychologist, Comp. Unit
Continuation of MHRS    3-17

MHRS-cc

237

| Continuation Form | CARR THOMAS RAYMOND | 656 |
|---|---|---|
| Dated: 02-27-06 | BHS # 217489 08-14-67 | WM |
| | 12-19-05 | F07808 |
| To be completed whenever a standard MHRS form does not provide adequate space for the required data. | PROGRAM: SPRUCE | |

observed and his grooming and hygiene have consistently been good. Physical movements, including gait and posture, were within normal limits. Speech was of normal pace, tone, and volume, and he was readily understandable. As noted above, he has refused to participate in any interview sessions with me, and it was therefore impossible to conduct a full and formal evaluation of his mental state. Since he was admitted he has repeatedly complained of hearing voices that make derogatory comments to him. He has additionally asserted that he has considerable problems with his memory. He has generally been rather vague when pressed for additional details concerning the voices that he claims to hear, however, and in any case there is no evidence that these phenomena in any way interfere with his day to day functioning. Indeed, in general, his thought processes appeared to be logical and coherent, and he has been able to cogently argue for advancement in the unit level privileging system when meeting with his treatment team. He has also been able to negotiate a change in medication without undue difficulty.

Strikingly, Mr. Carr's alleged memory deficits appear to be confined to issues regarding trial competency. He has been able to readily assimilate unit rules and procedures, he has been heard on the telephone making organized requests when speaking to his family, and he was able to recall details concerning the way in which informal written tests of factual competency information were administered to him. An observation by a unit Mental Health Worker is particularly salient: "He seems to enjoy trivia games, and shows knowledge in many subjects." It therefore seems more likely that his tenaciously claimed inability to recall competency information in fact reflects a lack of willingness to learn this information. There is no evidence suggesting that he is mentally retarded, and his use of vocabulary and his facility in presenting his arguments would suggest that his intellectual functioning is in the Low Average range or perhaps even somewhat higher. His judgement and insight are questionable, however.

UPDATED DIAGNOSES: (Per Joseph Black, M.D., attending psychiatrist)
Axis I:  Malingering V65.2
        Polysubstance Dependence 304.80
        Psychotic Disorder, Not Otherwise Specified 298.9
Axis II: Personality Disorder, Not Otherwise Specified 301.9
Axis III: Hypertension 401.9
        Hypercholesterolemia 272.0
        Hypertriglyceridemia 272.1
        Obesity 278.00
        Psoriasis 696.1
        High Risk Medication V58.69
Axis IV: Problems With Primary Support Group
        Problems Related to Social Environment
        Occupational Problems
        Problems Related to Interaction With Legal System/Crime
Axis V: Global Assessment of Functioning
    1.  Psychological Impairment – 65 – Although he continues to complain of auditory hallucinations and memory impairment, there is little evidence to support these claims, and in any case there is no evidence of impaired functioning as a result. His primary psychological deficits involve impaired judgment and insight, and a marked insensitivity to the feelings and needs of others.
    2.  Social Skills – 60 – He is sometimes socially inappropriate, and has little understanding of how to sympathize or share with others.
    3.  Violence – 70 – There have been no acts of verbal or physical aggression during his stay here.
    4.  ADL/Occupational Skills – 65 – Although he has a limited history of educational and occupational attainment, there are no obvious barriers to him being able to maintain a job and live independently

D: 05/BTG  T: 05/tdk/steno  C: 02-26-06
R: 05 @ AM by hand          Corr Form  [ ] Yes  [ ] No
Page 3 of 5

Signature, Date, and Time    B. Thomas Gray, Ph.D., ABPP
                             Chief Psychologist, Comp. Unit
                             Continuation of MHRS   3-17

MHRS

238

| Continuation Form | CARR THOMAS RAYMOND | 656 |
|---|---|---|
| | BHS # 217489 | |
| Dated: 02-27-06 | 08-14-67 | WM |
| | 12-19-05 | F07808 |
| To be completed whenever a standard MHRS form does not provide adequate space for the required data. | PROGRAM: SPRUCE | |

5. Substance Abuse – 20 – Functioning is extremely impaired by frequent or daily use of drugs such as marijuana, methamphetamine, alcohol, or others when not in a controlled environment.

6. Medical – 70 – Mild medical problems which may cause some difficulty in social or occupational functioning, including hypertension, obesity, psoriasis, his need to take prescription medications on a daily basis, and his need for periodic medical follow-up.

7. Ancillary Problems – 40 – Major problems with the law as evidenced by his having been found incompetent to stand trial.

Global Assessment of Functioning - Equivalent = (Subscales #1+#2+#3+#4) + 4 = 65
Highest GAF - Equivalent Past Year Unknown

CURRENT COMPETENCY ASSESSMENT: As has been noted above, Mr. Carr refused to participate in an interview concerning this information, and it has been necessary to make inferences from statements he has made to others, and from his behavior. The following information is organized according to the six specific areas that are mandated to be addressed in Article 46B of the Texas Code of Criminal Procedure.

1. Capacity to Understand the Charges and Potential Consequences of Pending Criminal Proceedings: When meeting with his treatment, as recently as 02-16-06 Mr. Carr has been able to accurately recite the charges that he faces. Although he denied understanding the meaning of these charges, it is interesting that, when interviewed by the treatment team Social Worker not long after his admission here, he was able to explain the details of the law regarding a prior charge that he faced. It would therefore seem more likely that, rather than being unable to understand the charge he faces, he is in fact simply unwilling to reveal this information. Furthermore, the lengths he has gone to in attempting to convince staff that he has psychiatric deficits of sufficient severity to make him unable to understand or to learn information pertaining to trial competency would imply some understanding of the severity of the consequences he might face, if convicted.

2. Capacity to Disclose Pertinent Facts, Events, and States of Mind to Counsel: When he was interviewed by Dr Pugliese prior to being sent to this facility, Mr. Carr was readily able to identify the attorney of record by name. He apparently expressed considerable dissatisfaction with his lawyer, and indicated his desire to have another attorney appointed to represent him. It is noteworthy that he has been able to reveal relevant information to members of his treatment team when it has suited his ends to do so. This would suggest that he would be able to provide his attorney with relevant information, as well, should he choose to do so.

3. Capacity to Engage in a Reasoned Choice of Legal Strategies and Options: He has repeatedly insisted he is unable to recall even basic information pertaining to trial competency. While meeting with his treatment team on 02-23-06, for example, he exhibited considerable difficulty in naming only three of the four possible pleas, and he stated he was uncertain as to their meanings. His performance on informal written tests of factual competency information has also been quite poor. In fact, his scores have been so low that it is far more likely he knows the correct answers to the questions, and has instead intentionally provided incorrect answers. It appears that he has been feigning and/or exaggerating symptoms of mental illness in order to avoid prosecution for the charges that he currently faces, a conclusion consistent with the lack of credibility seen in his claimed memory impairments and his alleged psychotic symptoms (i.e., hearing voices). Some courts have interpreted the use of such an approach as representing a distinctive legal strategy.

D: 05/BTG  T: 05/tdk/steno  C: 02-26-06
R: 05 @ AM by hand
Page 4 of 5

Signature, Date, and Time    B. Thomas Gray, Ph.D., ABPP
Core Form: [ ] Yes  [ ] No    Chief Psychologist, Comp. Unit
Continuation of MHRS  3-17

MHRS-cf



Continuation Form

Dated:   02-27-06

To be completed whenever a standard MHRS form does not provide adequate space for the required data.

CARR THOMAS RAYMOND                          656
BHIS # 217489
08-14-67                                     WM
12-19-05                                     F07808
PROGRAM:   SPRUCE

4.  **Capacity to Understand the Adversarial Nature of the Legal Process:** As with other areas pertaining to his trial competency, Mr. Carr has asserted ignorance of the roles played by various key courtroom personnel. The same informal written tests of factual competency information on which he performed so poorly (see above) have touched on a good deal of information pertaining specifically to the opposing roles played by the district attorney and defense attorney. His extremely poor performance strongly suggests that in fact he knows the information, but intentionally provided incorrect answers. Furthermore, the lengths to which he has gone to in an attempt to make staff believe that he is mentally ill, would imply some awareness of the adversarial nature of the proceedings.

5.  **Capacity to Exhibit Appropriate Courtroom Behavior:** Aside from his reluctance to cooperate with competency training or evaluation, Mr. Carr has posed no behavioral problems during his stay here. He has been cooperative with staff, and has demonstrated an ability to make his needs well known. There are no observable barriers to him being able to conduct himself in accordance with appropriate standards of courtroom decorum.

6.  **Capacity to Testify:** As noted above, Mr. Carr has been able to respond to questions posed to him during treatment team meetings. He has been able to present arguments to have medications changed, and to attempt to have his level in the unit privileging system increased. He has therefore demonstrated an ability to respond to questions appropriately when he chooses to do so.

**SUMMARY AND RECOMMENDATIONS:** It is my clinical opinion, with a reasonable degree of psychological certainty, that Thomas Raymond Carr currently meets criteria to be considered Competent to Stand Trial. This is based on information obtained from available records, from treatment team members, and from the observations of direct care staff on the unit. Mr. Carr does not appear to meet criteria to be considered mentally retarded, based on his use of language and his facility in two languages. He is currently stabilized in a therapeutic environment involving use of psychoactive medications. It is unclear whether these medications are essential for him to maintain trial competency; they do not appear to unduly impact his capacity to participate in his own defense. It would be helpful for him to have access to ongoing psychiatric care, it is quite important that he take prescribed medications as ordered, and it is essential that he abstain from alcohol and all illicit drugs. Failure to follow these recommendations could well result in deterioration of his condition, and a return to trial incompetency.

Mr. Carr has been diagnosed with Malingering, reflecting his tendency to exaggerate symptoms of mental illness. It is possible that he may engage in threats, gestures, or activities in a desperate attempt to appear mentally ill so as to continue avoiding the consequences of the charges he currently faces. This conceivably could include gestures or even outright attempts to harm himself. It is therefore recommended that he be closely monitored.

This report addresses issues of competency only, and is not a dangerousness risk assessment. If the court deems it appropriate, a qualified professional should be contacted to perform such an evaluation.

It is recognized that decisions concerning trial competency are made by a judge and/or jury, and not by mental health professionals. Consequently, opinions stated in the context of this report are offered as advisory only.

*This report may be protected by Fed. Reg. 42CFR(2).*

D: 05/BTG   T: 05/tdk/steno   C: 02-26-06
R: 05 @ AM by hand
Page 5 of 5

Core Form   [ ] Yes   [ ] No

Signature, Date, and Time        B. Thomas Gray, Ph.D., ABPP
                                 Chief Psychologist, Comp. Unit
                                 Continuation of MHRS   3-17

MHRS-cf



# Exhibit 20

241

DEFENDANT **BISHOP, TAMMY MICHELLE**     RACE **W**   SEX **F**   D/O/B **07-15-74**

D. A. NO. **04-921**     CHARGE **DELIVERY OF A CONTROLLED SUBSTANCE TO MINOR**

DATE FILED: **07-13-04**     FILING AGENCY: **HHPD**     CAUSE NO:

COMPLAINANT/VICTIM: **STATE OF TEXAS**     OFFENSE NO: **04-01847**

CO-DEFENDANT(S): **THOMAS CARR**     DATE OF OFFENSE: **06-19-04**

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS:

BEFORE ME, the undersigned authority, on this the **13TH** day of **JULY**, A.D., 20 **04**,

personally appeared **MIKE SIMMONS** who,

after being by me duly sworn, on oath deposes and says: That I have good reason to believe that heretofore, to wit: on or about the **19TH** day of **JUNE**, A.D., 20 **04**, and before the making and filing of this

Complaint, in the County of Bell, the State of Texas

**TAMMY MICHELLE BISHOP**     *01847*

**did then and there knowingly deliver a controlled substance to wit: Methamphetamine, to Jerrid May, a child less than 18 years of age**

FILED

2004 JUL 15 AM 8:17

SHELIA NORMAN
DISTRICT CLERK
BELL CO., TX
BY _____ DEPUTY

against the peace and dignity of the State.

SWORN TO AND SUBSCRIBED before me on the date first stated above.

Complainant

Assistant District Attorney
27th Judicial District
Bell County, Texas

242

AFFIDAVIT FOR ARREST

STATE OF TEXAS }
COUNTY OF BELL }

COMES NOW THE UNDERSIGNED AFFIANT, A PEACE OFFICER UNDER THE LAWS OF THE STATE OF TEXAS, AFTER HAVING BEEN DULY SWORN ON OATH, WHO DEPOSES AND SAYS THAT I HAVE GOOD REASON TO BELIEVE AND DO BELIEVE THAT **TAMMY MICHELLE BISHOP** HAS COMMITTED THE OFFENSE OF **DELIVERY OF A CONTROLLED SUBSTANCE TO A MINOR** AS CHARGED IN THE COMPLAINT TO WHICH THIS AFFIDAVIT IS ATTACHED AND THAT MY BELIEF IN THE FOREGOING IS BASED ON THE FOLLOWING INFORMATION.

I AM A CERTIFIED POLICE OFFICER UNDER THE LAWS OF THE STATE OF TEXAS CURRENTLY EMPLOYED BY THE HARKER HEIGHTS POLICE DEPARTMENT AS A DETECTIVE. PURSUANT TO MY DUTIES AS A DETECTIVE, I HAVE BEEN ASSIGNED THE INVESTIGATION OF A REPORT OF DELIVERY OF A CONTROLLED SUBSTANCE TO A MINOR IN WHICH THE SUSPECT'S NAME IS TAMMY MICHELLE BISHOP.

I HAVE READ THE STATEMENT OF ▓▓▓ M▓▓ WHO IS 16 YEARS OLD. HE REPORTS THAT THE SUSPECTS, THOMAS CARR AND TAMMY BISHOP, CAME OVER TO HIS HOME IN HARKER HEIGHTS, BELL COUNTY, TEXAS ON JUNE 19, 2004, WITH MARIHUANA AND METHAMPHETAMINE. JERRID AND HIS TWO 14 YEAR OLD FRIENDS WERE GIVEN METHAMPHETAMINE, BY INJECTION, BY THOMAS CARR. I HAVE SPOKEN TO TAMMY BISHOP, WHO GAVE A VOLUNTARY STATEMENT IN WHICH SHE ADMITS TO INGESTING METHAMPHETAMINE WITH THE THREE JUVENILES, WHICH SHE AND CARR BROUGHT TO THE RESIDENCE. I HAVE ALSO REVIEWED A VIDEOTAPE IN WHICH THE THREE JUVENILES, CARR AND BISHOP ALL REFER TO DRUG USE, AND IT IS APPARENT, BASED ON MY TRAINING AND EXPERIENCE AS A POLICE OFFICER, THAT ALL THREE JUVENILES ARE INTOXICATED. I HAVE BEEN MADE AWARE THROUGH MY INVESTIGATION THAT ONE OF THE 14 YEAR OLDS HAD A BAD REACTION TO THE DRUGS AND WAS TREATED AT A LOCAL HOSPITAL. I HAVE BEEN FURTHER INFORMED BY THE PARENTS OF ALL THREE JUVENILES THAT THE CHILDREN TESTED POSITIVE FOR METHAMPHETAMINE.

WHEREFORE, PREMISES CONSIDERED, YOUR AFFIANT REQUESTS THAT A WARRANT OF ARREST ISSUE FOR **TAMMY MICHELLE BISHOP** FOR THE FELONY OFFENSE OF **DELIVERY OF A CONTROLLED SUBSTANCE TO A MINOR.**

_____
Affiant

Sworn to and subscribed before me by the above named Affiant, a credible person, this the _13_ day of _July_, 2004.

_____
JUSTICE OF THE PEACE
PRECINCT NO. _____
BELL COUNTY, TEXAS

2004 JUL 15 AM 8: 17

SHEILA NORMAN
DISTRICT CLERK
BELL COUNTY, TX
BY _____ DEPUTY

243

# Exhibit 21

DEFENDANT CARR, THOMAS RAYMOND          RACE W    SEX M    D/O/B 06/14/67

D. A. NO. 05-189          CHARGE AGGRAVATED SEXUAL ASSAULT

DATE FILED: 01/03/05          FILING AGENCY: BCSO          CAUSE NO: _____

COMPLAINANT/VICTIM: TOM VICTOR          OFFENSE NO: 04-1847

CO-DEFENDANT(S): _____          DATE OF OFFENSE: 07/06/04

IN THE NAME AND BY THE AUTHORITY OF THE STATE OF TEXAS:

BEFORE ME, the undersigned authority, on this the __3rd__ day of __JANUARY__, A.D., 20 __05__, personally appeared __H. SIMMONS__ who, after being by me duly sworn, on oath deposes and says: That I have good reason to believe that heretofore, to wit: on or about the __18th__ day of __June__, A.D., 20 __04__, and before the making and filing of this Complaint, in the County of Bell, the State of Texas

*1847*

__THOMAS RAYMOND CARR__ DID THEN AND THERE CAUSE AN OBJECT, TO-WIT: A "DILDO" TO CONTACT AND PENETRATE THE ANUS OF TOM VICTOR, A CHILD LESS THAN 17 YEARS OF AGE AND NOT THE SPOUSE OF THE SAID THOMAS RAYMOND CARR, AND THE SAID THOMAS RAYMOND CARR OPERATED IN CONCERT WITH OTHER BISHOP DURING THE SAME CRIMINAL EPISODE

against the peace and dignity of the State.

SWORN TO AND SUBSCRIBED before me on the date first stated above.

Complainant

Assistant District Attorney
27th Judicial District
Bell County, Texas

FILED
2005 JAN -3 PM 2:31
SHELIA NORMAN
DISTRICT CLERK
BELL COUNTY TX
BY _____ DEPUTY

245

1847

AFFIDAVIT FOR ARREST

STATE OF TEXAS }
COUNTY OF BELL }

COMES NOW THE UNDERSIGNED AFFIANT, A PEACE OFFICER UNDER THE LAWS OF THE STATE OF TEXAS, AFTER HAVING BEEN DULY SWORN ON OATH, WHO DEPOSES AND SAYS THAT I HAVE GOOD REASON TO BELIEVE AND DO BELIEVE THAT **THOMAS RAYMOND CARR** HAS COMMITTED THE OFFENSE OF **AGGRAVATED SEXUAL ASSAULT OF A CHILD** AS CHARGED IN THE COMPLAINT TO WHICH THIS AFFIDAVIT IS ATTACHED AND THAT MY BELIEF IN THE FOREGOING IS BASED ON THE FOLLOWING INFORMATION.

I AM A CERTIFIED POLICE OFFICER UNDER THE LAWS OF THE STATE OF TEXAS CURRENTLY EMPLOYED BY THE BELL COUNTY DISTRICT ATTORNEY AS AN INVESTIGATOR. PURSUANT TO MY DUTIES AS AN INVESTIGATOR, I HAVE BEEN ASSIGNED THE INVESTIGATION OF A REPORT OF AGGRAVATED SEXUAL ASSAULT OF A CHILD IN WHICH THE SUSPECT'S NAME IS THOMAS RAYMOND CARR, AND THE VICTIM'S NAME IS TOM VICTOR.

TOM VICTOR (A PSEUDONYM) REPORTS THAT HE IS 16 YEARS OLD HE FURTHER REPORTS THAT THE SUSPECT, ON JUNE 16, 2004, INJECTED HIM WITH METHAMPHETAMINE. AFTER THAT, THE SUSPECT VIDEOTAPED THE VICTIM WHILE THE VICTIM WAS BEING ANALLY PENETRATED BY A "STRAP ON DILDO" WORN BY TAMMY BISHOP. I HAVE REVIEWED THE STATEMENT OF TAMMY BISHOP WHICH CONFIRMS THAT THIS HAPPENED IN HARKER HEIGHTS, BELL COUNTY, TEXAS, AND THAT, IN FACT, THE SUSPECT INJECTED TWO OTHER 14 YEAR OLD BOYS WITH METHAMPHETAMINE AND THAT SHE ALSO ANALLY PENETRATED THOSE BOYS WITH THE SAME DEVICE. I HAVE REVIEWED A VIDEOTAPE SHOWING THE ANAL PENETRATION OF THE VICTIM BY SUSPECT TAMMY BISHOP, AND IS RATHER APPARENT THAT THOMAS CARR IS DIRECTING AND VIDEOTAPING THE ACTIONS OF ALL PERSONS INVOLVED. IT IS ALSO APPARENT THAT THE BOYS INVOLVED ARE HESITANT, BUT AT ONE POINT THE SUSPECT THREATENS TO MAKE EACH OF THE BOYS PERFORM FELLATIO ON HIM. THE SUSPECT, IF THEY DO NOT ALLOW FOR THE ANAL INTERCOURSE. THE SUSPECT IS SEEN, BRIEFLY, WEARING WHAT APPEARS TO BE A BLACK "TEDDY" TYPE OF LINGERIE. I HAVE REVIEWED THE MEDICAL RECORDS OF ALL THREE BOYS, WHICH SHOWED POSITIVE RESULTS FOR METHAMPHETAMINE. DURING THE VIDEO, TOM VICTOR ALSO IS ALLOWED TO PLACE HIS FINGERS IN THE VAGINA OF TAMMY BISHOP AND PERFORMS CUNNILINGUS ON TAMMY BISHOP.

WHEREFORE, PREMISES CONSIDERED, YOUR AFFIANT REQUESTS THAT A WARRANT OF ARREST ISSUE FOR **THOMAS RAYMOND CARR** FOR THE FELONY OFFENSE OF **AGGRAVATED SEXUAL ASSAULT OF A CHILD.**

_____
Affiant

Sworn to and subscribed before me by the above named Affiant, a credible person, this the **3** day of **January** 2005.

_____
JUDGE, 264TH JUDICIAL DISTRICT COURT
BELL COUNTY, TEXAS





FILED
2005 JAN -3 PM 2: 31
SHELIA NORMAN
DISTRICT CLERK
BELL COUNTY TX
_____ DEPUTY

246

# Exhibit 22





All  Motions  Orders  Answers / Citations  Other Documents / Actions  Costs  Payments  Ledger

Check out our new affordable subscription plans at

## iDocket.com

View Case Track™                                    Start Case Track™

**Criminal Docket; Case 57557; DEL CS/MARIJ TO MINOR**
**THE STATE OF TEXAS vs CARR, THOMAS RAYMOND**
**Filed 07/13/2004 - Disposition: 11/21/2006 15 YEARS TDCJ;ID**
**264th District Court, District Clerk, Bell County, Texas**

Help

| Date | Description/Comments | Reference | Typ | Amount |
|------|--------------------|-----------|-----|--------|
| 07/16/2004 | FILE MAGISTRATE WARNING 07/15/04 | Docket | TXT | |
| 07/16/2004 | FILE APPOINTMENT OF ATTORNEY 07/16/04 | Docket | " | |
| 08/03/2004 | FILE MOTION TO SUBSTITUTE COUNSEL & ORDER GRANTING /S/MJT 08/02/04 | Docket | " | |
| 08/05/2004 | FILE LETTER OF RETAINMENT FROM POTTER07/29/04 | Docket | " | |
| 08/10/2004 | FILE ACKNOWLEDGMENT OF ATTORNEY-BIGHAM-08/09/04 | Docket | " | |
| 12/21/2004 | ISSUED SPECIAL HEARING LETTER | Docket | " | |
| 12/22/2004 | FILE DEFENDANT'S MOTION TO REDUCE BOND 12/21/04 & ORDER FOR A SETTING | Docket | " | |
| 01/03/2005 | FILE DEPUTY REPORTER STATEMENT 01/03/05 | Docket | " | |
| 01/03/2005 | PER DOCKET BOND SET AT 75,000 /S/MJT 01/03/05 | Docket | " | |
| 01/21/2005 | FILE MOTION TO SUBSTITUTE COUNSEL 01/20/05; SENT UP WITH FILE | Docket | " | |
| 01/24/2005 | FILE ORDER ON MOTION TO SUBSTITUTE /S/MJT 01/24/05 | Docket | " | |
| 03/23/2005 | ISSUED ARRAIGNMENT LETTER | Docket | " | |
| 03/30/2005 | ISSUED ARRAIGNMENT LETTER | Docket | " | |

1/18/2015 2:24 AM

| Date | Description | | | |
|------|-------------|---|---|---|
| 05/09/2005 | FILE WAIVER OF ARRAIGNMENT BY MONTGOMERY 05/09/05;PAULA TO SEE | Docket | " | |
| 05/09/2005 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 05/10/2005 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 05/10/2005 | ISSUED JURY TRIAL LETTER | Docket | " | |
| 05/23/2005 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 06/16/2005 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 06/16/2005 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 07/19/2005 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 07/20/2005 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 07/26/2005 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 08/15/2005 | ISSUED JURY TRIAL LETTER | Docket | " | |
| 08/18/2005 | FILE NOTICE OF INTENT TO OFFER INSANITY DEFENSE & MOTION FOR EXAM RE:INCOMPETENCY & INSANITY BY MONTGOMERY 08/17/05 | Docket | " | |
| 08/18/2005 | FILE DEFENDANT'S ELECTION AS TO PUNISHMENT 08/17/05 | Docket | " | |
| 08/18/2005 | FILE DEFENDANT'S OMNIBUS PRE-TRIAL MOTION BY MONTGOMERY 08/17/05 | Docket | " | |
| 08/24/2005 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 08/24/2005 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 09/20/2005 | FILE DEFENDANT'S AMENDED OMNIBUS PRE-TRIAL MOTION BY MONTGOMERY 09/20/05;NO ROUTING SLIP | Docket | " | |
| 10/21/2005 | ATTORNEY MONTY MONTGOMERY TOOK FILE TO COORDINATOR FOR HEARING SETTING10/21/05 | Docket | " | |
| 10/24/2005 | ISSUED JURY TRIAL LETTER | Docket | " | |
| 11/04/2005 | FILE ORDER OF COMMITMENT TO VERNON STATE HOSPITAL /S/MJT 11/04/05 | Docket | " | |
| 11/04/2005 | COMMITMENT PAPERS TO SGT. HEJL AND BELL CO. JAIL 11/04/05 | Docket | " | |
| 01/27/2006 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 02/21/2006 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 03/08/2006 | ISSUED BENCH WARRANT TO NORTH TEXAS STATE HOSPITAL VERNON CAMPUS ON THOMAS CARR /S/ MJT 03/08/06 ALSO CASE#57558 | Docket | " | |
| 03/09/2006 | FILE LETER FROM TEXAS DEPARTMENT OF STATE HEALTH SERVICES AT VERNON | Docket | " | |

**249**

| | CAMPUS EVALUATION REPORT 03/09/06;PAULA SAW | | | |
|---|---|---|---|---|
| 03/15/2006 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 03/24/2006 | ISSUED JURY TRIAL LETTER | Docket | " | |
| 03/29/2006 | ISSUED JURY TRIAL LETTER | Docket | " | |
| 05/25/2006 | ISSUED JURY TRIAL LETTER | Docket | " | |
| 07/12/2006 | FILE LETTER FROM KELLY TO JENNIFER CASE BE CHANGED TO THE 264 COURT 07/11/06 | Docket | " | |
| 09/19/2006 | FILE MOTION FOR CONTINUANCE BY MONTGOMERY 09/19/06;HE TOOK TO JENNIFER TO SEE W/FILE | Docket | " | |
| 09/19/2006 | FILE DEFENDANT'S COURT-DIRECTED MOTION FOR A SETTING ON A PREVIOUSLY UNHEARD PRE-TRIAL MOTION 09/19/06;HE TOOK 1JB | Docket | " | |
| 09/22/2006 | ISSUED JURY TRIAL LETTER | Docket | " | |
| 11/21/2006 | CPL 15 YEARS TDCJ;ID | Docket | " | |
| 11/21/2006 | PG 15 YEARS TDCJ;ID | Docket | " | |
| 11/22/2006 | FILE CERTIFICATE OF THUMBPRINT 11/22/06 | Docket | " | |
| 11/22/2006 | FILE TRIAL COURT'S CERTIFICATE OF DEFENDANT'S RIGHT TO APPEAL /S/MJT 11/22/06 | Docket | " | |
| 11/22/2006 | FILE NOTICE OF PLANNED DESTRUCTION OFEVIDENCE 11/21/06 | Docket | " | |
| 11/22/2006 | FILE DISCLOSURE OF PLEA RECOMMENDATIONS 11/21/06 | Docket | " | |
| 11/22/2006 | FILE ADDENDUM TO DISCLOSURE OF PLEA RECOMMENDATIONS 11/21/06 | Docket | " | |
| 11/22/2006 | FILE WAIVER OF MOTION FOR NEW TRIAL AND WAIVER OF RIGHT TO APPEAL /S/MJT 11/21/06 | Docket | " | |
| 11/22/2006 | FILE WAIVER OF JURY AND AGREEMENT TO STIPULATE UPON A PLEA OF GUILTY /S/MJT 11/21/06 | Docket | " | |
| 11/22/2006 | FILE JUDICIAL CONFESSION /S/MJT 11/21/06 | Docket | " | |
| 11/22/2006 | FILE ACKNOWLEDGMENT OF NOTICE AND WAIVER OF OBJECTION TO PRESERVATIONOF EVIDENCE /S/MJT 11/21/06 | Docket | " | |



1/18/2015 2:24 AM

| | | | | |
|---|---|---|---|---|
| 11/30/2006 | SENT PEN PACK TO JAIL 11/30/06 | Docket | " | |
| 12/07/2006 | FILE BACK BENCH WARRANT 12/07/2006 SERVED 03/16/2006 | Docket | " | |
| 11/20/2012 | COPY OF LETTER FROM CLERK'S OFFICE TODEFENDANT IN REGARDS TO NOT SIGNING WRIT 11.07 11/20/2012;SENT NEW APPLICATION | Docket | " | |
| 12/11/2012 | COPY OF LETTER FROM CLERK'S OFFICE TODEFENDANT REGARDING RETURNING WRIT-NON COMPLIANT 12/11/12 | Docket | " | |
| 01/02/2013 | FILED POST-WRIT; TO DA 01/02/13; DUE FROM DA 02/06/13 | Docket | " | |
| 01/02/2013 | POST-WRIT TO AUSTIN 05/23/13 BY CMRR:7011 3500 0001 5214 0686 | Docket | " | |
| 01/02/2013 | POST-WRIT DISP - DISMISSED | Docket | " | |
| 01/16/2013 | STATE'S ANSWER BY SEAN PROCTOR 01/16/2013 | Docket | " | |
| 01/18/2013 | COPY OF LETTER FROM SEAN PROCTOR TO DEFENDANT 01/16/2013 | Docket | " | |
| 01/24/2013 | COPY OF LETTER FROM SEAN PROCTOR TO DEFENDANT REGARDING COPIES 1/22/13 | Docket | " | |
| 01/24/2013 | DESIGNATION OF ISSUES & ORDER EXPANDING THE RECORD SIGNED JUDGE TRUDO 1/23/13;COPY TO BETTY YOUNG & SEAN PROCTOR | Docket | " | |
| 01/24/2013 | STATE'S SUPPLEMENTAL ANSWER 1/22/13 | Docket | " | |
| 01/25/2013 | COPY OF LETTER FROM ASSISTANT DISTRICT ATTORNEY SEAN PROCTOR TO ATTORNEY CHARLES MONTGOMERY 01/25/2013 | Docket | " | |
| 01/30/2013 | COPY OF LETTER FROM ASSISTANT DISTRICT ATTORNEY SEAN PROCTOR TO DEFENDANT 01/29/2013 | Docket | " | |
| 03/06/2013 | COPY OF LETTER FROM ASSISTANT DISTRICT ATTORNEY SEAN PROCTOR TO DEFENDANT ABOUT EXHIBITS 03/05/2013 | Docket | " | |
| 03/11/2013 | RECEIVED EXHIBITS 1 & 2 FROM DEFENDANT 03/11/2013 | Docket | " | |
| 03/11/2013 | COPY OF LETTER FROM SEAN PROCTOR TO LOWERY T. CARR IN REGARDS TO EXHIBITS WE RECEIVED 03/11/2013 | Docket | " | |



| | | | | |
|---|---|---|---|---|
| 04/10/2013 | COURT-ORDERED AFFIDAVIT BY CHARLES MONTY MONTGOMERY 04/10/2013 | Docket | " | |
| 04/12/2013 | LETTER TO DEFENDANT FROM SEAN PROCTORREGARDING AFFIDAVIT 4/11/13 | Docket | " | |
| 04/12/2013 | SEAN PROCTOR CHECKED OUT WRIT FILE 04/12/2013 | Docket | " | |
| 04/30/2013 | ATTORNEY TIMOTHY TESCH VIEWED FILE INLOBBY 04/30/13 4:12PM | Docket | " | |
| 05/01/2013 | DEBBIE CHECKED OUT WRIT FILE FOR SEANPROCTOR 05/01/13 | Docket | " | |
| 05/15/2013 | FINDINGS OF FACT AND CONCLUSIONS OF LAW SIGNED BY JUDGE TRUDO 05/15/13;MAILED COPY TO DEFENDANT | Docket | " | |
| 05/15/2013 | MOTION TO ENTER PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW BY SEAN PROCTOR 05/14/13 | Docket | " | |
| 05/15/2013 | LETTER FROM SEAN PROCTOR TO DEFENDANT05/14/13 | Docket | " | |
| 05/30/2013 | WHITE CARD FROM COURT OF CRIMINAL APPEALS 5/30/13;WRIT RECEIVED & PRESENTED TO COURT 5/24/13 | Docket | " | |
| 05/30/2013 | RETURNED CERTIFIED GREEN CARD 5/30/13; RECEIVED BY ABEL ACOSTA 5/24/13.CMRR: 7011 3500 0001 5214 0686 | Docket | " | |
| 07/16/2013 | LETTER FROM TIMOTHY TESCH LAW FIRM REGARDING SUPPLEMENTAL APPLICATION FORWRIT OF HABEAS CORPUS 7/16/13 | Docket | " | |
| 07/18/2013 | MAILED SUPPLEMENTAL RECORD TO AUSTIN 7/18/13 BY CMRR: 7001 0360 0001 2135 9923 | Docket | " | |
| 07/22/2013 | RETURNED CERTIFIED GREEN CARD 7/22/13;RECEIVED BY COURT OF CRIMINAL APPEALS 7/19/13. CMRR:7001 0360 0001 2135 9923 | Docket | " | |
| 09/12/2013 | WHITE CARD FROM COURT OF CRIMINAL APPEALS 9/12/13;WRIT DISMISSED WITHOUT WRITTEN ORDER FOR NON-COMPLIANCE 9/11/13 | Docket | " | |
| 01/15/2014 | FILED POST-WRIT; TO DA 01/16/14; DUE FROM DA 02/19/14 | Docket | " | |
| 01/15/2014 | POST-WRIT TO AUSTIN 01/31/14 BY CMRR:7013 1090 0000 0888 7279 | Docket | " | |
| 01/15/2014 | POST-WRIT DISP - DENIED - 03/26/14 | Docket | " | |

*252*

| | | | | |
|---|---|---|---|---|
| 01/22/2014 | COPY OF LETTER FROM SEAN PROCTOR TO ATTORNEY TIMOTHY TESCH REGARDINGCOPIES 1/22/14 | Docket | " | |
| 01/22/2014 | STATE'S ANSWER BY SEAN PROCTOR 1/22/14 | Docket | " | |
| 01/30/2014 | FINDINGS OF FACT & CONCLUSIONS OF LAWSIGNED JUDGE TRUDO 1/30/14;COPY TOAPPLICANT (BY CMRR: 70131090000008887477) | Docket | " | |
| 01/30/2014 | MOTION TO ENTER PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW BY SEAN PROCTOR 1/29/14 | Docket | " | |
| 01/30/2014 | COPY OF LETTER FROM SEAN PROCTOR TO ATTORNEY TIMOTHY TESCH REGARDING COPIES 1/29/14 | Docket | " | |
| 02/03/2014 | RETURNED CERTIFIED GREEN CARD 2/3/14;SIGNED FOR BY SHAINA MEDFORD. CMRR: 7013 1090 0000 0888 7477 | Docket | " | |
| 02/04/2014 | RETURNED CERTIFIED GREEN CARD 2/4/14;RECEIVED BY COURT OF CRIMINAL APPEALS 2/3/14. CMRR: 7013 1090 0000 0888 7279 | Docket | " | |
| 02/06/2014 | WHITE CARD FROM COURT OF CRIMINAL APPEALS 2/6/14;WRIT RECEIVED & PRESENTED TO COURT 2/3/14 | Docket | " | |
| 02/10/2014 | APPLICANT'S OBJECTIONS TO STATE'S FINDINGS OF FACT & CONCLUSIONS OF LAW & APPLICANT'S PROPOSED FINDINGS 2/10/14 | Docket | " | |
| 02/11/2014 | MAILED SUPPLEMENTAL RECORDS TO COURT OF CRIMINAL APPEALS BY CMRR: 7012 1640 0000 4262 9989 | Docket | " | |
| 02/13/2014 | GREEN CARD RETURNED FROM COURT OF CRIMINAL APPEALS 2/13/14;RECEIVED SUPPLEMENTAL RECORD 2/12/14 | Docket | " | |
| 03/28/2014 | WHITE CARD FROM COURT OF CRIMINAL APPEALS 3/27/14; WRIT DENIED WITHOUT WRITTEN ORDER 3/26/14 | Docket | " | |
| 06/13/2014 | MOTION FOR POST CONVICTION FORENSIC DNA TESTING BY TIMOTHY TESCH 6/13/14 | Docket | " | |
| 07/21/2014 | LETTER FROM SEAN K. PROCTOR TO TIM TESCH REGARDING POST- CONVICTING | Docket | " | |

**253**

# Exhibit 23

254



Check out our new affordable subscription plans at
iDocket.com

View Case Track™                                    Start Case Track™

**Criminal Docket; Case 57558; AGG SEXUAL ASSAULT CHILD**
**THE STATE OF TEXAS vs CARR, THOMAS RAYMOND**
**Filed 01/03/2005 - Disposition: 11/21/2006 30 YEARS TDCJ;ID**
**264th District Court, District Clerk, Bell County, Texas**

Help

| Date | Description/Comments | Reference | Typ | Amount |
|------|---------------------|-----------|-----|--------|
| 01/03/2005 | ISSUED CAPIAS NO ARREST PER MARK D. KIMBALL BOND SET AT 1,000,000.00 PER JUDGE MARTHA J. TRUDO 1/3/05 | Docket | TXT | |
| 01/21/2005 | FILE MOTION TO SUBSTITUTE COUNSEL 01/20/05; SENT UP WITH FILE | Docket | " | |
| 01/24/2005 | FILE ORDER ON MOTION TO SUBSTITUTE /S/MJT 01/24/05 | Docket | " | |
| 01/25/2005 | FILE BACK PRECEPT TO SERVE ON THOMAS RAYMOND CARR 01/25/05;SERVED01/04/05 | Docket | " | |
| 03/22/2005 | FILE BACK CAPIAS 03/22/05;SERVED 01/04/05 | Docket | " | |
| 03/23/2005 | ISSUED ARRAIGNMENT LETTER | Docket | " | |
| 03/30/2005 | ISSUED ARRAIGNMENT LETTER | Docket | " | |
| 05/09/2005 | FILE WAIVER OF ARRAIGNMENT BY MONTGOMERY 05/09/05;PAULA TO SEE | Docket | " | |
| 05/09/2005 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 05/27/2005 | ISSUED JURY TRIAL LETTER | Docket | " | |
| 06/16/2005 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 07/19/2005 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 07/20/2005 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 07/21/2005 | ISSUED SPECIAL HEARING LETTER | Docket | " | |

| | | | | |
|---|---|---|---|---|
| 07/26/2005 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 08/18/2005 | FILE NOTICE OF INTENT TO OFFER INSANITY DEFENSE & MOTION FOR EXAM RE:INCOMPETENCY & INSANITY BY MONTGOMERY 08/17/05 | Docket | " | |
| 08/18/2005 | FILE DEFENDANT'S ELECTION AS TO PUNISHMENT 08/17/05 | Docket | " | |
| 08/18/2005 | FILE DEFENDANT'S OMNIBUS PRE-TRIAL MOTION BY MONTGOMERY 08/17/05 | Docket | " | |
| 08/24/2005 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 08/24/2005 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 09/07/2005 | ISSUED BENCH WARRANT TO TDCJ-DOMINGUEZ UNIT 09/07/05 /S/MJT | Docket | " | |
| 09/20/2005 | FILE DEFENDANT'S AMENDED OMNIBUS PRE-TRIAL MOTION BY MONTGOMERY 09/20/05;NO ROUTING SLIP | Docket | " | |
| 09/28/2005 | FILE ORDER APPOINTING DISINTERESTED EXPERT TO EXAMINE DEFENDANT /S/ MJT 09/28/05;APPOINTED FRANK PUGLIESE | Docket | " | |
| 10/13/2005 | FILE EXPENSE PAY APPLICATION TO FRANKPUGLIESE AMOUNT OF $270.00 & ORDER/S/ MJT 10/13/05;DC ADDED PSYCH/FEES | Docket | " | |
| 10/13/2005 | FILE PSYCHOLOGY REPORT FROM DR. PUGLIESE 10/07/05;PAULA SAW-ENCLOSED INBROWN ENVELOPE | Docket | " | |
| 10/21/2005 | ATTORNEY MONTY MONTGOMERY TOOK FILE TO COORDINATOR FOR HEARING SETTING10/21/05 | Docket | " | |
| 10/24/2005 | ISSUED JURY TRIAL LETTER | Docket | " | |
| 11/04/2005 | FILE ORDER OF COMMITMENT TO VERNON HOSPITAL /S/MJT 11/04/05 | Docket | " | |
| 11/04/2005 | COMMITMENT PAPERS TO SGT. HEJL AT BELL CO. JAIL 11/04/05 | Docket | " | |
| 01/27/2006 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 02/21/2006 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 03/07/2006 | FILE REPORT FROM VERNON STATE HOSPITAL 03/07/06;FORWARDED TO P.KING, COORDINATOR FOR REVIEW FOR BENCH WARRANT | Docket | " | |
| 03/08/2006 | ISSUED BENCH WARRANT TO NORTH TEXAS STATE HOSPITAL VERNON CAMPUS | Docket | " | |

256

| | | | | |
|---|---|---|---|---|
| | ON THOMAS CARR 03/08/06 /S/ MJT | | | |
| 03/15/2006 | ISSUED PRE-TRIAL LETTER | Docket | " | |
| 03/22/2006 | DEF SUBPOENA TO HENRY GARZA | Docket | " | |
| 03/23/2006 | FILE BACK DEFENDANT SUBPOENA ON HENRYGARZA 03/23/06; SERVED 03/23/06 | Docket | " | |
| 03/24/2006 | ISSUED JURY TRIAL LETTER | Docket | " | |
| 03/27/2006 | FILE REPORT FROM NORTH TEXAS STATE HOSPITAL-VERNON CAMPUS 03/08/06 | Docket | " | |
| 03/27/2006 | FILE REPORT FROM NORTH TEXAS STATE HOSPITAL-VERNON CAMPUS (DEFENDANT'S EXHIBIT #1) 03/06/06 | Docket | " | |
| 03/29/2006 | ISSUED JURY TRIAL LETTER | Docket | " | |
| 05/25/2006 | ISSUED JURY TRIAL LETTER | Docket | " | |
| 07/12/2006 | FILE LETTER FROM KELLY TO JENNIFER CASE BE CHANGED TO THE 264 COURT 07/11/06 | Docket | " | |
| 09/11/2006 | STATE SUBPOENA TO ███████████ V███ | Docket | " | |
| 09/11/2006 | STATE SUBPOENA TO ███████████ | Docket | " | |
| 09/11/2006 | STATE SUBPOENA TO ███████████ | Docket | " | |
| 09/13/2006 | ISSUED BENCH WARRANT TO TDCD GATESVILLE FOR TAMMY BISHOP /S/SL 09/13/06 | Docket | " | |
| 09/19/2006 | FILE MOTION FOR CONTINUANCE BY MONTGOMERY 09/19/06;HE TOOK TO JENNIFER TO SEE W/FILE | Docket | " | |
| 09/19/2006 | FILE DEFENDANT'S COURT-DIRECTED MOTION FOR A SETTING ON A PREVIOUSLY UNHEARD PRE-TRIAL MOTION 09/19/06;HE TOOK 1JB | Docket | " | |
| 09/22/2006 | ISSUED JURY TRIAL LETTER | Docket | " | |
| 10/30/2006 | STATE DT SUBPOENA TO CUSTODIAN OF RECORDS | Docket | " | |
| 10/30/2006 | STATE DT SUBPOENA TO CUSTODIAN OF RECORDS | Docket | " | |
| 10/30/2006 | STATE DT SUBPOENA TO CUSTODIAN OF RECORDS | Docket | " | |
| 10/31/2006 | FILE BACK STATE SUBPOENA DUCES TECUM ON CUSTODIAN OF REC- ORDS METROPLEX HEALTH SYSTEM 10/30/06;SERVED 10/30/06 | Docket | " | |

*[handwritten margin notes:]* Hearing Mar 24, 2006 need amended indictment

*[handwritten left margin:]* was Hearing heard

**257**

| | | | |
|---|---|---|---|
| 10/31/2006 | FILE BACK STATE SUBPOENA DUCES TECUM ON CUSTODIAN OF REC- ORDS METROPLEX HEALTH SYSTEM 10/30/06;SERVED 10/30/06 | Docket | " |
| 10/31/2006 | FILE BACK STATE SUBPOENA DUCES TECUM ON CUSTODIAN OF REC- ORDS METROPLEX HEALTH SYSTEM 10/30/06;SERVED 10/30/06 | Docket | " |
| 11/06/2006 | FILE NOTICE OF INTENT TO USE RECORDS BY KIMBALL 11/06/06 | Docket | " |
| 11/21/2006 | CPL 30 YEARS TDCJ;ID | Docket | " |
| 11/21/2006 | PG 30 YEARS TDCJ;ID | Docket | " |
| 11/22/2006 | FILE CERTIFICATE OF THUMBPRINT 11/22/06 | Docket | " |
| 11/22/2006 | FILE TRIAL COURT'S CERTIFICATE OF DEFENDANT'S RIGHT TO APPEAL /S/MJT 11/22/06 | Docket | " |
| 11/22/2006 | FILE DISCLOSURE OF PLEA RECOMMENDATIONS 11/21/06 | Docket | " |
| 11/22/2006 | FILE WAIVER OF MOTION FOR NEW TRIAL AND WAIVER OF RIGHT TO APPEAL /S/MJT 11/21/06 | Docket | " |
| 11/22/2006 | FILE WAIVER OF JURY AND AGREEMENT TO STIPULATE UPON A PLEA OF GUILTY /S/MJT 11/21/06 | Docket | " |
| 11/22/2006 | FILE JUDICIAL CONFESSION /S/MJT 11/21/06 | Docket | " |
| 11/22/2006 | FILE ACKNOWLEDGMENT OF NOTICE AND WAIVER OF OBJECTION TO PRESERVATIONOF EVIDENCE /S/MJT 11/21/06 | Docket | " |
| 11/22/2006 | FILE ADDENDUM TO DISCLOSURE OF PLEA AGREEMENT 11/21/06 | Docket | " |
| 11/22/2006 | FILE NOTICE OF PLANNED DESTRUCTION OFEVIDENCE 11/21/06 | Docket | " |
| 11/22/2006 | FILE SUPPLEMENTAL ADMONISHMENTS FOR SEX OFFENDERS REGISTRATION REQUIREMENTS /S/MJT 11/21/06 | Docket | " |
| 11/30/2006 | SENT PEN PACK TO JAIL 11/30/06 | Docket | " |
| 12/07/2006 | FILE BACK BENCH WARRANT 12/07/2006 SERVED 03/16/2006 | Docket | " |

*258*

| Date | Description | | |
|------|-------------|---|---|
| 11/20/2012 | COPY OF LETTER FROM CLERK'S OFFICE TODEFENDANT IN REGARDS TO NOT SIGNING WRIT 11.07 11/20/2012;SENT NEW APPLICATION | Docket | " |
| 12/11/2012 | COPY OF LETTER FROM CLERK'S OFFICE TODEFENDANT REGARDING RETURNING WRIT-NON COMPLIANT 12/11/12 | Docket | " |
| 01/02/2013 | FILED POST-WRIT; TO DA 01/02/13; DUE FROM DA 02/06/13 | Docket | " |
| 01/02/2013 | POST-WRIT TO AUSTIN 05/23/13 BY CMRR:7011 3500 0001 5214 0723 | Docket | " |
| 01/02/2013 | POST-WRIT DISP - DISMISSED | Docket | " |
| 01/16/2013 | STATE'S ANSWER BY SEAN PROCTOR 01/16/2013 | Docket | " |
| 01/18/2013 | COPY OF LETTER FROM SEAN PROCTOR TO DEFENDANT 01/16/2013 | Docket | " |
| 01/24/2013 | COPY OF LETTER FROM SEAN PROCTOR TO DEFENDANT REGARDING COPIES 1/22/13 | Docket | " |
| 01/24/2013 | STATE'S SUPPLEMENTAL ANSWER 1/22/13 | Docket | " |
| 01/24/2013 | DESIGNATION OF ISSUES & ORDER EXPANDING THE RECORD SIGNED JUDGE TRUDO 1/23/13;COPY TO BETTY YOUNG & SEAN PROCTOR | Docket | " |
| 01/25/2013 | COPY OF LETTER FROM ASSISTANT DISTRICT ATTORNEY SEAN PROCTOR TO ATTORNEY CHARLES MONTGOMERY 01/25/2013 | Docket | " |
| 01/29/2013 | ORIGINIAL & TWO COPIES OF REPORTER'S RECORD BY BETTY YOUNG FILED 1/29/13;ONE COPY TO SEAN PROCTOR | Docket | " |
| 01/30/2013 | COPY OF LETTER FROM ASSISTANT DISTRICT ATTORNEY SEAN PROCTOR TO DEFENDANT 01/29/2013 | Docket | " |
| 03/04/2013 | DEBBIE STURTEVANT CHECKED OUT WRIT FILE 03/04/2013 | Docket | " |
| 03/06/2013 | COPY OF LETTER FROM ASSISTANT DISTRICT ATTORNEY SEAN PROCTOR TO DEFENDANT ABOUT EXHIBITS 03/05/2013 | Docket | " |
| 03/11/2013 | RECEIVED EXHIBITS 1 & 2 FROM DEFENDANT 03/11/2013 | Docket | " |
| 03/11/2013 | COPY OF LETTER FROM SEAN PROCTOR TO LOWERY T. CARR IN REGARDS TO | Docket | " |

**259**

| | | | |
|---|---|---|---|
| | EXHIBITS WE RECEIVED 03/11/2013 | | |
| 04/10/2013 | COURT-ORDERED AFFIDAVIT BY CHARLES MONTY MONTGOMERY 04/10/2013 | Docket | " |
| 04/12/2013 | LETTER TO DEFENDANT FROM SEAN PROCTORREGARDING AFFIDAVIT 4/11/13 | Docket | " |
| 04/12/2013 | SEAN PROCTOR CHECKED OUT WRIT FILE 04/12/2013 | Docket | " |
| 04/30/2013 | ATTORNEY TIMOTHY TESCH VIEWED FILE INLOBBY 04/30/13 4:11PM | Docket | " |
| 05/01/2013 | DEBBIE CHECKED OUT WRIT FILE FOR SEANPROCTOR 05/01/13 | Docket | " |
| 05/15/2013 | FINDINGS OF FACT AND CONCLUSIONS OF LAW SIGNED BY JUDGE TRUDO 05/15/13;MAILED COPY TO DEFENDANT | Docket | " |
| 05/15/2013 | MOTION TO ENTER PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW BY SEAN PROCTOR 05/14/13 | Docket | " |
| 05/15/2013 | COPY OF LETTER FROM SEAN PROCTOR TO DEFENDANT 05/14/13 | Docket | " |
| 05/30/2013 | RETURNED CERTIFIED GREEN CARD 5/30/13;RECEIVED BY ABEL ACOSTA 5/24/13.CMRR: 7011 3500 0001 5214 0723 | Docket | " |
| 05/30/2013 | WHITE CARD FROM COURT OF CRIMINAL APPEALS 5/30/13;WRIT RECEIVED & PRESENTED TO COURT 5/24/13 | Docket | " |
| 07/16/2013 | LETTER FROM TIMOTHY TESCH LAW FIRM REGARDING SUPPLEMENTAL APPLICATION FORWRIT OF HABEAS CORPUS 7/16/13 | Docket | " |
| 07/18/2013 | MAILED SUPPLEMENTAL RECORD TO AUSTIN 7/18/13 BY CMRR: 7001 0360 0001 2135 9626 | Docket | " |
| 07/22/2013 | RETURNED CERTIFIED GREEN CARD 7/22/13;RECEIVED BY COURT OF CRIMINAL APPEALS 7/19/13. CMRR:7001 0360 0001 2135 9626 | Docket | " |
| 09/12/2013 | WHITE CARD FROM COURT OF CRIMINAL APPEALS 9/12/13;WRIT DISMISSED WITHOUT WRITTEN ORDER FOR NON-COMPLIANCE 9/11/13 | Docket | " |
| 01/15/2014 | FILED POST-WRIT; TO DA 01/16/14; DUE FROM DA 02/19/14 | Docket | " |
| 01/15/2014 | POST-WRIT TO AUSTIN 01/31/14 BY CMRR:7010 1670 0000 4848 9580 | Docket | " |



| | | | |
|---|---|---|---|
| 01/15/2014 | POST-WRIT DISP - DENIED - 03/26/14 | Docket | " |
| 01/22/2014 | COPY OF LETTER FROM SEAN PROCTOR TO ATTORNEY TIMOTHY TESCH REGARDINGCOPIES 1/22/14 | Docket | " |
| 01/22/2014 | STATE'S ANSWER BY SEAN PROCTOR 1/22/14 | Docket | " |
| 01/30/2014 | FINDINGS OF FACT & CONCLUSIONS OF LAWSIGNED JUDGE TRUDO 1/30/14;COPY TOAPPLICANT (BY CMRR: 70131090000008887484) | Docket | " |
| 01/30/2014 | MOTION TO ENTER PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW BY SEAN PROCTOR 1/29/14 | Docket | " |
| 01/30/2014 | COPY OF LETTER FROM SEAN PROCTOR TO ATTORNEY TIMOTHY TESCH REGARDING COPIES 1/29/14 | Docket | " |
| 02/03/2014 | RETURNED CERTIFIED GREEN CARD 2/3/14;SIGNED FOR BY SHAINA MEDFORD. CMRR: 7013 1090 0000 0888 7484 | Docket | " |
| 02/04/2014 | RETURNED CERTIFIED GREEN CARD 2/4/14;RECEIVED BY COURT OF CRIMINAL APPEALS 2/3/14. CMRR: 7010 1670 0000 4848 9580 | Docket | " |
| 02/06/2014 | WHITE CARD FROM COURT OF CRIMINAL APPEALS 2/6/14;WRIT RECEIVED & PRESENTED TO COURT 2/3/14 | Docket | " |
| 02/10/2014 | APPLICANT'S OBJECTIONS TO STATE'S FINDINGS OF FACT & CONCLUSIONS OF LAW & APPLICANT'S PROPOSED FINDINGS 2/10/14 | Docket | " |
| 02/11/2014 | MAILED SUPPLEMENTAL RECORD TO COURT OF CRIMINAL APPEALS 2/11/14 BY CMRR: 7012 1640 0000 4263 0008 | Docket | " |
| 02/13/2014 | GREEN CARD RETURNED FROM COURT OF CRIMINAL APPEALS 2/13/14;RECEIVED SUPPLEMENTAL RECORD 2/12/14 | Docket | " |
| 03/28/2014 | WHITE CARD FROM COURT OF CRIMINAL APPEALS 3/27/14; WRIT DENIED WITHOUT WRITTEN ORDER 3/26/14 | Docket | " |
| 06/13/2014 | MOTION FOR POST CONVICTION FORENSIC DNA TESTING BY TIMOTHY TESCH 6/13/14 | Docket | " |

261



| | | | |
|---|---|---|---|
| 07/21/2014 | LETTER FROM SEAN K. PROCTOR TO TIM TESCH REGARDING POST-CONVICTION DNA TESTING 07/21/14 | Docket | " |
| 07/23/2014 | STATE'S REPLY TO DEFENDANT'S MOTION FOR POST-CONVICTION DNA TESTING 7/21/14 | Docket | " |
| 07/23/2014 | MOTION TO ENTER PROPOSED ORDER DENYING POST-CONVICTION DNA TESTING 7/21/14 | Docket | " |
| 07/23/2014 | FINDINGS OF FACT/ORDER DENYING POST-CONVICTION DNA TESTING SIGNED JUDGE TRUDO 7/22/14;COPY TO T.TESCH & S.PROCTOR | Docket | " |
| 07/23/2014 | MAILED TIM TESCH COPY OF ORDER 7/23/14 BY CMRR # 7014 0510 0002 3175 2499 | Docket | " |
| 07/29/2014 | GREEN CARD RETURNED FROM TIM TESCH 7/29/14;RECEIVED COPY OF ORDER DENYING DNA TESTING 7/8/14 | Docket | " |

262

# Exhibit 24

# Tesch Law Firm

Ph (254) 865-0313

P.O. Box 255
Gatesville, TX 76528

fax 1(254)-731-2584
teschlaw@gmail.com

June 6, 2014

Mr. Charles F. Montgomery
4400 Seven Coves Rd
Temple, Texas 76502

Re: Thomas Raymond Carr

Dear Mr. Montgomery:

I spoke with you about obtaining Thomas Raymond Carr's file. You wanted a release and $100.00 to copy the file.

I represent Mr. Carr. Enclosed is a "RELEASE OF FILE" signed by Mr. Carr.

Mr. Carr is entitled to his "Original" file per the State Bar Rules. Should you wish to copy the file for your own records, please do so.

I request that you provide the information requested in numbers one through ten in the release.

If you want someone to pick up the file as opposed to your mailing it, please let me know. Please provide the file within te n(10) days to the date of this letter. Thank you.

Sincerely,

Timothy Tesch
Attorney for Thomas Raymond Carr

P.S. The release has my bar number as 119808200, when it should be 19808200.



## RELEASE OF FILE

I, Thomas Raymond Carr, Wynne Unit, Huntsville, Texas, authorize the release of my entire legal file to Timothy Tesch, P.O. Box 255, Gatesville, Texas 76528, SBN 119808200

This authorization includes the release of information on any criminal matter, child custody information, and child support information that Charles Montgomery, Jr. may have.

It includes, but is not limited to the following:

1) Witness statements in whatever format used( tape recorded, written, and notes of interviews with witnesses),
2) All notes of meetings with Thomas Raymond Carr,
3) All research done on statutory and case law,
4) Names, addresses , and phone numbers of persons contacted about competency and insanity,
5) Medical records concerning physician reports and drug prescribed, including medications that Mr. Carr was receiving during the time of his plea hearing on or about November 21 , 2006,
6) Names, addresses, and phone numbers of all potential experts contacted including forensic computer analysis experts, psychologists, psychiatrists, DNA experts and Lab experts regarding Methamphetamines, and any other experts,
7) Your contract of employment with Thomas Raymond Carr,
8) The entire original file as required to be released pursuant to the disciplinary rules,
9) If you do not have any documents requested, then an explanation as to why, and
10) If you are refusing to release any item, then an explanation as to why.

_____
Thomas Raymond Carr

265

# Exhibit 25



No. <u>57,557</u>

| | | |
|---|---|---|
| IN RE | * | IN THE 27TH JUDICIAL |
| | * | |
| | * | DISTRICT COURT OF |
| | * | |
| THOMAS RAYMOND CARR | * | BELL COUNTY, TEXAS |

<u>State's Reply to Defendant's</u>
<u>Motion for Post-Conviction DNA Testing</u>

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW the State of Texas, by and through her District Attorney for the 27th Judicial District of Texas, and respectfully requests that Thomas Raymond Carr's (hereinafter referred to as "Tom" or "the defendant") Motion for Post-Conviction Forensic DNA Testing be denied, and in support thereof would show the Court as follows:

I.

### Procedural Summary

The defendant was indicted on March 23, 2005, for the felony offenses of Delivery of a Controlled Substance to a Minor (Cause Number 57,557) and Aggravated Sexual Assault (Cause Number 57,558), both alleged to have occurred on June 18, 2004. On November 21, 2006, he plead guilty to the trial court in both cases, and the trial court found him guilty in each case, and sentenced him to fifteen (15) years imprisonment for the Delivery of a Controlled Substance to a Minor, and thirty (30) years imprisonment for the Aggravated



COPY

267

to Tom's house and smoked weed. He also recalls J█████ and Christopher having sexual contact with Tammy, while they were still at J████'s house, which he thought Tom videotaped.

HHPD officers also took a statement from C███████r V███ on July 8, 2004.[4] According to the officers' offense report, Christopher recalled the events much the same as did J████ and S█████n. He recalls Tom shooting the Meth into his right arm, and Tom providing Marijuana for them to smoke more than once.

The officers note in their offense report, that during conversations they had with the mothers of J████ Christopher, and S█████, each of them stated that their son had tested positive for the presence of Marijuana and Methamphetamine during their treatment at Metroplex Hospital.[5]

After obtaining written statements from the boys, the officers report that they prepared an affidavit for search warrant for Thomas Carr's residence located at 114 West Mark Road in Harker Heights, and on July 9, 2004, presented it to District Judge Martha Trudo, who, after reviewing it, authorized the search. At 9:45 a.m, the officers report that they made entry into the residence after knocking on the front door and ringing the door bell received no response. They report that once inside, they encountered Tammy Bishop and

---

[4] *See* Statement of C███████ V███ attached to this Response as State's Exhibit No. 3, and incorporated by reference for all purposes.

[5] *See* partial medical records of J████ M█ and C███████ V███ attached to this Response as State's Exhibit No. 4 and State's Exhibit No. 5, respectively, and incorporated by reference for all purposes.

6

Thomas Carr asleep in the bedroom, and two children asleep elsewhere in the residence. They report that they moved Thomas Carr into the living room, and kept Tammy in the bedroom where she was advised of her Miranda rights. Tammy spoke to the officers at the scene and voluntarily agreed to accompany them to the police station and give a written statement.[6] She admitted to knowing that Tom had provided Marijuana and Methamphetamine to the boys, and admitted that she had sexual contact with J███ by letting him perform oral sex on her, and by having sexual intercourse with all three boys with a "dildo." She stated that Tom videotaped these sexual encounters because he had been wanting her to "do something with another man" for quite some time. She admitted that all three boys looked young, but J███ told her that he was eighteen years old.

At the scene, the officers advised Thomas Carr of his Miranda Rights. Carr admitted to the officers that he had been at J███'s house, and that all three boys had been to his, but denied providing drugs to the boys, insisting that they had their own. He also denied injecting any of them with Methamphetamine. He explained that he met J███ on a web cite called "Adultfriendfinders.com," and that he purported in his profile to be eighteen years old. He further explained to the officers that he had been searching for someone he and Tammy could have a "threesum" with to "spice up their marriage" because they had been together for 12 years. Officers report that Carr was arrested on suspicion of possession of Marijuana when he took control of a cigarette package from his bedroom that contained a

---

[6] *See* Statement of Tammy Bishop, attached to this Response as State's Exhibit No. 6, and incorporated by reference for all purposes

7

Marijuana cigarette.

The officers report that during the execution of the search warrant, among the items seized were: a computer and its peripherals, video tapes, a digital audio player with a flash card memory, plastic envelopes containing suspected Methamphetamine residue, unidentified pills, 8mm video tapes, and a Sony Handycam. They report that all the items seized during the search were cataloged and entered into the HHPD evidence vault.

The State has been in contact with Detective Daniel C. De Leon, custodian of the evidence section at HHPD. Detective De Leon explained that all the evidence seized by the officers in this case was itemized on a HHPD "Evidence Submission Report," and then placed in storage for long term safekeeping. According to HHPD records, he states in an affidavit that all of the items seized by the officers in this case are still in police custody except several video recordings that were reviewed by officers and later released to Thomas Carr's mother at his request. He further states that the Department has never had biological evidence, or items thought to contain biological evidence, in their custody in this case.[7]

On July 13, 2004, both Tammy Bishop and Thomas Carr were charged by Complaint with the felony offense of Delivery of a Controlled Substance to a Minor. The record reflects that on March 23, 2005, Carr was indicted for the felony offenses of Delivery of a Controlled Substance to a Minor, and Aggravated Sexual Assault. On November 30, 2005, Bishop, pursuant to a plea agreement, waived indictment and pled guilty to an Information

---

[7] *See* Affidavit of Detective Daniel C. De Leon, HHPD Evidence Custodian, attached to this Response as State's Exhibit No. 7, and incorporated by reference for all purposes

8

**270**

support of its Orders denying relief to the said defendant.

Respectfully submitted,

**HENRY GARZA**
**DISTRICT ATTORNEY**
**27TH JUDICIAL DISTRICT**

By: _____
Sean K. Proctor   TSB# 16349500
Assistant District Attorney
27th Judicial District
Post Office Box 540
Belton, Texas 76513
(254) 933-5215
(254) 933-5704 [FAX]

## Certificate of Service

I, the undersigned, do hereby certify that a true and correct copy of the State's

Response was mailed to the attorney of record for the defendant, Tim Tesch, at Post Office

Box 255, Gatesville, Texas 76528, by United States mail, postage paid, on this the

___21 st___ day of July, 2014.

_____
Sean K. Proctor

15

271



## No. <u>57,558-D</u>

| EX PARTE | | IN THE 27TH JUDICIAL |
|---|---|---|
| | * | |
| | * | DISTRICT COURT OF |
| | * | |
| THOMAS RAYMOND CARR | * | BELL COUNTY, TEXAS |

## State's Answer

**COMES NOW** the State of Texas, by and through the District Attorney for the 27th Judicial District of Texas, and **denies generally** the allegations of the Applicant's Petition for post-conviction Writ of Habeas Corpus relief, and <u>opposes any request for bond</u> pursuant thereto. The State would show the Court that this is a subsequent application for Writ of Habeas Corpus relief by the Petitioner, and it does not contain sufficient facts establishing either of the exceptions enumerated in Texas Code of Criminal Procedure, art. 11.07 §(4)(a)(1), (2) & (3) (West Supp. 2014) and therefore should be dismissed.

## Prayer

**WHEREFORE, PREMISES CONSIDERED,** the State of Texas prays that this Court recommend that the Applicant's Petition be dismissed, sending him hence without day.

Respectfully submitted,

**HENRY GARZA**
**DISTRICT ATTORNEY**
**27TH JUDICIAL DISTRICT**

By:_____
Sean K. Proctor  TSB# 16349500
Assistant District Attorney
27th Judicial District
Post Office Box 540
Belton, TX 76513
(254) 933-5215
(254) 933-5704 [FAX]



FILED
2015 AUG -6  AM 10:22



272

## Certificate of Service

I, the undersigned, do hereby certify that a true and correct copy of the State's Answer was mailed to the attorney of record for the Applicant, Timothy Tesch, Post Office Box 255, Gatesville, TX 76528, by United States mail, postage pre-paid, on this the ___6th___ day of August, 2015.

Sean K. Proctor



No. 57,558-D

FILED

2015 AUG -7 P 4: 08

JO...
DISTRICT COURT
BELL COUNTY, TX
BY_____ DEPUTY

| | | |
|---|---|---|
| EX PARTE | * | IN THE 27TH JUDICIAL |
| | * | |
| | * | DISTRICT COURT OF |
| | * | |
| THOMAS RAYMOND CARR | * | BELL COUNTY, TEXAS |

## Motion to Enter Proposed
## Findings of Fact and Conclusions of Law

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW the State of Texas, by and through her District Attorney for the 27th

Judicial District, and moves the Court to consider and enter in this case the proposed

Findings of Fact and Conclusions of Law as those of the Court.

Respectfully submitted,

**HENRY GARZA**
**DISTRICT ATTORNEY**
**27TH JUDICIAL DISTRICT**

By: _____
Sean K. Proctor  TSB#16349500
Assistant District Attorney,
27th Judicial District
Post Office Box 540
Belton, Texas 76513
(254) 933-5215
(254) 933-5704 [FAX]



278

## Certificate of Service

I, the undersigned, do hereby certify that a true and correct copies of the State's Motion to Enter Proposed Findings of Fact and Conclusions of Law, and the State's proposed Findings of Fact and Conclusions of Law, were mailed to the attorney of record for the Applicant, Timothy Tesch, at Post Office Box 255, Gatesville, TX 76528, by United States mail, postage pre-paid, on this the ____6th____ day of August 2015.

Sean K. Proctor

275



**No. 57,558-D**

| | | |
|---|---|---|
| EX PARTE | * | IN THE 27TH JUDICIAL |
| | * | |
| | * | DISTRICT COURT OF |
| | * | |
| THOMAS RAYMOND CARR | * | BELL COUNTY, TEXAS |

## Findings of Fact and Conclusions of Law

Having considered the Applicant's Petition, the State's Answer, and the record in the above numbered cause, this Court makes the following Findings of Fact and Conclusions of Law:

### I.

### Findings of Fact

*History of the Case*

1.     The Applicant is currently incarcerated in the Correctional Institutions Division of the Texas Department of Criminal Justice by virtue of a Judgment of Conviction entered in the 27th District Court of Bell County, Texas, in Cause Number 57,558, wherein he was convicted of the first degree felony offense of Aggravated Sexual Assault.

2.     The Applicant pled guilty to the charge, and the trial court found him guilty and assessed his punishment at thirty (30) years imprisonment.

3.     The Applicant did not appeal his conviction, but this is his fourth Petition for post-conviction Writ of Habeas Corpus relief in this case, his first and third having been dismissed, and his second having been denied.[1]



---

[1] *See Ex parte Thomas Raymond Carr*, No. WR-79,620-02 (Tex.Crim.App., delivered September 11, 2013) (not designated for publication); *Ex parte Thomas Raymond Carr*, No. WR-79,620-04 (Tex.Crim.App., delivered March 26, 2014) (not designated for publication) and *Ex parte Thomas Raymond Carr*, No. WR-79,620-06 (Tex.Crim.App., delivered July 8, 2015) (not designated for publication).

## *Allegations of the Applicant*

4.      In ground one the Applicant alleges that his plea of guilty was involuntary and un-knowing because of coercion by the State.

5.      In ground two the Applicant alleges that the State made false representations about the results of drug tests.

6.      In ground three the Applicant alleges that his trial attorney lied about researching the law and explaining the law to the him, and was ineffective.

7.      In ground four the Applicant alleges that he was incompetent at the time he entered his plea of guilty.

8.      In ground five the Applicant alleges that he could not be convicted of aggravated sexual assault "because no date rape drug was administered" to the victim.

9.      In ground six the Applicant alleges that he could not have been found guilty under the aggravated sexual assault "because he did not act in concert" with his co-defendant.

## *Necessity for an Evidentiary Hearing or Expansion of the Record*

10.     The Court finds that the existing record is sufficient to address the Applicant's Petition.

## *Jurisdiction*

11.     The Court finds that this is a subsequent Petition by the Applicant, therefore, before the Court can review the merits of the Applicant's allegations, it must address the Court's jurisdiction to entertain them.

12.     The Court finds that the factual and legal basis for the Applicant's allegations in the instant Petition existed at the time he filed his previous Petitions.

13.     The Court finds that the Applicant's Petition advances no facts establishing that the current claims were unavailable when he submitted his previous Petitions, or, that but for a federal constitutional violation, no rational juror could have found him guilty beyond a reasonable doubt.



## II.

## Conclusions of Law

Based on a study of the applicable law, this Court makes the following

Conclusion of Law:

### *Grounds For Relief*

1. The Applicant's Petition should be forwarded to the Court of Criminal Appeals because this Court may not consider the merits of this application, because it does not contains sufficient facts establishing that: (1) the current claims have not and could not have been presented previously; or (2) by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found him guilty beyond a reasonable doubt. *See* Tex. Code Crim. Proc. Ann., art. 11.07, §4(a)(1) &(2) (West Supp. 2014).

## III.

## Recommendation

The Court recommends that the Applicant's Petition be **dismissed**.

## IV.

## Transmittal Order

The Clerk is directed to prepare a transcript to include copies of the following

documents:

1. the Applicant's Petition;
2. the State's Answer;
3. the Motion to Enter Proposed Findings of Fact and Conclusions of Law;
4. the Findings of Facts and Conclusions of Law of the Court;

and transmit the same to the Court of Criminal Appeals in Austin, Texas. The Clerk is



further directed to serve a signed copy of these Findings of Fact and Conclusions of Law

upon the attorney of record for the applicant, Timothy Tesch, at Post Office Box 255,

Gatesville, TX  76528.

Signed this the _____7_____ day of August, 2015.

JUDGE PRESIDING
27TH DISTRICT COURT
BELL COUNTY, TEXAS

FILED
2015 AUG -7 P 4: 09
JOANNA STATON
DISTRICT COURT
BELL COUNTY, TX
BY_____ DEPUTY

279

STATE OF TEXAS

COUNTY OF BELL

CAUSE NO: 57558-D

EX PARTE

THOMAS RAYMOND CARR

I, **Joanna Staton**, Clerk of the District Court, in and for Bell County,

Texas, do hereby certify that the attached instruments are true and correct copies of the

Originals as contained in the courts file in the above styled and numbered cause, now

On file and of record in the said 264TH District Courts,

**WITNESS MY HAND AND SEAL OF SAID COURT,** in my office at Belton,

Bell County, Texas, on this 12th day of August, 2015.

**Joanna Staton**
District Clerk
Bell County, Texas

BY: _____
Deputy Clerk

280